1   Michael S. Elkin (admitted *pro hac vice*)
    WINSTON & STRAWN LLP
2   200 Park Avenue
    New York, NY 10166-4193
3   Telephone:    212-294-6700
    Facsimile:    212-294-4700
4   Email:  melkin@winston.com

5   Jennifer A. Golinveaux (SBN: 203056)
    Matthew A. Scherb (SBN: 237461)
6   WINSTON & STRAWN LLP
    101 California Street
7   San Francisco, CA  94111-5894
    Telephone:    415-591-1000
8   Facsimile:    415-591-1400
    Email:  jgolinveaux@winston.com; mscherb@winston.com

9
    Attorneys for Defendant
10  VEOH NETWORKS, INC.

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13                   **SAN JOSE DIVISION**

14  IO GROUP, INC.                          | **Case No. C 06-3926 HRL**

15              Plaintiff,                   | **DEFENDANT VEOH NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

16      vs.

17  VEOH NETWORKS, INC.                      | Date:     September 4, 2007
                                             | Time:     10:00 a.m.
18              Defendant.                   | Place:    Courtroom 2

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Dockets.Justia.com

1

**NOTICE OF MOTION AND MOTION**

2

TO PLAINTIFF AND ITS ATTORNEY OF RECORD:

3      NOTICE IS HEREBY GIVEN that on September 4, 2007 at 10:00 a.m., or as soon thereafter

4  as counsel may be heard by the above-entitled court, located at 280 First Street, San Jose, California,

5  Courtroom 2, 5th floor, Defendant Veoh Networks, Inc. ("Veoh") will and hereby does move the

6  Court for an order granting summary judgment to Veoh and against Plaintiff on all of Plaintiff's

7  claims for relief, pursuant to Fed. R. Civ. Proc. 56 and Local Rule 56.

8      Veoh brings this motion on the grounds that it is entitled to summary judgment because Veoh

9  qualifies for safe harbor from all of Plaintiff's claims under section 512(c) of the Digital Millennium

10  Copyright Act, which bars Plaintiff's recovery of any monetary relief and limits injunctive relief so

11  that it is moot.  Veoh's motion is based on this Notice of Motion and Motion, Memorandum of

12  Points and Authorities, the Declarations of Ted Dunning, Joseph Papa, and Matthew Scherb filed

13  herewith, the pleadings and papers on file herein, and any further material and argument presented to

14  the Court at the time of the hearing.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

VEOH NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. C 06-3926 HRL

# <u>TABLE OF CONTENTS</u>

I.      Introduction ............................................................................................................. 1

II.     Statement of the Issues ........................................................................................... 2

III.    Factual Background ................................................................................................ 2

      **A.**    Defendant Veoh Networks .......................................................................... 2

            1.    Content Available on Veoh ............................................................ 3

            2.    Veoh's Revenue Model .................................................................. 4

            3.    Veoh's Policies Prohibiting Infringement ..................................... 4

            4.    Veoh's Decision to Prohibit Adult Content on Veoh ..................... 8

      **B.**    Plaintiff and Its Claims ............................................................................. 8

IV.     Argument ............................................................................................................. 10

      **A.**    Summary Judgment Standard ................................................................... 10

      **B.**    Veoh Qualifies for DMCA Section 512(c) Safe Harbor .......................... 10

            1.    Veoh is a Service Provider ........................................................... 12

            2.    Veoh Meets the Eligibility Requirements of Section 512(i) ......... 12

                   a.    Veoh's Robust Copyright Policy and Implementation of that Policy Meet the Eligibility Requirements of Section 512(i)(1)(A) ................................................................... 13

                   b.    Veoh Accommodates Standard Technical Measures as Required by Section 512(i)(1)(B) ..................................... 15

            3.    Veoh Meets the Conditions of Section 512(c) .............................. 16

                   a.    Veoh Meets the Requirements of Section 512(c)(1)(A) ..... 17

                   b.    Veoh Does Not Lose Safe Harbor Pursuant to Section 512(c)(1)(B) ................................................................... 19

                          i.    Veoh Does Not Have the Right and Ability to Control the Infringing Activity .................................. 19

                          ii.    Veoh Does Not Derive a Financial Benefit Directly Attributable to the Alleged Infringing Activity ............. 22

      **C.**    The DMCA Provides Safe Harbor from all Monetary Relief, and Any Injunctive Relief Allowed is Moot ................................................ 24

V.      Conclusion ........................................................................................................... 25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

ii

# TABLE OF AUTHORITIES

**CASES**

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001) ...................................................................................23

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ...............................................................................................10

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ...............................................................................................10

*Corbis Corp. v. Amazon.com, Inc.,*
  351 F. Supp. 2d 1090 (W.D. Wash. 2004) .................................................... Passim

*CoStar Group, Inc. v. LoopNet, Inc.,*
  164 F. Supp. 2d 688 (D. Md. 2001) ................................................ 11-12, 21, 23

*CoStar Group, Inc. v. LoopNet, Inc.,*
  373 F.3d 544 (4th Cir. 2004) ........................................................... 10, 19, 23

*Ellison v. Robertson,*
  357 F.3d 1072 (9th Cir. 2004) ............................................................... Passim

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
  76 F.3d 259 (9th Cir. 1996) ...................................................................21

*Hendrickson v. Amazon.com, Inc.,*
  298 F. Supp. 2d 914 (C.D. Cal. 2003) ....................................................12

*Hendrickson v. eBay,*
  165 F. Supp. 2d 1082 (C.D. Cal. 2001) ...................................... 11-12, 20-21

*In re Aimster Copyright Litig.,*
  334 F.3d 643 (7th Cir. 2003) ..........................................................12, 21

*Meyer v. Holley,*
  537 U.S. 280 (2003)..................................................................................22

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  487 F.3d 701 (9th Cir. 2007) ..........................................................10, 18

*Perfect 10, Inc. v. CCBill LLC,*
  __ F.3d __, 2007 U.S. App. LEXIS 12508 (9th Cir. May 31, 2007)............................ Passim

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ..............................................15, 21

*Perfect 10 v. CCBill,*
  340 F. Supp. 2d 1077 (C.D. Cal. 2004) ....................................................13

*Perfect 10 v. Visa Int'l Serv. Ass'n,*
  __ F.3d __, 2007 U.S. App. LEXIS 15824 (9th Cir. July 3, 2007) ........................19

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

iii

*Rivera v. Philip Morris,*
   395 F.3d 1142, (9th Cir. 2005) .................................................................10

*Shapiro, Bernstein and Co. v. H.L. Green Co.,*
   316 F.2d 304 (2d Cir. 1963)....................................................................22

STATUTES

17 U.S.C. § 512 ......................................................................................10, 12

17 U.S.C. § 512(c) ..................................................................................Passim

17 U.S.C. § 512(c)(1)....................................................................................16

17 U.S.C. § 512(i)(1).....................................................................................12

17 U.S.C. § 512(i)(2).....................................................................................15

17 U.S.C. §512(j)...............................................................................11, 24-25

17 U.S.C. § 512(k)(1)(B)...............................................................................12

OTHER AUTHORITIES

Fed. R. Civ. P. 56(e) .....................................................................................10

Fed. R. Civ. P. 56(c) .....................................................................................10

LEGLISIVE MATERIALS

H.R. Rep. 105-551 (Part I) at 26 (1998) .........................................................2

H. Rep. No. 105-796, at 73 (1998) ...............................................................10

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## MEMORANDUM

## I.     INTRODUCTION

Defendant Veoh Networks, Inc. ("Veoh") brings this motion for summary judgment on the ground that it is afforded safe harbor under section 512(c) of the Digital Millennium Copyright Act ("DMCA") from all of Plaintiff's claims in this case.[1]

Veoh was founded to provide a forum for the efficient sharing of high-quality, user created video content on the Internet, while providing strong protections for intellectual property. Since its inception, Veoh has worked diligently with content owners to keep unauthorized works off of Veoh's service. It is undisputed that Veoh has a rigorous DMCA policy, promptly terminates access to allegedly infringing content upon proper notice, and promptly terminates any repeat infringers.

