1  Michael S. Elkin (admitted *pro hac vice*)
   WINSTON & STRAWN LLP
2  200 Park Avenue
   New York, NY 10166-4193
3  Telephone:   212-294-6700
   Facsimile:    212-294-4700
4  Email: melkin@winston.com

5  Jennifer A. Golinveaux (SBN: 203056)
   Matthew A. Scherb (SBN: 237461)
6  WINSTON & STRAWN LLP
   101 California Street
7  San Francisco, CA 94111-5894
   Telephone:   415-591-1000
8  Facsimile:    415-591-1400
   Email: jgolinveaux@winston.com; mscherb@winston.com
9
   Attorneys for Defendant
10 VEOH NETWORKS, INC.

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14 IO GROUP, INC.                    Case No. C 06-3926 HRL

15          Plaintiff,               DECLARATION OF MATTHEW SCHERB
                                     IN SUPPORT OF DEFENDANT VEOH
16    vs.                            NETWORKS, INC.'S MOTION FOR
                                     SUMMARY JUDGMENT
17 VEOH NETWORKS, INC.
                                     Date:    September 4, 2007
18          Defendant.               Time:    10:00 a.m.
                                     Place:   Courtroom 2
19

20

21

22

23

24

25

26

27

28

DECLARATION OF MATTHEW SCHERB IN SUPPORT OF DEFENDANT VEOH NETWORKS, INC.'S MOTION
FOR SUMMARY JUDGMENT
Case No. C 06-3926 HRL

*Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894*

I, Matthew Scherb, declare under penalty of perjury that the following statements, made from personal knowledge, are true and correct:

1.      I am an attorney at law and duly licensed to practice law in the State of California.  I am an associate in the law firm of Winston & Strawn LLP, counsel to Defendant, Veoh Networks, Inc.

2.      The following documents, attached hereto as exhibits, support Defendant Veoh Networks, Inc.'s Motion for Summary Judgment.

A.      Exhibit A is a true and correct copy of excerpts of the deposition transcript from the May 21, 2007 deposition of Dmitry Shapiro taken in this case.

B.      Exhibit B is a true and correct copy of excerpts of the deposition transcript from the March 16, 2007 deposition of Ted Dunning taken in this case.

C.      Exhibit C  is a true and correct copy of excerpts of the deposition transcript from the May 21, 2007 (Day One) deposition of Joseph Papa.

D.      Exhibit D is a true and correct copy of excerpts of the deposition transcript from the May 22, 2007 (Day Two) deposition of Joseph Papa.

E.      Exhibit E  is a true and correct copy of Defendant Veoh Networks, Inc.'s Supplemental Responses to Interrogatory Nos. 6, 21 and 22.

F.      Exhibit F is a true and correct copy of Defendant Veoh Networks, Inc's Supplemental Response to Interrogatory No. 5.

G.      Exhibit G is a true and correct copy of excerpts of the deposition transcript form the May 24, 2007 deposition of Keith Ruoff taken in this case.

H.      Exhibit H is a true and correct copy of excerpts of Plaintiff's Response to Defendant's First Set of Interrogatories in this case.

I.      Exhibit I is a true and correct copy of excerpts of Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories in this case.

J.      Exhibit J is a true and correct copy of Plaintiff's Response to Defendant's

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Second Set of Request for Admissions in this case.

2        K.    Exhibit K is a true and correct copy of excerpts of Plaintiff's Response to

3    Defendant's First Set of Request for Admissions in this case.

4        L.    Exhibit L is a true and correct copy of excerpts of Plaintiff's Response to

5    Defendant's Third Set of Request for Admissions in this case.

6        M.    Exhibit M is a true and correct copy of Plaintiff's Supplemental Response to

7    Defendant's Second Set of Request for Admissions.

8    3.    After Veoh produced to Plaintiff in discovery storage media containing all video files

9    that had been terminated from the publicly accessible portion of the Veoh.com website prior to the

10    filing of Plaintiff's lawsuit on June 23, 2006, Plaintiff added three new works to those it had alleged

11    were available on Veoh. Plaintiff amended its discovery responses on June 15, 2007 to add these

12    new works and to drop one of the works it originally claimed was infringed, *Prowl 3*. *See* Exhibit I,

13    No. 1.

14    Executed this 30th day of July, 2007, in San Francisco, California

15

16

17    _____
       Matthew Scherb

18

19

20

21

22

23

24

25

26

27                                  3

28    DECLARATION OF MATTHEW SCHERB IN SUPPORT OF DEFENDANT VEOH NETWORKS, INC.'S MOTION
       FOR SUMMARY JUDGMENT
       Case No. C 06-3926 HRL

SF:176642.2

# EXHIBIT <u>A</u>

CONFIDENTIAL

Certified Copy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IO GROUP, INC., a California )

Corporation,                 )

                             )

            Plaintiff,       )

                             )

vs.                          ) Case No. C-06-3926(HRL)

                             )

VEOH NETWORKS, Inc., a       )

California Corporation,       )

                             )

            Defendant.       )

_____)

HIGHLY CONFIDENTIAL

DEPOSITION OF DMITRY SHAPIRO

SAN DIEGO, CALIFORNIA

MAY 21, 2007

REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101



Peterson Reporting
Truth and Technology, Transcribed.

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

530 B Street          800 649 6353 toll free
Suite 350             619 260 1069 tel
San Diego, CA         619 688 1733 fax
92101

bookadepo.com

1    and, you know, without a marketing department at the

2    time, you know, if anyone would have had a final

3    sign-off, it would have been me.

4        Q.    But is it your testimony that things were

5    relatively casual at the time and there was no formal

6    sign-off?

7        A.    That's correct.   Absolutely.

8        Q.    Did that change when you went with the

9    Rose Group?

10       A.    No.   I wouldn't say that from a formal

11   standpoint -- I mean, we are getting kind of more

12   formal now, but just now.   We've never been very

13   formal on those kinds of things.

14           So somebody drafts it, you know, people

15   throw in, you know, their own language for mostly

16   quotes, and then we release it.

17       Q.    Okay.   Let me give this exhibit to the

18   court reporter and ask her to mark it as Exhibit 4.

19   And this is a series of press releases.   And these

20   are new document production numbers that I did just

21   so they would be sequential.   Some of the documents

22   may have been produced to your attorneys before.

23           These particular documents have plaintiff's

24   Document No. 200917 through 200927.   Take your time

25   to look over -- let's start with the first page

                                                          10

1    there, which is 200917.  Take a few minutes to look

2    through that and read it and then I am going to ask

3    you a few questions.  Let me know when you have

4    finished looking at it.

5            (Plaintiff's Exhibit No. 4 was marked.)

6            THE WITNESS:  Got it.

7    BY MR. SPERLEIN:

8        Q.  Okay.  This press release is dated

9    August 10th, 2005.  Is that the date that this would

10    have been issued to the press?

11        A.  Yes.  I suspect either this date or a date

12    prior, but yeah.

13        Q.  And is there any reason to believe that

14    this isn't actually the press release that was sent

15    from Veoh to the press?

16        A.  No reason to believe that.

17        Q.  Looking down at, I believe it is, paragraph

18    5, and it starts with "Veoh utilizes proprietary,"

19    et cetera, do you see that paragraph?

20        A.  Yes, I do.

21        Q.  And the second sentence of that paragraph.

22    I am going to read it out loud, and I ask that you

23    read along with me as I read it.  "Unlike rogue P to

24    P networks that utilize unmanaged bit torrent to

25    share mostly pirated video, Veoh is a community of

                    11

1    publishers and consumers where published content is

2    approved by editors and consumers are assured that

3    they get what they request."

4          Did I read that correctly?

5    A.    Yes, you did.

6    Q.    Was that a correct statement of Veoh's

7    policy at the time this press release was issued?

8    A.    No.

9    Q.    And how was it inconsistent with Veoh's

10   policy?

11   A.    "Where a published content as approved by

12   editors," is -- was not the case.

13   Q.    Can you tell me specifically how that

14   varied?  Was content not approved by editors, was it

15   approved by anyone else?

16   A.    No.  Content was not monitored at all.

17   Q.    Now, I am going to go on to the next page,

18   which is dated August 17th, 2005, at the top.  And

19   this is page -- Document Production Page 200918.

20   A.    Okay.

21   Q.    And without reviewing the entire --

22   actually, strike that.

23         Will you please take a few moments to look

24   through this press release?

25   A.    Yes.  I am just turning off my phone here

                                                      12

1     so we don't get bothered -- my apologies.  I'm sorry.

2     So read the whole release?

3          Q.    Do read through.

4          A.    Okay.  I am done.  Thank you.

5          Q.    Now, does the press release mention

6     anything about content being approved by editors?

7          A.    Not that I saw.

8          Q.    And now I would like you to turn your

9     attention to the following page, page 200919, which

10    is dated October 12th, 2005.  And if you could direct

11    your attention to the fifth paragraph in the first

12    sentence.  I am going to read the sentence once aloud

13    as you read along with me, please.

14               "Unlike rogue P to P networks used to share

15    mostly pirated video, Veoh is a community of

16    publishers and consumers where published content is

17    approved by editors and consumers are assured they

18    get what they request."

19               Did I read that correctly?

20         A.    Yes, you did.

21         Q.    And that's -- is that exactly the same

22    sentence as we saw on August the 10th?

23         A.    It looks like the exact same sentence, yes.

24         Q.    But did not appear in the August 17th press

25    release.

13

1          A.    Yes.   That seems correct.

2          Q.    And was this sentence an accurate statement

3     of Veoh's policy as of October 12th, 2005?

4          A.    No.

5          Q.    Do you have any idea why this statement

6     would be included in a press release when it wasn't

7     an accurate statement of Veoh's policies?

8          A.    I suspect for the lack of process in

9     reviewing and issuing press releases.

10         Q.    I can understand that as a reason why it

11    went out with a statement that wasn't accurate, but I

12    am curious as to how -- why the statement would be

13    put into the press release by anyone in the first

14    place if it was inaccurate.

15              Do you have an explanation for that?

16         A.    Why it would have been put into the general

17    first release, then into this release, you mean, or

18    why it was taken --

19         Q.    I am speaking about this one, this release

20    that we are looking at specifically right now, the

21    October 12th, but maybe we should go back and say --

22    yeah, even in the first one, August 10th press

23    release, why would someone have written this

24    particular sentence and put it into the press

25    release?

14

1          A.    It is perhaps my style of communicating

2    that led to this.   We have never had a -- you know,

3    the process that is being described here.   Initially,

4    when I was conceptualizing the company I envisioned

5    lots of different things, and those would be one of

6    the things that I would say as part of general spiel.

7    And clearly somebody that wrote this took it and put

8    it in there, and it looks like it came in and out of

9    this, you know, boilerplate that people are putting

10    together.

11          Q.    Did you write that sentence?

12          A.    I don't know if I wrote it, but I may have

13    spoken it at one time or another.

14          Q.    And then you kind of foreshadowed my next

15    question, which is:   If it was inaccurate on

16    August 10th and then taken out on August 17th and

17    then reinserted on October 12th, is there any

18    explanation as to why it would have been not in one

19    press release and then added back in for another

20    press releases.

21          A.    I have no idea.   Does it do that anywhere

22    else in there?

23          Q.    I am going to go through all these,

24    hopefully pretty quickly; and we will establish what

25    did occur.

15

1      A.    Okay.

2      Q.    On the next one, which is November 8th,

3    which is Document No. -- ends with 920.  Just before

4    the "about Veoh Networks," would you agree that that

5    same sentence appears there?

6      A.    Yes.  That's correct.

7      Q.    And then moving on to the next one, which

8    is November 30th, 2005, Page No. 921 in roughly the

9    same location, the same sentence appears there; is

10   that correct?

11     A.    Yes.  That is true.

12     Q.    January 9th, 2006, Page No. 922.  Again,

13   roughly the same location the same sentence appears;

14   is that correct?

15     A.    That's correct.

16     Q.    January 10th?

17     A.    Correct.

18     Q.    And January 18th, Document No. 924, towards

19   the end of the page, does the same sentence appear

20   there?

21     A.    Yes, it does.

22     Q.    And then on February 15th, 2006 -- this is

23   page 925, near the bottom of the page -- does the

24   same sentence appear there?

25     A.    Yes, it does.

                                                      **16**

1    Q.    September 21st, 2006.  I want you to read

2    the sentence to yourself and I will read it out loud.

3    It says "Unlike rogue peer to peer networks that

4    utilize unmanaged bit torrent to share mostly pirated

5    video, Veoh is a community of publishers and

6    consumers where published content is approved by

7    editors and consumers are assured they get what they

8    request."

9         Did I read that correctly?

10    A.    Yes, you did.

11    Q.    Now, that's slightly different from the

12    other versions that we read in the earlier press

13    releases; is that correct?

14    A.    Is it?

15    Q.    Well, let's compare it.  The first few

16    words it says "Unlike rogue P to P networks."  In an

17    earlier version it says "That are used to share

18    mostly pirated video."  Here it says "Utilized

19    unmanaged bit torrent to share mostly pirated

20    videos."

21    A.    I see.

22    Q.    So it has been edited at this point; is

23    that correct?

24    A.    Yes.

25    Q.    Does the new language reflect Veoh's policy

17

1    question?

2          MS. GOLINVEAUX:  You can answer subject to

3    the objections.

4          THE WITNESS:  Yes, I believe that, you

5    know, what was stated in these documents is what the

6    users agreed to.

7    BY MR. SPERLEIN:

8      Q.   Okay.  That is fine.  Thank you.

9          Does Veoh license material for distribution

10   through the Veoh system from individuals or

11   organizations other than the standard user of the

12   Veoh system?

13         MS. GOLINVEAUX:  I'm sorry.  Can you repeat

14   the question, please?  Read back the question,

15   please.

16         (Record read.)

17         THE WITNESS:  We have a content group, as

18   it is called, that does -- we call them deals -- with

19   content owners, some content owners.

20   BY MR. SPERLEIN:

21     Q.   How long has the content group been in

22   existence?  Is that something that has existed since

23   the beginning of Veoh or something that started

24   later?

25     A.   No.  It is something started later.  I am

                                                    33

1    of the content group?

2         A.   I am actually not sure if there were any

3    other deals.

4         Q.   After the content group was formed, have

5    they made deals to put content on the Veoh system?

6         A.   Yes, they have.

7         Q.   Can you give me a few examples of some of

8    the deals that you might consider to be one of the

9    more important ones?

10         A.   Sure.

11              CBS, Us Magazine, Road and Track Magazine,

12    Car and Driver Magazine, United Talent Agency.

13         Q.   Are all of those deals similar to the

14    Turner deal in that there's no payment by one side or

15    the other for the transaction?

16         A.   Yes, I believe so.

17         Q.   What content did CBS have a deal to --

18         A.   So it is not launched yet.  It is a new

19    deal for us, but it is shows from CBS.

20         Q.   Do you want this portion to be marked?

21              MS. GOLINVEAUX:  I was going to ask should

22    this -- would you like this portion to be designated

23    confidential?  Is this public knowledge?

24              THE WITNESS:  No.  It is public knowledge.

25    It has been announced.

1    of them playing nothing, one of them playing

2    propaganda.   I watched until the age of nine maybe an

3    hour worth of cartoons.

4           So when I moved to the States I grew up on

5    television and always kind of saw it and respected it

6    as being this incredible medium to be able to

7    communicate and influence and motivate people.

8    Right.

9           And as I was running Aronix, the previous

10   company that I founded, I realized that we were now

11   at a time where technology would allow us to create

12   practically, as I call it, infinite amount of

13   spectrum, channels for individuals to use, to be able

14   to broadcast their thoughts to the world very, quite

15   frankly, politically motivated behind the scenes.

16   But I saw it as, and still do see it as, the, you

17   know, democratized medium that allows the average man

18   to be able to communicate with the entire world.

19        Q.   You see Veoh in that regard?

20        A.   Yes.   I see democratization of the video.

21   YouTube is clearly similar in that regard.   There are

22   hundreds of sites that are allowing these kinds of

23   things now.   Veoh was one of the first ones.

24        Q.   And have you referred to Veoh as an

25   "Internet television network" before?

                                                      53

1          A.    Yes.

2          Q.    And what is your basis of that statement?

3    Why do you consider Veoh an "Internet television

4    network"?

5          A.    Well, that is just kind of what we call

6    this capability of being able to broadcast, you know,

7    your own video.   It is like having your own TV

8    station.   It is something that consumers understand.

9          Q.    When you were in the formative stages of

10   creating Veoh, did you consider issues of copyright

11   infringement?

12         A.    Sure.

13         Q.    It was something that was on your mind?

14         A.    Of course.

15         Q.    And understanding that Veoh has evolved

16   a lot from what you initially had envisioned, at

17   those early stages did you come up with a solution

18   for dealing with potential copyright issues?

19            MS. GOLINVEAUX:   Object to the form of the

20   question.

21            THE WITNESS:   Well, what I envisioned

22   was -- going perhaps to that e-mail that you showed

23   me -- was the press releases that talk about peer to

24   peer, the traditional peer to peer networks are --

25   these days are not centralized, and therefore they

                                                     54

1    cannot take content down.  And we wanted to build a

2    network that -- if inappropriate content got up, that

3    we could take it down.

4    BY MR. SPERLEIN:

5        Q.    So when you built Veoh, was Veoh built as a

6    closed system?

7            MS. GOLINVEAUX:  Object to the form of the

8    question.

9            THE WITNESS:  Well, if you could clarify

10   for me what "closed" means in your question?

