```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5

 6  IO GROUP, INC., a California )
    Corporation,                 )
 7                               )
                    Plaintiff,   )
 8                               )
       vs.                       )Case No. C-06-3926(HRL)
 9                               )
    VEOH NETWORKS, Inc., a       )
10  California Corporation,      )
                                 )
11                  Defendant.   )
    _____)
12

13

14              HIGHLY CONFIDENTIAL

15         DEPOSITION OF DMITRY SHAPIRO

16            SAN DIEGO, CALIFORNIA

17                MAY 21, 2007

18

19

20

21

22  REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101

23

24

25
```

Dockets.Justia.com

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                       SAN JOSE DIVISION

5

6

7   IO GROUP, INC., a California )
    Corporation,                )
8                               )
                       Plaintiff, )
9                               )
       vs.                      )Case No. C-06-3926(HRL)
10                              )
    VEOH NETWORKS, Inc., a      )
11  California Corporation,     )
                                )
12                     Defendant. )
    _____)
13

14

15

16            DEPOSITION OF DMITRY SHAPIRO,

17  taken by the Plaintiff, commencing at the hour of

18  2:00 p.m., on Monday, May 21, 2007, at

19  530 B Street, Suite 350, San Diego, California,

20  before Nicole R. Harnish, Certified Shorthand

21  Reporter in and for the State of California.

22

23

24

25

 1  APPEARANCES:

 2

 3       For the Plaintiff:

 4            GILL SPERLEIN
              GENERAL COUNSEL
 5            TITAN MEDIA.COM
              BY:  GILL SPERLEIN, ESQ.
 6            584 Castro Street, Suite 849
              San Francisco, California  94114

 7

 8       For the Defendant:

 9            WINSTON & STRAWN
              BY:  JENNIFER A. GOLINVEAUX, ESQ.
10            101 California Street
              San Francisco, California  94111

11

12
         Also Present:  Keith Ruoff
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2  WITNESS:  DMITRY SHAPIRO

3

4  EXAMINATION:                              Page

5  By Mr. Sperlein                             5

6

7                  E X H I B I T S

8  MARKED FOR IDENTIFICATION

9  4     Document entitled "Press Releases"        11

10 5     Document entitled "Terms of Use"          24

11 6     Document entitled "Acceptable Use Policy"  29

12 7     E-mail correspondence from Joseph Papa    50
         to Engineering
13
   8     E-mail correspondence from               72
14       Francis Costello to Dmitry Shapiro,
         dated 8/7/2006
15
   9     E-mail correspondence from               73
16       Dmitry Shapiro to Francis Costello,
         dated 6/5/2006
17
   10    Document entitled "Red Herring, The      75
18       Business of Technology," dated
         8/17/2005
19

20       Questions Witness Instructed Not To Answer
                       Page    Line
21                      66      25

22

23

24

25
```

4

```
 1                    DMITRY SHAPIRO,

 2      having been duly sworn, testified as follows:

 3

 4                    EXAMINATION

 5

 6  BY MR. SPERLEIN:

 7      Q.   Good afternoon, Mr. Shapiro.  Have you ever

 8  had your deposition taken before?

 9      A.   No.

10      Q.   No.  Hopefully you won't ever have to have

11  to do it again.  No one likes to do it, but I will do

12  my best to make it as painless as possible for you.

13      Just a couple of ground rules that I always go

14  over with people.  I am going to be asking you

15  questions and you are going to be giving your

16  responses under oath as you just took.  Our

17  conversation is going to be a little bit different

18  from the way that people generally communicate.

19              Because the reporter is trying to record

20  everything we say, she cannot hear any nonaudible

21  responses to my questions.  So I ask that instead of

22  shaking your head yes or no, that you actually

23  verbally say yes or no.

