```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5    _____
                                    )
 6    IO GROUP, INC., a             )
      California Corporation,       )
 7                                  )
              Plaintiff,            )
 8                                  )
      vs.                           )  CASE NO. C-06-3926(HRL)
 9                                  )
      VEOH NETWORKS, INC., a        )
10    California Corporation,       )
                                    )
11            Defendant.            )
      _____)
12

13

14

15

16                  DEPOSITION OF JOHN STYN

17                    SAN DIEGO, CALIFORNIA

18                       MAY 31, 2007

19

20

21

22    REPORTED BY REGINA L. GARRISON, CSR NO. 12921

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5    _____
                                    )
 6    IO GROUP, INC., a             )
      California Corporation,       )
 7                                  )
              Plaintiff,            )
 8                                  )
      vs.                           )  CASE NO. C-06-3926(HRL)
 9                                  )
      VEOH NETWORKS, INC., a        )
10    California Corporation,       )
                                    )
11            Defendant.            )
      _____)
12

13

14

15

16           DEPOSITION OF JOHN STYN, taken on behalf of

17    the Plaintiff, at 530 B Street, Suite 350, San Diego,

18    California, on Thursday, May 31, 2007, at 9:57 a.m.,

19    before Regina L. Garrison, Certified Shorthand

20    Reporter, in and for the County of San Diego, State of

21    California.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2
       FOR THE PLAINTIFF:
 3
            THE LAW OFFICES OF GILL SPERLEIN
 4          BY GILL SPERLEIN
            69 Converse Street
 5          San Francisco, California 94103
            (415) 487-1211, Ext. 32
 6
       FOR THE DEFENDANT:
 7
            WINSTON & STRAWN LLP
 8          BY JENNIFER A. GOLINVEAUX
            101 California Street
 9          San Francisco, California 94111-5894
            (415) 591-1506
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          A.   Yes.
2          Q.   And would you keep track of your hours?
3          A.   Yes.
4          Q.   And then you would send them a bill; is that
5    how it worked?
6          A.   Yes.
7          Q.   How often would you bill them?
8          A.   Every two months.
9          Q.   And again, this is prior to your -- to the
10   VEOH.com going live; is that accurate?
11         A.   I don't remember when it went live.  That has
12   been my arrangement throughout my -- throughout them
13   being a client.
14         Q.   Okay.  And you said earlier that you believed
15   that they became a client about a year ago; is that
16   accurate?
17         A.   Yes.
18         Q.   So before they became a client, does the fact
19   that they were paying you -- is that what determined
20   when you became a -- or they became a client?
21         A.   Yes.
22         Q.   In other words, early on, were you doing some
23   of these activities without being paid?  When I say
24   "earlier on," I mean, you know, at the initial
25   formation before the site, the VEOH.com, went live.

```
1     were active at the time.
2          Q.   Do you remember ever looking at
3     pornotube.com?
4          A.   I don't remember if that was a part of it at
5     the time.
6          Q.   And how about xtube.com?
7          A.   I'm not sure if I was familiar with those at
8     the time.
9          Q.   You're familiar with them now?
10         A.   Yes.
11         Q.   But you're not sure you were familiar with
12    them back --
13         A.   Correct.
14         Q.   Did you encourage other people to submit
15    video files to VEOH?
16         A.   Yes.
17         Q.   Was that part of what you got paid to do for
18    VEOH?
19         A.   Not specifically.
20         Q.   When did you first have a discussion with
21    anyone at VEOH about being paid?
22         A.   Before it was a company, when Dmitry and I
23    had initial conversations.  I did not want to be a part
24    of the company, but I said I could do consulting work,
25    help advise.
```

27