Plaintiff Io Group, Inc. dba Titan Media is a San Francisco based provider of adult content. Plaintiff has filed some 30 to 40 lawsuits for copyright infringement, always demanding payment of money in addition to injunctive relief. In this case, Plaintiff claims that snippets—that Plaintiff admits contained no markings indicating that Plaintiff owned or asserted copyright in the material—from a few of Plaintiff's adult videos were available on Veoh between June 1, 2006 and June 22, 2006. Plaintiff was well versed in the workings of the notice and takedown provisions of the DMCA, having sent scores of DMCA notices to service providers in the past. Rather than send Veoh a notice regarding the alleged infringements, however—in which case Veoh would have promptly responded as it does in response to all proper DMCA notices—for several weeks Plaintiff set about trying to gather evidence of as many infringements as possible, in order to demand a windfall settlement from Veoh. Coincidentally during June 2006, however, Veoh independently made a decision to cease allowing access to any pornographic content, and on June 22, 2006 terminated such content. The next day, without having made any attempt to first contact Veoh, and despite the fact that Veoh had already disabled access to pornographic content on its own initiative,

---

[1]  Veoh has also asserted other defenses in this case, including that Plaintiff's secondary liability claims are barred because Plaintiff cannot establish direct infringements in this case and because Veoh's products and services are staple articles of commerce, that the alleged infringement was not caused by a volitional act attributable to Veoh, that Plaintiff cannot establish the elements of its claims, and that Veoh's conduct constitutes fair use, among others. *See* Defendant's Answer at 5-7. This motion is based only upon Defendant's eligibility for safe harbor pursuant to 17 U.S.C. § 512(c).

1   Plaintiff filed this lawsuit alleging that Veoh should be held both directly and indirectly liable for

2   copyright infringement based upon allegedly infringing works uploaded to Veoh by Veoh users, and

3   seeking enhanced statutory damages.

4         Section 512(c) of the DMCA provides safe harbor to qualifying service providers like Veoh

5   from liability for monetary relief and limits injunctive relief for infringing user submitted material if

6   the service provider meets the safe harbor's requirements.  There is no issue of material fact

7   regarding Veoh's entitlement to DMCA safe harbor in this case.  In fact, this is a textbook case of

8   when the safe harbor should apply.  Veoh is the "Good Samaritan" envisioned by the DMCA's

9   enactors who "acts responsibly upon obtaining information indicating an infringement."  H.R. Rep.

10  105-551 (Part I) at 26 (1998).

11  **II.    STATEMENT OF THE ISSUES**

12        Whether Veoh is entitled to summary judgment on all of Plaintiff's claims because it

13  qualifies for safe harbor from all of Plaintiff's claims under section 512(c) of the Digital Millennium

14  Copyright Act, which bars Plaintiff's recovery of any monetary relief and limits injunctive relief so

15  that it is moot.

16  **III.    FACTUAL BACKGROUND**

17        **A.    Defendant Veoh Networks**

18        Veoh was founded to provide a forum for users to share user created video content on the

19  Internet, while being able to terminate any inappropriate content that was uploaded to Veoh of which

20  Veoh received notice.  Transcript of May 21, 2007 Deposition of Dmitry Shapiro ("Shapiro Dep.

21  Tr."), attached to the Declaration of Matthew Scherb ("Scherb Decl.") as Exh. A, at 53:20-55:3.

22  Veoh consists of two principal components: (i) the Veoh.com website where, among other things,

23  one can share and browse videos available through Veoh, create a user account and profile, and

24  interact with content providers and viewers; and (ii) an optional Veoh Player software application,

25  which allows uploading and delivery of videos, and provides additional benefits, such as allowing

26  users to subscribe to certain programming.  Declaration of Ted Dunning ("Dunning Decl."), ¶ 2;

27  Transcript of March 16, 2007 Deposition of Ted Dunning ("Dunning Dep. Tr."), attached to the

28  Scherb Decl. as Exh. B, at 16.  Veoh's website became operational in February 2006, Transcript of

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2

1  May 21, 2007 Deposition of Joseph Papa ("Papa Dep. Tr. (Day One)"), attached to the Scherb Decl.

2  as Exh. C, at 69:9-11; Shapiro Dep. Tr. at 76:22-24; Dunning Decl. ¶ 3, and Veoh began distributing

3  the first beta version of its Veoh Player software in August of 2005, Dunning Decl. ¶ 3.

4          1.   <u>Content Available on Veoh</u>

5       The video content available on Veoh is submitted by Veoh users.  Dunning Decl. ¶ 4.[2]  In

6  order to upload video content to Veoh, a user must first register with Veoh at Veoh.com by

7  providing a user name, email address, and password.  Papa Dep. at 12:2-5; Dunning Dep. at 72:3-6;

8  Dunning Decl. ¶ 4 & Exh. A (registration screen on Veoh's website).  When a user uploads a new

9  video to Veoh, a user provides information about the video to help other users locate the video, such

10  as a title of the user's choosing and tags (keywords) to describe the video, and selects appropriate

11  categories that best describe the video.  Dunning Decl. ¶ 5 & Exhs. B, C (print-out from Veoh's

12  website reflecting these fields from June 13, 2006 and print-out of current comparable page); Papa

13  Dep. Tr. (Day One) at 31:21 to 33:5.  The Veoh system then automatically "publishes" the new

14  video, making it available to other users of Veoh.  Absent a failure in the computer system,

15  publication is an entirely automated process.  Dunning Dep. Tr. at 135; 138.  Veoh computers

16  automatically receive users' video submissions, extract certain metadata from each video file,

17  including the file's format and length, and assign each published video a "permalink," a locator that

18  accompanies the display of each video and uniquely identifies each video on Veoh.  Dunning Dep.

19  Tr. at 132-33.  The metadata is automatically indexed on Veoh's servers.  *Id.*  Veoh computers also

20  automatically extract a preview clip and automatically generate low resolution thumbnail images,

21  each approximately 90 by 60 pixels, that communicate to Veoh users what content the video likely

22  contains.  Dunning Dep. Tr. at 133:6-14; Transcript of May 22, 2007 Deposition of Joseph Papa

23  ("Papa Dep. Tr. (Day Two)"), attached to the Scherb Decl. as Exh. D, at 155:22-24, 159:25 to

24  161:18, 166:8-17.  Veoh also utilizes third party software to convert each user-submitted video into

25  the Flash format for compatibility purposes, because the vast majority of Web users have software

26  that can play videos in the Flash format.  Defendant Veoh Networks, Inc.'s Supplemental Responses

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

27  28  [2] Veoh has also entered agreements with certain content providers such as Turner, CBS, Us Magazine, Road and Track Magazine, Car and Driver Magazine, and United Talent Agency to distribute their content on Veoh.  Shapiro Dep. Tr. at 33:17-19, 37:11-16.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  to Interrogatory Nos. 6, 21, and 22, attached to the Scherb Decl. as Exh. E,  at 3; Papa Dep. Tr. (Day

2  One) at 124:3-17, 125:7-12.  The conversion to Flash format is an entirely automated process.

3  Dunning Decl. ¶ 6.

4       Veoh employees do not review user submitted content before it is available on Veoh, and it

5  would not be feasible to do so.  Dunning Dep. Tr 129:24 to 130:15; Papa Dep. Tr. (Day One) 35:6-8.

6  Veoh employees may "spot check" some videos after publication, on an *ad hoc* basis, for terms of

7  use compliance and for proper categorization.  For example, Veoh employees may spot check videos

8  that appear in prominent places on the website (such as the home page or on a featured video list), or

9  those that are the subject of notices of alleged infringement.  Dunning Dep. Tr. at 136-37; *see*

10  *generally* Papa Dep. Tr. (Day Two) at 233:23 to 234:17.  Although certain Veoh press releases and

11  documents contained a statement that "published content is approved by editors", *see e.g.* Shapiro

12  Dep. Tr. at 10:17 to 17:10, editorial review was a concept that was considered during the early days

13  of Veoh and was never implemented, because it was not feasible to do so.  Dunning Dep. 129:17 to

14  130:15; Shapiro Dep. Tr. at 84:16 to 85:1; *see also* Def's. Supp. Resp. to Interrogatory No. 5,

15  attached to the Scherb Decl. as Exh. F.