11   BY MR. SPERLEIN:

12       Q.   I will also clarify the time frame.  Let's

13   talk about as of today.  You talked about an open

14   system which meant that -- which resulted in not

15   being able to control the video files that were on

16   that system used.

17           So my question to you is -- I will word it

18   differently.  Is Veoh an open system currently?

19           MS. GOLINVEAUX:  Object to the form of the

20   question.

21           THE WITNESS:  Well, I will answer what I

22   believe you mean.  Veoh allows anyone to create an

23   account and publish video.  And so is that -- was

24   that your question?  Does that make it open?

25   BY MR. SPERLEIN:

55

1           When Veoh first launched, did Veoh allow

2      adult or sexually explicit material at that time?

3           A.    Yes.

4           Q.    And did that remain the policy until

5      approximately June 21st, 2006?

6           A.    Yes, if that was the day that we took it

7      down.  I assume it was, but, yes.

8           Q.    So what I'm specifically asking is, was

9      there any time between the time that Veoh first

10     started operating and sometime after that where adult

11     was not allowed and then began to be permitted prior

12     to --

13          A.    No.  Not that I recall.

14          Q.    It was put in from the beginning until --

15          A.    Yes.  Exactly.

16          Q.    Did the sexually explicit video files that

17     appeared on Veoh prior to Veoh's change in policy

18     attract a certain audience base to veoh.com?

19               MS. GOLINVEAUX:  Object to the form of the

20     question.

21               THE WITNESS:  I don't know if it attracted

22     the base itself, but clearly they were viewed.

23     BY MR. SPERLEIN:

24          Q.    There were people interested in viewing

25     sexually explicit material on veoh.com?

                                                          63

1          MS. GOLINVEAUX:  2 says "Human editors,"

2     not human filters.

3          MR. SPERLEIN:  I'm sorry.

4     BY MR. SPERLEIN:

5          Q.    "Human editors to filter out."

6          A.    Look, at that time our default spiel -- you

7     know, painting a vision of a service was such.  So

8     whether I said this or she read it in a press release

9     or -- I don't recall.  But I could have said it, or

10    she could have gotten it from some other place.  But,

11    again, there was -- people believed at that time that

12    we were going towards this system of having human

13    editors.

14         Q.    Thank you.

15               Following up on that then, do you

16    acknowledge that you have made statements to the

17    press that that kind of -- that same basic time

18    frame?  And we are talking about -- let's see.  That

19    was August 2005.  Let's say up to the launch of

20    veoh.com web site, February 2006, is that

21    approximately right for that time frame?

22         A.    February of 2006 is the launch that -- yes.

23    I believe that is true.  February or March, sometime

24    in there.

25         Q.    Okay.  So do you acknowledge that prior to

                                                          76

1    that I don't have any follow-up questions for you.

2            I know that this timing could have maybe

3    allowed us a little more time with other folks,

4    but -- so give us a few minutes, maybe even a little

5    bit more than usual.  I want to make sure, because

6    this will be the last opportunity I have to ask you

7    questions, and I want to see if I have anything else

8    for you, any clarifications.  And then we will wrap

9    up.

10            MS. GOLINVEAUX:  Okay.

11            (Recess.)

12   BY MR. SPERLEIN:

13       Q.   Mr. Shapiro, earlier you talked about the

14   way that you envisioned a process for reviewing video

15   files before publication on Veoh network.

16            My question to you now is why did you

17   eventually not come to implement such a procedure?

18       A.   Well, again, as we started kind of looking

19   at the system and how it was going to scale primarily

20   was the concern -- there's no way that we felt that

21   we could build a system that could do that.

22       Q.   And what were the -- where were the

23   limitations on doing the system?

24       A.   Well, the ability for our editors to

25   correctly identify copyrighted content and the

84

1    ability to deal with volume.

2         Q.   And focusing in just on the correctly

3    identifying copyrighted content, did you consider

4    that you might be able to at least reduce some

5    copyright infringement, if not catch all the

6    copyright infringement?

7         A.   I don't know if we specifically thought of

8    it that way.  You know, we are engineers, if you

9    deduced a bit.  We try to build systems that work --

10   program adequately.  And so we just felt that we

11   couldn't do it.

12        Q.   Okay.  And going back to the idea that you

13   had a vision for the company that you expressed

14   publicly that in the end may not have come to

15   fruition, specifically around reviewing for copyright

16   infringement, when you approached venture capitalists

17   and sought funding for veoh.com, did you present that

18   same vision to the venture capitalists?

19             MS. GOLINVEAUX:  Object to the form.

20             THE WITNESS:  So in the Series A in the

21   first one, you know, before we launched, I believe

22   that I did.  I presented the entire vision.  I

23   believe by the Series B I didn't.  But I can't recall

24   when.

25   BY MR. SPERLEIN:

85

1    I, NICOLE R. HARNISH, Certified Shorthand Reporter

2    for the State of California, do hereby certify:

3

4    That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the

6    whole truth and nothing but the truth in the

7    foregoing cause; that the deposition was taken by me

8    in machine shorthand and later transcribed into

9    typewriting, under my direction, and that the

10   foregoing contains a true record of the testimony of

11   the witness.

12

13   Dated: This _8th_ day of _June    2007_

14   at San Diego, California.

15

16

17

18                          _NRH._

19                          NICOLE R. HARNISH

20                          C.S.R. NO. 13101

21

22

23

24

25

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5    _____

6    IO GROUP, INC., a California       )
     corporation,                       )
7                                       )
                          Plaintiff,    )
8          vs.                          )    Case No. C-06-03926 (HRL)
                                        )
9    VEOH NETWORKS, INC., a             )
     California Corporation,            )
10                                      )
                          Defendants.   )         **CONFIDENTIAL**
11   _____   )

12

13

14                  DEPOSITION OF TED DUNNING

15                    SAN DIEGO, CALIFORNIA

16                       MARCH 16, 2007

17

18

19

20

21   REPORTED BY RITA BURGESS, CSR NO. 8374

22

**Peterson** Reporting
Truth and Technology, Transcribed.

530 B Street          800 649 6353 toll free
Suite 350             619 260 1069 tel
San Diego, CA         619 688 1733 fax
92101
                      bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1    which rents out space and access to networking.

2         Q.    And in that situation, does -- they just provide

3    the computer space, but does Veoh control how that -- how

4    those computer systems are programmed?

5              MS. GOLINVEAUX:  Object to the form of the

6    question.

7              THE WITNESS:  A co-location facility provides

8    space, and whoever rents the space controls whatever

9    computers that they place in the space.

10   BY MR. SPERLEIN:

11        Q.    Okay.  I want to go through now what happens when

12   someone wants to publish a video on the Veoh system.

13             What is the first step that if I were an

14   individual and I had a video file that I wanted to publish,

15   what would I have to do to publish it through the Veoh

16   system?

17        A.    There are two primary mechanisms.  One is you can

18   upload smaller videos using a browser.  Larger videos require

19   the use of software that we have written in order to manage

20   the upload in the event of network errors and similar

21   corruptions.

22        Q.    Starting with the first type that you mentioned,

23   smaller videos, is there a size limitation on that?

24        A.    I don't know if there are precise size

25   limitations on that.

1    it called user name?

2         A.    User name would not be the person's name.

3         Q.    That's what I thought you were trying to get the

4    point across when -- so let me ask again.  Was there a place

5    for them to enter a user name?

6         A.    Yes.

7         Q.    Was there a separate place for them to identify

8    their given name?

9         A.    They had the opportunity to type in a given name.

10        Q.    If you know, if that information was -- if

11   nothing was entered in that field, could their registration

12   be completed?

13        A.    I believe so.

14        Q.    Was there a place for them to enter an e-mail

15   address?

16        A.    Yes.

17        Q.    And did Veoh verify that e-mail address by

18   sending a confirming e-mail prior to allowing the video to

19   upload any video files to the Veoh system?

20        A.    At least at one time we did, but we discontinued

21   that.

22        Q.    Do you know why you discontinued it?

23        A.    It was an error-prone process.

24        Q.    And when you say error-prone, does that mean that

25   you -- were there concerns that you would lose a certain

1    file sufficiently where we could not find it.

2         Q.    Does the Veoh system search only in a particular

3    folder that's set up by the Veoh client or does it search the

4    entire hard drive of the user to look for the file?

5         A.    I don't know the details of how it works, the

6    deletion of it.

7         Q.    Okay.  And what is the -- do you know what the

8    purpose of that tool, why it was set up so that it could

9    operate that way?

10        A.    The intent, I believe, was that we wanted to make

11   sure that we could comply with copyright owner's desires in

12   terms of deleting files that were stolen by somebody else.

13   If we were notified, then we would be able to as effectively

14   as we could conceivably do, or plausibly do or feasibly do,

15   to remove the file.

16        Q.    Okay.  And I have -- from reviewing some of the

17   statements on the web site, I also got the impression that it

18   served as a function for making sure that user had disk space

19   for fresher, newer files that were coming in, that there was

20   a feature whereby unless the user overwrote it, Veoh would

21   actually come in and delete files based purely on the amount

22   of space that was available.  Do you know about that aspect

23   of the system or not?

24        A.    I know some.  It doesn't sound accurate.

25        Q.    Is there -- can you give me a more accurate

1    hint.

2         Q.    In those situations, will Veoh then go and take a

3    look at the video file to determine if this statement is

4    accurate, that it does appear on its face to infringe a

5    copyright?

6         A.    It depends a little bit, but only a little bit.

7    If they refer to a video in a form specific enough for us to

8    find it at all, then we absolutely will look at it.  We got a

9    notice the other day where they had typed a video identifier

10   and not provided a title.  It was almost unfindable.  I did

11   quite a few database searches and looked at all variants of

12   how they might have mistyped it, and I found one that

13   appeared to be the one they were talking about.  So

14   neglecting that one corner case, which is relatively rare, if

15   they identify a video that we can understandably go to look

16   at it, we do -- well, sorry.  Not in all cases.  If it's a

17   formal DMCA notice from somebody who's large, we have heard

18   of them, and they seem to understand how to give us reliable

19   links, we will take down almost no questions, anything they

20   tell us.  So in those cases, I do those take downs.  I

21   wouldn't even look at the material, except after I have done

22   the take down.  I will do a random sampling to verify the

23   technical means I use actually took down with high likelihood

24   all the videos that were notified, or we were notified about.

25              If it's an informal notice, there is a much

1    higher chance that it's not an identifiable video.  But if it

2    comes through the flagging system, then there is included a

3    link to the thing, which is essentially guaranteed to be

4    resolved to a video owner.  And there I will look, if I get

5    that e-mail or if somebody else forwards it to me, I will

6    follow that link and look at it, and see what -- what I

7    think.  It's sometimes a difficult judgement.  Sometimes it's

8    an easy judgement.  There have been cases where people were

9    feuding with each other so they said, everything they are

10   doing is copyright infringement.  They sent it back.  Those

11   are child, you know, school yard taunts more than anything.

12          In other cases, it's very very clear that it's,

13   say, a movie or something.  There's a copyright notice on the

14   front.  The user's name does not match or there's an apparent

15   effort to obscure what that is, and there's an immediate take

16   down in that case.

17          Q.   What other types of things would help you

18   identify something that was clearly a case of copyright

19   infringement?  Let me try to recap the things that you

20   mentioned in your last answer.  You said something about it

21   being a movie.  By that, do you mean a -- you mean, a long

22   play, a Hollywood type movie, not -- as opposed to an amateur

23   production.  Is that what you intended when you said movie?

24          A.   Yes.  Movie is, as you pointed out, ambiguous.

25   And I was referring to the extreme case where it's an hour

1    taunting back and forth, what do you do in those cases?

2            MS. GOLINVEAUX:  I object to this line of

3    questioning to the extent it calls for Dr. Dunning to make a

4    determination as to whether certain content is or is not

5    infringing, because he's not an attorney that would call for

6    it.

7            MR. SPERLEIN:  I'm not asking him for whether

8    those statements are accurate or not.  I'm just asking what

9    you go -- the process that you go through, and you said that

10   this is something that you do.  So I want to ask you some

11   questions about that.

12   BY MR. SPERLEIN:

13       Q.    So my question to you is, again, in a case where

14   it doesn't seem obvious to you, you make a call whether to

15   take that video down or to leave it up; is that correct, or

16   do you error on the side of taking it down?

17       A.    Well, you are correct that ultimately there has

18   to be some decision because there are some cases which aren't

19   clearly one way or clearly the other, which means they're on

20   middle ground as well.  And I try, and we try, to error

21   strongly on the side of taking it down if there's any

22   plausible reason that it's material that would be

23   copyrighted.  We have an objection process where an owner can

24   say, you took this down inaccurately, so that makes us much

25   more willing to take down first, and let somebody else ask

1    questions later.

2         Q.    Thank you.  At this point in time, currently,

3    does Veoh do any review of video files some time between

4    their submission -- when they are submitted by the user,

5    publisher, and the time that it's published throughout the

6    Veoh system, does Veoh do any review to determine whether the

7    material might be infringing on someone's copyright or not?

8         A.    No.

9         Q.    If you -- if you chose to do that for one

10   particular video, would you have the ability to do that?

11             MS. GOLINVEAUX:  I object to the extent that it

12   calls for Dr. Dunning to make a legal conclusion as to what

13   is and is not infringing material.

14             THE WITNESS:  I can't answer that I could make a

15   conclusion about whether it's infringing material.

16   BY MR. SPERLEIN:

17        Q.    Earlier you said when something was brought to

18   your attention, you review it, and you decide whether it

19   should come down or not.  Understanding that the publisher

20   had an opportunity to make a counterclaim later on, is there

21   anything preventing you from doing that review prior to

22   publication on the Veoh system?

23             MS. GOLINVEAUX:  Same objection.

24             THE WITNESS:  And I did not say that I made a

25   determination of whether or not something was copyright

1    infringement.

2    BY MR. SPERLEIN:

3         Q.    You make a determination of whether it --

4         A.    Should be taken down.

5         Q.    Should be taken down or not.

6         A.    I think it would be completely infeasible to

7    review everything.

8         Q.    Has -- by you personally, is that what you mean?

9         A.    By any reasonable multiple me personally.

10        Q.    And by multiple of you, do you literally mean

11   people with your experience and knowledge or do you just mean

12   a number of -- any number of people, it would be impossible

13   to review materials before it was published?

14        A.    I mean any number of people that is feasible for

15   us to martial to the task.

16        Q.    Has Veoh ever done any sort of study as to --

17   strike that.

18             It's your testimony here today that Veoh doesn't

19   do any review on a regular basis of video files that are

20   submitted by users prior to the publication process; is that

21   correct?

22             MS. GOLINVEAUX:  Could you repeat the question,

23   please?

24             (The record was read).

25             THE WITNESS:  It's correct, but prior to

1    title and a description, and they can select tags.  That's

2    what we talked about before.  Is that -- the things that I

3    just covered, is that entirely of what the entering the meta

4    data is involved?

5        A.    I couldn't say that's all of it, but that's some

6    very important parts of it.

7        Q.    Okay.  And from there, they select the video file

8    from wherever it resides on their computer and they somehow

9    deliver it electronically to the Veoh system; is that

10   correct?

11       A.    That's correct.

12       Q.    And can you tell me from there what happens once

13   that file in the meta data that the user inputed is delivered

14   to Veoh, what happens there?

15       A.    Meta data has to be stored in the database, the

16   meta data must be indexed.  The technical particulars of the

17   video have to be examined.

18       Q.    Let me stop you right there.  What does that

19   mean, the technical particulars of the video have to be

20   examined?

21       A.    Which Kodak is used, which envelope format is

22   used.  How many seconds is it.  What the frame rate is.  What

23   the audio Kodak that are used are.  It's like 30 or 40

24   separate pieces of information that need to be extracted from

25   the file and verified for usability.

1          Q.    Is that done entirely by an electronic process

2    with no human input?

3          A.    Entirely, automatically.

4          Q.    And after that information is extracted, what is

5    the next step in the process?

6          A.    I don't remember if I said indexes of meta data,

7    that occurs contemporaneously with the extraction of

8    technical information about the video.  Then frames are

9    extracted for use as thumbnails.  One of those, the most

10   seemingly interesting is selected as the single thumbnail to

11   be represented for search results.  The Flash preview is

12   copied from the original video file.  These various pieces of

13   data are positioned on the correct servers, not just for

14   internal access, but for external access.

15         Q.    Let me stop you there for just a second.  I want

16   to clarify something.

17               With regard to both the meta data and the

18   original video file, is there a key entry point where they

19   come to Veoh and then get distributed to different places for

20   these processes, or does that happen instantaneously as the

21   user submits them?  And if you would like, I can give you an

22   example of what I mean.  You said that the meta data has to

23   go to the indexing system, which we know resides in four

24   servers here in San Diego.  Does that information go directly

25   there, or does it go to a kind of central processing area

1    times, I might go, oh yes --

2        Q.    That's okay.

3        A.    -- there's something there.

4        Q.    Let me focus a little bit on the actual --

5        A.    I'm sorry.  I knew there was.  Of course

6    transport to all of the cashing layers does not occur

7    until -- except on demand.  That is effectively part of the

8    publishing process, but it is done as late as possible,

9    meaning the first time something is accessed as opposed to

10   being caused by.  Some things are caused by the users

11   submitting the video.  Some things are caused by the first

12   access of the video.  Some things are caused by the tenth

13   access.  But the process of publishing is not complete just

14   because things stop happening after submission of the video

15   file itself.