24              Can you do that?

25      A.   Yes, I can.
```

1  releases.

2       A.   Not at all.

3       Q.   Thank you.

4            Does Veoh have policies in place that

5  discuss how users of the Veoh system are permitted to

6  use the system?

7       A.   Yes.

8       Q.   And would those policies, in general, be

9  covered in what is referred to as "the terms of use"?

10      A.   Specifically.

11      Q.   And you are familiar with Veoh's terms of

12  use?

13      A.   At a high level.

14      Q.   Okay.  And you are familiar with any

15  changes that have occurred to the terms of use over

16  time?  I am not asking you for specific recollections

17  at this time, but in general.

18      A.   No.  I actually can't say that I would be

19  familiar with the changes.  I mean, the terms of

20  use -- you know, I'm the CEO of the company and I

21  spend my time on the road, and that is done at

22  different levels of organization.  I suspect they've

23  changed over time.

24      Q.   Were you involved in the initial drafting

25  of the terms of use?

1      A.   No.  I was present on a phone call at one

2  time, although I don't remember specifics of the

3  phone call.  But the primary drafting was done

4  between our attorneys and Dr. Dunning, who you have

5  met.

6      Q.   Are users required to agree to Veoh's terms

7  of use when they register with Veoh?

8      A.   Yes.  I believe their registration states

9  that they are agreeing to the terms of use by

10 registering.

11     Q.   And is registration required before an

12 individual could upload a video file to the Veoh

13 network?

14     A.   Yes, it is.

15     Q.   So I think that is an example of a

16 transitive property, if I recall from my high school

17 days.  If someone places a file on the Veoh system,

18 then they would have had to agree with Veoh's terms

19 of use in order to do that?

20     A.   I think that is fair to say.

21     Q.   They have to register.  In order to

22 register, they have to agree to terms of use.

23     A.   Yes, they do.

24     Q.   Thank you.

25     A.   You are right.  That is the transitive

1  property.

2      Q.  Do you know if a user has always agreed to

3  the terms of use before they could upload a video

4  file to Veoh?

5      A.  Yes, I believe so.

6      Q.  I am going to give you another exhibit and

7  ask the reporter to mark this as Exhibit No. 5.  And

8  why don't you take a few minutes to look that over.

9  I don't want you to read every paragraph, but just

10  generally take a look at the document.  If you want

11  to read the whole thing, you can.

12          (Plaintiff's Exhibit No. 5 was marked.)

13          THE WITNESS:  Okay.

14  BY MR. SPERLEIN:

15      Q.  For the record, this document is numbered

16  with plaintiff's Document Production No. 200029

17  through 032.  And has the title of "Terms of Use."

18          At the bottom left-hand corner there's a

19  URL.  Will you take a look at that URL, Mr. Shapiro?

20      A.  Uh-huh.

21      Q.  And then on the bottom right hand corner

22  there is a date of June 13th, 2006; is that correct?

23      A.  That's correct.

24      Q.  Does this appear to be the terms of use as

25  they appeared on the Veoh web site as of June 13th,

24

1  2006?

2      A.   I wouldn't know if they were incorrect, but

3  they appear to be correct.

4      Q.   Is there any reason to believe that this

5  isn't an accurate copy of the terms of use as they

6  appeared on the Veoh network?

7      A.   No.

8      Q.   Okay.  If you'll go down to the third

9  paragraph from the bottom that begins with "you

10 expressly."  I am going to read that aloud and ask

11 that you read it along with me.

12          "You expressly acknowledge and agree that

13 any user material that you make available on the Veoh

14 service may be freely available by Veoh" -- I am

15 going to have to back up and reread that because I

16 didn't get that quite right.

17          I'm going to start at the beginning of the

18 line.  "The Veoh service may be made freely available

19 by Veoh through the Veoh service, including, without

20 limitation, for download by others.  And that this

21 permission is made and granted in consideration of

22 your use of the Veoh service and is nonexclusive,

23 perpetual, royalty free, irrevocable, and

24 transferable."

25          MS. GOLINVEAUX:  You made one more minor

1  error in the third line.

2            MR. SPERLEIN:  Okay.

3            MS. GOLINVEAUX:  "By other users," rather

4  than by others.

5            MR. SPERLEIN:  Thank you.

6  BY MR. SPERLEIN:

7      Q.  "User material that you obtain from the

8  Veoh service is limited to your personal

9  noncommercial use.  And you will not redistribute or

10  attempt to redistribute such user material outside

11  the Veoh service."

12            Now, with Ms. Golinveaux's corrections and

13  my minor correction, did I read that accurately?

14      A.  Yes, you did.

15      Q.  Was that an accurate statement of Veoh's

16  policy as of June 13th, 2006?

17      A.  Well, there are lots of things in here,

18  but, yes, they look overall correct.

19      Q.  As you understand this paragraph, does a

20  user give Veoh the right to take any video file that

21  they submit to the system and then further

22  broadcast -- let me rephrase that.

23            Under this paragraph, is a user granting