```
1       what I programming-type person would do for VEOH?
2            A.   I don't know.
3            Q.   Did anyone at VEOH ever ask you to encourage
4       certain types of video producers to submit their
5       content?
6            A.   No.
7            Q.   Were there certain types of content producers
8       that you personally were more interested in seeing come
9       to VEOH?
10           A.   No.
11           Q.   Were you interested in seeing as many people
12      come to VEOH and submit content as possible?
13           A.   Yes.
14           Q.   And that's true regardless of what type of
15      content they brought with them?
16           A.   Correct.
17           Q.   Why is that true?  Why is it true that you
18      wanted as many people to come to VEOH and submit
19      content as possible?
20           A.   The more content, the more compelling site.
21           Q.   Does that mean the more content that was on
22      the site, the more people would be more likely to come
23      and visit the website?
24           A.   Correct.
25           Q.   And was that something that was of interest
```

```
 1     to you personally or an advantage to VEOH, the company?
 2              MS. GOLINVEAUX:  Object to the form of the
 3     question.
 4              THE WITNESS:  Both.
 5     BY MR. SPERLEIN:
 6        Q.   And were there any other reasons why you
 7     found it important that a lot of people would come to
 8     VEOH?
 9        A.   It's where my personal TV network was
10     stationed.
11        Q.   So the more content on VEOH, the more people
12     would come, and the more people that would come, the
13     more people would see the videos that you produced; is
14     that accurate?
15        A.   Yes.
16        Q.   Did you ever make suggestions to people about
17     what types of programming that they could produce to
18     put on VEOH?
19        A.   Can you explain "programming"?
20        Q.   Video content.  Did you give people ideas of,
21     you know, something they might want to try and produce
22     and then put on VEOH?
23        A.   Yes.
24        Q.   And did you do that through an internet web
25     page?
```

```
1           Q.   And I know that these things are -- that
2      you're very much involved on the internet, and I don't
3      expect you to have a complete recollection --
4           A.   Yeah, no.
5           Q.   -- of everything, but what I want to find out
6      specifically here is -- let me just move on with some
7      quick questions.
8                In any of your business dealings, have you
9      ever heard of people refer to "18 USC 2257"?
10          A.   Yes.
11          Q.   You heard people talk about it in terms of
12     just referring to it as "2257"?
13          A.   Yes.
14          Q.   What's your understanding of what that's all
15     about?
16          A.   It is a recordkeeping rule geared toward the
17     adult industry.
18          Q.   And have you engaged in any conversations
19     designed to help you better understand the requirements
20     of 18 USC 2257?
21          A.   Have I engaged in any conversations?
22          Q.   Have you talked to any other people who tried
23     to understand it better?
24          A.   No.
25          Q.   Have you ever operated a website where 18 --
```

```
 1    drafted on your own?
 2         A.   Yes.
 3         Q.   And when you added that last sentence there,
 4    "Adult content requires some additional documentation,"
 5    can you tell me what you had in mind?
 6         A.   That was exactly around the -- the --
 7    addressing the potential 2257.
 8         Q.   What kind of additional documentation did you
 9    see as being required for the submission of adult
10    content?
11         A.   I didn't know, which is why it's vague here
12    and why this was never public.  This is -- yeah, I
13    just -- I didn't know what it would be.
14         Q.   And then I just want you to look at one other
15    section here, and this is on the very last page of the
16    document under No. 4.  Again, I'll read part of it out
17    loud and ask you to read along with me.
18              The heading there or the question, rather,
19    is:  "What are you doing to prevent content that
20    violates your policies from appearing in VEOH,"
21    question mark.
22              And the response to the FAQ is:  "We do a
23    preliminary review on uploaded shows through both a
24    manual and automated process.  Although we try our best
25    to detect and remove shows that violate our policy
```

```
1      guidelines, our review process is primarily focused" --
2      and it's cut off there a little bit.  I'm pretty sure
3      it says "on" -- "removing adult content or obvious
4      copyright violations and is not bulletproof."
5              Do you recall whether that was something that
6      was in the original document that you copied?
7          A.   I don't recall.
8          Q.   So you don't know if that's something that
9      you drafted yourself?
10         A.   I don't know.
11         Q.   Do you know whether YouTube has a policy of
12     reviewing material?
13         A.   I don't know.
14         Q.   At the time that you made changes to this
15     document and were drafting it, is it fair to say that
16     you either left this in there -- in the document or
17     drafted it yourself?
18         A.   Yes.
19         Q.   It wouldn't have come from any third
20     possibility; is that accurate?
21         A.   Yes.
22         Q.   Do you understand what I'm talking about?
23         A.   Yes.
24         Q.   So why would you either leave or add a
25     statement that said "VEOH's policy was to review
```