16            2.    Veoh's Revenue Model

17       During the June 1, 2006 to June 22, 2006 time period at issue in this case, there was no

18  advertising on Veoh, and Veoh did not charge users for viewing videos or for memberships or

19  subscriptions.  Declaration of Joseph Papa ("Papa Decl.") ¶ 2.  Veoh currently offers opportunities

20  for advertisers to place advertisements on Veoh and participates in certain Google-sponsored

21  advertisement programs.  Papa Decl. ¶ 3; Papa Dep. Tr. (Day One) at 118:17-19.  Veoh has also

22  implemented a "premium content" program whereby users who upload content can choose to charge

23  for the content and Veoh receives a portion of the proceeds.  Papa Decl. ¶ 4.

24            3.    Veoh's Policies Prohibiting Infringement

25       From its inception, Veoh's policies have strictly prohibited the use of its website or software

26  in connection with infringing content.  In fact, Veoh's system was designed to enable Veoh to

27  terminate access to inappropriate content once it received notice of such content.  Shapiro Dep. Tr. at

28  54:9 to 55:3 ("[W]e wanted to build a network that -- if inappropriate content got up, that we could

1   take it down."); Dunning Dep. at 99:10-15.  Veoh has always promptly removed access to allegedly

2   infringing content upon adequate notice, and has always had a policy whereby it terminated repeat

3   infringers.  Dunning Decl. ¶¶ 7, 9-10.

4          Veoh's policies have always been prominently displayed on Veoh's website at Veoh.com.

5   Papa Decl. ¶ 7.  Veoh's Terms of Use have always prominently stated that Veoh does not permit

6   copyright infringing activities and reserved the right to terminate repeat infringers.  Veoh's first

7   Terms of Use was posted on the Veoh.com website from February 27, 2006 to April 25, 2006 and is

8   attached to the Papa Decl. as Exh. B.  The next version of Veoh's Terms of Use, was posted on the

9   Veoh.com website from April 25, 2006 to June 23, 2006 (hereafter the "June 2006 TOU") and is

10  attached to the Papa Decl. as Exh. A.  Veoh's June 2006 TOU, the Terms of Use operative during

11  the relevant June 1, 2006 to June 22, 2006 time period at issue in this case, prominently stated that:

> **. . . Veoh does not permit copyright infringing activities on the Veoh Service and
> reserves the right to terminate access to the Veoh Service, and remove all User
> Materials posted, by any persons who are found to be repeat infringers (i.e., persons
> found to have uploaded copyright infringing User Material on more than two
> occasions).**

16  June 2006 TOU at 2 (bold emphasis in original terms).

17         Veoh's currently effective Terms of Use ("Current TOU"), attached to the Papa Decl. as Exh.

18  E, and Copyright Policy, attached to the Papa Decl. as Exh. F, contain similar provisions, stating:

> As a condition of use, you agree not to use the Veoh Service for any purpose that is unlawful.
> . . . including, without limitation, all intellectual property laws (such as, U.S. copyright laws).

21  Current TOU at 3; and

> Veoh takes copyright and other intellectual property rights very seriously. It is Veoh's policy
> to (1) expeditiously block access to or remove content that it believes in good faith may
> contain material that infringes the copyrights of third parties and (2) remove and discontinue
> service to repeat offenders.

25  Copyright Policy at 1.

26         In June 2006, Veoh also had a separate "Acceptable Use Policy," that strictly prohibited use

27  of Veoh for "any illegal purpose" or the making available of files that "contain music, film, video,

28  images, photographs, software or any other material protected by intellectual property laws,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   including but not limited to copyright and trade secret law, unless you own or control the rights or

2   are authorized  to make such material available."  Acceptable Use Policy Dated June 13, 2006[3] (the

3   "June 2006 AUP"), attached to the Papa Decl. as Exh. G, at 1.  Veoh also explained in detail in its

4   June 2006 AUP, and in all previous Acceptable Use Policies for the Veoh website, how users could

5   notify Veoh of any infringing content, in accordance with the DMCA, and that Veoh had the right to

6   terminate the accounts of infringers.  June 2006 AUP at 2; Papa Decl. ¶ 6 & Exh. H (first Acceptable

7   Use Policy, dated February 27, 2006).  Veoh's current Terms of Use links to its Copyright Policy,

8   which contains a detailed description of its DMCA policy and describes in detail how to provide

9   Veoh with notice of alleged infringements.  Current TOU at 2; Copyright Policy.

10      Veoh also reminds users of its policies each time a user begins to upload a video to the

11  Veoh.com website.  Each time a user begins to upload a video, they receive a message stating "Do

12  not upload copyrighted, pornographic, obscene, violent, or any other videos that violate Veoh

13  Publisher Terms and Conditions."  Papa Decl. ¶ 8, Exh. I (a copy of the Veoh website's current

14  upload screen).  Veoh gave the same or a similar warning to users during June of 2006.  *Id.*

15      Veoh provides additional warnings to users of its Veoh Player software.  Before using the

16  software, users must first consent to Veoh's software license, which conditions use of the Veoh

17  Player on the user's express agreement to "not use the Software or Service to infringe the copyrights

18  or other intellectual property rights of others in any way."  Papa Decl. ¶ 9 & Exh. J at 3.  The

19  software license contained the same or a similar condition of use during June of 2006.  *Id.*

20      Veoh strictly enforces its policies prohibiting infringing content.  *See, e.g.*, Dunning Dep. at

21  125:6 to 126:16; Papa Dep. Tr. (Day One) at 96:20 to 97:21; Dunning Decl. ¶ 7.  Veoh has always

22  promptly terminated access to allegedly infringing content upon receiving notice of such content.

23  Dunning Decl. ¶ 9; Dunning Dep. Tr. at 125:6 to 126:16.  Veoh goes far beyond what is required by

24  law, investigating informal user complaints when Veoh can determine what video or videos the

25  complaints implicate.  *Id.*  One way Veoh may receive informal complaints is through Veoh's "flag"

26  feature, which allows users to "flag" video content available on Veoh as inappropriate.  Dunning

27

28  [3] This Acceptable Use Policy was operative from April 25, 2006 through the relevant June 1, 2006 to
    June 22, 2006 time period.  Papa Decl. ¶ 6.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  Decl. ¶ 9 & Exh. E (screenshot of Veoh's flag feature).  Responding to informal notices requires

2  some judgment calls, but Veoh errs "strongly on the side of taking [works] down if there's any

3  plausible reason that it's material that would be copyrighted."  Dunning Dep. Tr. at 128:20-23.

4  Veoh responds to DMCA notices promptly, often the very same day that Veoh receives the notice, or

5  within a day or two of notice.  Dunning Decl. ¶ 9.

6      From the inception of its service to the present, Veoh has had an agent to receive notices of

7  alleged infringement.  On August 15, 2005, Veoh designated its Chief Executive Officer, Dmitry

8  Shapiro, as its agent to receive notifications of claimed infringement.  Dunning Decl. ¶ 8 & Exh. D

9  at 1 (Interim Designation of Agent to Receive Notification of Claimed Infringement).  From that

10 date, Veoh has prominently made available on its website at Veoh.com and by providing the

11 Copyright Office the following information: the name, address, phone number, and electronic mail

12 address of the agent.  *See* Dunning Decl. ¶ 8 & Exh. D; *see also*, *e.g.,* June 2006 AUP at 2;

13 Copyright Policy at 2.

14     Veoh has also adopted and implemented, and informs users of its policy providing for the

15 termination in appropriate circumstances of Veoh users who are repeat infringers.  June 2006 TOU

16 at 2; Copyright Policy at 2; *see also* Papa Decl. ¶ 5 (collecting other versions of policies to same

17 effect).  If Veoh receives notice that a user has uploaded infringing content after that user has already

18 received a first warning, that user's account is promptly automatically terminated.  Dunning Decl. ¶

19 10; Papa Dep. Tr. (Day One) at 98:3-7.  When Veoh terminates a user's account, all content

20 provided by that user is disabled (unless that content was also published by a non-terminated user,

21 and is content for which Veoh has not otherwise received a DMCA notice), that user id no longer

22 allows access to Veoh, or uploading of content to Veoh, and the user's email address is added to a

23 black list so that user cannot register for a new user id with that email address.  Dunning Decl. ¶ 11.