16       Q.    Does Veoh or any employee of Veoh actually look

17   at any of the video material or the video content on a video

18   file during that publication process?

19       A.    No.  We do have automated systems that look in

20   the back log of number of videos that have been submitted,

21   the number have gone up, you know, available, so that we can

22   detect system failures, and somebody's phone will ring if

23   there's a failure and things are coming in but not

24   publishing.

25       Q.    And at that point would anyone physically look at

1    the video?

2         A.    They wouldn't look at the content, they would

3    look more along the lines of how many files are there, what

4    phase of the automated process did they get stuck in.

5    There's at least a dozen steps on two dozen different

6    computers or more where this -- this process is happening.

7    And so any one of those -- not any one of them, but many

8    steps can cause a hang up.

9         Q.    I understand.

10              Once the video publishing process is complete and

11   the video is now on the Veoh servers and available to other

12   users, does Veoh currently review any of those videos by

13   physically looking at the videos prior to some sort of flag

14   or ownercation from a user that it should be looked at?

15        A.    We look at prominent pieces of our site, the

16   front page, the featured videos, things like that to make

17   sure that we're not as an introductory experience, showing

18   something that's lude by very strict standards, you know.

19   Kind of the lowest common denominator community standards.

20   But that primarily involves a quick glance at a screen full

21   of thumbnails.

22        Q.    If you see something that is appearing on the

23   front page of Veoh as part of this automated process that you

24   think is not something that you want the public, or the first

25   glance of Veoh to be some nudity or you mentioned ludness, is

1    there some way that you can prevent those video files from

2    appearing on the front page without removing it entirely from

3    the Veoh system?

4         A.    We can rate them mature content.

5         Q.    And if something is -- if a video file is rated

6    as mature content, it will not appear on the front page of

7    the web site; is that correct?

8         A.    That's correct.

9         Q.    And there are other places on the web site where

10   it will not appear; is that correct?

11        A.    Presumably.  Web site is a very fluid thing

12   because the viewer filters and things like that influence the

13   way it looks.

14        Q.    Okay.  Earlier you mentioned that if a viewer

15   indicates they think of video is infringing, that you'll take

16   a look at it and possibly remove it.  If during this review

17   of what is currently appearing on the front page, you saw a

18   Twentieth Century Fox logo that you believe might be

19   infringing, would you move that to another part of the web

20   site or take it down completely?

21             MS. GOLINVEAUX:  Object; calls for speculation.

22             THE WITNESS:  Simply seeing a logo or parity of a

23   logo could mean many things.  I wouldn't comment on whether

24   or not that's infringing, but if I think that there's any

25   credible claim of infringement, I take it down.  I don't move

1    it.  I just disablize it.

2    BY MR. SPERLEIN:

3         Q.    Okay.  At any other time prior to -- we have been

4    talking about what your current process is.  At any other

5    time were videos systematically reviewed before they were

6    made available to other users on the Veoh system?

7         A.    I wouldn't call it a systematic review, but we

8    all watched the first 10 because we were so excited that

9    anything worked.  So I am sure we all watched all those.

10   Since then, no, there's no system to review.

11        Q.    Is there any review at all?

12        A.    There are the automated reviews that we talked

13   about.

14        Q.    As far as a person actually reviewing files for

15   some -- whatever reason it might be, prior to the files going

16   out to the general user base?

17        A.    No.

18             MS. GOLINVEAUX:  Object to the form of the

19   question.

20             THE WITNESS:  Oh, excuse me.

21             There is no systematic review by humans before

22   the general public can see videos.

23   BY MR. SPERLEIN:

24        Q.    Going back to the current system, is it correct

25   that Veoh no longer allows sexually explicit video files to

1          Q.     And has Veoh ever explored the possibility of

2     using that type of -- either of those systems for filtering

3     material?

4          A.     I have thought about trying to use water

5     markings, but I have never heard of any water marking system

6     that is in wide use, and therefore have discounted any

7     benefit that we might receive from that in terms of being

8     able to take down infringing materials.  I have no idea of

9     any system that more than a tiny, tiny fraction of video

10    material is water marked with.

11              It's conceivable that if we add a database of

12    infringing material, that we might be able to do a

13    fingerprinting type of approach, but we would do a contents

14    comparison.  And we currently do a limited form of that.  We

15    would receive a note about one piece of content, we take down

16    all identical files, regardless of whether or not we were

17    ever noticed about that.  And any time somebody tries to

18    publish that file again, it's immediately taken down.

19         Q.     And how does the -- how do you identify that?  Is

20    it something that's previously been taken down?

21         A.     We use what's known as a cryptographically secure

22    hash function, the particular one I think we use is the

23    secure hash algorithm number one.

24         Q.     I'm not going to ask you to describe that any

25    further.

1   I, RITA BURGESS, Certified Shorthand Reporter for the State

2   of California do hereby state under penalty of perjury:

3

4

5   That the witness in the foregoing deposition was by me first

6   duly sworn to testify to the truth, the whole truth and

7   nothing but the truth in the foregoing cause; that the

8   deposition was taken by me in machine shorthand and that the

9   foregoing contains a true record of the testimony of the

10  witness.

11

12

13  Dated this_____ 31 St _____day of__ March _____, 2007, at

14  San Diego, California.

15                                          _Rita Burgess_____
                                            RITA BURGESS
16                                          C.S.R. No. 8374

17

18

19

20

21

22

23

24

25

# EXHIBIT C

Copy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IO GROUP, INC., a California )
Corporation,                 )
                             )
            Plaintiff,       )
                             )
    vs.                      )Case No. C-06-3926(HRL)
                             )
Veoh NETWORKS, Inc., a       )
California Corporation,      )
                             )
            Defendant.       )
_____ )

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL

DEPOSITION OF JOSEPH PAPA

VOLUME I

SAN DIEGO, CALIFORNIA

MAY 21, 2007

REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101

**Peterson** Reporting
Truth and Technology, Transcribed.

530 B Street          800 649 6353 toll free
Suite 350             619 260 1069 tel
San Diego, CA         619 688 1733 fax
92101
                      bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1       A.    Okay.

2       Q.    Before the user is able to pick a video

3   file off of their system and upload it to Veoh, are

4   they required to register with Veoh?

5       A.    Yes.

6       Q.    And are they required to download the Veoh

7   client onto their system before they can upload a

8   video?

9       A.    No.

10       Q.    Are users only able to upload video files

11   to the Veoh system as opposed to any other type of

12   file?

13       A.    Only video.

14       Q.    Only video.

15            If a user attempted to upload a software

16   file, what would happen?

17       A.    It would be rejected.

18       Q.    Would they get a message that said it was

19   being rejected?

20       A.    Yes.

21       Q.    Do you know exactly what that message would

22   say -- or I shouldn't say "exactly."  Do you know

23   approximately what the message would say?

24       A.    Approximately it says "unknown codec."

25       Q.    So is the codec what the system would look

12

1              MS. GOLINVEAUX:  Object to the form.

2              THE WITNESS:  I don't know the answer to

3      that.

4      BY MR. SPERLEIN:

5          Q.    Going back to individual users that upload

6      content onto the Veoh system.  Does Veoh ask those

7      users if they have permission -- strike that.

8              Does Veoh ask users if they own the content

9      that they're uploading onto the Veoh system?

10             MS. GOLINVEAUX:  Objection to the form.

11             THE WITNESS:  "Ask"?  What do you mean by

12     "ask"?

13     BY MR. SPERLEIN:

14         Q.    During the upload process, are users

15     required to respond to any questions about the video

16     file that they are attempting to upload?

17             MS. GOLINVEAUX:  Object to the form.

18             THE WITNESS:  Users have to agree to our

19     terms of service prior to uploading.

20     BY MR. SPERLEIN:

21         Q.    Okay.  And earlier you said that users are

22     required to input a title for the video file before

23     they uploaded it; is that correct?

24         A.    That's correct.

25         Q.    And you also said earlier that users have

                                                          31

1    an opportunity to input a description, but you are

2    not sure if that is required or optional; is that

3    correct?

4        A.    That's correct.  I don't remember.

5        Q.    It is okay.

6              During that same process, does Veoh ask the

7    user to respond to any other questions?

8              MS. GOLINVEAUX:  Object to the form.

9              THE WITNESS:  There are currently three

10   questions which are asked.

11   BY MR. SPERLEIN:

12       Q.    What are those questions?

13       A.    Excuse me, four questions.

14             If the video contains pornographic content.

15   If it contains violence.  The last question is

16   reaffirming that they agree to our terms of service,

17   and I can picture the third check box, but I cannot

18   remember what it says.

19       Q.    Could it be nudity?

20       A.    It could be nudity, but I am speculating.

21       Q.    Okay.  Are there any other fields where a

22   user can input additional information about the video

23   file that they are attempting to upload?

24       A.    There's a tags field.

25       Q.    And what is the purpose of that field?

32

1        A.    It let's the publisher assign keywords to

2    the video.

3        Q.    And can users later use those keywords to

4    help them search for video files on the Veoh system?

5        A.    Correct.

6        Q.    Are there any other fields that users are

7    given the option of filling in information for?

8        A.    They can assign it to a series.

9        Q.    Any others?

10        A.    Not that I can recall.

11        Q.    Can users associate it with a channel --

12    strike that.

13              Can users associate it with a category?

14        A.    Yes.

15        Q.    Can you recall any other information that

16    users are allowed to fill in during the upload

17    process?

18        A.    No.

19        Q.    Is there a question -- let me start over.

20              Does the interface ask the user at that

21    time if they have permission to upload the video

22    file?

23        A.    They have to reafirm they agree to the

24    terms of service.

25        Q.    Other than that, are users specifically

33

1        Q.    Does Veoh review user submitted video files

2    during the upload process?

3              MS. GOLINVEAUX:  Object to the form.

4              THE WITNESS:  Can you clarify "review"?

5    BY MR. SPERLEIN:

6        Q.    Does an employee of Veoh actually look at

7    each video file during the upload process?

8        A.    No.

9        Q.    Does a Veoh employee actually look at the

10   video files once the upload process is complete?

11             MS. GOLINVEAUX:  Object to the form.

12             THE WITNESS:  Can you repeat it?

13   BY MR. SPERLEIN:

14       Q.    Let me clarify.

15             Does Veoh actually look at every video file

16   that is uploaded onto the system during the upload

17   process?

18             MS. GOLINVEAUX:  Object to the form.

19             THE WITNESS:  No.

20   BY MR. SPERLEIN:

21       Q.    After the upload process is complete, does

22   Veoh look at every video file?

23             MS. GOLINVEAUX:  Object to the form.

24             THE WITNESS:  No.

25   BY MR. SPERLEIN:

35

1    taken to the -- what we call the video details page

2    which is where the video was presented.  And then I

3    would select the edit function, and then from that

4    page I would cancel the video.

5        Q.   And to clarify the time frame -- let's

6    narrow down to the first two weeks of June 2006, June

7    1st to June 15th.  If you saw a sexually explicit

8    video file that contained sexually explicit material

9    at that time, would you select the edit page and

10   delete the video file?

11       A.   I don't recall when we stopped permitting

12   sexually explicit content.  If those two weeks were

13   prior to that, then I would confirm -- rather than

14   cancal the video, I would confirm that the rating was

15   adult.

16       Q.   And if the rating was adult, would you take

17   no further action?

18       A.   I would change the rating.

19       Q.   If the rating were correctly indicated as

20   adult?

21       A.   So when viewing the most recent page I

22   would do that with the content filter turned on.  So

23   my expectation would be that there would be no adult.

24   So the presence of adult implies that it was

25   improperly rated.

                                                    53

1    kind of chronologically go through any of those

2    changes if you can help me with that.

3            So starting with prior to veoh.com going

4    live, are you aware of any plans for Veoh to have a

5    review process in its formative stages?

6        A.   Yes.

7        Q.   And what was the date that Veoh went live

8    again?

9        A.   Veoh the company was launched in July of

10   '05.  Veoh.com, the site, was launched, I want to

11   say, February '06.

12       Q.   Okay.  So that is the time frame I am

13   talking about, between July '5 and February '6, did

14   Veoh undertake to develop a policy with regard to

15   viewing during that time frame?

16           MS. GOLINVEAUX:  With regard to?

17           MR. SPERLEIN:  The editing -- I'm sorry --

18   reviewing video files.

19   BY MR. SPERLEIN:

20       Q.   Let me prephrase the question.  During the

21   time of the formation of Veoh and the time that

22   Veoh.com went live, did Veoh undertake a policy --

23   did Veoh develop or talk about a policy for reviewing

24   video files?

25           MS. GOLINVEAUX:  Object to the form.

                                                        69

1      Q.   During your -- at any time when you were

2   reviewing video files through the most recent video

3   page, did you ever cancel a video file for any reason

4   other than the video file being violent?

5      A.   I canceled beastiality and child

6   pornography.

7      Q.   And when you did that, were those files not

8   marked as adult by the user that uploaded the file?

9      A.   Correct.

10     Q.   Did you ever cancel a video file because

11  you thought it was an instance of copyright

12  infringement?

13     A.   Have I personally ever deleted a file?

14     Q.   Yes.

15     A.   Yes.

16     Q.   Can you give me an example of what files

17  you have deleted?

18     A.   What time frame are we speaking of?

19     Q.   This is anytime?

20     A.   Anytime.  I deleted a copy of 300 that was

21  available on the site -- or, excuse me, I canceled a

22  copy of 300 that was available on the site.

23     Q.   And why did you cancel that?

24     A.   I was in the process of testing some new

25  functionalty, and I encountered it.  I happened to

96

1     know that it launched in the theaters that weekend,

2     and I felt that it was blatantly copyrighted, and it

3     was my obligation to cancel it under our DMCA policy.

4          Q.   Did you ever cancel any other video files

5     for being suspected of infringing copyrights?

6          A.   I have personally canceled perhaps two

7     dozen.

8          Q.   Were all of those video files movies that

9     were currently in the theaters?

10         A.   Not all of them, no.

11         Q.   Were any of them for television shows?

12         A.   Yes.

13         Q.   What kind of television shows did you

14    delete from the system -- or cancel from the system?

15         A.   An episode of 24.

16         Q.   When you canceled the video file that was

17    an episode of 24, did you cancel that entirely on

18    review of the actual content on the video file; or

19    was there some external factor that led you to

20    believe there was copyright infringement?

21         A.   It was the content of the video file.

22         Q.   Did you contact the user who uploaded the

23    video file?

24         A.   Users are automatically contacted when we

25    do a DMCA take down, which these -- so there's

                                                                97

1    canceled and then there's canceled for copyright as a

2    different function of the editor page.

3         Canceled for copyright triggers are

4    automatic DMCA lodging.  So I don't know if the user

5    was terminated or not.  If the user was a first time

6    offender, they get a warning.  If the user was a

7    second time offender, they get terminated.

8         Q.   Were you instructed by anyone else at Veoh

9    to cancel video files that were blatant copyright

10   infringement?

11        A.   All members of Veoh are expected to comply

12   with our DMCA policy.

13        Q.   And does your DMCA policy include a

14   provision that Veoh employees will cancel video files

15   that are obvious cases of copyright infringement?

16        MS. GOLINVEAUX:  Object to the form of the

17   question.

18        THE WITNESS:  I can't speak for other

19   employees.  As I have indicated for myself

20   personally, there's been a couple dozen times that --

21   when I've felt that something was obviously

22   copyrighted.

23   BY MR. SPERLEIN:

24        Q.   My question is:  Did Veoh give you a

25   directive that said you should cancel copyright -- or

                                                       98

1       other video files?  I am talking specifically about

2       the advertisements now.

3                   MR. SPERLEIN:  Right.  Video files that may

4       also be advertising.

5                   MS. GOLINVEAUX:  Okay.  That is a stretch.

6       I would say that this is not covered by the 30B6 and

7       would not count as testimony on behalf of Veoh

8       Networks and is Mr. Papa's own testimony at this

9       point.

10                  MR. SPERLEIN:  Noted.

11      BY MR. SPERLEIN:

12          Q.    Do you remember the question?

13          A.    Repeat.

14          Q.    What I am asking about is are there video

15      files that act also as commercials on the Veoh

16      network?

17          A.    The extent of advertising on Veoh is banner

18      ads served by value click and Google AdWords served

19      by Google.  We don't have any video advertising.

20          Q.    Do you know if -- strike that.

21                  Can you tell me what it means to move a

22      video up or move a video down with regard to if a

23      Veoh employee is in the video editor page?  Is there

24      a function move video up or move video down?

25          A.    I don't believe there is an up or down on

                                                          118

1    process?

2         A.    Yes.

3         Q.    Are all video files that are submitted to

4    Veoh transcoded into Flash format?

5         A.    No.

6         Q.    In what circumstances would a video file

7    not be transcoded into Flash format?

8         A.    If the format of the video file is not

9    compatible.

10        Q.    And in that case it would be -- it would be

11   marked as noncompatible and possibly maintained for

12   up to 90 days?

13        A.    Correct.

14        Q.    If a video file is in a compatible format,

15   is that video file then transformed into Flash

16   format?

17        A.    Yes.

18        Q.    Are there any other exceptions to what

19   would be -- what video files would be transcoded into

20   Flash format?

21        A.    All valid videos are encoded into Flash

22   format.

23        Q.    All what kind of videos?

24        A.    Valid videos.

25        Q.    Is the entire video file transcoded into

124

1       Flash format?

2           A.    Currently, yes.

3           Q.    Was there a different policy in the past

4       where the entire video file was not transcoded into

5       Flash format?

6           A.    Yes.

7           Q.    Why are video files transcoded into Flash

8       format after they are submitted to Veoh?