24  Veoh permission to further broadcast any video file

25  that they uploaded onto the Veoh system?

                                                    26

1          MS. GOLINVEAUX:  I object.  That calls for

2     a legal conclusion.  The witness is not an attorney.

3     BY MR. SPERLEIN:

4          Q.   I am not asking you for your legal opinion

5     on this.  I want you to tell me if that was what the

6     policy was at the time.

7          MS. GOLINVEAUX:  Same objection.  It calls

8     for a legal conclusion.

9     BY MR. SPERLEIN:

10         Q.   Would you go ahead and answer the question?

11         MS. GOLINVEAUX:  And I think you restated

12    the question.  Could you reread the question, please?

13         MR. SPERLEIN:  Why don't we strike all

14    that.  I will start over, rather than rereading.

15    BY MR. SPERLEIN:

16         Q.   For the time being I am going to move on.

17    And now I want to go and read another paragraph.

18    This is the last paragraph on the page that starts

19    with "Veoh."  "Veoh shall have no obligation to

20    monitor any user material.  However, Veoh and its

21    agents shall have, and do reserve the right, to

22    monitor any user material from time to time for any

23    lawful purpose.  Veoh may, without notice to you,

24    remove or block content of any user material from the

25    Veoh service, including disabling access to such user

27

1    material that you have downloaded through the Veoh

2    service.  Veoh reserves the right to terminate your

3    use of the Veoh service if we determine that you have

4    violated these terms or the acceptable use policy."

5            Did I read that correctly?

6        A.   Yes, you did.

7        Q.   And was that an accurate statement of

8    Veoh's policies as of June 13th, 2006?

9        A.   It is what is written in the terms of use.

10       Q.   Would all users have had to agree to that

11   term along with the other terms of use in order to

12   register at that moment in time?

13       A.   Yes.

14       Q.   Following with the next paragraph on

15   page 30.  I am just going to read the last sentence

16   of that paragraph and have you read silently along

17   with me.  "You agree to indemnify and hold Veoh

18   harmless from and against any liability, claims,

19   losses, demands, or damages arising out of or

20   relating to your violation of these terms per the

21   acceptable use policy."

22           Did I read that correctly?

23       A.   Yes.

24       Q.   And is that a term that a user would have

25   had to agree to in order to register with the Veoh

1  really bad with dates.  I would say definitely less

2  than a year.  Six to nine months ago, perhaps.

3      Q.    And that group is specifically charged with

4  attempting to gain additional content for the Veoh

5  system; is that correct?

6          MS. GOLINVEAUX:  Object to the form -- I'm

7  sorry.  Could you read back the question, please?

8          (Record read.)

9          MS. GOLINVEAUX:  Object to the form of the

10  question.  You can answer subject to the objection,

11  if you understand the question.

12          THE WITNESS:  Yes.  The group talks to

13  primarily kind of brand name content owners and gets

14  them to use Veoh.

15  BY MR. SPERLEIN:

16      Q.    Okay.  I'll come back to that group

17  shortly.  But prior to the existence of that group,

18  did Veoh obtain content from other sources?

19          MS. GOLINVEAUX:  Object to the form of the

20  question.

21  BY MR. SPERLEIN:

22      Q.    Let me ask you a specific example, and then

23  we can go from there.

24      A.    Okay.

25      Q.    Did Veoh have a deal with Turner

34

1  Broadcasting or -- if I don't have the name exactly

2  correct, perhaps you can correct me -- but one of the

3  Turner properties to put some of Turner's content on

4  the Veoh system?

5      A.   We did do a short-lived promotion, is what

6  we called it, with Turner that supported a marathon

7  that they were doing.  And yes, that promotion had

8  Turner content that they put on the system.

9      Q.   Did Veoh pay Turner for any of that

10  content?

11      A.   No.

12      Q.   And did Turner pay Veoh to put any of that

13  content on the system?

14      A.   No.

15      Q.   So it was a deal where both sides were

16  considered to have been benefiting from it; is that

17  accurate?

18      A.   Yes.

19      Q.   Otherwise why do it, right?

20      A.   Right.

21      Q.   When you were putting the Turner

22  content -- or when the Turner content was being put

23  onto the Veoh network, did employees or others

24  associated with Turner go to the -- use either the

25  Veoh client or Veoh web site and upload the content

1  onto the Veoh system?

2          MS. GOLINVEAUX:  Sorry.  Would you read the

3  question back, please?

4          (Record read.)

5  BY MR. SPERLEIN:

6      Q.   Let me form a cleaner question for you.

7  Did Turner upload the content or did Veoh upload the

8  content to the system?

9      A.   I don't know, but one of the two parties

10  did.  I would suspect it was Turner.

11      Q.   Why would you suspect that?

12      A.   I mean, that is what we prefer, that Turner

13  do it.

14      Q.   As part of any deal to put content on the

15  Veoh system, is one of the negotiated terms the

16  question of whether the content provider uploads the