```
 1      content for obvious signs of copyright violations"?
 2              MS. GOLINVEAUX:  If you recall.
 3              THE WITNESS:  I know at some -- at some
 4      stages of discussions, that was an idea.  I don't know
 5      if that was ever implemented or not.  But I know that
 6      was -- that was an idea, that we would have a review.
 7      BY MR. SPERLEIN:
 8          Q.   Do you know if that was the plan at the time
 9      that you were creating these FAQs?
10          A.   I believe so.
11          Q.   Does this document refresh your recollection
12      about any conversations that you had with VEOH about
13      policies concerning copyright infringement?
14          A.   I remember pointing out DMCA, like, as --
15      because this was not their -- this was all my stuff.
16      This document is all my stuff, and I remember, because
17      I didn't understand some of the -- like it says, "See
18      our DMCA policy for more information," and I do
19      remember telling them that they should have something
20      like that, too.
21          Q.   Do you remember telling VEOH that they should
22      have something like that?
23          A.   Yeah.
24          Q.   At that time, do you know that VEOH did not
25      have a DMCA policy?
```

```
 1                MS. GOLINVEAUX:  Object to the form of the
 2     question.
 3                THE WITNESS:  I don't think VEOH was live
 4     when this was being made.  I don't think it was a
 5     public -- I don't think it was -- I don't think the
 6     site existed.
 7     BY MR. SPERLEIN:
 8          Q.   So there would be no place to state that they
 9     had a DMCA policy at the time you created this?
10          A.   No.  This is all theoretical.
11          Q.   If you had a conversation about the need for
12     a DMCA policy, would that conversation have been with
13     Dmitry?
14          A.   Yes.
15          Q.   And just to clarify once more, in light of
16     having looked at this document, do you have any
17     recollection of having a conversation with Dmitry about
18     the need for a DMCA policy?
19          A.   I -- I remember highlighting it as something
20     in the same way I said 2257 is an issue and this is an
21     issue that you guys need to deal with.
22          Q.   And do you have a recollection of whether
23     Dmitry responded in a similar way, such as to say, "I'm
24     aware of the issues, and we've got it covered"?
25          A.   I don't remember.  That was -- my
```

                                                                 59

```
 1    relationship was more like, you know, "This shouldn't
 2    be a comma.  You should make sure you do this."
 3            And they would do it.  They would deal with
 4    it.
 5       Q.   You said earlier that you believe that there
 6    was, at some point, the idea of having a review
 7    process.  Is that what you said?
 8       A.   Yes.
 9       Q.   How did you get that information?
10       A.   That was just the way the -- the -- the
11    process was explained to me at one point or was
12    discussed with Dmitry, of going through from content to
13    site.
14       Q.   Okay.  So --
15       A.   I believe those conversations were stopped by
16    other video sites once there was -- that discussion
17    only happened before there was any sites doing this.
18    And then once there was other sites like YouTube out
19    there that we were competing with that had, you know, a
20    15-minute upload-to-visualize process, I think that's
21    when it didn't -- you know, it was dropped.
22       Q.   Is the idea behind what you just said the
23    fact that YouTube was doing it and it didn't seem to be
24    a problem, so maybe it's not as big of a problem as we
25    thought it was?
```