24 To date, Veoh has terminated a total of 1,742 users, 1,096 users for repeat copyright violations, and

25 the remainder for other terms of service related violations.  Dunning Decl. ¶ 12.

26     Veoh also accommodates and does not interfere with any standard technical measures used

27 by copyright owners to identify or protect copyrighted works.  Dunning Decl. ¶ 13.  In fact, Veoh

28 goes well beyond this requirement, and has adopted a means of generating a unique fingerprint

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7

1  (called a "hash") of a video file, and once Veoh receives notice that a file is alleged to be infringing,

2  Veoh's system automatically checks any newly submitted videos and rejects any new files with the

3  identical hash, and also terminates user access to any existing files with the identical hash.  Dunning

4  Dep. at 143; Dunning Decl. ¶ 13.

5                  4.     <u>Veoh's Decision to Prohibit Adult Content on Veoh</u>

6         Prior to June 22, 2006, Veoh did not prohibit users uploading adult content to Veoh so long

7  as it was properly categorized as such.  Papa Dep. Tr. (Day One) at 53:5-15.  In June of 2006,

8  however, Veoh made a decision to prohibit adult content on Veoh.  Shapiro Dep. Tr. at 63:1-7;

9  Transcript of May 25, 2007 Deposition of Keith Ruoff ("Ruoff Dep. Tr."), attached to the Scherb

10  Decl. as Exh. G, at 60:6-17; Papa Decl. ¶ 10.  By June 22, 2006, Veoh disabled access to all content

11  that had been categorized by users as "adult."  Papa Decl. ¶ 10.

12      **B.**     **Plaintiff and Its Claims**

13         Plaintiff Io Group, Inc., which does business as "Titan Media", produces, markets, and

14  distributes gay erotica content, including Internet website content, videos, DVDs, and photographs.

15  Compl., ¶ 2; Ruoff Dep. Tr. 11:9-14.  Plaintiff has filed some 30 to 40 lawsuits for copyright

16  infringement of its content, always demanding payment of money in addition to injunctive relief.

17  Ruoff Dep. Tr. 64:3-6, 65:4-22.  Plaintiff has also sent numerous DMCA notices or take-down

18  notices, always accompanied by a demand for payment.  Ruoff Dep. Tr. 59:22 – 60:2.  It is

19  Plaintiff's custom to send take-down notices prior to filing suit.  *Id.*

20         Plaintiff claims that, despite Veoh's policy prohibiting infringing content, unauthorized

21  copies or excerpts of a few of Plaintiff's copyrighted adult videos were available on Veoh between

22  June 1, 2006 and June 22, 2006.  Compl. ¶ 13.  Plaintiff became aware of the alleged infringements

23  the second week of June 2006.  Ruoff Dep. Tr. 41:11-17.  All of the allegedly infringing works at

24  issue in this lawsuit were adult content, Ruoff Dep. Tr.18:15-17, to which Veoh had terminated

25  access by June 22, 2006, before Plaintiff filed this lawsuit. *Id.* at 60:6-17.

26         Plaintiff originally claimed that snippets of eight of its copyrighted adult videos were

27  available on Veoh.  Pls.' Response to Defs.' First Set of Interrogatories, attached to the Scherb Decl.

28  as Exh. H, No. 1.  Plaintiff recently amended its discovery response to drop one of the works it

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    originally claimed was infringed, *Prowl 3*, and to add three new titles to those it claims were

2    infringed, bringing the total number of works allegedly infringed to ten. *Compare* Scherb Decl.,

3    Exh. H, No. 1 (the original response), *with* Pls.' Supp. Response to Defs.' First Set of

4    Interrogatories, attached to the Scherb Decl. as Exh. I, No. 1 (the supplemental response).[4]

5         None of the allegedly infringing works at issue in this lawsuit contained a copyright notice.

6    Pl's. Resp. to Def's Second Set of RFAs, attached to the Scherb Decl. as Exh. J, No. 58 ("It appears

7    that the copyright notice was removed."). Moreover, Plaintiff's Vice President Keith Ruoff aka

8    Keith Webb, who investigated the alleged infringements for Plaintiff, Ruoff Dep Tr. at 47:21-24,

9    admits that none of the allegedly infringing works, whether the video excerpts or the extracted

10   thumbnails, identified Plaintiff as the owner or source in any way.[5] Ruoff Dep. Tr. at 55:13-16;

11   56:19 to 57:13.

12        Despite Veoh's clearly stated policy to respond to notices of infringement—and despite the

13   fact that Veoh had such a policy since its inception—Plaintiff never notified Veoh of any alleged

14   infringements prior to filing suit. Pl's. Resp. to Def's. First Set of RFAs, attached to the Scherb

15   Decl. as Exh. K, Nos. 21, 22, 24; Ruoff Dep. Tr. at 57:19-23. In fact, Plaintiff admits that it "never

16   sent any notice to Veoh regarding infringements of [its] copyrights, apart from communications in

17   connection with this action." Pl's. Resp. to Def's. Third Set of RFAs, attached to the Scherb Decl.

18   as Exh. L, No. 61. Rather than simply ask Veoh to disable access to the alleged infringements,

19   Plaintiff instead waited several weeks, gathering evidence of as many alleged infringements as

20   possible. Ruoff Dep. Tr. at 61:4-22. Veoh first received notice of Plaintiff's claims on June 23,

21   2006 when Plaintiff filed its Complaint in this action, at which time Veoh had already disabled

---

[4] Plaintiff added the three new works to those it alleges were available on Veoh after Veoh produced
to Plaintiff in discovery storage media containing all video files that had been terminated from the
publicly accessible portion of the Veoh.com website prior to the filing of Plaintiff's lawsuit on June
23, 2006. Scherb Decl. ¶ 3.

[5] In fact, Plaintiff initially admited that none of the allegedly infringing works identified Io Group,
Inc. or Titan Media as the source. Scherb Decl., Exh. J, Nos. 59-60 (Pl's. Resp. to Def's. Second Set
of RFAs). After Mr. Ruoff testified at his deposition, and at the time Plaintiff amended its discovery
responses to indicate it was claiming additional infringements, Plaintiff amended its response to
Veoh's Request for Admission No. 59 to deny that none of the allegedly infringing works identify
Titan Media as the source. Pl's. Supp. Resp. to Def's. Second Set of RFAs, attached to the Scherb
Decl. as Exh. M, No. 59. Despite this, Plaintiff has never identified any allegedly infringing works
that *do* identify Plaintiff as the source.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

9

1  access to all pornographic work on its website, including any infringing works alleged in this

2  litigation.  Ruoff Dep. Tr. at 60:6-17.

3       On June 22, 2006, Plaintiff discovered that Veoh had disabled access to adult content.  *Id.*

4  Plaintiff then, nevertheless, made the decision to sue Veoh, and prepared and filed the complaint in

5  this action.  Ruoff Dep. Tr. at 142:24 to 143:5, 152:14-18, 154:13 to 155:11.

6  **IV.  ARGUMENT**

7      **A.    Summary Judgment Standard**

8       A motion for summary judgment should be granted if there is no genuine issue of material

9  fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson*

10  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of

11  informing the Court of the basis for the motion and identifying the portions of the pleadings,

12  depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a

13  triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party

14  meets this initial burden, the burden shifts to the non-moving party to present specific facts showing

15  that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "A mere

16  scintilla of evidence supporting the non-moving party's position is insufficient:" the moving party

17  will win summary judgment unless there is "evidence on which a jury could reasonably find for the

18  non-moving party."  *Rivera v. Philip Morris*, Inc., 395 F.3d 1142, 1146 (9th Cir. 2005).

19       Given the undisputed evidence, Veoh qualifies for DMCA safe harbor and the Court should

20  grant Veoh summary judgment as to all of Plaintiff's claims.