9           A.    Adobe's Flash player has something like

10      98 percent penetration in the browser market, so a

11      video formatted into Flash can be played by just

12      about anybody on the Web.

13          Q.    When a viewer views a video file through

14      the web-based application at veoh.com, is the video

15      file the person is viewing in Flash format?

16          A.    Is the video file in Flash format?  Yes.

17          Q.    Does Veoh make more than one flash -- does

18      Veoh make more than one Flash formatted file for

19      playing through the Veoh system for each video file?

20          A.    Under some circumstances, yes.

21          Q.    Are some video files transcoded into a

22      higher and a lower resolution version?

23          A.    Some files are, yes.

24          Q.    Is it ever anymore than two versions?

25          A.    Only two Flash versions.

                                                          125

1    I, NICOLE R. HARNISH, Certified Shorthand Reporter

2    for the State of California, do hereby certify:

3

4    That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the

6    whole truth and nothing but the truth in the

7    foregoing cause; that the deposition was taken by me

8    in machine shorthand and later transcribed into

9    typewriting, under my direction, and that the

10   foregoing contains a true record of the testimony of

11   the witness.

12

13   Dated:  This 8th day of June 2007

14   at San Diego, California.

15

16

17

18                         _NRH_.

19                         NICOLE R. HARNISH

20                         C.S.R. NO. 13101

21

22

23

24

25

# EXHIBIT <u>D</u>

Copy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IO GROUP, INC., a California Corporation, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. C-06-3926 (HRL) |
| | ) |
| VEOH NETWORKS, Inc., a California Corporation, | ) |
| | ) **CONFIDENTIAL** |
| | ) |
| Defendant. | ) |
| | ) |

HIGHLY  CONFIDENTIAL

DEPOSITION OF JOSPEH PAPA

VOLUME II

SAN DIEGO, CALIFORNIA

MAY 22, 2007

REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101



**Peterson** Reporting
Truth and Technology, Transcribed.

530 B Street      800 649 6353 toll free
Suite 350         619 260 1069 tel
San Diego, CA     619 688 1733 fax
92101

bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1            THE WITNESS:  At what time?

2    BY MR. SPERLEIN:

3        Q.   After the user uploads a new video file

4    onto the Veoh system.

5        A.   After a user uploads a new video, we verify

6    that the codec is one that we support.

7        Q.   And after that is a Flash file generated?

8            MS. GOLINVEAUX:  Object to the form.

9            THE WITNESS:  A Flash file is generated

10   after we confirm the version is supported.

11   BY MR. SPERLEIN:

12       Q.   And is that Flash file created on a

13   computer or a computer that is owned and operated by

14   Veoh?

15       A.   Yes.

16       Q.   At around that same time when the Flash

17   file is being generated, are there also screen

18   captures generated?

19           MS. GOLINVEAUX:  Object to the form.

20           THE WITNESS:  Yes.

21   BY MR. SPERLEIN:

22       Q.   Are screen captures generated for every

23   video file?

24       A.   Yes.

25       Q.   Has it always been the case that screen

155

1    BY MR. SPERLEIN:

2        Q.   Well, actually, that is why you are here

3    today, to speak for all of Veoh, unfortunately.

4             MS. GOLINVEAUX:  Would you repeat the

5    question, please?

6             (Record read.)

7             THE WITNESS:  I understood that the value

8    of that was significantly diminished with the advent

9    of previews.

10   BY MR. SPERLEIN:

11       Q.   Do you know why Veoh continued to generate

12   screen captures after the preview feature was

13   available?

14       A.   It is not common practice to remove

15   features.

16       Q.   So the fact that the screen capture feature

17   remained on the system may be somewhat of a legacy

18   type of situation?

19       A.   That is a fair characterization.

20       Q.   Can you tell me what the -- just a minute.

21            What format, file format are the screen

22   captures in?

23       A.   JPEG.

24       Q.   And what is the pixel resolution?

25       A.   There is two resolutions, 16 of them are

                                                      159

1    the same resolution as the incoming video.  16 of

2    them are reduced resolution, approximately 90 pixels

3    by 60 pixels.  I don't recall the exact dimensions of

4    the small range.

5        Q.   Is there a reason for having one set of 16

6    that is at a reduced resolution?

7        A.   Prior to the launch of veoh.com, the visual

8    design on the videos pages dictated two sizes.

9        Q.   Was there a reason why two sizes were

10   dictated?

11       A.   The visual designers preferred a layout

12   that required two sizes.

13       Q.   After the launch of veoh.com, was there any

14   longer a reason for having two different sets with

15   different resolution sizes?

16       A.   No.

17       Q.   When a user is accessing veoh.com and

18   they're at a video details page, are they required to

19   click a button to show the screen captures?

20       A.   Yes.

21       Q.   And when they click that button, do they

22   see all 32 screen captures?

23       A.   No.

24       Q.   Do they just see 16 screen captures?

25       A.   Yes.

160

1      Q.   And the screen captures that they see, are

2    they the screen captures that are set in the original

3    pixel resolution?

4      A.   No.

5      Q.   Are the screen captures that they see in

6    the reduced pixel resolution?

7      A.   Yes.

8      Q.   Are the screen captures that are in the

9    original pixel resolution available for an end user

10   to view at all?

11     A.   No.

12     Q.   Where do they reside?

13     A.   On Veoh storage system.

14     Q.   So to be clear, there are 16 screen

15   captures that are generated that reside on the Veoh

16   system that users cannot view at all; is that

17   correct?

18     A.   That is accurate.

19     Q.   Are any of the screen captures made

20   available to users in a larger size on the Veoh Web

21   site anywhere?

22          MS. GOLINVEAUX:  Object to the form.

23          THE WITNESS:  No.

24   BY MR. SPERLEIN:

25     Q.   If an end user points his cursor over top

161

1    other high resolution images could be sent to the

2    community editors that we had talked about for

3    reviewing video files?

4        A.    No.

5        Q.    That wasn't one of the reasons that Veoh

6    decided to generate 16 high resolution images?

7        A.    No.

8        Q.    Can you tell me why Veoh generated 15 high

9    resolution images that viewers could not view?

10        A.    We automatically select the image that

11    appears on the video details page.  And by generating

12    16 we had a larger sample set of the selection.

13        Q.    So 16 images were generated by an automated

14    system.  One of those images was selected to

15    represent the video file on the video details page;

16    is that accurate?

17        A.    That is accurate.

18        Q.    I want to go back for a second to the idea

19    of LimeLight and see if I can get a better

20    understanding.

21            When an end user is using the veoh.com Web

22    site and accesses a page with a video file, does the

23    Veoh interface go through a process that is roughly

24    as I am about to describe?  Does the system first ask

25    LimeLight to display or play the video file, and if

166

1          MS. GOLINVEAUX:  Object to the form of the

2     question.

3          THE WITNESS:  If any employee encounters

4     blatantly copyrighted material, they can take it down

5     in compliance with our DMCA policy.

6     BY MR. SPERLEIN:

7          Q.   I have handed you Exhibit 14 -- 006417 it

8     is marked "highly confidential.  Attorneys eyes

9     only," but by stipulation of counsel it's been

10    reduced designation to confidential.  Will you take a

11    few minutes to look over the document.

12          (Plaintiff's Exhibit No. 14 was marked.)

13          THE WITNESS:  Yes.  Okay.

14    BY MR. SPERLEIN:

15         Q.   And is this a section of wiki?

16         A.   Yes.

17         Q.   And I was told if I say "the wiki," I will

18    sound like George Bush saying "the Internets."

19    That's why I was asking yesterday.

20          Under "copyright violations," do you see

21    that section?

22         A.   Yes.

23         Q.   It says "Veoh always responds immediately

24    to DMCA compliant takedown notices.  These will

25    generally come from Dmitry or Francis.  In addition,

                                                      233

1    Veoh is obligated to respond to blatant copyright

2    violation.  In other words, any copyright violations

3    that are 'flagged' in the Veoh system should be taken

4    down if it is a clear violation.  In general usage of

5    the site, one encounters blatantly copyrighted

6    material, it too should be taken down."

7           Did I read that accurately?

8       A.   Yes.

9       Q.   And if we go looking back up towards the

10   top of the page, is there header typed information

11   that indicates that this was put on wiki by you?

12      A.   Yes.

13      Q.   On 6/28/2006; is that correct?

14      A.   That's correct.

15      Q.   And was this an accurate statement of Veoh

16   policies at the time?

17      A.   Yes.

18      Q.   And when you wrote the phrase "blatantly

19   copyrighted material," did you have something in mind

20   when you wrote that?  Can you describe what that

21   means to me?

22      A.   To me blatantly copyrighted material -- or

23   determining if something is blatantly copyrighted

24   depends on a variety of factors, duration being one

25   of those factors.  If I have specific knowledge that

234

1    I, NICOLE R. HARNISH, Certified Shorthand Reporter

2    for the State of California, do hereby certify:

3

4    That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the

6    whole truth and nothing but the truth in the

7    foregoing cause; that the deposition was taken by me

8    in machine shorthand and later transcribed into

9    typewriting, under my direction, and that the

10   foregoing contains a true record of the testimony of

11   the witness.

12

13   Dated:  This 6th day of ___June_____

14   at San Diego, California.

15

16

17

18                    _____NRH._____

19                    NICOLE R. HARNISH

20                    C.S.R. NO. 13101

21

22

23

24

25

# EXHIBIT E

ORIGINAL

1  Michael S. Elkin  (admitted *pro hac vice*)
   WINSTON & STRAWN LLP
2  200 Park Avenue
   New York, NY  10166-4193
3  Telephone:    212-294-6700
   Facsimile:    212-294-4700
4  Email: melkin@winston.com

5  Jennifer A. Golinveaux (SBN: 203056)
   WINSTON & STRAWN LLP
6  101 California Street, Suite 3900
   San Francisco, CA  94111
7  Telephone:    415-591-1000
   Facsimile:    415-591-1400
8  Email:  jgolinveaux@winston.com

9  Attorneys for Defendant
   VEOH NETWORKS, INC.

10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14  IO GROUP, INC., a California corporation,      Case No. C-06-3926 HRL

15                      Plaintiff,               DEFENDANT VEOH NETWORKS, INC.'S
                                                 SUPPLEMENTAL RESPONSES TO
16          vs.                                  INTERROGATORY NOS. 6, 21, AND 22

17  VEOH NETWORKS, INC., a California
    corporation,

18                      Defendant.

19

20          Defendant Veoh Networks, Inc.  ("Veoh") hereby submits pursuant to Federal Rules of Civil

21  Procedure 26 and 33 and Local Rule 26 of this Court the following supplemental responses to

22  Plaintiff's Interrogatory Nos. 6, 21, and 22.

23

24

25

26

27

28

*(left margin)* Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**GENERAL OBJECTIONS**

Veoh expressly incorporates the following General Objections as if set forth fully in response to each of the following individual interrogatories.

1.    Veoh objects to the definition of "VEOH" as overly broad to the extent it seeks information from other entities that is outside Veoh's possession, custody or control.

2.    Veoh objects to each interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, the work product privilege and/or any other applicable privilege. Such information will not be disclosed. Any inadvertent disclosure of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statute or case law.

3.    Veoh objects to each interrogatory and to Plaintiff's Instructions to the extent that they purport to impose any requirement or discovery obligation on Veoh other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.    Veoh objects to each interrogatory to the extent that it purports to require Veoh to inquire of Veoh's employees other than those employees that would reasonably be expected to have responsive information. Veoh's responses shall be based upon (1) a reasonable search, given the time allocated to Veoh to respond to the interrogatories, of files that could reasonably be expected to contain responsive information, and (2) inquiries of Veoh's employees and/or representatives who could reasonably be expected to possess responsive information.

5.    Veoh objects that the defined terms "USER MATERIAL" and "VEOH SERVICE" render the requests vague, ambiguous and compound, and seek information outside Veoh's possession, custody, or control.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NUMBER 6:**

Describe in detail how USER MATERIALS are distributed through the VEOH SERVICE, including without limitation, if the USER MATERIALS are transcoded or copied during the process.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  **ORIGINAL RESPONSE TO INTERROGATORY NUMBER 6:**

2       Veoh objects to this interrogatory as overbroad, unduly burdensome, compound, and as

3  vague and ambiguous.

4  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NUMBER 6:**

5       In a letter dated June 7, 2007, Plaintiff's counsel agreed to narrow Interrogatory No. 6 to the

6  following: "Describe how Veoh sets the frame rate during the transcoding process." As narrowed

7  and subject to and without waiving the foregoing objections and General Objections, Veoh responds

8  as follows: Veoh utilizes a widely used third party software program provided by On2, Inc. for

9  encoding user provided content into the Flash format. Veoh has selected default frame rates which

10  are communicated to On2, Inc.'s Flix Engine software for use during the encoding process.

11  **INTERROGATORY NUMBER 21:**

12       Identify the document produced by Plaintiff in its initial disclosures which bears Plaintiff's document

13  production numbers 200045 -200051 by providing a description of the document, the

14  name of the person (or persons) who prepared the document, the person or persons who received the

15  document (if any), the date the document was prepared, and the dates the document appeared on Veoh's

16  website (if at all).

17  **ORIGINAL RESPONSE TO INTERROGATORY NUMBER 21:**

18       Veoh objects that with interrogatory nos. 16 and 17, Plaintiff has exceeded its limit of 25

19  interrogatories and, therefore, no request is required to this interrogatory. In addition, this

20  interrogatory is compound and contains multiple subparts.

21       Veoh further objects that this interrogatory seeks information outside the scope of discovery

22  in that it seeks information that is not relevant to the subject matter of this action and is not

23  reasonably calculated to lead to the discovery of admissible evidence. Veoh further objects to the

24  extent the interrogatory calls for information apparent from the face of document, as Veoh and

25  Plaintiff would face a similar burden of deriving or ascertaining the answer to this interrogatory from

26  those documents. *See* Fed. R. Civ. P. 33(d).

27

28

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NUMBER 21:**

In a letter dated June 7, 2007, Plaintiff's counsel agreed to narrow Interrogatory No. 21 to have Veoh "provide the dates the document 200045-200051 (TOUs) were on the Veoh website, if at all." As narrowed and subject to and without waiving the foregoing objections and General Objections, Veoh responds as follows: To the best of Veoh's knowledge, document 200045-200051 (which Veoh notes is not a "TOU" as indicated in Plaintiff's June 7, 2007 letter) was available on the Veoh.com website from June 21, 2006 through July 7, 2006.

**INTERROGATORY NUMBER 22:**

Identify the document produced by Plaintiff in its initial disclosures which bears Plaintiff's document production numbers 200056 -200060 by providing a description of the document, the name of the person (or persons) who prepared the document, the person or persons who received the document (if any), the date the document was prepared, and the dates the document appeared on Veoh's website (if at all).

**ORIGINAL RESPONSE TO INTERROGATORY NUMBER 22:**

Veoh objects that with interrogatory nos. 16 and 17, Plaintiff has exceeded its limit of 25 interrogatories and, therefore, no request is required to this interrogatory.

Veoh further objects that this interrogatory seeks information outside the scope of discovery in that it seeks information that is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence. Veoh further objects to the extent the interrogatory calls for information apparent from the face of document, as Veoh and Plaintiff would face a similar burden of deriving or ascertaining the answer to this interrogatory from those documents. *See* Fed. R. Civ. P. 33(d).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NUMBER 22:**

Plaintiff's counsel agreed to narrow Interrogatory No. 22 to have Veoh "provide the dates the document 200056-200060 (FAQs) were on the Veoh website, if at all." As narrowed and subject to and without waiving the foregoing objections and General Objections, Veoh responds as follows: To the best of Veoh's knowledge, document 200056-200060 was never on the Veoh.com website.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

2    Dated:  July 25, 2007                    WINSTON & STRAWN, LLP

3                                             By 

4                                             Jennifer A. Golinveaux
                                              Attorneys for Defendant
5                                             VEOH NETWORKS, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

5



**VERIFICATION**

I, Joseph Papa, declare:

I am Director of Product Development for Defendant Veoh Networks, Inc.  I have read the attached **VEOH NETWORKS, INC.'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NOS. 6, 21,** and **22** and the matters set forth therein are true to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of July, 2007.

SF:178421.1

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

6
DEFENDANT VEOH NETWORKS, INC.'S SUPPLEMENTAL RESPONSES TO INTERROGATORY NOS. 6, 21-22
CASE NO. C-06-3926 HRL

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Winston & Strawn LLP, 101 California Street, San Francisco, CA 94111-5894. On July 25, 2007 I served the within documents:

1. **DEFENDANT VEOH NETWORKS, INC.'S SUPPLEMENTAL RESPONSES TO INTERROGATORIES NOS. 6, 21, AND 22; and**

2. **DOCUMENT PRODUCTION BATES NUMBERS VEOH 07610 THROUGH VEOH 08212**

☐    By transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date.

☒    By placing the document listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, addressed as set forth below.

☐    By causing personal delivery by Worldwide Network, Inc. of the document(s) listed above to the person(s) at the addresses set forth below.

☐    By sending the document(s) listed above to the person(s) at the addresses set forth below via Federal Express overnight courier.

☒    By electronically mailing a true and correct copy of the document(s) listed above to the person(s) listed below through Winston & Strawn LLP's electronic mail system at the e-mail address set forth below.

☐    By sending the document(s) listed above to the person(s) listed and addresses set forth below via Messenger Services.