17  content or Veoh uploads the content?

18      A.   I don't know.

19      Q.   Are there some deals where the content

20  provider actually gives the files, the video files,

21  to Veoh and Veoh's employees upload the content onto

22  the system?

23      A.   Yes, I believe so.

24      Q.   Can you give me a few other examples of

25  deals that were entered into prior to the formation

1    Q.    And let me kind of just bring this back to

2  full circle.  The reason why I am asking these

3  questions under this topic is that I want to know if

4  it is important for Veoh to have a lot of content on

5  its system?

6          MS. GOLINVEAUX:  I'm sorry.  Is that the

7  question?

8          MR. SPERLEIN:  Yes.

9          MS. GOLINVEAUX:  Object to the form of the

10 question.

11 BY MR. SPERLEIN:

12   Q.    I am going to ask you a new question,

13 Mr. Shapiro.  Does Veoh seek deals with third-party

14 content provider's because it is important for Veoh

15 to have content on veoh.com?

16         MS. GOLINVEAUX:  Object to the form.

17 BY MR. SPERLEIN:

18   Q.    Go ahead and answer.

19   A.    Again, back to my prior answer.  Veoh seeks

20 deals with content providers for a number of reasons,

21 one of them being brand association.  Absolutely

22 content.  Along with that, brand association is

23 important.

24   Q.    Thank you.

25         Does Veoh take any measures to ensure that

43

1 of them playing nothing, one of them playing

2 propaganda.  I watched until the age of nine maybe an

3 hour worth of cartoons.

4      So when I moved to the States I grew up on

5 television and always kind of saw it and respected it

6 as being this incredible medium to be able to

7 communicate and influence and motivate people.

8 Right.

9      And as I was running Aronix, the previous

10 company that I founded, I realized that we were now

11 at a time where technology would allow us to create

12 practically, as I call it, infinite amount of

13 spectrum, channels for individuals to use, to be able

14 to broadcast their thoughts to the world very, quite

15 frankly, politically motivated behind the scenes.

16 But I saw it as, and still do see it as, the, you

17 know, democratized medium that allows the average man

18 to be able to communicate with the entire world.

19     Q.   You see Veoh in that regard?

20     A.   Yes.  I see democratization of the video.

21 YouTube is clearly similar in that regard.  There are

22 hundreds of sites that are allowing these kinds of

23 things now.  Veoh was one of the first ones.

24     Q.   And have you referred to Veoh as an

25 "Internet television network" before?

1      A.    Yes.

2      Q.    And what is your basis of that statement?

3  Why do you consider Veoh an "Internet television

4  network"?

5      A.    Well, that is just kind of what we call

6  this capability of being able to broadcast, you know,

7  your own video.  It is like having your own TV

8  station.  It is something that consumers understand.

9      Q.    When you were in the formative stages of

10  creating Veoh, did you consider issues of copyright

11  infringement?

12      A.    Sure.

13      Q.    It was something that was on your mind?

14      A.    Of course.

15      Q.    And understanding that Veoh has evolved

16  a lot from what you initially had envisioned, at

17  those early stages did you come up with a solution

18  for dealing with potential copyright issues?

19          MS. GOLINVEAUX:  Object to the form of the

20  question.

21          THE WITNESS:  Well, what I envisioned

22  was -- going perhaps to that e-mail that you showed

23  me -- was the press releases that talk about peer to

24  peer, the traditional peer to peer networks are --

25  these days are not centralized, and therefore they

54

1    Q.   And the video file has to first go to Veoh

2   and it is centralized -- the centralized part of the

3   system and then goes out to the other user that might

4   want that video file; is that correct?

5    A.   Well, let me clarify to -- so a content

6   publisher or content owner uploads the content to

7   Veoh.  The content is then posted on Veoh.  And the

8   peer clients connect to Veoh or other peers in the

9   system and get file fragments, as they are called,

10   from those peers.

11    Q.   And in addition those users would watch the

12   Flash version of the video file through the veoh.com

13   web site; is that correct?

14    A.   That's correct.

15    Q.   You said earlier that you envisioned a

16   system where Veoh could remove files from its system

17   if they were discovered to be infringing; is that

18   accurate?

19    A.   Yes.  That's correct.

20    Q.   Did you ever envision a system where video

21   files would be reviewed in advance of being broadcast

22   to determine if they were infringing on copyright?

23    A.   Yes.  I did envision a system like that.

24    Q.   And how would that system operate?

25    A.   Well, there would be a queue that would,

1  you know, hold the file for review and then a series

2  of previewers that would review it.

3       Q.   And where would those -- would those

4  reviewers have potentially been Veoh employees?

5       A.   I wasn't sure.  I suspected they could have

6  been Veoh employees or been kind of like

7  about.com, which is what I used to use, which are

8  volunteers distributed throughout the world.  I don't

9  know if you know how about.com works.  They are