```
 1          A.   Which problem --
 2               MS. GOLINVEAUX:  Objection.
 3     BY MR. SPERLEIN:
 4          Q.   I don't want to mischaracterize anything that
 5     you said, but I'm trying to understand.  You said that
 6     something changed at the point that YouTube came onto
 7     the scene.  I'm trying to understand what that change
 8     was.
 9               MS. GOLINVEAUX:  I'm sorry.  What's the
10     question?
11     BY MR. SPERLEIN:
12          Q.   Could you explain to me what changes in
13     policy occurred as a result of YouTube coming online?
14               MS. GOLINVEAUX:  Object to the form.
15               THE WITNESS:  I don't know the policy.  I --
16     I only know in the discussion of the way things worked,
17     we had discussions of the review.  And -- and then,
18     realizing that -- and then I remember, then, that not
19     being part of discussions after other sites had no
20     review.
21               I don't know if -- I do not -- was not a part
22     of any conversations, if that was the reason for it.
23     But I remember that being about the time line of --
24     BY MR. SPERLEIN:
25          Q.   Did you personally think that the idea of a
```

```
 1      review process was dropped because YouTube was
 2      operating without a review process?
 3              MS. GOLINVEAUX:  If you recall.
 4              THE WITNESS:  I don't recall.
 5      BY MR. SPERLEIN:
 6          Q.  Do you recall if anything that anyone from
 7      VEOH said to you would indicate that the idea of having
 8      a review policy was being dropped because YouTube was
 9      operating without a review policy?
10          A.  No.  And this is -- this is a -- the relation
11      of YouTube to this stuff is me connecting dots, because
12      that's when I was uploading videos to, you know, every
13      place I could.  And this -- that was not a -- that was
14      not an option for the speeds that all the sites were
15      doing in.  I believe including VEOH at the time.  I
16      don't think anybody was -- again, I don't know.  I just
17      know that videos were being uploaded very quickly.
18          Q.  And so that I understand your last statement,
19      are you saying that in order for videos to be uploaded
20      that quickly, a review process was not practical?
21              MS. GOLINVEAUX:  Objection.  Mischaracterizes
22      his prior testimony.
23              THE WITNESS:  With my limited understanding
24      of what goes on behind the scenes, I didn't see how it
25      was functionally feasible.  I mean, I don't know how
```

```
 1     there could be technical and manual processes in ten
 2     minutes.
 3             MS. GOLINVEAUX:  I would just point out for
 4     the record that Mr. Styn only reviewed Exhibit 1, which
 5     is a five-page document, very briefly before the
 6     questions commenced.
 7     BY MR. SPERLEIN:
 8        Q.   I'm going to hand you another document now,
 9     which I'll ask the court reporter to mark as Exhibit 2
10     today.  And again, take as much time as you need to
11     review that document, Mr. Styn.
12             (Plaintiff's Exhibit No. 2 was marked.)
13             THE WITNESS:  Okay.
14     BY MR. SPERLEIN:
15        Q.   You've had an opportunity to review the
16     document?
17        A.   Yes.
18        Q.   This document is marked with Defendant's
19     Exhibit No. VEOH 005643.  I meant to say "production
20     number."  This document appears to be an e-mail
21     generated internally as a result of your submitting a
22     flag for a certain video file; is that correct?
23        A.   Correct.
24        Q.   Have you ever seen this document before?
25        A.   No.
```

```
 1    STATE OF CALIFORNIA

 2    COUNTY OF SAN DIEGO

 3

 4         I, REGINA L. GARRISON, a Certified Shorthand

 5    Reporter for the State of California, CSR No. 12921, do

 6    hereby certify:  That the proceedings were taken before

 7    me at the time and place herein named; that the said

 8    proceedings were reported by me in shorthand and

 9    transcribed through computer-aided transcription, under

10    my direction; and that the foregoing is a true record

11    of the testimony elicited at proceedings had at said

12    proceedings to the best of my ability.

13         I do further certify that I am a disinterested

14    person and am in no way interested in the outcome of

15    this action or connected with or related to any of the

16    parties in this action or to their respective counsel.

17         In witness whereof, I have hereunto set my hand

18    this  21st  day of     June           , 2007.

19

20

21                    _____

22                    REGINA L. GARRISON, CSR NO. 12921

23

24

25


              Peterson Reporting, Video & Litigation Services
```