21      **B.    Veoh Qualifies for DMCA Section 512(c) Safe Harbor**

22       Independent of any other defense to copyright infringement claims that a defendant might

23  raise, *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004), the Online Copyright

24  Infringement Liability Limitation Act, Title II of the DMCA, 17 U.S.C. § 512, establishes safe

25  harbors that "protect qualifying service providers from liability for all monetary relief for direct,

26  vicarious and contributory infringement," H. Rep. No. 105-796, at 73 (1998), *as reprinted in* 1998

27  U.S.C.C.A.N. 639, 649; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 732 (9th Cir.

28  2007) ("We have held that the limitations on liability contained in 17 U.S.C. § 512 protect secondary

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

10

1    infringers as well as direct infringers."); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

2    Section 512 not only shields qualifying service providers from "all monetary relief," but also "most

3    equitable relief." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098-99 (W.D. Wash.

4    2004).  Copyright holders may obtain only the narrowest of injunctions where a safe harbor applies.

5    *See* 17 U.S.C. §512(j) (limiting injunctions to those curtailing access to infringing works at a

6    "particular online site" or "particular online location," and to those terminating the accounts of

7    infringing users).  While the safe harbors "do not affect the question of ultimate liability under the

8    various doctrines of direct, vicarious, and contributory liability," *Perfect 10, Inc. v. CCBill LLC*, __

9    F.3d __, 2007 U.S. App. LEXIS 12508, at *5 (9th Cir. May 31, 2007), the injunctive relief available

10    once a safe harbor applies is so narrow that a service provider's assurance that it terminated accounts

11    of infringing users can moot infringement claims, with no further relief available.  *See Corbis*, 351 F.

12    Supp. 2d at 1110-11.

13        Section 512's four safe harbors "provide protection from liability for: (1) transitory digital

14    network communications; (2) system caching; (3) information residing on systems or networks at the

15    direction of users; and (4) information location tools." *Ellison*, 357 F.3d at 1076-77 (citing 17

16    U.S.C. §§ 512(a)-(d)).  The third safe harbor, Section 512(c), protects service providers from liability

17    for "the storage at the direction of a user of material that resides on a system or network controlled

18    or operated by or for the service provider."  17 U.S.C. § 512(c).  It applies where, as in this case, "a

19    plaintiff seeks to hold a service provider responsible for either (1) infringing 'material' stored and

20    displayed on the service provider's website or (2) infringing 'activity using the material on the

21    [service provider's computer] system." *Hendrickson v. eBay*, 165 F. Supp.2d 1082, 1088 (C.D. Cal.

22    2001).  Particularly, the safe harbor applies to a service provider who allows users to upload content

23    of their choosing.  *CoStar Group, Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 701-02 (D. Md. 2001)

24    (noting that even when humans are involved in screening the content, it is the users at the users' own

25    volition that causes the service provider to store the content).  Veoh allows users to upload and share

26    video content.  The material is stored on Veoh's servers at the direction of Veoh's users.  Dunning

27    Decl. ¶ 4.

28        Section 512(c) safe harbor is available to "service providers" who meet the other threshold

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

11

conditions of eligibility laid out in section 512(i).  *Id.* at 1080.  The undisputed evidence shows that

Veoh qualifies as a service provider, meets the section 512(i) eligibility requirements, and qualifies

for safe harbor under section 512(c).

1.    Veoh is a Service Provider

For purposes of Section 512(c), a "service provider" is defined as "a provider of online

services or network access, or the operator of facilities therefore . . . ."[6]  17 U.S.C. § 512(k)(1)(B).

This expansive definition of "service provider" has been held to encompass a broad variety of

Internet actors and their "online services," including those who facilitate online content sharing and

create online communities.  *See, e.g.*, *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir.

2003) (holding that Aimster, an Internet-based music sharing service, was a service provider);

*Hendrickson v. Amazon.com, Inc.,* 298 F. Supp.2d 914, 915 (C.D. Cal. 2003) (holding that Amazon,

with its website that facilitates the sale of goods, is a service provider); *Corbis*, 351 F. Supp. 2d at

1100 (same); *Hendrickson*, 165 F. Supp.2d at 1088 (holding that eBay's provision of an auction site

qualifies it as a service provider); *CoStar*, 164 F. Supp. 2d at 701 (holding that LoopNet's online real

estate listing service qualified LoopNet as a service provider).

Likewise as a provider of online services, Veoh is a service provider.  Veoh's website

provides an online community for the sharing of video content.  Just like Aimster, Amazon, eBay,

and LoopNet, Veoh "is a provider of online services."  17 U.S.C. § 512(k)(1)(B).

2.    Veoh Meets the Eligibility Requirements of Section 512(i)

Eligibility requirements for the safe harbors are set forth in section 512(i).  The safe harbors

apply to a service provider if the service provider:

> (A) has adopted and reasonably implemented, and informs subscribers and account
> holders of the service provider's system or network of, a policy that provides for the
> termination in appropriate circumstances of subscribers and account holders of the
> service provider's system or network who are repeat infringers; and
> (B) accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i)(1); *Ellison*, 357 F.3d at 1080.  Veoh meets both requirements.

---

[6]  Section 512 has two definitions of "service provider:" the first, at section 512(k)(1)(A), applies
only to those seeking the 512(a) safe harbor for providers of "transitory digital network
communications;" the second, at section 512(k)(1)(B), is a broader definition applicable to those
seeking the other three safe harbors.  Since Veoh is moving for summary judgment based upon the
512(c) safe harbor, the broader definition set forth at section 512(k)(1)(B) applies.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

a.    Veoh's Robust Copyright Policy and Implementation of that Policy
Meet the Eligibility Requirements of Section 512(i)(1)(A)

Tracking the statute's text, the Ninth Circuit has held that section 512(i)(1)(A) requires service providers to: "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform subscribers of the policy." *Ellison,* 357 F.3d at 1080. "Congress requires reasonable implementation of [a repeat infringer] policy rather than perfect implementation." *See Perfect 10 v. CCBill*, 340 F. Supp.2d 1077, 1089 (C.D. Cal. 2004).

Since it first began offering services, Veoh has adopted and informed account holders of a repeat infringer policy. Tracking similar language in all other versions of Veoh's TOU, Veoh's June 2006 TOU in effect during the period that Plaintiff claims there was infringing content on Veoh, prominently stated that:

> **. . . Veoh does not permit copyright infringing activities on the Veoh Service and reserves the right to terminate access to the Veoh Service, and remove all User Materials posted, by any persons who are found to be repeat infringers (i.e., persons found to have uploaded copyright infringing User Material on more than two occasions).**

June 2006 TOU at 2 (bold formatting emphasis in original). Veoh also explained in detail in its 2006 AUP how users could notify Veoh of any infringing content and that Veoh would terminate the accounts of infringers. 2006 AUP at 2. Veoh's June 2006 TOU and 2006 AUP were posted and available on Veoh's website throughout the period in June 2006 when the alleged infringements took place. The current policies are substantially the same:

> As a condition of use, you agree not to use the Veoh Service for any purpose that is unlawful. . . . including, without limitation, all intellectual property laws (such as, U.S. copyright laws).

Current TOU at 3; and

> Veoh takes copyright and other intellectual property rights very seriously. It is Veoh's policy to (1) expeditiously block access to or remove content that it believes in good faith may contain material that infringes the copyrights of third parties and (2) remove and discontinue service to repeat offenders.

Copyright Policy at 1. Other versions of Veoh's policies had similar language. Papa Decl. ¶ 5 & Exhs B, C, D.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

13

1    These policy statements "convey[ed to] users that those who repeatedly or flagrantly abuse

2    their access to the Internet through disrespect for the intellectual property rights of others . . . know

3    that there is a realistic threat of losing that access." *Corbis*, 351 F. Supp. 2d at 1101.  Moreover,

4    these policy statements were and are publicly available at Veoh's website and Veoh's users are

5    deemed to accept the policies by their continued use of the Veoh service and when they are told

6    when uploading content that all uploads must comply with Veoh's Terms of Use.  Communication

7    of a repeat infringer policy by website terms of use or similar publicly available policy document is a

8    sufficient communication for the DMCA.  *See id.* at 1101-02 (citing cases).