☐    By the Court's ECF electronic mailing system.

> Gill Sperlein
> General Counsel
> Io Group, Inc.
> 69 Converse Street
> San Francisco, CA 94103
> legal@titanmedia.com
> T: 415.487.1211, x32
> F: 415.252.7747

I declare that I am employed in the office of a member of the bar of this court whose direction the service was made.

Executed on July 25, 2007, at San Francisco, California.

_____
Ginny Hirsch Ebert

PROOF OF SERVICE                                    CASE NO. C-06-3926 HRL

SF:164035.1

# EXHIBIT F

Michael S. Elkin  (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY  10166-4193
Telephone:     212-294-6700
Facsimile:     212-294-4700
Email: melkin@winston.com

Jennifer A. Golinveaux (SBN: 203056)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111
Telephone:     415-591-1000
Facsimile:     415-591-1400
Email: jgolinveaux@winston.com

Attorneys for Defendant
VEOH NETWORKS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IO GROUP, INC., a California corporation, | Case No. C-06-3926 HRL |
| Plaintiff, | **DEFENDANT VEOH NETWORKS, INC.'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5** |
| vs. | |
| VEOH NETWORKS, INC., a California corporation, | |
| Defendant. | |

PROPOUNDING PARTY:              PLAINTIFF IO GROUP, INC.

RESPONDING PARTY:              DEFENDANT VEOH NETWORKS, INC.

SET NUMBER:              ONE

    Defendant Veoh Networks, Inc.  ("Veoh") hereby submits pursuant to Federal Rules of Civil

Procedure 26 and 33 and Local Rule 26 of this Court the following supplemental objections and

response to Plaintiff's Interrogatory No. 5.

1

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

## GENERAL OBJECTIONS

2       Veoh expressly incorporates the following General Objections as if set forth fully in response

3  to each of the following individual interrogatories.

4  1.      Veoh objects to the definition of "VEOH" as overly broad to the extent it seeks information

5  from other entities that is outside Veoh's possession, custody or control.

6  2.      Veoh objects to each interrogatory to the extent that it seeks information that is protected by

7  the attorney-client privilege, the work product privilege and/or any other applicable privilege. Such

8  information will not be disclosed. Any inadvertent disclosure of such information shall not be

9  deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other

10  applicable privilege or immunity recognized by statute or case law.

11  3.      Veoh objects to each interrogatory and to Plaintiff's Instructions to the extent that they

12  purport to impose any requirement or discovery obligation on Veoh other than those set forth in the

13  Federal Rules of Civil Procedure and the applicable rules of this Court.

14  4.      Veoh objects to each interrogatory to the extent that it purports to require Veoh to inquire of

15  Veoh's employees other than those employees that would reasonably be expected to have responsive

16  information. Veoh's responses shall be based upon (1) a reasonable search, given the time allocated

17  to Veoh to respond to the interrogatories, of files that could reasonably be expected to contain

18  responsive information, and (2) inquiries of Veoh's employees and/or representatives who could

19  reasonably be expected to possess responsive information.

20  5.      Veoh objects that the defined term "USER MATERIAL" renders the requests vague,

21  ambiguous and compound, and seek information outside Veoh's possession, custody, or control.

22

## RESPONSES TO INTERROGATORIES

23  **INTERROGATORY NUMBER 5:**

24       Describe in detail all procedures VEOH ever followed for reviewing and approving USER

25  MATERIALS.

26  **ORIGINAL RESPONSE TO INTERROGATORY NUMBER 5:**

27

28

1       Veoh objects to this interrogatory as overbroad, unduly burdensome, compound, and as

2   vague and ambiguous.  Veoh further objects to the interrogatory to the extent that it seeks

3   information that is protected by the attorney-client privilege and the work product privilege.

4   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NUMBER 5:**

5       Veoh objects to this interrogatory as overbroad, unduly burdensome, compound, and as

6   vague and ambiguous.  Veoh further objects to the interrogatory to the extent that it seeks

7   information that is protected by the attorney-client privilege and the work product privilege.

8       Subject to and without waiving the foregoing objections and General Objections, Veoh

9   responds as follows:  Veoh has no "procedures" "for reviewing and approving USER

10  MATERIALS."  Veoh does not "review and approve" user material (which is defined by Plaintiff as

11  "files submitted by USERS to the VEOH SERVICE for display, distribution or publication by and

12  through the VEOH SERVICE") prior to such material being made available through Veoh.  Early on

13  in the development of Veoh, Veoh considered a review process prior to user provided material being

14  made available through Veoh, but determined that no such process was feasible and no such process

15  was ever implemented.

16  Dated:  June 20, 2007

                WINSTON & STRAWN, LLP

18                  By:

                      Jennifer A. Golinveaux

19                        Attorneys for Defendant
                      VEOH NETWORKS, INC.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894



**VERIFICATION**

I, Joseph Papa, declare:

I am Director of Product Development for Defendant Veoh Networks, Inc.  I have read the attached **VEOH NETWORKS, INC.'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5** and the matters set forth therein are true to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 20th day of June, 2007.

SF:140643.3

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**4**

PAGE 5/5 * RCVD AT 6/20/2007 1:58:58 PM [Pacific Daylight Time] * SVR:WSSFRF01/1 * DNIS:1 * CSID:8583572282 * DURATION (mm-ss):01-32

1

## PROOF OF SERVICE

2      I am a resident of the State of California, over the age of eighteen years, and not a party
3  to the within action. My business address is Winston & Strawn LLP, 101 California Street, San
   Francisco, CA 94111-5894. On June 20, 2007 I served the within document:

4
             **DEFENDANT VEOH NETWORKS, INC.'S**
5              **SUPPLEMENTAL RESPONSE TO**
                  **INTERROGATORY NO. 5**
6

7  ☐       By transmitting via facsimile the document(s) listed above to the fax number(s) set
           forth below on this date.
8

9  ☒       By placing the document listed above in a sealed envelope with postage thereon fully
           prepaid, in the United States mail at San Francisco, addressed as set forth below.

10
                           Gill Sperlein
11                         General Counsel
                           Io Group, Inc.
12                         69 Converse Street
                           San Francisco, CA 94103
13                         legal@titanmedia.com
                           T: 415.487.1211, x32
14                         F: 415.252.7747

15 ☐       By causing personal delivery by Worldwide Network, Inc. of the document(s) listed
           above to the person(s) at the addresses set forth below.
16
   ☐       By sending it via Federal Express overnight courier.
17

18 ☒       By electronically mailing a true and correct copy through Winston & Strawn LLP's
           electronic mail system at the e-mail address(es) set forth below.
19

20 ☐       By sending it via Messenger Services.

21 ☐       By the Court's ECF electronic mailing system.

22      I declare that I am employed in the office of a member of the bar of this court whose
23 direction the service was made.

24      Executed on June 20, 2007, at San Francisco, California.

25
                              _Ginny Ebert_
26                            _____
                              Ginny Hirsch Ebert
27

28

SF:156848.1

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVSION

---oOo---

IO GROUP, INC., a California          )
corporation,                          )
                                      )
                Plaintiff,            )
                                      )   No. C-06-3926 HRL
vs.                                   )
                                      )
                                      )
VEOH NETWORKS, INC., a                )
California corporation,               )
                                      )
                Defendant.            )

**CERTIFIED COPY**

CONFIDENTIAL SECTION, PAGES 23 - 34

Deposition of

KEITH RUOFF

_____

Thursday, May 24, 2007

Reported by:

GEORGE SCHUMER, CSR 3326                    (395992)

**M E R R I L L   L E G A L   S O L U T I O N S**

575 Market Street, 11th Floor          415.357.4300
www.merrillcorp.com/law    San Francisco, CA 94105

KEITH RUOFF     May 24, 2007

| | | |
|---|---|---|
| 09:10:35 | 1 | Q. What are the names of them, if you can remember? |
| 09:10:38 | 2 | A. Fallen Angel III; Sea Men; Fallen Angel IV; |
| 09:10:48 | 3 | Cirque Noir; Carny. Usually whatever our big feature film |
| 09:10:55 | 4 | of the year is, I'll usually produce. |
| 09:11:20 | 5 | Q. Incident to your acting in the films that you |
| 09:11:29 | 6 | have described, did you take any training as an actor, or |
| 09:11:34 | 7 | is it just sort of on-the-job work? |
| 09:11:38 | 8 | A. No, it came pretty naturally. |
| 09:11:40 | 9 | Q. Is there a particular genre of films that you |
| 09:11:48 | 10 | have produced, directed and acted in, as you just |
| 09:11:51 | 11 | described the various titles? |
| 09:11:53 | 12 | A. "Genre," as in...? |
| 09:11:56 | 13 | Q. Is it all gay erotica films? |
| 09:11:59 | 14 | A. Yes. |
| 09:12:00 | 15 | Q. We talked about marketing, and your acting in |
| 09:12:10 | 16 | various films. So let me just return to the question that |
| 09:12:14 | 17 | I put to you earlier. Please continue on, describing the |
| 09:12:18 | 18 | evolution of your job titles and duties and |
| 09:12:21 | 19 | responsibilities at Io Group. |
| 09:12:23 | 20 | A. I think it was in late 1998, early 1999, that I |
| 09:12:34 | 21 | came on as vice-president of the company. |
| 09:12:38 | 22 | Q. What were your duties and responsibilities as |
| 09:12:41 | 23 | vice-president? |
| 09:12:41 | 24 | A. Still continued with being responsible for sales |
| 09:12:46 | 25 | and marketing; Internet development. And new business |

11

KEITH RUOFF     May 24, 2007

| | | |
|---|---|---|
| 09:22:23 | 1 | A.  Bruce Lahey. |
| 09:22:29 | 2 | Q.  What percentage of the company does he own? |
| 09:22:33 | 3 | A.  I believe 100 percent. |
| 09:22:39 | 4 | Q.  Where, if any, does Io have offices? |
| 09:22:48 | 5 | A.  Here in San Francisco. |
| 09:22:51 | 6 | Q.  Any other locations? |
| 09:22:53 | 7 | A.  No. |
| 09:22:54 | 8 | Q.  Do you know whether or not it has any affiliates, |
| 09:22:58 | 9 | that is to say, companies at which it owns any interest? |
| 09:23:02 | 10 | A.  I don't believe so, no. |
| 09:23:06 | 11 | Q.  What does Io do? |
| 09:23:09 | 12 | A.  Io is a content production company. |
| 09:23:16 | 13 | Q.  What kind of content does it create? |
| 09:23:20 | 14 | A.  Primarily gay adult erotica. |
| 09:23:24 | 15 | Q.  Is there any other content that Io creates, other |
| 09:23:30 | 16 | than adult gay erotica? |
| 09:23:33 | 17 | A.  No. |
| 09:23:33 | 18 | Q.  Does it do anything other than produce content? |
| 09:23:44 | 19 | MR. SPERLEIN:  Objection.  Vague. |
| 09:23:47 | 20 | THE WITNESS:  That's the primary function of the |
| 09:23:49 | 21 | company. |
| 09:23:50 | 22 | MR. ELKIN:  Q.  Does it also distribute content? |
| 09:23:52 | 23 | A.  Can you define "distribute"? |
| 09:23:57 | 24 | Q.  Sure.  Does it sell it? |
| 09:23:58 | 25 | A.  Yes. |

18

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:00:31 | 1 | A.  Over the past few years, as we have seen the |
| 10:00:37 | 2 | growth of it, and see the devastation to our business |
| 10:00:41 | 3 | through the piracy of our content, I have thought about: |
| 10:00:44 | 4 | "Is there a way to turn lemons into lemonade, trying to |
| 10:00:50 | 5 | figure out ways to utilize it?"  But I have yet to figure |
| 10:00:53 | 6 | out any effective way to monetize it. |
| 10:00:55 | 7 | Q.  When is the last time you actually considered |
| 10:00:58 | 8 | whether it would be useful to use peer-to-peer application |
| 10:01:01 | 9 | to promote the sale of your content? |
| 10:01:04 | 10 | A.  Probably within the last three to six months. |
| 10:01:11 | 11 | Q.  At some point you gained knowledge that certain |
| 10:01:32 | 12 | of your content was being accessed through the Veoh site; |
| 10:01:39 | 13 | is that correct? |
| 10:01:40 | 14 | A.  Yes. |
| 10:01:40 | 15 | Q.  When did that first come to your attention? |
| 10:01:44 | 16 | A.  I believe approximately the second week of June, |
| 10:01:51 | 17 | 2006. |
| 10:01:51 | 18 | Q.  What are the circumstances under which this came |
| 10:01:55 | 19 | to your attention? |
| 10:01:55 | 20 | A.  I think within a day or two, two different |
| 10:01:59 | 21 | sources brought it to our attention. |
| 10:02:02 | 22 | Q.  Could you tell us exactly the instances in which |
| 10:02:12 | 23 | that occurred? |
| 10:02:13 | 24 | MR. SPERLEIN:  I just want to remind the witness |
| 10:02:15 | 25 | not to cut off your question. |

41

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 10:19:41 | 1 | just can't remember when it was used; if it is still being |
| 10:19:45 | 2 | used.  But it did restrict usage. |
| 10:19:50 | 3 | MR. ELKIN:  We would call for the production of |
| 10:19:51 | 4 | that document, if you can find it. |
| 10:19:53 | 5 | THE WITNESS:  Okay. |
| 10:19:56 | 6 | MR. ELKIN:  Q.  Let's go back to the |
| 10:20:07 | 7 | investigation. |
| 10:20:09 | 8 | Once the investigation began -- do you have |
| 10:20:18 | 9 | something you want to say? |
| 10:20:19 | 10 | A.  I'm remembering the last question. |
| 10:20:21 | 11 | The document came into use, in that for |
| 10:20:26 | 12 | magazines, if they were going to publish a review of the |
| 10:20:30 | 13 | film, if they were going to use associated still |
| 10:20:32 | 14 | photographic works -- that there was a terms of use that |
| 10:20:36 | 15 | dictated how they used the photographic images with the |
| 10:20:39 | 16 | review. |
| 10:20:40 | 17 | Q.  Right.  But no other restrictions other than that |
| 10:20:44 | 18 | one, that you can recall; is that correct? |
| 10:20:45 | 19 | A.  Since it was print, yes.  There was no use of the |
| 10:20:53 | 20 | audio-visual work at all. |
| 10:20:55 | 21 | Q.  Let's talk about the investigation.  Who at Io |
| 10:20:59 | 22 | was charged or tasked with investigating the content up on |
| 10:21:06 | 23 | the Veoh site?  This is in June of 2006; correct? |
| 10:21:10 | 24 | A.  Right.  Myself. |
| 10:21:11 | 25 | Q.  Were any other parties, or any other personnel |

47

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:32:24 | 1 | player. |
| 10:32:26 | 2 | You downloaded the material that you believed you |
| 10:32:29 | 3 | owned; right? |
| 10:32:30 | 4 | A.  Yes. |
| 10:32:30 | 5 | Q.  With regard to the material that you downloaded |
| 10:32:34 | 6 | that you believed you owned, did you ever see a reference |
| 10:32:37 | 7 | to Titan Media? |
| 10:32:42 | 8 | A.  Within the audio-visual work itself?  That's what |
| 10:32:48 | 9 | you are asking? |
| 10:32:49 | 10 | Q.  Yes. |
| 10:32:49 | 11 | A.  I'm trying to understand, so I can answer you |
| 10:32:53 | 12 | correctly. |
| 10:32:54 | 13 | From the files that I downloaded -- and when we |
| 10:33:01 | 14 | reviewed them, I don't remember seeing any reference to |
| 10:33:03 | 15 | Titan Media within those audio-visual works that I |
| 10:33:07 | 16 | downloaded through Veoh. |
| 10:33:09 | 17 | Q.  So with regard to the screen shots, was there any |
| 10:33:13 | 18 | reference contained in those screen shots of the -- I |
| 10:33:16 | 19 | guess stills -- to Titan Media or Io? |
| 10:33:21 | 20 | A.  Yes. |
| 10:33:21 | 21 | Q.  Let's first take Io.  Was there any reference to |
| 10:33:25 | 22 | Io in that portion of the screen shot that reflected your |
| 10:33:34 | 23 | material? |
| 10:33:35 | 24 | A.  You are talking about the video details page? |
| 10:33:40 | 25 | Q.  No, I'm actually referring to -- now you took |

55

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:33:44 | 1 | shots; right, of -- we talked about the downloading of the |
| 10:33:50 | 2 | video stuff; the audio-visual stuff.  Now we're talking |
| 10:33:55 | 3 | about the screen shots themselves. |
| 10:33:56 | 4 | You want to describe what that is again, so you |
| 10:34:00 | 5 | and I are reading from the same playbook? |
| 10:34:02 | 6 | A.  As in earlier depositions this week on Veoh, the |
| 10:34:05 | 7 | page that plays the flash review of a video file is called |
| 10:34:10 | 8 | a video details page. |
| 10:34:11 | 9 | Q.  Is that what you are referring to, that you |
| 10:34:13 | 10 | captured? |
| 10:34:13 | 11 | A.  Yes, and the video details page is what I made |
| 10:34:17 | 12 | printout copies of, that shows the embedded flash player, |
| 10:34:20 | 13 | as well as the associated metadata for that file. |
| 10:34:23 | 14 | Q.  So the video details page:  Does the video |
| 10:34:28 | 15 | details page reflect any photographic image of your work? |
| 10:34:36 | 16 | A.  Yes. |
| 10:34:36 | 17 | Q.  So the following questions refer only to the |
| 10:34:41 | 18 | photographic image of your work. |
| 10:34:43 | 19 | A.  Okay. |
| 10:34:44 | 20 | Q.  Was there any indication, in the photographic |
| 10:34:49 | 21 | image of the work, that the work was owned by Io? |
| 10:34:53 | 22 | A.  No, because there were screen captures, and in a |
| 10:35:01 | 23 | movie there's no running -- no overlay showing the name of |
| 10:35:06 | 24 | the company that owns the movie. |
| 10:35:07 | 25 | Q.  Thank you.  And then with respect to the |