10  volunteers, not employees.  I am a technologist, not

11  a media guy still to this day.

12       Q.   Did you feel that reviewers were able to

13  look at a video file before it went through the

14  system, that they could reduce copyright

15  infringement?

16       A.   I don't know if I ever thought through it

17  enough to, you know, be able to answer how I felt

18  about it.  But I did envision a system that had

19  reviewers.

20       Q.   For the purpose of reducing copyright

21  infringement; is that correct, or no?

22       A.   Well, clearly that would have been one of

23  the purposes, I suspect, for other purposes.

24       Q.   At any time since Veoh went live, did you

25  personally see a video file that you suspected of

1  being copyright infringement and take action to

2  remove that video file from the system?

3      A.   Not that I recall.  I have flagged files,

4  but not for copyright purposes.  I flagged files that

5  I saw were violent or, you know, broke our current

6  policy of nudity, but that is done by our, you know,

7  group.  We've got a person that does that.

8      Q.   I'm sorry.  Could you clarify?  That does

9  what?

10      A.   That does a takedown.  That does the actual

11  takedown.

12      Q.   So to the extent that you have been

13  involved in the takedown of any particular video

14  file, it has been in the same way that a community

15  member could flag a video file and bring it to a core

16  groups' attention that perhaps it needed to be --

17      A.   Correct.

18      Q.   Okay.  Thank you.

19           Was Veoh designed to earn revenue from ad

20  sales?

21      A.   We envisioned Veoh to -- yes, to be able to

22  earn revenue from ad sales.

23      Q.   How does that business model operate -- or

24  how -- let me ask you this.  How did you envision

25  Veoh earning revenue from the ad sales?

1     A.   We envisioned people seeing video and our

2  ability to be able to serve an ad to them while they

3  were launching.

4     Q.   Did you envision banner ads?

5     A.   Sure.

6     Q.   And did you also envision maybe video files

7  that actually could play subsequent to or prior to a

8  video clip?

9     A.   Yes.

10    Q.   Do you currently -- does Veoh currently

11 obtain revenue from advertising on veoh.com?

12    A.   We are playing around, as we call it, with

13 advertising.

14    Q.   And are any of those ads video ads yet?

15         MS. GOLINVEAUX:  Object to the form of the

16 question.

17         THE WITNESS:  I don't know.  I have seen in

18 demo form a -- I don't know if I have ever seen a

19 video ad in the site.  So I don't know if I could

20 answer that question for you, but I have seen a

21 prototype of a video ad.  But I believe I saw it on

22 the test system rather than a production system.

23 BY MR. SPERLEIN:

24    Q.   Is there a hope that Veoh could direct ads

25 that are specific to what a user might be interested

1  in based on video files that that user has previously

2  reviewed?

3          MS. GOLINVEAUX:  Could you reread the

4  question for me, please?

5          (Record read.)

6          MS. GOLINVEAUX:  I will object to the form.

7          THE WITNESS:  Yes.

8  BY MR. SPERLEIN:

9      Q.   Does Veoh currently control what ads a user

10 views?

11     A.   Not that I know.

12     Q.   Is that in development?

13     A.   Again, I don't know if "development" would

14 be -- it is in research.

15     Q.   Is there a correlation between how many

16 users come to veoh.com and how much revenue Veoh is

17 able to earn?

18         MS. GOLINVEAUX:  Object to the form of the

19 question.

20         THE WITNESS:  There will be a correlation

21 between how much video a -- yes, how much video a

22 viewer watches and revenue, we believe.  Again, don't

23 have real data on it, but that is the assumption.

24 BY MR. SPERLEIN:

25     Q.   Is there a correlation between the quality

1  of video content available on veoh.com and the number

2  of people that come to veoh.com?

3          MS. GOLINVEAUX:  Object to the form.

4          THE WITNESS:  I have discussed

5  theoretically with smart people what the word

6  "quality" means.  So it is somewhat of an ambiguous

7  word.  But I think to each person a video is -- you

8  know, whether they like it or not is dependent on

9  many different factors.  So I don't know how to

10  quantify that.

11          But, you know, if they like it, they watch

12  it.  And to me, I guess that means quality.  I don't

13  know if you are referring to picture quality or

14  storytelling or, you know, writing or the resolution.

15  You know, all of those are -- to me it is an

16  ambiguous question.  I don't know how to really

17  answer it, but --

18  BY MR. SPERLEIN:

19      Q.   If Veoh has more content on its web site,

20  is it more likely that some of that content will

21  appeal to any given individual user?

22          MS. GOLINVEAUX:  Object to the form.

23          THE WITNESS:  Yes.

24  BY MR. SPERLEIN:

25      Q.   When veoh.com -- strike that.

1          When Veoh first launched, did Veoh allow

2   adult or sexually explicit material at that time?

3       A.   Yes.

4       Q.   And did that remain the policy until

5   approximately June 21st, 2006?

6       A.   Yes, if that was the day that we took it

7   down.  I assume it was, but, yes.

8       Q.   So what I'm specifically asking is, was