9    Veoh has at all times also reasonably implemented its repeat infringer policy.  If Veoh

10    receives notice that a user has uploaded infringing content after that user has already received a first

11    warning, that user's account is promptly automatically terminated.  Dunning Decl. ¶¶ 10, 12; Papa

12    Dep. Tr. (Day One) at 98:3-7.  Moreover, "a service provider 'implements' a policy if it has a

13    working notification system, a procedure for dealing with DMCA-compliant notifications, and if it

14    does not actively prevent copyright owners from collecting information needed to issue such

15    notifications." *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *6.  The implementation is

16    "reasonable" so long as terminations of repeat infringers occurs when appropriate—that is, when the

17    service provider has notice of infringement under one of the kinds of notice recognized by section

18    512(c).  *Id.* at *10-11.  Section 512(c) recognizes notice by (1) having actual knowledge of

19    infringement, (2) awareness "of facts or circumstances from which infringing activity is apparent,"

20    and (3) receiving notice compliant with section 512(c)(3).  *Id.*; 17 U.S.C. § 512(c).  A service

21    provider has no obligation to "affirmatively police" its service, nor any other obligation not codified

22    in section 512(c) – an opposite result would render the 512(c) safe harbor meaningless.  *Id.*

23    Veoh takes action to remove access to content and to terminate users not only in response to

24    compliant DMCA notices, but also in response to informal notice, or if Veoh otherwise becomes

25    aware of potentially infringing content on the Veoh service.  Veoh does nothing to prevent content

26    owners from finding the information needed to file complaints.  Complainants can easily

27    communicate to Veoh the location of allegedly infringing content by providing a "permalink," the

28    unique locator that Veoh assigns to each video and displays alongside each video.  Veoh has

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

14

1    consistently implemented a policy respectful, and even deferential towards, copyright owners.

2    Dunning Dep. Tr. at 128:20-23 (Veoh errs "strongly on the side of taking [works] down if there's

3    any plausible reason that it's material that would be copyrighted.").

4           Because from the beginning of its service Veoh has promptly removed content and

5    terminated users under reasonable circumstances, Veoh easily meets the safe harbor eligibility

6    requirements of section 512(i)(1)(A).

7                        b.       Veoh Accommodates Standard Technical Measures as Required by
                                  Section 512(i)(1)(B)
8

9           Veoh also meets the eligibility requirement of section 512(i)(1)(B), requiring it to

10   accommodate and not interfere with standard technical measures.  "Standard technical measures"

11   are:

12          measures that are used by copyright owners to identify or protect copyrighted works and (A)
            have been developed pursuant to a broad consensus of copyright owners and service
13          providers in an open, fair, voluntary, multi-industry standards process; (B) are available to
            any person on reasonable and nondiscriminatory terms; and (C) do not impose substantial
14          costs on service providers or substantial burdens on their systems or networks.

15   17 U.S.C. § 512(i)(2).

16          No case has named a standard technical measure and none has denied safe harbor eligibility

17   based on a service provider's failure to accommodate such a measure.  To the contrary, one court has

18   indicated that it "appears to be an open question if any conduct or policy could interfere with

19   "standard technical measures."  *Perfect 10, Inc. v. Cybernet Ventures, Inc.*,  213 F. Supp. 2d 1146,

20   1174 (C.D. Cal. 2002) (citing 3 Nimmer on Copyright § 12B.02[B] [3], at 12B-39 ("Given the

21   incentives of the various parties whose consensus is required before any such technical measures can

22   win adoption, it seems unlikely ... that the need for any such monitoring will eventuate.").

23   Meanwhile, it is clear that plaintiffs bear the burden of challenging a defendant's assertion that it

24   accommodates or does not interfere with standard technical measures.  *Corbis*, 351 F. Supp. 2d at

25   1106.

26          Plaintiff has not alleged or identified any technical measure it employs that Veoh fails to

27   accommodate, and Veoh accommodates and does not interfere with standard technical measures

28   used by copyright owners to identify or protect copyrighted works.  Dunning Decl. ¶ 13.  In addition,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

15

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   Veoh takes advantage of the latest technology to protect copyrighted works, for example by having

2   its system automatically reject any newly submitted file that contains an identical fingerprint to a

3   work that Veoh has received notice that is infringing.  Dunning Dep. Tr. at 143.  Veoh's efforts to

4   reduce infringement by technical means and its willingness to abide by standard technical measures

5   fully satisfy Veoh's obligations under section 512(i)(B).

6              3.    Veoh Meets the Conditions of Section 512(c)

7       Because there is no issue of material fact that Veoh meets the threshold requirements of

8   being a "service provider" as defined by 512(k), and the threshold requirements of section 512(i),

9   Veoh is entitled to Section 512(c) safe harbor so long as it has, first, designated an agent to receive

10   notice of infringements under subsection (c)(2) and, second, does not fail the three conditions of

11   subsection (c)(1).

12      There is no dispute that Veoh meets the requirements of subsection (c)(2).  From the

13   inception of its service, Veoh has had an agent to receive notices of alleged infringement, has

14   prominently made that information available on its website at Veoh.com and by providing the

15   Copyright Office with the name, address, phone number, and electronic mail address of the agent.

16   Dunning Decl ¶ 8 & Exh. D (Interim and Amended Interim Designation of Agent to Receive

17   Notification of Claimed Infringement); 2006 AUP at 2; Copyright Policy at 2.

18      As to the three prongs of subsection (c)(1), these state that a service provide will not be held

19   liable for monetary damages … if the service provider:

20      (A)    (i) does not have actual knowledge that the material or an activity using the material
        on the system or network is infringing;
21           (ii) in the absence of such actual knowledge, is not aware of facts or circumstances
        from which infringing activity is apparent; or
22           (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or
        disable access to, the material;
23      (B) does not receive a financial benefit directly attributable to the infringing activity, in a
        case in which the service provider has the right and ability to control such activity; and
24      (C) upon notification of claimed infringement as described in paragraph (3), responds
        expeditiously to remove, or disable access to, the material that is claimed to be infringing or
25      to be the subject of infringing activity.

26   17 U.S.C. § 512(c)(1).  Veoh meets each of these conditions.

27      //

28      //

a.    Veoh Meets the Requirements of Section 512(c)(1)(A)

It is undisputed that Veoh did not have actual knowledge of the alleged infringements. Plaintiff does not allege that Veoh had actual knowledge of the alleged infringements, and Veoh had no such knowledge. *See* Compl. Plaintiff never provided Veoh with notice of any alleged infringements on Veoh's system before filing this lawsuit, at which time Veoh had already disabled access to all pornographic content. Scherb Decl., Exh. K, Nos. 21, 22, 24; *id.* Exh. L, No. 61 (Plaintiff admits it "never sent any notice to Veoh regarding infringements of [its] copyrights, apart from communications in connection with this action"); Ruoff Dep. Tr. at 57:19-23; 60:6 to 61:6. There is no issue of fact that Veoh meets the requirements of 512(c)(1)(A)(i). As stated by the court in *Corbis,* "[Plaintiff's] decision to forego the DMCA notice . . . stripped it of its most powerful evidence of a service provider's knowledge." *Corbis*, 351 F. Supp. 2d at 1107.

Veoh was also not "aware of facts or circumstances from which infringing activity is apparent", and meets the requirements of 512(c)(1)(A)(ii). Plaintiff concedes that none of the alleged infringements uploaded by Veoh users contained copyright notices, Scherb Decl., Exh. J, No. 58 (Pl's. Resp. to Def's. Second Set of RFAs) ("It appears that the copyright notice was removed."), and Plaintiff's deposition testimony is that none of these works identified Plaintiff in any way. Ruoff Dep. Tr. at 55:13-16 ("I don't remember seeing any reference to Titan Media within those audio-visual works that I downloaded through Veoh."); *id.* at 56:19 to 57:13 (thumbnails).

Even if they had, it is not feasible for Veoh to review every user submission before it is made available on the Veoh system, Dunning Dep. 129:17 to 130:15; Shapiro Dep. Tr. at 84:16 to 85:1, and the law places no such burden on a service provider, *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *10 ("[A] service provider need not affirmatively police its users."). And even if such a review was required or feasible, absent adequate notice from Plaintiff, there was simply no way for Veoh to determine whether a user had authorization to upload the content or not. *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *19-21 (acknowledging the ambiguity and possible falsity of facts which a plaintiff might consider clear evidence of infringement and relieving service providers of the burden to investigate).