56

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:35:11 | 1 | photographic image embedded in this Veoh details page, was |
| 10:35:21 | 2 | there any identification that Titan Media owned the work? |
| 10:35:26 | 3 | A.  Are you referring to -- |
| 10:35:32 | 4 | Q.  It is the very same question I just asked you. |
| 10:35:35 | 5 | A.  I'm just trying to make sure I understand what |
| 10:35:37 | 6 | you are referring to. |
| 10:35:37 | 7 | Q.  Sure. |
| 10:35:38 | 8 | A.  Is that the 16-thumbnail screen capture images |
| 10:35:43 | 9 | that Veoh provides on that video details page?  Is that |
| 10:35:47 | 10 | what you are referring to? |
| 10:35:48 | 11 | Q.  Yes. |
| 10:35:49 | 12 | A.  In those screen capture images, no, there is no |
| 10:35:52 | 13 | indication of ownership by Titan Media. |
| 10:35:53 | 14 | Q.  Let me ask you this:  Through what period of time |
| 10:36:04 | 15 | did you collect evidence of your material, in June of |
| 10:36:12 | 16 | 2006? |
| 10:36:12 | 17 | A.  From approximately June 13th or 14th, through the |
| 10:36:20 | 18 | 22nd or 23rd, when all the adult material was removed. |
| 10:36:24 | 19 | Q.  Now from the time when you first gained knowledge |
| 10:36:32 | 20 | that your material was accessed through Veoh -- accessible |
| 10:36:46 | 21 | through Veoh -- did you ever provide a notice to Veoh to |
| 10:36:58 | 22 | take down your material? |
| 10:37:00 | 23 | A.  No. |
| 10:37:01 | 24 | Q.  From time to time, you notice that companies -- |
| 10:37:31 | 25 | without your permission -- distribute or make copies of |

57

KEITH RUOFF     May 24, 2007

| | | |
|---|---|---|
| 10:38:46 | 1 | Q.  But don't you want also to get them to stop doing |
| 10:38:54 | 2 | what they are doing? |
| 10:38:55 | 3 | A.  Yes, and that's part of the request. |
| 10:39:01 | 4 | Q.  Are you familiar with a concept called a "DMCA |
| 10:39:14 | 5 | take-down notice"?  Ever heard that before? |
| 10:39:18 | 6 | A.  Yes. |
| 10:39:19 | 7 | Q.  What is that? |
| 10:39:19 | 8 | MR. SPERLEIN:  Objection.  It calls for a legal |
| 10:39:21 | 9 | conclusion. |
| 10:39:22 | 10 | MR. ELKIN:  Q.  What is your understanding of a |
| 10:39:25 | 11 | DMCA take-down notice? |
| 10:39:27 | 12 | A.  A Digital Millenium Copyright Act compliant |
| 10:39:33 | 13 | notice, to remove content from a -- from somebody. |
| 10:39:39 | 14 | Q.  And I'm not asking for your legal conclusion; I |
| 10:39:43 | 15 | know you are not a lawyer.  But your company, from time to |
| 10:39:48 | 16 | time, sends out these DMCA take-down notices; correct? |
| 10:39:54 | 17 | A.  Yes. |
| 10:39:55 | 18 | Q.  And if some material that you see published on |
| 10:40:03 | 19 | some web site is owned by you, and it is being used in an |
| 10:40:06 | 20 | unauthorized manner, is it your company's custom and |
| 10:40:10 | 21 | practice to send these DMCA take-down notices? |
| 10:40:14 | 22 | A.  It is our custom to send take-down notices.  They |
| 10:40:20 | 23 | were not necessarily always DMCA take-down notices. |
| 10:40:23 | 24 | Q.  So it is either DMCA notices, or take-down |
| 10:40:28 | 25 | notices? |

59

KEITH RUOFF     May 24, 2007

| | | |
|---|---|---|
| 10:40:28 | 1 | A.  Demand for payment... |
| 10:40:32 | 2 | Q.  Right. |
| 10:40:38 | 3 | Now the lawsuit was filed in this case |
| 10:40:41 | 4 | approximately on June 23, 2006.  Does that seem right? |
| 10:40:45 | 5 | A.  That sounds correct. |
| 10:40:47 | 6 | Q.  Now you became aware, on June 22 -- at least by |
| 10:40:54 | 7 | June 22, 2006 -- that Veoh made a decision to remove adult |
| 10:40:58 | 8 | content; correct? |
| 10:41:00 | 9 | A.  22nd; 23rd-ish, yes. |
| 10:41:04 | 10 | Q.  But prior to filing the lawsuit, you were made |
| 10:41:08 | 11 | aware of that? |
| 10:41:09 | 12 | A.  Because all of a sudden everything disappeared, |
| 10:41:12 | 13 | while I was in the middle of cataloging it. |
| 10:41:15 | 14 | Q.  So you were aware of it; right? |
| 10:41:17 | 15 | A.  Yes. |
| 10:41:17 | 16 | Q.  And you nevertheless filed a lawsuit; correct? |
| 10:41:24 | 17 | A.  Correct. |
| 10:41:24 | 18 | Q.  Did you consider not filing a lawsuit, once you |
| 10:41:31 | 19 | found out they weren't providing adult material, or you |
| 10:41:35 | 20 | could not access adult material through their site? |
| 10:41:41 | 21 | A.  No. |
| 10:41:51 | 22 | Q.  Can you think of any good reason why you didn't |
| 10:41:54 | 23 | send them a take-down notice before filing the lawsuit? |
| 10:41:57 | 24 | MR. SPERLEIN:  Object to the form. |
| 10:42:00 | 25 | THE WITNESS:  Can you repeat it? |

60

KEITH RUOFF     May 24, 2007

10:42:02  1          MR. ELKIN:  Q.  Can you think of any good reason
10:42:04  2     for why you didn't send them a take-down notice before
10:42:08  3     filing the lawsuit?
10:42:08  4          A.  Because of the fact we had no idea of the extent,
10:42:11  5     and it made no sense to send a take-down notice for each
10:42:15  6     file that we were able to identify.
10:42:17  7               Plus, also, because of the fact that we had to
10:42:20  8     download the full file before we could actually review the
10:42:24  9     entirety, to ensure that it was our file.  And the
10:42:28  10    download process through the Veoh clients -- which I
10:42:31  11    believe was using the Bit Torrent, or whatever process it
10:42:34  12    was using to transfer the file -- it took an amount of
10:42:37  13    time for the files to actually download before we could
10:42:41  14    review them.
10:42:41  15         Q.  You went up on the web site, and you spent
10:42:44  16    somewhere in the neighborhood of 6 to 12 hours of time
10:42:47  17    examining your content.  You made copies of the material
10:42:52  18    that you could see up there.  You captured the thumbnails.
10:42:57  19              And that wasn't sufficient notice to you to
10:43:00  20    actually send them a take-down notice?  Is that what you
10:43:03  21    are saying?
10:43:04  22         A.  We were not finished with our investigation.
10:43:06  23         Q.  So you were going to file the lawsuit, and finish
10:43:08  24    your investigation thereafter?  Is that correct?
10:43:11  25         A.  We filed the lawsuit so quickly afterwards to

61

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:46:05 | 1 | Q.  Sure.  I'll take it. |
| 10:46:07 | 2 | A.  It would be in the range of 30-40. |
| 10:46:10 | 3 | Q.  Of those 30-40 cases, are those situations where |
| 10:46:22 | 4 | some third party has used your material without your |
| 10:46:25 | 5 | permission, to the best of your knowledge? |
| 10:46:27 | 6 | A.  Yes, I believe so. |
| 10:46:31 | 7 | Q.  Do you recall whether in any of those 30-40 other |
| 10:46:41 | 8 | cases, you or your counsel ever sent letters or notices to |
| 10:46:49 | 9 | the offending party, telling them to stop, or take down, |
| 10:46:52 | 10 | or stop doing what they were doing? |
| 10:46:55 | 11 | A.  Yes, I believe with every one of them there was a |
| 10:47:01 | 12 | take-down notice, along with a demand for payment. |
| 10:47:05 | 13 | Q.  And when they didn't do it, you filed a lawsuit; |
| 10:47:08 | 14 | correct? |
| 10:47:08 | 15 | MR. SPERLEIN:  Objection.  Misstates testimony. |
| 10:47:12 | 16 | THE WITNESS:  When they didn't do what? |
| 10:47:14 | 17 | MR. ELKIN:  Q.  When they didn't take it down, |
| 10:47:18 | 18 | you filed a lawsuit. |
| 10:47:19 | 19 | A.  I don't think there has ever been a case where |
| 10:47:22 | 20 | they didn't take it down. |
| 10:47:23 | 21 | Q.  You would send the notice, they would take it |
| 10:47:26 | 22 | down, and then you filed the lawsuit or would resolve it? |
| 10:47:29 | 23 | A.  If we can't come to a resolution we were forced |
| 10:47:33 | 24 | to file a lawsuit, yes. |
| 10:47:35 | 25 | Q.  Of the 30-40 cases that you filed, other than |

64

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 10:47:38 | 1 | this one, that is still being litigated -- did they all |
| 10:47:43 | 2 | get resolved prior to trial? |
| 10:47:45 | 3 | A.  Yes. |
| 10:47:46 | 4 | Q.  And the 30-40 lawsuits that were filed by your |
| 10:47:53 | 5 | company:  Did they all result in a settlement, whereby Io |
| 10:47:58 | 6 | was paid money? |
| 10:47:59 | 7 | A.  Either paid money, or awarded money. |
| 10:48:04 | 8 | Q.  Was there ever a situation in which you filed a |
| 10:48:08 | 9 | lawsuit for copyright infringement, where you didn't get |
| 10:48:11 | 10 | paid anything? |
| 10:48:11 | 11 | A.  Can you repeat that again? |
| 10:48:23 | 12 | MR. ELKIN:  George, can you repeat that? |
| 10:48:25 | 13 | (Record read:  "Q.  Was there ever a situation in which |
| 10:48:08 | 14 | you filed a lawsuit for copyright infringement, where you |
| 10:48:11 | 15 | didn't get paid anything?") |
| 10:48:27 | 16 | THE WITNESS:  Yes. |
| 10:48:28 | 17 | MR. ELKIN:  Q.  How many instances? |
| 10:48:29 | 18 | A.  There's a number of default judgments, where we |
| 10:48:33 | 19 | have not been able to collect on it. |
| 10:48:34 | 20 | Q.  Other than default judgments, can you recall any |
| 10:48:37 | 21 | situation where you haven't got paid? |
| 10:48:39 | 22 | A.  If you steal our content, everyone pays. |
| 10:48:43 | 23 | Q.  Do you recall a situation in which you had one of |
| 10:49:03 | 24 | your friends attempt to upload adult material to Veoh? |
| 10:49:09 | 25 | A.  Yes. |

65

KEITH RUOFF      May 24, 2007

14:37:02    1    you appreciate that, as much as you would expect your

14:37:06    2    lawyer to do in reverse.

14:37:07    3        You made a decision, did you not, to bring the

14:37:11    4    lawsuit prior to your learning that Veoh was going to

14:37:16    5    disable access to adult material?

14:37:19    6    A.  No.

14:37:19    7    Q.  When did you learn that Veoh was going to disable

14:37:28    8    access to adult material?

14:37:29    9    A.  The day that they removed the adult material from

14:37:35    10   their web site.

14:37:36    11   Q.  When was that?

14:37:37    12   A.  I don't remember the exact date.

14:37:39    13   Q.  Would it refresh your recollection if I said

14:37:41    14   "June 22, 2006"?

14:37:43    15   A.  If that's the date you say was the date, then I

14:37:48    16   would believe you, yes.

14:37:49    17   Q.  And you believe that you gave instructions to --

14:37:52    18   that you made a decision to go forward with the lawsuit

14:37:55    19   prior to that date?

14:37:56    20   A.  No.

14:38:00    21   Q.  When did you decide to bring a lawsuit?

14:38:05    22   A.  I believe it was after the adult content was

14:38:08    23   removed, and we no longer had access to the content.

14:38:12    24   Q.  So let's assume for a moment that I'm right; that

14:38:15    25   it is June 22.  You made a decision to commence the

142

KEITH RUOFF     May 24, 2007

| | | |
|---|---|---|
| 14:38:19 | 1 | lawsuit, and you provided all the information to |
| 14:38:23 | 2 | Mr. Sperlein, and then he prepared the complaint, polished |
| 14:38:26 | 3 | it up, and had it filed within 24 hours.  Is that your |
| 14:38:30 | 4 | testimony? |
| 14:38:30 | 5 | A.   Sounds about right. |
| 14:38:32 | 6 | Q.   And that's what happened?  That's what you are |
| 14:38:35 | 7 | telling me? |
| 14:38:36 | 8 | A.   To the best of my recollection, yes. |
| 14:38:41 | 9 | Q.   Did you ever have any communications with any |
| 14:38:49 | 10 | third parties, about whether or not you decided to not go |
| 14:38:53 | 11 | forward with the lawsuit, as a result of the fact that |
| 14:38:56 | 12 | Veoh actually had disabled access to adult material? |
| 14:39:00 | 13 | MR. SPERLEIN:  Object to the form. |
| 14:39:03 | 14 | MR. ELKIN:  Q.  You can answer. |
| 14:39:04 | 15 | A.   I don't understand what you are trying to ask. |
| 14:39:07 | 16 | MR. ELKIN:  Please repeat it, George. |
| 14:39:26 | 17 | (Record read: "Q. Did you ever have any communications |
| 14:38:48 | 18 | with any third parties, about whether or not you decided |
| 14:38:52 | 19 | to not go forward with the lawsuit, as a result of the |
| 14:38:56 | 20 | fact that Veoh actually had disabled access to adult |
| 14:38:59 | 21 | material?") |
| 14:39:28 | 22 | THE WITNESS:  I still don't understand. |
| 14:39:30 | 23 | MR. ELKIN:  Q.  You have taken the position, or |
| 14:39:32 | 24 | you have testified -- correct me if I'm wrong -- that you |
| 14:39:40 | 25 | didn't decide to bring the lawsuit until you learned that |

143

KEITH RUOFF      May 24, 2007

14:54:32    1    a decision to do it --

14:54:34    2         I assume that you are going to claim that you

14:54:38    3    made a decision to file the lawsuit after you sent this

14:54:41    4    e-mail, and that it was filed before the end of the day --

14:54:44    5    despite the fact that it is a very detailed and concise

14:54:47    6    and relatively coherent complaint, thanks to the good work

14:54:50    7    of Mr. Sperlein.

14:54:54    8         A.  This is a very simple document of 11 pages that

14:54:59    9    is basically a template, plated from previous suits, that

14:55:04    10   you could fill in the information in, in an hour or two.

14:55:07    11        Q.  Maybe we should hire Mr. Sperlein for all of our

14:55:10    12   cases.  It is a very detailed complaint, and contains all

14:55:14    13   of the copyright notices.

14:55:15    14        At what point after 9:05 a.m. on June 23, 2006,

14:55:21    15   did your company make the decision to file these

14:55:24    16   proceedings?

14:55:25    17        A.  Within that same day.  That's the best time range

14:55:30    18   I can get you.

14:55:30    19        Q.  And there was no follow-on e-mail after this

14:55:33    20   date, concerning this lawsuit?

14:55:34    21        A.  Not that I know of.

14:55:35    22        Q.  So you were just screaming on one hand to the

14:55:38    23   president, and screaming to Mr. Sperlein on the other.

14:55:41    24   And that's how the whole thing happened?

14:55:43    25        A.  They walk out of their offices and walk into my

152

KEITH RUOFF        May 24, 2007

| | | |
|---|---|---|
| 14:57:03 | 1 | the presence of Mr. Sperlein. |
| 14:57:06 | 2 | A.  I don't remember. |
| 14:57:07 | 3 | Q.  But you knew, prior to filing this lawsuit, that |
| 14:57:47 | 4 | Veoh had stopped hosting adult content; isn't that |
| 14:57:51 | 5 | correct? |
| 14:57:52 | 6 | A.  Yes. |
| 14:57:54 | 7 | Q.  And you decided to pursue a legal action against |
| 14:57:56 | 8 | them anyway; is that correct? |
| 14:57:58 | 9 | A.  Yes. |
| 14:58:52 | 10 | MR. ELKIN:  Next is 17. |
| 14:58:54 | 11 | (Document referred to herein marked for |
| 14:59:11 | 12 | identification Defendant Exhibit 17) |
| 14:59:11 | 13 | MR. ELKIN:  Q.  By the way, I'm looking at the |
| 14:59:18 | 14 | complaint here, and there is a file stamp on it.  It says |
| 14:59:28 | 15 | June 23, 2006, and it looks like it is 12:39.  So if, in |
| 14:59:37 | 16 | fact, Mr. Sperlein is very, very, very, very, very, |
| 14:59:45 | 17 | fast -- because he would have had to have had the |
| 14:59:48 | 18 | discussion and the go-ahead, prepare the complaint, and |
| 14:59:50 | 19 | got the copyright stuff, and made sufficient copies, and |
| 14:59:53 | 20 | been able to have this thing filed -- within three hours. |
| 14:59:59 | 21 | A.  It is not that difficult in our case. |
| 15:00:03 | 22 | Q.  And you are still sticking to your testimony; is |
| 15:00:07 | 23 | that what you are saying? |
| 15:00:08 | 24 | A.  There may have been some paperwork that he had |
| 15:00:11 | 25 | already pre-prepared.  I don't remember. |

154

KEITH RUOFF    May 24, 2007

| | |
|---|---|
| 15:00:14 | 1 |
| 15:00:20 | 2 |
| 15:00:20 | 3 |
| 15:00:21 | 4 |
| 15:00:24 | 5 |
| 15:00:27 | 6 |
| 15:00:28 | 7 |
| 15:00:32 | 8 |
| 15:00:34 | 9 |
| 15:00:35 | 10 |
| 15:00:39 | 11 |
| 15:00:40 | 12 |
| 15:00:44 | 13 |
| 15:00:47 | 14 |
| 15:00:52 | 15 |
| 15:01:04 | 16 |
| 15:01:08 | 17 |
| 15:01:20 | 18 |
| 15:01:24 | 19 |
| 15:01:30 | 20 |
| 15:01:34 | 21 |
| 15:01:39 | 22 |
| 15:01:45 | 23 |
| 15:01:56 | 24 |
| 15:02:01 | 25 |

1      Q.   Why would he pre-prepare it, if you hadn't made a

2   decision before?