9   there any time between the time that Veoh first

10  started operating and sometime after that where adult

11  was not allowed and then began to be permitted prior

12  to --

13      A.   No.  Not that I recall.

14      Q.   It was put in from the beginning until --

15      A.   Yes.  Exactly.

16      Q.   Did the sexually explicit video files that

17  appeared on Veoh prior to Veoh's change in policy

18  attract a certain audience base to veoh.com?

19          MS. GOLINVEAUX:  Object to the form of the

20  question.

21          THE WITNESS:  I don't know if it attracted

22  the base itself, but clearly they were viewed.

23  BY MR. SPERLEIN:

24      Q.   There were people interested in viewing

25  sexually explicit material on veoh.com?

1     A.   Yes.  There were.

2     Q.   Was there a drawback to Veoh allowing

3  sexually explicit material to appear on the web site?

4          MS. GOLINVEAUX:  Object to the form.

5          THE WITNESS:  You mean a negative aspect of

6  it?

7  BY MR. SPERLEIN:

8     Q.   Yes, sir.

9     A.   Yes.

10    Q.   And what were those negative aspects?

11    A.   Well, we got overrun by it very quickly.

12 And we were afraid that the marketplace would

13 perceive us as being an adult provider.

14    Q.   Where there any other negative aspects?

15    A.   That was the primary aspect.

16    Q.   Acknowledging that that was the primary

17 aspect, were there other negative aspects?

18    A.   We were concerned about litigation that

19 we -- or a law that we did not understand, which was

20 this 2257 that the adult industry is judged by.  And

21 we were concerned that --

22         MS. GOLINVEAUX:  I would just interject

23 here to the extent that your testimony would disclose

24 any attorney-client communications of any sort, I

25 would instruct the witness not to answer.

1          THE WITNESS:  Okay.

2   BY MR. SPERLEIN:

3       Q.   Do you know when --

4       A.   I'm sorry.  Let me make one statement.  By

5   far the biggest concern for us was -- by far,

6   underline, bolded, all upper case, was that we were

7   going to get branded as an adult destination.

8       Q.   And if that happened, how would that affect

9   your business?

10      A.   Well, we were a venture capital backed

11  company.  And venture capital backed companies go for

12  big, big projects.  Even though the adult industry is

13  a very big industry, we felt that there was something

14  bigger.  And that is, you know, getting this

15  democratized platform for anyone to be able to

16  broadcast.  And we thought that we could build a

17  bigger business.

18          While we didn't necessarily discriminate

19  against -- we always envisioned a network that would

20  allow people to, in a sense, have free speech, we

21  were concerned that it was going to make us be

22  perceived as an adult --

23      Q.   Was it your feeling that CBS wouldn't come

24  and enter a deal with you if your web site was

25  primarily composed, at that time, of adult video?

1          MS. GOLINVEAUX:  Object to the form.  And

2   it assumes facts not in evidence.

3          THE WITNESS:  I don't think we specifically

4   thought that far ahead with, you know, just signing

5   the CBS deal.  But, again, we were concerned that the

6   world would perceive us -- you know, when people

7   wrote stories and talked with Veoh that they would

8   perceive Veoh as a predominately adult site.

9   BY MR. SPERLEIN:

10      Q.   The idea being that companies that were

11  producing material that was not sexually explicit

12  would not want to be broadcast in the same location

13  as material that was sexually explicit; is that

14  accurate?

15      A.   Again, probably not.  That wasn't our

16  biggest concern.  The companies would not want to do

17  it.  I mean, they do do it on cable.  Next to Playboy

18  you have got the Disney channel.  We were just more

19  concerned with the general perception of consumers

20  and press and everybody else.

21      Q.   Including your user base, the people that

22  actually came to view video files?

23      A.   Well, yeah.  To me, they fall into that

24  bucket of consumers, yeah.

25      Q.   Do you know when Veoh officials first

1      A.   Not offhand.

2      Q.   Would that be measured?

3      A.   I don't know how accurately, but I expect

4  probably could be given a ballpark.

5      Q.   And how about just the raw numbers of

6  sexually explicit files compared to say nonsexually

7  explicit files, can you -- do you have any idea what

8  that ratio was at the time?

9      A.   I don't know.

10     Q.   Do you have any idea of the -- just the raw

11  number of sexually explicit video files that were on

12  the Veoh system at that time?

13     A.   I don't recall.  I think at one time I

14  probably knew an approximate number, but I can't

15  recall it.

16     Q.   When Veoh changed it's policy, did Veoh at

17  that time remove sexually explicit files that were

18  currently on the system?

19     A.   Yes.

20     Q.   Do you know the number of files that were

21  removed at that time?

22     A.   That is the number that I am referring to

23  that would be a number that I could give you a number

24  if I remembered it.

25     Q.   And when Veoh removed them from the system,

1  did Veoh actually remove the sexually explicit video

2  files that were residing on registered members' home