While Plaintiff may attempt to rely on a "red flag" theory in this case given its failure to

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  provide any notice to Veoh, there are no facts to indicate that any red flags existed.  The fact that

2  adult content was available on Veoh until June 22, 2006 certainly does not suffice.  As recently

3  stated by the Ninth Circuit, even when "titillating" photographs are described as "illegal" or

4  "stolen," (which was not the case here) the courts "do not place the burden of determining whether

5  [they] are actually illegal on the service provider."  *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *19

6  (noting that photographs could have been untruthfully described as "stolen" to create buzz and

7  excitement only); *see also Corbis*, 351 F. Supp. 2d at 1107-08 ("The issue is not whether Amazon

8  had a general awareness that a particular type of item [celebrity photos,] may be easily infringed;"

9  rather, whether Amazon knew of specific infringements."); *Perfect 10*, 487 F.3d at 729 ("[A]

10  computer system operator can be held contributorily liable if it 'has actual knowledge that specific

11  infringing material is available using its system.').  Service providers do not face "investigative

12  duties" under Section 512(c)(1)(A)(ii) to ferret out what may be infringing and what is not.  *Perfect

13  10*, 2007 U.S. App. LEXIS 12508 at *21.

14      Finally, there is no issue of fact that Veoh meets the requirements of 512(c)(1)(A)(iii),

15  because "upon obtaining such knowledge or awareness," Veoh "acts expeditiously to remove, or

16  disable access to, the material."  As to the works alleged in this case, it is undisputed that Veoh had

17  no knowledge or awareness that Plaintiff claimed they were infringing until this lawsuit was filed, at

18  which time, they had already been removed from Veoh along with all other adult content.  Despite

19  ample opportunity to do so, Plaintiff never provided Veoh with any notice of alleged infringements,

20  other than the filing of this lawsuit.  As to Veoh's track record in responding to third party notices, it

21  is exemplary.  *See, e.g.*, *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *17-18 (in the absence of

22  notice from Plaintiff, it may also be appropriate for courts to consider how those claiming a

23  reasonable implementation of policy responded to third party notices).  Whenever Veoh received

24  DMCA-compliant notices, Veoh acted expeditiously to remove the infringing works from the Veoh

25  service and, as appropriate, to terminate the user account associated with the infringing work if the

26  user account had previously been subject to a copyright removal.  Veoh often processed a DMCA-

27  compliant notice, removed noticed content, and responded to the complainant on the same day that

28  Veoh received the notice; other times Veoh would respond within only a few days.  Dunning Decl. ¶

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

18

9.

b.    <u>Veoh Does Not Lose Safe Harbor Pursuant to Section 512(c)(1)(B)</u>

Veoh also did not derive a financial benefit directly attributable to the infringing activity where it has the right and ability to control the activity.  There are two components to subsection 512(c)(1)(B): direct financial benefit and right and ability to control.  Each of these requirements is familiar from the common law doctrine of vicarious copyright liability, which makes liable one who has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.  *Perfect 10 v. Visa Int'l Serv. Ass'n*, __ F.3d __, 2007 U.S. App. LEXIS 15824, at *31-32 (9th Cir. July 3, 2007) (citing *Ellison*, 357 F.3d at 1078).  While the language of subsection 512(c)(1)(B) mirrors that of the common law doctrine, *id.* at *29-30, the DMCA must require less of a service provider than the common law, because the DMCA would shield a vicarious infringer from liability—or be superfluous, *CoStar*, 373 F.3d at 555 ("An ISP, however, can become liable indirectly upon a showing of additional involvement sufficient to establish a contributory or vicarious violation of the Act.  In that case, the ISP could still look to the DMCA for a safe harbor if it fulfilled the conditions therein."); *see also* 3 Melville B. Nimmer & David Nimmer, Nimmmer on Copyright, § 12B.04[A][2] n.30.1 (noting how some courts have, when analyzing vicarious liability under the common law, allowed indirect financial benefit to substitute for direct financial benefit, which the DMCA would prohibit).  Veoh is entitled to safe harbor if it can demonstrate based on the undisputed facts that any one of the components is not met in this case.  *Corbis*, 351 F. Supp. 2d. at 1110 (noting no need to consider the issue of direct financial benefit when claimant of safe harbor did not have right and ability to control infringing conduct).  The undisputed facts show that Veoh does not have the right and ability to control the allegedly infringing activity and does not derive a direct financial benefit from such activity.

i.    *Veoh Does Not Have the Right and Ability to Control the Infringing Activity*

Veoh has neither the right nor the ability to control the allegedly infringing activity.  Veoh does not have the ability to control the infringing activity.  As already noted, it is not feasible for Veoh to review every user submission before it is made available on the Veoh system, Dunning Dep.

19

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   129:17 to 130:15; Shapiro Dep. Tr. at 84:16 to 85:1, and the law places no such burden on a service

2   provider. *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *10, *16 ("[T]he burden of policing

3   copyright infringement-identifying the potentially infringing material and adequately documenting

4   infringement-[rests] squarely on the *owners of the copyright*.") (emphasis added); *id.* at *21 ("We

5   impose no such investigative duties on service providers."); *Corbis*, 351 F. Supp. 2d at 1110 (no

6   right and ability to control when Amazon did not "pick" the content to appear on its site or preview

7   them). Even if Veoh could review content before publication, the DMCA does not require a service

8   provider to review user content *at any stage*. *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *10 ("[A]

9   service provider need not affirmatively police its users."). Therefore, even any voluntary monitoring

10  by Veoh:

11              for "apparent" infringements . . . cannot, in and of itself, lead the Court
            to conclude that [it] has the right and ability to control infringing
12          activity within the meaning of the DMCA. The legislative history
            shows that Congress did not intend for companies such as eBay to be
13          penalized when they engage in voluntary efforts to combat piracy over
            the Internet: This legislation is not intended to discourage the service
14          provider from monitoring its service for infringing material. Courts
            should not conclude that the service provider loses eligibility for
15          limitations on liability under section 512 solely because it engaged in a
            monitoring program.
16

17  *Hendrickson*, 165 F. Supp. 2d at 1094.

18          More significantly, even if review of all user provided material was required or feasible,

19  absent notice from Plaintiff, there was simply no way for Veoh to determine whether the user had

20  the right to upload the content or not. *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *19-21 (holding

21  that absent DMCA-compliant notice, awareness cannot be imputed to a service provider and that the

22  burden of identifying unauthorized content remains with the content owner, even when works are

23  described as illegal or stolen, as such descriptions may be a hoax). Plaintiff has conceded that none

24  of the allegedly infringing works that appeared on Veoh contained a copyright notice, Scherb Decl.,

25  Exh. J, No. 58 ("It appears that the copyright notice was removed."), and none of the allegedly

26  infringing thumbnail images that Veoh automatically extracted from the videos identified Plaintiff as

27  the owner. Ruoff Dep. at 56:19 to 57:13; *see also id.* at 55:13-16 ("I don't remember seeing any

28  reference to Titan Media within those audio-visual works that I downloaded through Veoh."). More

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

20

1    generally, Veoh of course could not have identified Plaintiff's works as infringing simply because

2    they were pornographic in nature.  *Perfect 10*, 2007 U.S. App. LEXIS 12508, at *19 (noting that

3    even when "titillating" photographs are described as "illegal" or "stolen," the courts "do not place

4    the burden of determining whether [they] are actually illegal on the service provider.").  Absent

5    notice, Veoh has no way of knowing whether a work, pornographic or not, is infringing or not.