3      A.   I don't know.

4      Q.   Mr. Sperlein is not authorized to commence legal

5   work without you giving him instructions; correct?

6      A.   Commence legal work?

7      Q.   He's not going to be spending his time drafting

8   complaints unless he gets instructions from you; correct?

9      A.   I don't know.

10      Q.   You're his boss; right?

11      A.   Correct.

12      Q.   Take a look at what has been marked Defendant

13   Exhibit 17, and tell me what that is, please.

14      A.   It appears to be -- well, there's a couple of

15   different things.  The first page is 200524 through 528 --

16   appear to be communications between myself and Patrick

17   Finger during February of 2007, asking him to upload a

18   file to Veoh.

19      Q.   Why don't I take them -- these E-mails --

20   separately, just to avoid unnecessary confusion.

21           The first two pages that are Bates-stamped 200524

22   to 200525 is an e-mail sent by you to Patrick Finger

23   February 19, 2007, at 3:28 p.m., and following that is an

24   e-mail from Mr. Finger to you dated February 19, 2007 at

25   3:23 p.m., five minutes earlier.

155

### CERTIFICATE OF REPORTER

I, George Schumer, a Certified Shorthand Reporter of the State of California, hereby certify that the witness in the foregoing matter was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said proceeding was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of said witness or proceeding was thereafter reduced to typewriting under my direction and supervision;

That before completion of the deposition, review of the transcript ✓ was ____ was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties in this case, nor in any way interested in the event of this cause; further, that I am not related to any of the parties thereof.

DATED: ___June  1_____, 2007

_____
George Schumer, CSR

# EXHIBIT H

1  GILL SPERLEIN (172887)
2  THE LAW OFFICE OF GILL SPERLEIN
   584 Castro Street, Suite 849
3  San Francisco, California 94114
   Telephone: (415) 378-2625
4  legal@titanmedia.com

5  Attorney for Plaintiff
6  IO GROUP, INC.

7

8

9              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
10                   SAN JOSE DIVISION

11                                  )
                                    )  CASE NO.: C-06-3926 (HRL)
12  IO GROUP, INC., a California corporation,  )
                                    )  PLAINTIFF IO GROUP INC.'S RESPONSE
13     Plaintiff,                   )  TO DEFENDANT'S FIRST SET OF
                                    )  INTERROGATORIES
14                   vs.            )
                                    )
15                                  )
                                    )
16  VEOH NETWORKS, Inc, a California  )
    Corporation,                    )
17                                  )
                                    )
18     DEFENDANT.                   )
                                    )
19

20

21  PROPOUNDING PARTY:   VEOH NETWORKS, INC.

22  RESPONDING PARTY:    IO GROUP, INC.

23  SET NUMBER:          ONE

24

25

26

27

28

                              -1-

                                    PLAINTIFF'S RESPONSE TO VEOH'S
                                    FIRST SET OF INTERROGATORIES
                                    C-06-3926 (HRL)

## GENERAL OBJECTIONS

Io Group expressly incorporates the following General Objections as if set forth fully in response to each of the following interrogatories.

1.      Io Group objects to each interrogatory to the extent it seeks information outside Io Group's possession, custody, or control.

2.      Io Group objects to each interrogatory to the extent that it seeks information that is protected by attorney-client privilege, the work product privilege and/or any other applicable privilege.  Such information will not be disclosed.  Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.      Io Group objects to each interrogatory and to Defendant's instructions to the extent they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.      Io Group objects to each interrogatory to the extent that it purports to require Io Group to inquire of Io Group's employees other than those employees that would reasonably be expected to have responsive information.  Io Group's responses shall be based upon (1) a reasonable search, given the time allocated to Io Group to respond to the interrogatories, of files that could reasonably be expected to contain responsive information, and (2) inquiries of Io Group's employees and/or representatives who could reasonably be expected to possess responsive information.

5.      Io Group objects to each interrogatory to the extent that it purports to require Io Group to disclose information in violation of a legal or contractual obligation of nondisclosure to a

third party.  Io Group will not provide such information without either the consent of the relevant third party or a court order compelling production.

6.      Io Group objects generally to each interrogatory to the extent it seeks information not reasonably related to the claims or defenses in this matter.

7.      Io Group objects to these interrogatories to the extent they seek legal conclusions, and/or would require Io Group to reach a legal conclusion in order to prepare a response.

8.      Io Group objects to these interrogatories to the extent they are premature, and Io Group's responses of production of any documents or things in response to these interrogatories is without prejudice to this objection. Io Group reserves the right to amend and/or supplement its responses.

9.      Io Group objects to the interrogatories to the extent that either on their face or in combination with Defendant's definition section the interrogatories create more than one discrete subpart which should be numbered as separate interrogatories.

10.      Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

11.      Io Group objects to the defined term "identify" in that it is vague and ambiguous and creates discrete subparts which should be numbered as separate interrogatories.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all copyrights owned by, or exclusively licensed to, you that you claim Veoh has infringed, whether directly, contributorily, or vicariously.

**RESPONSE TO INTERROGATORY NO. 1:**

Io Group Inc. objects to this contention interrogatory pursuant to Federal Rule of Civil Procedure 33(c) on the grounds that it is premature at this stage of the litigation and Defendant has

not yet responded to Plaintiff's Request for Production Number Sixteen, thereby denying Plaintiff

sufficient opportunity to review video files copied and publicly displayed by Veoh in order to

determine the extent to which Veoh infringed Plaintiff's works.  Plaintiff further objects to the

term "current exclusive licensee" as used in Defendant's definition of "identify with respect to a

copyright" as being vague, ambiguous and meaningless.  Plaintiff further objects to Defendant's

definition of "identify with respect to a copyright" in that it creates discrete subparts to the

Interrogatory.

       Subject to and without waiving the forgoing objections and General Objections, Io Group,

Inc. responds as follows:

   a.  Work:  *Boner*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current Exclusive

      Licensee: None; U.S. Copyright Registration Number(s): PA 990-715

   b.  Work:  *Prowl 3: Genuine Leather*; Author: MSR Video Inc.; Current Owner:  Io Group,

      Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-

      230-108

   c.  Work:  *Don't Ask Don't Tell*; Author: MSR Video Inc.; Current Owner:  Io Group, Inc.;

      Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-230-011

   d.  Work:  *Heat*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current Exclusive

      Licensee: None; U.S. Copyright Registration Number(s): PA 1-017-633

   e.  Work:  *Island Guardian*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current

      Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 984-693; PA 1-

      077-968

   f.  Work:  Sea Men:  *Fallen Angel IV*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.;

      Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-065-767

   g.  Work:  *Detour*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current Exclusive

      Licensee: None; U.S. Copyright Registration Number(s): PA 1-091-230

h. Work: *River Patrol*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current

Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 885-073; PA 1-

086-865

**INTERROGATORY NO. 2:**

For each copyright requested to be identified in Interrogatory No. 1, identify each direct

infringement as to which you claim that Veoh bears contributory or vicarious liability.

**RESPONSE TO INTERROGATORY NO. 2:**

Io Group Inc. objects to this contention interrogatory pursuant to Federal Rule of Civil

Procedure 33(c) on the grounds that it is premature at this stage of the litigation and Defendant has

not yet responded to Plaintiff's Request for Production Number Sixteen, thereby denying Plaintiff

sufficient opportunity to review video files copied and publicly displayed by Veoh in order to

determine the extent to which Veoh infringed Plaintiff's works. Plaintiff further objects to

Defendant's definition of "identify with respect to a copyright infringement" in that it creates

discrete subparts to the Interrogatory.

Subject to and without waiving the forgoing objections and General Objections, Io Group,

Inc. responds as follows:

a. *Boner*. Infringers: persons identified by the user names flickrmen2 and halifax222, and

Veoh Networks, Inc.; Rights Infringed: Io Group's exclusive right to reproduce the

copyrighted work in copies (17 U.S.C. §106(1)), Io Group's exclusive right to prepare

derivative works based on the copyrighted work (17 U.S.C. §106(2)), Io Group's exclusive

right to distribute copies of the copyrighted work to the public by sale or other transfer of

ownership, or by rental, lease, or lending (17 U.S.C. §106(3)), Io Group's exclusive right

to perform the copyrighted work publicly (17 U.S.C. §106(4)) and Io Group's exclusive

right to display the copyrighted work publicly (17 U.S.C. §106(5)). Flickrmen2 and

halifax222, reproduced the work and distributed the work by providing a copy to

Veoh.com along with a purported license to further distribute the work. Veoh transcoded

-5-

1      For each person identified in response to Interrogatory No. 7, identify the IP address for

2  the computer or device used by that person to access Veoh.com.

3  **RESPONSE TO INTERROGATORY NO. 9:**

4      Io Group objects that this interrogatory is vague, ambiguous and unintelligible.  Io further

5  objects that the interrogatory seeks information outside Io Group's custody or control and is

6  overbroad.  Io further objects to the interrogatory the extent that it calls for information protected

7  by the attorney client privilege or the attorney work product doctrine.  Io Group, Inc. further

8  objects to this interrogatory as calling for confidential information.

9

10

11

12  Dated: April 13, 2007

13

14

15                                                     _____

16                                      GILL SPERLEIN

                                    Attorney for Plaintiff Io Group, Inc.

17

18                              **VERIFICATION**

19      I, Keith Ruoff, declare:

20      I am Vice-President of Plaintiff Io Group, Inc.  I have read the attached PLAINTIFF IO

21  GROUP INC.'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES and

22  the matters set forth therein are true to the best of my knowledge, information and belief.

23

24      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the

25  United States that the foregoing is true and correct.

26

27  April 13, 2007

28                                  Keith Ruoff

                                Vice President Io Group, Inc.

-34-

# EXHIBIT I

1  GILL SPERLEIN (172887)
   THE LAW OFFICE OF GILL SPERLEIN
2  584 Castro Street, Suite 849
3  San Francisco, California  94114
   Telephone: (415) 378-2625
4  legal@titanmedia.com

5  Attorney for Plaintiff
6  IO GROUP, INC.

7

8                    UNITED STATES DISTRICT COURT
9                  NORTHERN DISTRICT OF CALIFORNIA
                          SAN JOSE DIVISION
10

11                                    )
   IO GROUP, INC., a California corporation,  ) CASE NO.:  C-06-3926 (HRL)
12                                    )
                                      ) PLAINTIFF IO GROUP INC.'S
13     Plaintiff,                     ) SUPPLEMENTAL RESPONSE TO
                                      ) DEFENDANT'S FIRST SET OF
14                 vs.                ) INTERROGATORIES
15                                    )
                                      )
16 VEOH NETWORKS, Inc, a California   )
   Corporation,                       )
17                                    )
                                      )
18     DEFENDANT.                     )
                                      )
19  ─────────────────────────────────

20

21 PROPOUNDING PARTY:    VEOH NETWORKS, INC.

22 RESPONDING PARTY:     IO GROUP, INC.

23 SET NUMBER:           ONE

24

25

26

27

28

## **GENERAL OBJECTIONS**

Io Group expressly incorporates the following General Objections as if set forth fully in response to each of the following interrogatories.

1.      Io Group objects to each interrogatory to the extent it seeks information outside Io Group's possession, custody, or control.

2.      Io Group objects to each interrogatory to the extent that it seeks information that is protected by attorney-client privilege, the work product privilege and/or any other applicable privilege.  Such information will not be disclosed.  Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.      Io Group objects to each interrogatory and to Defendant's instructions to the extent they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.      Io Group objects to each interrogatory to the extent that it purports to require Io Group to inquire of Io Group's employees other than those employees that would reasonably be expected to have responsive information.  Io Group's responses shall be based upon (1) a reasonable search, given the time allocated to Io Group to respond to the interrogatories, of files that could reasonably be expected to contain responsive information, and (2) inquiries of Io Group's employees and/or representatives who could reasonably be expected to possess responsive information.

5.      Io Group objects to each interrogatory to the extent that it purports to require Io Group to disclose information in violation of a legal or contractual obligation of nondisclosure to a

PLAINTIFF'S SUPPLEMENTAL RESPONSE TO VEOH'S
FIRST SET OF INTERROGATORIES
C-06-3926 (HRL)

third party.  Io Group will not provide such information without either the consent of the relevant third party or a court order compelling production.

6.    Io Group objects generally to each interrogatory to the extent it seeks information not reasonably related to the claims or defenses in this matter.

7.    Io Group objects to these interrogatories to the extent they seek legal conclusions, and/or would require Io Group to reach a legal conclusion in order to prepare a response.

8.    Io Group objects to these interrogatories to the extent they are premature, and Io Group's responses of production of any documents or things in response to these interrogatories is without prejudice to this objection. Io Group reserves the right to amend and/or supplement its responses.

9.    Io Group objects to the interrogatories to the extent that either on their face or in combination with Defendant's definition section the interrogatories create more than one discrete subpart which should be numbered as separate interrogatories.

10.    Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

11.    Io Group objects to the defined term "identify" in that it is vague and ambiguous and creates discrete subparts which should be numbered as separate interrogatories.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all copyrights owned by, or exclusively licensed to, you that you claim Veoh has infringed, whether directly, contributorily, or vicariously.

### RESPONSE TO INTERROGATORY NO. 1:

Io Group Inc. objects to this contention interrogatory pursuant to Federal Rule of Civil Procedure 33(c) on the grounds that it is premature at this stage of the litigation and Defendant has

PLAINTIFF'S SUPPLEMENTAL RESPONSE TO VEOH'S
FIRST SET OF INTERROGATORIES
C-06-3926 (HRL)

1    not yet responded to Plaintiff's Request for Production Number Sixteen, thereby denying Plaintiff

2    sufficient opportunity to review video files copied and publicly displayed by Veoh in order to

3    determine the extent to which Veoh infringed Plaintiff's works.  Plaintiff further objects to the

4    term "current exclusive licensee" as used in Defendant's definition of "identify with respect to a

5    copyright" as being vague, ambiguous and meaningless.  Plaintiff further objects to Defendant's

6    definition of "identify with respect to a copyright" in that it creates discrete subparts to the

7    Interrogatory.

8         Subject to and without waiving the forgoing objections and General Objections, Io Group,

9    Inc. responds as follows:

10    a.   Work: *Boner*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current Exclusive

11         Licensee: None; U.S. Copyright Registration Number(s): PA 990-715

12

13    b.   Work: *Prowl 3: Genuine Leather*; Author: MSR Video Inc.; Current Owner:  Io Group,

14         Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-

15         230-108

16    c.   Work: *Don't Ask Don't Tell*; Author: MSR Video Inc.; Current Owner:  Io Group, Inc.;

17         Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-230-011

18

19    d.   Work: *Heat*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current Exclusive

20         Licensee: None; U.S. Copyright Registration Number(s): PA 1-017-633

21    e.   Work: *Island Guardian*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current

22         Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 984-693; PA 1-

23         077-968

24

25    f.   Work:  Sea Men:  *Fallen Angel IV*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.;

26         Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-065-767

27    g.   Work: *Detour*; Author: Io Group, Inc.; Current Owner:  Io Group, Inc.; Current Exclusive

28         Licensee: None; U.S. Copyright Registration Number(s): PA 1-091-230

h. Work: *River Patrol*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 885-073; PA 1-086-865

**SUPPLEMENTAL RESPONSE**

Io Group Inc. objects to the term "current exclusive licensee" as used in Defendant's definition of "identify with respect to a copyright" as being vague, ambiguous and meaningless. Plaintiff further objects to Defendant's definition of "identify with respect to a copyright" in that it creates discrete subparts to the Interrogatory.