3  computers?

4       A.   I believe that is true.

5       Q.   Did Veoh's traffic drop when Veoh changed

6  its policy to no longer allow sexually explicit video

7  files on the video system?

8       A.   Yes, it did.

9       Q.   Do you have a quantitative number that you

10  could give me as to how much?

11       A.   Again, not offhand.  At one time I believe

12  we did measure it.

13       Q.   What statistics would one look at to

14  measure that change in traffic?

15       A.   Well, number of videos viewed; Number of,

16  you know, users coming to the site.  Those are, I

17  think, the two primary.

18       Q.   Do you know if the LimeLight usage dropped

19  significantly at that time?

20       A.   I don't know specifically, but the number

21  of videos viewed, I believe dropped.  And because I

22  think LimeLight was serving at that time -- I don't

23  recall if it was or not, but if it was, clearly

24  LimeLight would have noticed that.

25       Q.   I am going to take a few minutes to go

1    through this.  It is probably a little early for a

2    break, but if you want to take advantage of this five

3    minutes or something while I look through documents,

4    you can do that.

5           MS. GOLINVEAUX:  Okay.  Let's do that.

6           (Recess.)

7           MR. SPERLEIN:  Okay.  Exhibit No. 8.

8           (Plaintiff's Exhibit No. 8 was marked.)

9    BY MR. SPERLEIN:

10     Q.   Defendant's Document Production No. 00203,

11   an e-mail from Francis Costello to Dmitry Shapiro,

12   dated August 7th, 2006; is that correct?

13     A.   Yes, it is.

14     Q.   I am going to read this.  It says "Traffic

15   was down last week by approximately 10 percent,

16   almost all from lower direct links to

17   Video Details.HTML.  We should talk about strategies

18   to get promotion going in the car.  Numbers are flat

19   to down still since porn takedown."

20           Did I read that correctly?

21     A.   Yes.

22     Q.   Does this acknowledge that even on

23   August 7th of 2006, veoh.com is still feeling the

24   effects of no longer having sexually explicit video

25   files on the Veoh web site?

1          MS. GOLINVEAUX:  Object to the form.

2          THE WITNESS:  Yes.  I think in August of

3   that year our traffic was lower than expected.

4          MR. SPERLEIN:  That is all for that one.

5   Thank you.

6   BY MR. SPERLEIN:

7      Q.   Exhibit No. 9.  This is defendant's

8   Document Production No. 00218.

9          (Plaintiff's Exhibit No. 9 was marked.)

10         THE WITNESS:  Okay.

11  BY MR. SPERLEIN:

12     Q.   You have had an opportunity to review the

13  exhibit?

14     A.   Yes, I have.

15     Q.   Do you recall getting this e-mail

16  originally from Francis Costello to you and then your

17  brief reply back to Francis Costello?

18     A.   I don't explicitly recall it, but I see it

19  here now.

20         MS. GOLINVEAUX:  Mr. Sperlein, is this a

21  multipage e-mail?  Is this just the first page of

22  more than one page that was produced?

23         MR. SPERLEIN:  I don't believe so.  But

24  certainly if there is another page, it would

25  obviously be in the same order and you could take a

1   look at it.

2   BY MR. SPERLEIN:

3        Q.   And does this e-mail -- the portion from

4   Francis Costello to you, lay out some different

5   strategies for dealing with adult content?

6        A.   Yes, it does.

7        Q.   In a general way?

8        A.   Yes.

9        Q.   And the third option as presented says

10  "Create dedicated porn product under different

11  brand."

12       A.   Uh-huh.

13       Q.   Did Veoh ever further consider that option?

14       A.   Yeah, we thought about it and decided not

15  to do it.

16       Q.   Do you recall why Veoh decided not to do

17  that?

18       A.   Because we felt any association, whether we

19  had it on one site or two sites, was all still going

20  to be perceived as Veoh and we would be perceived as

21  an adult company rather than a --

22       Q.   Did you discuss any measures that you could

23  take to distinguish the two different brands from

24  each other so that wouldn't be a risk?

25       A.   Well, you have them on different sites and

                                                        74

1  call them different things, but people always know

2  who owns what.  At least we believe they do, so --

3      Q.   Okay.  Let me look at also No. 1 that is

4  listed there.  It says "current allow but hide

5  strategy."

6           Was this the idea of allowing sexually

7  explicit video files to remain on Veoh, but tagging

8  them in a way that they wouldn't appear on the front

9  page or the most popular page?

10     A.   Yes, I believe that is what that refers to.

11     Q.   Okay.  Do you recall doing an interview

12  with Red Herring around August 17th of 2005?  Do you

13  have any recollection of that?

14     A.   I do so many interviews.  I have clearly

15  interviewed a number of times with Red Herring, so --

16     Q.   Let me do this.  Take your time to review

17  it, but eventually I am going to ask you to direct

18  your attention to the top of the third column, the

19  first paragraph.

20           (Plaintiff's Exhibit No. 10 was marked.)

21           THE WITNESS:  Okay.

22  BY MR. SPERLEIN:

23     Q.   Do you recall specifically having said that

24  "Veoh would use human filters to filter out illegally