6         This fact is underscored by the fact that Plaintiff itself initially identified a work, *Prowl 3*, as

7    having been infringed, and then changed its mind months later and conceded that it had not been

8    infringed after all.  Scherb Decl. ¶ 3.  *Compare* Scherb Decl., Exh. H, No. 1 (the original

9    identification of alleged infringements), *with* Scherb Decl., Exh. I, No. 1 (the supplemental

10   response).  If Plaintiff could not itself accurately identify whether user submitted works infringed

11   Plaintiff's works, it is unclear how Veoh could possibly have done so.

12        Finally, Veoh's ability to remove works once notified that they are infringing, and its

13   automated processing of uploaded content do not create a right and ability to control.  As noted in

14   *Hendrickson*:

15            The 'right and ability to control' the infringing activity, as the concept
              is used in the DMCA, cannot simply mean the ability of a service
16            provider to remove or block access to materials posted on its website
              or stored in its system. . . .  The DMCA specifically requires a service
17            provider to remove or block access to materials posted on its system
              when it receives notice of claimed infringement. . . . Congress could
18            not have intended for courts to hold that a service provider loses
              immunity under the safe harbor provision of the DMCA because it
19            engages in acts that are specifically required by the DMCA.

20   165 F. Supp. 2d at 1093-94; *see also Perfect 10 v. Cybernet Ventures*, 213 F. Supp. 2d 1146, 1181

21   (C.D. Cal. 2002) ("[C]losing the safe harbor based on the mere ability to exclude users from the

22   system is inconsistent with the statutory scheme"); *CoStar*, 164 F. Supp. 2d at 704 (quoting

23   *Hendrickson*).

24        Veoh also lacks the right to control the allegedly infringing activity.  The "right and ability to

25   control," as it is understood in the common law of vicarious copyright infringement, arises from a

26   special relationship between an infringer and another.  Vicarious liability was an outgrowth of

27   respondeat superior, which would make an employer liable for certain acts of his employee.

28   *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-62 (9th Cir. 1996).  Today, relationships

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    such as the employer-employee relationship and the principal-agent relationship and those like them

2    may give rise to a right and ability to control, *see, e.g.*, *In re Aimster Copyright Litig.*, 334 F.3d 643,

3    654 (7th Cir. 2003), but other relationships do not.  Indeed, the Second Circuit has distinguished

4    landlord-tenant relationships, which do not create vicarious liability, from employer-employee

5    relationships, which can give risk to such liability, and it used those examples as ends of a spectrum

6    on which to place, and by which to evaluate, challenged conduct.  *Shapiro, Bernstein and Co. v. H.L.*

7    *Green Co.*, 316 F.2d 304, 307-308 (2d Cir. 1963).  Courts should be wary of finding the right and

8    ability to control in other contexts.  In *Meyer v. Holley*, 537 U.S. 280 (2003), the Supreme Court

9    considered the scope of vicarious liability for a federal statutory tort under the Fair Housing Act.

10   The Court held that courts must not expand vicarious liability for alleged federal statutory violations

11   (as in this case involving the Copyright Act) beyond limited traditional boundaries without express

12   authorization by Congress.  *Id.* at 290-91.  The Court described traditional vicarious liability as

13   making principals or employers liable for the acts of their agents or employees.  *Id.* at 285.

14         There are no facts suggesting any relationship between Veoh and alleged direct infringers

15   equivalent to an employer-employee or principal-agent relationship with respect to the alleged

16   infringing activity that would give Veoh the right and ability to control the alleged infringers'

17   conduct.   Veoh and the alleged infringers are only connected in the loosest sense as anyone can

18   become a Veoh user.  The main contact Veoh might have with an infringing user is to terminate that

19   user's account.  Veoh goes to great lengths to remove infringing content from its service upon notice

20   and to protect the rights of content providers.  It does not, however, have a relationship with alleged

21   direct infringers that gives it a right to control their infringing conduct, nor does it have the ability,

22   absent notice, to determine which of the multitude of videos on Veoh may be infringing.  Veoh had

23   neither the right nor ability to control the allegedly infringing activity in this case.

ii.      *Veoh Does Not Derive a Financial Benefit Directly*
         *Attributable to the Alleged Infringing Activity*

26        Although the Court need not reach the financial benefit inquiry because Veoh does not have

27   the right and ability to control the allegedly infringing activity, it is also clear from the undisputed

28   facts that Veoh does not receive a financial benefit directly attributable to the allegedly infringing

**Winston & Strawn LLP**
101 California Street
San Francisco, CA 94111-5894

1   activity. Direct financial benefit exists only where the availability of infringing material "acts as a

2   draw for customers" and there is a "causal relationship between the infringing activity and any

3   financial benefit." *Ellison*, 357 F.3d at 1077, 1079. Thus, in *Ellison*, the existence of infringing

4   content on one of America Online's Internet services was not a "draw" because it was a part of a

5   larger service with non-infringing content and there was no evidence that users joined the service for

6   the illegal content or left the service when the content was removed. *Id.* at 1079. However, where

7   Napster operated a file sharing service devoted to the traffic of unauthorized audio works and

8   refused to respond to takedown notices concerning those works, those works were a "draw." *A&M*

9   *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).

10         At the time of the alleged infringements in this case and at all times while Veoh permitted

11  adult content, Veoh generated no revenue from its service, and no direct financial benefit directly

12  attributable to the alleged infringing activity. Only months after this lawsuit began and after Veoh

13  had banned adult content did Veoh realize any advertising revenue from its service. In any event,

14  according to the DMCA's legislative history, there can be no direct financial benefit "where the

15  infringer makes the same kind of payment as non-infringing users" for use of the service provider's

16  service. *CoStar*, 164 F. Supp. 2d at 705 (quoting H.R. Rep. No. 105-551 Part 2, at 54). In *CoStar*,

17  the court held that since no users made any payments for use of the service provider's site, there

18  could be no direct financial benefit as a result of the infringing conduct. *CoStar*, 164 F. Supp. 2d at

19  705.

20         Likewise here, the undisputed evidence shows that both before and after Veoh changed its

21  adult content policy, infringing content has never been a draw for Veoh. To the contrary, as

22  discussed at length above, Veoh has always prohibited infringing content and has acted

23  expeditiously to remove it when put on notice. Plaintiff may argue that *adult material* was once a

24  draw to Veoh, but adult content does not equate to infringing content, and there is simply no

25  evidence that Veoh ever attempted to capitalize on providing *infringing material*. Therefore, Veoh

26  is more like America Online in *Ellison* than like Napster. The undisputed facts show that Veoh does

27  not derive a financial benefit directly attributable to infringing conduct.

28         //

VEOH NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. C 06-3926 HRL

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**C.    The DMCA Provides Safe Harbor from all Monetary Relief, and Any Injunctive Relief Allowed is Moot**

Once it qualifies for Section 512(c) safe harbor, "[a] service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 15 U.S.C. § 512(c). Section 512(j) only permits injunctive relief that directs a service provider (i) to restrain "from providing access to infringing material or activity residing at a particular online site on the provider's system or network," (ii) to restrain "from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order," or (iii) to stop "infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose." 15 U.S.C. § 512(j).  Plaintiff concedes that Defendant terminated access to all allegedly infringing material in June 2006 prior to the filing of this lawsuit.  Because it is undisputed that Veoh prohibited adult content beginning in June 2006, and also that Veoh promptly responds to notices of alleged infringing, and promptly terminates repeat infringers, any injunctive relief permitted by Section 512(j) is moot in this case. *Corbis*, 351 F. Supp. 2d at 1111 (denying injunctive relief under 512(j) as moot: "considering that Amazon has asserted that it has terminated the accounts of the defendant vendors, it is not certain how the limited injunctive relief would apply in the context of this litigation.")

//

//

//

//

//

//

//

//

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## V.   CONCLUSION

The undisputed facts establish that Veoh is entitled to summary judgment on all of Plaintiff's claims because it qualifies for safe harbor from all of Plaintiff's claims under section 512(c) of the Digital Millennium Copyright Act, which bars Plaintiff's recovery of any monetary relief and limits injunctive relief so that it is moot.  Accordingly, Veoh respectfully requests that the Court grant summary judgment in Veoh's favor.


Dated:  July 30, 2007                              WINSTON & STRAWN, LLP


                                                   By:____/s/_____
                                                        Michael S. Elkin
                                                        Jennifer A. Golinveaux
                                                        Matthew A. Scherb
                                                        Attorneys for Defendant
                                                        VEOH NETWORKS, INC.

VEOH NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. C 06-3926 HRL

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894