Subject to and without waiving the forgoing objections and General Objections, Io Group, Inc. responds as follows:

a. Work: *Boner*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 990-715

b. Work: *Don't Ask Don't Tell*; Author: MSR Video Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-230-011

c. Work: *Heat*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-017-633

d. Work: *Island Guardian*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 984-693; PA 1-077-968

e. Work: Sea Men: *Fallen Angel IV*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-065-767

f. Work: *Detour*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 1-091-230

g. Work: *River Patrol*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current

Exclusive Licensee: None; U.S. Copyright Registration Number(s): PA 885-073; PA 1-

086-865

h. Work: *Carny*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive

Licensee: None; U.S. Copyright Registration Number: PA-1-221-850;

i. Work: *Laid Up*; Author: Io Group, Inc.; Current Owner: Io Group, Inc.; Current Exclusive

Licensee: None; U.S. Copyright Registration Number: PA-1-040-878

j. Work: *First Crush*; Author Active Research d/b/a MSR Videos; Current Owner: Io

Group, Inc.; Current Exclusive Licensee: None; U.S. Copyright Registration Number: PA-

1-232-826.

**INTERROGATORY NO. 2:**

For each copyright requested to be identified in Interrogatory No. 1, identify each direct

infringement as to which you claim that Veoh bears contributory or vicarious liability.

**RESPONSE TO INTERROGATORY NO. 2:**

Io Group Inc. objects to this contention interrogatory pursuant to Federal Rule of Civil

Procedure 33(c) on the grounds that it is premature at this stage of the litigation and Defendant has

not yet responded to Plaintiff's Request for Production Number Sixteen, thereby denying Plaintiff

sufficient opportunity to review video files copied and publicly displayed by Veoh in order to

determine the extent to which Veoh infringed Plaintiff's works. Plaintiff further objects to

Defendant's definition of "identify with respect to a copyright infringement" in that it creates

discrete subparts to the Interrogatory.

Subject to and without waiving the forgoing objections and General Objections, Io Group,

Inc. responds as follows:

a. *Boner.* Infringers: persons identified by the user names flickrmen2 and halifax222, and

Veoh Networks, Inc.; Rights Infringed: Io Group's exclusive right to reproduce the

copyrighted work in copies (17 U.S.C. §106(1)), Io Group's exclusive right to prepare

-6-

website and had the right and ability to control the infringing activity in that it purported to license the infringing content, had the right to remove infringing content and could have taken simple measures to reduce infringement, yet failed to take such steps.

Dated: June 15, 2007

GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

## VERIFICATION

I, Keith Ruoff, declare:

I am Vice-President of Plaintiff Io Group, Inc. I have read the attached PLAINTIFF IO GROUP INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES and the matters set forth therein are true to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

June 15, 2007

Keith Ruoff
Vice President Io Group, Inc.

PLAINTIFF'S SUPPLEMENTAL RESPONSE TO VEOH'S
FIRST SET OF INTERROGATORIES
C-06-3926 (HRL)

# EXHIBIT J

GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 849
San Francisco, California 94114
Telephone: (415) 378-2625
legal@titanmedia.com

Attorney for Plaintiff
IO GROUP, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| IO GROUP, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>VEOH NETWORKS, Inc, a California Corporation,<br><br>DEFENDANT. | CASE NO.: C-06-3926 (HRL)<br><br>**PLAINTIFF IO GROUP INC.'S RESPONSE TO DEFENDANT'S SECOND SET OF REQUESTS FOR ADMISSIONS** |

PROPOUNDING PARTY:     VEOH NETWORKS, INC.

RESPONDING PARTY:     IO GROUP, INC.

SET NUMBER:     TWO

    Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 36, Plaintiff Io Group, Inc. hereby responds to Defendant's First Set of Requests for Admissions through the undersigned counsel, as follows:

-1-

## GENERAL OBJECTIONS

Io Group expressly incorporates the following General Objections as if set forth fully in response to each and every request for admission contained in Veoh's First Set of Requests for Admissions.

1.      Io Group objects to each request for admission to the extent it seeks information outside Io Group's possession, custody, or control.

2.      Io Group objects to each request for admission to the extent it seeks information protected by attorney-client privilege, the work product privilege and/or any other applicable privilege.  Such information will not be disclosed.  Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.      Io Group objects to each request for admission and to Defendant's instructions to the extent that they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.      Io Group objects generally to each request for admission to the extent it seeks information not reasonably related to the claims or defenses in this matter.

5.      Io Group objects to these requests for admission to the extent they are premature, and Io Group's responses to these requests for admission in response to these requests for admission are without prejudice to this objection.

6.      Io Group objects to each request for admission to the extent that either on its face or in combination with definitions provided by Defendant the request for admission is compound.

7.      Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

-2-

## OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 58:**

Admit that none of the allegedly infringing works at issue in this case that you claim were available thorough Veoh.com website contained a copyright notice.

**RESPONSE TO REQUEST NO. 58:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it seeks information outside Io Group's possession, custody, or control, Plaintiff has not completed its investigation and the request is otherwise vague and ambiguous.

Each of the works contained a copyright notice when it was placed in the stream of commerce. Infringing copies were made by Veoh's Users and by Veoh itself. It appears the copyright notice was removed from each of the works at some point, but Plaintiff does not know if the copyright notices were removed prior to the works being made available through the Veoh.com website or after.

**REQUEST FOR ADMISSION NO. 59:**

Admit that none of the allegedly infringing works at issue in this case that you claim were available thorough Veoh.com website identified Titan Media as the source.

**RESPONSE TO REQUEST NO. 59:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it seeks information outside Io Group's possession, custody, or control, Plaintiff has not completed its investigation and the request is otherwise vague and ambiguous.

Each of the works identified Titan Media as the source when it was placed in the stream of commerce. Infringing copies were made by Veoh's Users and by Veoh itself. It appears the Titan Media mark was removed from each of the works at some point, but Plaintiff does not know if it was removed prior to the works being made available through the Veoh.com website or after.

**REQUEST FOR ADMISSION NO. 60:**

Admit that none of the allegedly infringing works at issue in this case that you claim were available thorough Veoh.com website identified Io Group, Inc. as the source.

-3-

**RESPONSE TO REQUEST NO. 60:**

     Admit.


Dated: April 30, 2007


                                    GILL SPERLEIN
                                  Attorney for Plaintiff Io Group, Inc.

-4-

## CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of 18 years , and not a party to the action within. My business address is 69 Converse Street, San Francisco, California, 94103. On April 30, 2007 I served the within documents:

- **PLAINTIFF IO GROUP INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES**
- **PLAINTIFF IO GROUP INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS**
- **PLAINTIFF IO GROUP INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**
- **PLAINTIFF IO GROUP INC.'S RESPONSE TO DEFENDANT'S SECOND SET OF REQUESTS FOR ADMISSIONS**
- **PLAINTIFF IO GROUP INC.'S RESPONSE TO DEFENDANT'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

by causing a true and correct copy of the above to be placed with God's Speed Delivery Service for personal delivery in a sealed envelope with postage prepaid, addressed as follows:

JENIFER A. GOLINVEAUX
WINSTON & STRAW LLP
101 CALIFORNIA STREET, SUITE 3900
SAN FRANCISCO, CA 94111-5894

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 30, 2007.

Gill Sperlein

-1-

# EXHIBIT <u>K</u>

GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 849
San Francisco, California 94114
Telephone: (415) 378-2625
legal@titanmedia.com

Attorney for Plaintiff
IO GROUP, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| IO GROUP, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>VEOH NETWORKS, Inc, a California Corporation,<br><br>DEFENDANT. | CASE NO.: C-06-3926 (HRL)<br><br>PLAINTIFF IO GROUP INC.'S RESPONSE TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS |

PROPOUNDING PARTY:    VEOH NETWORKS, INC.

RESPONDING PARTY:    IO GROUP, INC.

SET NUMBER:    ONE

    Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 36, Plaintiff Io Group, Inc. hereby responds to Defendant's First Set of Requests for Admissions through the undersigned counsel, as follows:

-1-

# GENERAL OBJECTIONS

Io Group expressly incorporates the following General Objections as if set forth fully in response to each and every request for admission contained in Veoh's First Set of Requests for Admissions.

1.      Io Group objects to each request for admission to the extent it seeks information outside Io Group's possession, custody, or control.

2.      Io Group objects to each request for admission to the extent it seeks information protected by attorney-client privilege, the work product privilege and/or any other applicable privilege. Such information will not be disclosed. Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.      Io Group objects to each request for admission and to Defendant's instructions to the extent that they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.      Io Group objects generally to each request for admission to the extent it seeks information not reasonably related to the claims or defenses in this matter.

5.      Io Group objects to these requests for admission to the extent they are premature, and Io Group's responses to these requests for admission in response to these requests for admission are without prejudice to this objection.

6.      Io Group objects to each request for admission to the extent that either on its face or in combination with definitions provided by Defendant the request for admission is compound.

7.      Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

**RESPONSE TO REQUEST NO. 20:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it seeks information outside Io Group's possession, custody, or control and the request is otherwise vague and ambiguous.

**REQUEST FOR ADMISSION NO. 21:**

Admit that you have never sent a DMCA Notice to Veoh.

**RESPONSE TO REQUEST NO. 21:**

Admit.

**REQUEST FOR ADMISSION NO. 22:**

Admit that before filing this lawsuit, you never sent a DMCA Notice to Veoh

**RESPONSE TO REQUEST NO. 22:**

Admit.

**REQUEST FOR ADMISSION NO. 23:**

Admit that you have never sent any notice to Veoh regarding infringement of your copyrights.

**RESPONSE TO REQUEST NO. 23:**

Deny.

**REQUEST FOR ADMISSION NO. 24:**

Admit that before filing this lawsuit, you never sent any notice to Veoh regarding infringement of your copyrights.

**RESPONSE TO REQUEST NO. 24:**

Admit.

**REQUEST FOR ADMISSION NO. 25:**

Admit that Veoh is a "service provider" as defined by the 17 U.S.C. § 512(k)(1)(A).

**RESPONSE TO REQUEST NO. 25:**

Deny.

**REQUEST FOR ADMISSION NO. 26:**

Admit that Veoh is a "service provider" as defined by 17 U.S.C. § 512(k)(1)(B).

**REQUEST FOR ADMISSION NO. 57:**

Admit that at some time prior to the infringements you allege in this action, you created and provided copies, whether complete, modified, or excerpted, of copyrighted works claimed by you in this action which copies you directly or indirectly made available for free without explicitly asserting that viewers may not violate your copyrights in that copy.

**RESPONSE TO REQUEST NO. 57:**

Io Group objects that the term "provided copies' is vague and ambiguous and that the request is otherwise unintelligible. Io Group further objects that the request is compound. For these reasons Io Group cannot truthfully admit or deny this statement.

Dated: April 13, 2007

GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

-18-

# EXHIBIT L

1  GILL SPERLEIN (172887)
   THE LAW OFFICE OF GILL SPERLEIN
2  584 Castro Street, Suite 849
3  San Francisco, California 94114
   Telephone: (415) 378-2625
4  legal@titanmedia.com

5  Attorney for Plaintiff
6  IO GROUP, INC.

7

8                    UNITED STATES DISTRICT COURT
9                  NORTHERN DISTRICT OF CALIFORNIA
10                         SAN JOSE DIVISION

11                                )
                                  )   CASE NO.: C-06-3926 (HRL)
12  IO GROUP, INC., a California corporation,  )
                                  )   PLAINTIFF IO GROUP INC.'S RESPONSE
13                                )   TO DEFENDANT'S THIRD SET OF
       Plaintiff,                 )   REQUESTS FOR ADMISSIONS
14                                )
            vs.                   )
15                                )
16  VEOH NETWORKS, Inc, a California  )
    Corporation,                  )
17                                )
18     DEFENDANT.                 )
                                  )
19  _____

20  PROPOUNDING PARTY:    VEOH NETWORKS, INC.

21  RESPONDING PARTY:     IO GROUP, INC.

22  SET NUMBER:           THREE

23

24      Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule

25  36, Plaintiff Io Group, Inc. hereby responds to Defendant's First Set of Requests for Admissions

26  through the undersigned counsel, as follows:

27

28

                                      -1-

                                         PLAINTIFF'S RESPONSE TO VEOH'S
                                      THIRD SET OF REQUESTS FOR ADMISSIONS
                                             C-06-3926 (HRL)

**GENERAL OBJECTIONS**

Io Group expressly incorporates the following General Objections as if set forth fully in response to each and every request for admission contained in Veoh's First Set of Requests for Admissions.

1.        Io Group objects to each request for admission to the extent it seeks information outside Io Group's possession, custody, or control.

2.        Io Group objects to each request for admission to the extent it seeks information protected by attorney-client privilege, the work product privilege and/or any other applicable privilege.  Such information will not be disclosed.  Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.        Io Group objects to each request for admission and to Defendant's instructions to the extent that they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.        Io Group objects generally to each request for admission to the extent it seeks information not reasonably related to the claims or defenses in this matter.

5.        Io Group objects to these requests for admission to the extent they are premature, and Io Group's responses to these requests for admission in response to these requests for admission are without prejudice to this objection.

6.        Io Group objects to each request for admission to the extent that either on its face or in combination with definitions provided by Defendant the request for admission is compound.

7.        Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

-2-

## OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 61:**

Admit that you never sent any notice to Veoh regarding infringements of your copyrights, apart from communications in connection with this action.

**RESPONSE TO REQUEST NO. 61:**

Admit

**REQUEST FOR ADMISSION NO. 62:**

Admit that at some time prior to June 21, 2006, you uploaded to Veoh a copy or copies of a work, or portion thereof, alleged by you in this action.

**RESPONSE TO REQUEST NO. 62:**

Deny

**REQUEST FOR ADMISSION NO. 63:**

Admit that at some time prior to June 21, 2006, you uploaded to the Internet a copy or copies of a work, or portion thereof, alleged by you in this action.

**RESPONSE TO REQUEST NO. 63:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it is vague and ambiguous as to the terms "uploaded" and "Internet".

**REQUEST FOR ADMISSION NO. 64:**

Admit that at some time prior to June 21, 2006, you gave away for free DVDs or other media containing a copy or copies of a work, or portion thereof, alleged by you in this action.

**RESPONSE TO REQUEST NO. 64:**

Admit.

**REQUEST FOR ADMISSION NO. 65:**

Admit that of the files on the disk you produced labeled 200282, 17 are video files with run times of less than one minute.

-3-

**REQUEST FOR ADMISSION NO. 77:**

Admit that the file named "Falcon Boner.mpg" on the disk you produced labeled 200282 is a video with a run time of approximately 28 minutes or less.

**RESPONSE TO REQUEST NO. 77:**

Admit.

**REQUEST FOR ADMISSION NO. 78:**

Admit that the file named "Gay Porn Dont Ask Dont Tell Mi.mpg" on the disk you produced labeled 200282 is a video with a run time of approximately 31 minutes or less.

**RESPONSE TO REQUEST NO. 78:**

Admit.

**REQUEST FOR ADMISSION NO. 79[sic]:**

Admit that you employ no "standard technological measures," as defined by 17 U.S.C. §512(i)(2).

**RESPONSE TO REQUEST NO. 79:**

Deny.

Dated: May 30, 2007

GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

-6-

# EXHIBIT <u>M</u>

GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 849
San Francisco, California 94114
Telephone: (415) 378-2625
legal@titanmedia.com

Attorney for Plaintiff
IO GROUP, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| IO GROUP, INC., a California corporation, | ) CASE NO.: C-06-3926 (HRL) |
|  | ) |
| Plaintiff, | ) **PLAINTIFF IO GROUP INC.'S RESPONSE** |
|  | ) **TO DEFENDANT'S SECOND SET OF** |
| vs. | ) **REQUESTS FOR ADMISSIONS** |
|  | ) |
| VEOH NETWORKS, Inc, a California Corporation, | ) |
|  | ) |
| DEFENDANT. | ) |

PROPOUNDING PARTY:     VEOH NETWORKS, INC.

RESPONDING PARTY:     IO GROUP, INC.

SET NUMBER:     TWO

    Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 36, Plaintiff Io Group, Inc. hereby responds to Defendant's First Set of Requests for Admissions through the undersigned counsel, as follows:

## GENERAL OBJECTIONS

Io Group expressly incorporates the following General Objections as if set forth fully in response to each and every request for admission contained in Veoh's First Set of Requests for Admissions.

1.    Io Group objects to each request for admission to the extent it seeks information outside Io Group's possession, custody, or control.

2.    Io Group objects to each request for admission to the extent it seeks information protected by attorney-client privilege, the work product privilege and/or any other applicable privilege. Such information will not be disclosed. Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.    Io Group objects to each request for admission and to Defendant's instructions to the extent that they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.    Io Group objects generally to each request for admission to the extent it seeks information not reasonably related to the claims or defenses in this matter.

5.    Io Group objects to these requests for admission to the extent they are premature, and Io Group's responses to these requests for admission in response to these requests for admission are without prejudice to this objection.

6.    Io Group objects to each request for admission to the extent that either on its face or in combination with definitions provided by Defendant the request for admission is compound.

7.    Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

PLAINTIFF'S SUPPLEMENTAL RESPONSE TO VEOH'S
SECOND SET OF REQUESTS FOR ADMISSIONS
C-06-3926 (HRL)

## OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 59:**

Admit that none of the allegedly infringing works at issue in this case that you claim were available thorough Veoh.com website identified Titan Media as the source.

**RESPONSE TO REQUEST NO. 59:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it seeks information outside Io Group's possession, custody, or control, Plaintiff has not completed its investigation and the request is otherwise vague and ambiguous.

Each of the works identified Titan Media as the source when it was placed in the stream of commerce. Infringing copies were made by Veoh's Users and by Veoh itself. It appears the Titan Media mark was removed from each of the works at some point, but Plaintiff does not know if it was removed prior to the works being made available through the Veoh.com website or after.

**SUPPLEMENTAL RESPONSE TO REQUEST NO. 59:**

Deny.

Dated: June 15, 2007

GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

-3-