25  miscategorized and improperly formatted content"?

75

1  that I don't have any follow-up questions for you.

2          I know that this timing could have maybe

3  allowed us a little more time with other folks,

4  but -- so give us a few minutes, maybe even a little

5  bit more than usual.  I want to make sure, because

6  this will be the last opportunity I have to ask you

7  questions, and I want to see if I have anything else

8  for you, any clarifications.  And then we will wrap

9  up.

10          MS. GOLINVEAUX:  Okay.

11          (Recess.)

12  BY MR. SPERLEIN:

13      Q.   Mr. Shapiro, earlier you talked about the

14  way that you envisioned a process for reviewing video

15  files before publication on Veoh network.

16          My question to you now is why did you

17  eventually not come to implement such a procedure?

18      A.   Well, again, as we started kind of looking

19  at the system and how it was going to scale primarily

20  was the concern -- there's no way that we felt that

21  we could build a system that could do that.

22      Q.   And what were the -- where were the

23  limitations on doing the system?

24      A.   Well, the ability for our editors to

25  correctly identify copyrighted content and the

1  ability to deal with volume.

2      Q.   And focusing in just on the correctly

3  identifying copyrighted content, did you consider

4  that you might be able to at least reduce some

5  copyright infringement, if not catch all the

6  copyright infringement?

7      A.   I don't know if we specifically thought of

8  it that way.  You know, we are engineers, if you

9  deduced a bit.  We try to build systems that work --

10  program adequately.  And so we just felt that we

11  couldn't do it.

12      Q.   Okay.  And going back to the idea that you

13  had a vision for the company that you expressed

14  publicly that in the end may not have come to

15  fruition, specifically around reviewing for copyright

16  infringement, when you approached venture capitalists

17  and sought funding for veoh.com, did you present that

18  same vision to the venture capitalists?

19          MS. GOLINVEAUX:  Object to the form.

20          THE WITNESS:  So in the Series A in the

21  first one, you know, before we launched, I believe

22  that I did.  I presented the entire vision.  I

23  believe by the Series B I didn't.  But I can't recall

24  when.

25  BY MR. SPERLEIN:

1      A.   Well, when we did change the policy

2  concerning adult, it was changed as -- well, it's the

3  board.  It was a board decision.  So I don't know if

4  I would say "pressure."  I believe I was the one that

5  volunteered it, because I was concerned about it.

6  And I believe everyone agreed.

7      Q.   Okay.  How many people are on Veoh's board?

8      A.   Today there are, I want to say, five.  Let

9  me just -- yes, five.  And at that time I believe it

10  was four.

11      Q.   And who were the four people on the board

12  at that time?  You?

13      A.   I, Art Bilger, Michael Eisner, and

14  Tod Dagres.

15      Q.   Would you spell his last name?

16      A.   D-a-g-r-e-s.

17      Q.   So it was those four people that voted?

18  Let me back up.  Did those four people vote to change

19  the policy so that adult video files would no longer

20  be allowed on Veoh?

21      A.   I don't think it was a vote, but those four

22  people would have known about and agreed upon

23  changing the policy, sure.

24      Q.   Prior to the change in policy where Veoh no

25  longer allowed sexually explicit video files on the

1  Veoh system, did Veoh make a change in policy so that

2  adult files would not appear on the front page, the

3  home page?

4      A.   I don't know if you'd say we made a policy;

5  but yes, we tried to not have those files on the home

6  page.

7      Q.   And was that in part to appease concerns of

8  investors?

9      A.    Well, it was to appease concern of -- I

10 don't know if it was concern of investors.  It was to

11 try not to embarrass, in a sense, investors.  And

12 again, it was a general overall feeling of we did not

13 want somebody to come to veoh.com after reading about

14 it in whatever magazine, saying it is this great new

15 platform for independent producers and the first

16 thing that hits you is adult content.

17     Q.   Do you have any recollection as to when

18 that policy went into effect, when you started making

19 that change?

20     A.    It would have all happened in a very short

21 time frame because, again, all this happened in a

22 series of a month and a half to two months.

23     Q.   Was there any decision why you delayed

24 completely removing sexually explicit video files

25 until the time you did, rather than at that same time

1    I, NICOLE R. HARNISH, Certified Shorthand Reporter

2    for the State of California, do hereby certify:

3

4    That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the

6    whole truth and nothing but the truth in the

7    foregoing cause; that the deposition was taken by me

8    in machine shorthand and later transcribed into

9    typewriting, under my direction, and that the

10   foregoing contains a true record of the testimony of

11   the witness.

12

13   Dated: This _8th_ day of _June_ _2007_

14   at San Diego, California.

15

16

17

18   _____

19   NICOLE R. HARNISH

20   C.S.R. NO. 13101

21

22

23

24

25