GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 849
San Francisco, California 94114
Telephone: (415) 378-2625
legal@titanmedia.com

Attorney for Plaintiff
IO GROUP, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| IO GROUP, INC., a California corporation, | ) CASE NO.: C-06-03926 (HRL) |
|  | ) |
|  | ) **PLAINTIFF'S OPPOSITION TO** |
|  | ) **DEFENDANT'S MOTION FOR SUMMARY** |
| Plaintiff, | ) **JUDGMENT** |
|  | ) |
| vs. | ) |
|  | ) |
| VEOH NETWORKS, Inc., a California | ) DATE: September 4, 2007 |
| Corporation, | ) TIME: 10:00 a.m. |
|  | ) COURTROOM: 2 |
| Defendant. | ) |
|  | ) |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      Summary of Argument ................................................................................. 1

II.     Veoh Does Not Qualify for Immunity under the 17 U.S.C. §512, because It Has
        not Shown That Its Repeat Infringer Policy and the Implementation Thereof,
        Satisfies the Requirements of 512(i)(1)(B) ................................................. 3

III.    Veoh Is Not Eligible for the Safe Harbor Provision of 17 U.S.C §512(c) because
        the Infringement of Plaintiff's Works Was Not "by reason of the storage at the
        direction of a user". ..................................................................................... 5

IV.     Veoh Does not Meet the Conditions of 512(c)(1)(B) because Defendant Receives a
        Benefit Directly Attributable to the Infringing Activity and Has the Right and
        Ability to Control Such Activity. ................................................................. 6

        A.  The Standards for 512(c)(1)(B) Are the Same as the Common Law Standard
            for Vicarious Copyright Infringement. ................................................ 6

        B.  Knowledge Is Not an Element of Common Law Vicarious Copyright
            Infringement or 17 U.S.C. §512(c)(1)(B). ........................................... 9

        C.  Defendant Receives a Direct Financial Benefit from the Infringing Activity 12

        D.  Defendant Has the Right and Ability to Control the Infringing Activity ...... 17

V.      Defendant Does not Meet the Conditions of 512(c)(1)(A)(ii) because Defendant
        Was Aware of Facts and Circumstances from Which Infringing Activity was
        Apparent. ..................................................................................................... 24

VI.     Conclusion.................................................................................................. 25

1

2

## TABLE OF AUTHORITIES

3

## CASES

4

5   *A & M Records, Inc. v. Napster, Inc.*, 2000 U.S. Dist. LEXIS 6243  (N.D. Cal. 2000) ................. 5

6   *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 907 (N.D.Cal 2000) .......................... 14

7   *A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)("*Napster II*") .............. 9, 11, 13, 18

    *Anderson v. Nidorf*, 26 F.3d 100 (9th Cir. 1994) ........................................................................ 23

8   *Arista Records, Inc. v. Flea World, Inc.*, 2006 U.S. Dist. LEXIS 14988 (D.N.J. 2006)... 11, 18, 21

9   *Broadcast Music, Inc. v. Hobi, Inc.*, 1993 WL 404152 (M.D. La 1993) ..................................... 14

10  *Buck v. Crescent Gardens Operating Co.,* 28 F. Supp. 576 (D. Mass. 1939).............................. 10

11  *Buck v. Pettijohn*, 34 F. Supp. 968 (D. Tenn. 1940) ................................................................... 10

12  *Chess Music, Inc. v. Sipe*, 442 F. Supp. 1184, 1185 (D. Minn. 1977) ................................... 10, 15

13  *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (D. Wash. 2004) ............................... 19

14  *CoStar Group, Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001)................................. 14

15  *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) .............................................. 8

16  *De Acosta v. Brown*, 146 F.2d 408 (2d Cir. 1944) ...................................................................... 12

    *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354 (7th Cir. 1929).............. 10

17  *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ................................................................... 15

18  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ........................... 7, 11, 13, 17

19  *Fonovisa, Inc. v. Napster, Inc.*, 2002 U.S. Dist. LEXIS 4270 (N.D. Cal. 2002) ................... 10, 14

20  *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971)

21  ......................................................................................................................................... 7, 9

22  *Hendrickson v. Ebay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001) .................................. 19

23  *Irving Berlin, Inc. v. Daigle*, 26 F.2d 149 (E.D. La. 1928)......................................................... 10

24  *Major Bob Music v. Stubbs*, 851 F.Supp. 475 (S.D. Ga. 1994) ................................................... 14

25  *Perfect 10, Inc. v. Cybernet Ventures , Inc.*, 213 F. Supp. 2d 1146, (CD Cal. 2002) .................. 20

26  *Perfect 10, Inc. v.CCBill* ............................................................................................................... 8

27  *Playboy Enters. v. Webbworld Inc.*, 968 F. Supp. 1175 (N.D. Tex. 1997)  ................................ 22

28  *PolyGram Int'l Publishing, Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314 (D. Mass. 1994)
    ..................................................................................................................... 17, 12, 17

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F. Supp. 1361 (N. Cal. 1995)....... 7

*Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.,* 119 F.3d 55 (1st Cir. 1997)......... 24

*Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir. 1963)............. 1, 7, 11, 12, 17

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (U.S. 1984) ........................... 10

*Tur v. YouTube, Inc.*, No. 06-4436 (C.D. Cal. filed Aug. 14, 2006)................................ 2

*UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993 (E.D. CA 2004) .................................... 17

*Veoh Networks, Inc. v. UMG Recordings, Inc, et al.,* No. 07-1568 (S.D.Cal. filed Aug. 9, 2007) 2

*Viacom International, Inc. v. YouTube, Inc.*, No. 07-2103 (S.D.N.Y. filed Mar. 13, 2007)........... 2

*Walden Music, Inc. v. C.H.W., Inc.* 1996 U.S. Dist. LEXIS 6622, 1996 WL 254654 (D.Kan.1996) ..................................................................................................................................... 14

*Warner Bros., Inc. v. O'Keefe*, 468 F. Supp. 16, 20 (D. Iowa 1977) ............................................ 7

**STATUTES**

17 U.S.C. §205(c)................................................................................................................... 24

17 U.S.C. § 512(c).........................................................................................................Passim

17 U.S.C. § 512 (i)(1)(B) .........................................................................................................3-5

18 U.S.C. §2257 (f)(4) ............................................................................................................ 24

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

## **MEMORANDUM OF POINTS AND AUTHORITIES**

"Although copyright infringements are quite generally termed piracy, only a minority of infringers fly the Jolly Roger." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963). (citations omitted)(explaining why knowledge of infringing activity is not a requirement for vicarious infringement).

**I.      Summary of Argument**

Defendant has moved this Court for Summary Judgment based on the application of 17 U.S.C.§512(c)[1]. However, Defendant fails to establish essential elements of a §512(c) affirmative defense, and is exposed to liability under traditional application of direct, contributory and vicarious infringement claims as established in Plaintiff's Motion for Summary Judgment, which Plaintiff fully incorporates by reference here.

Defendant fails to reasonably implement a repeat infringer policy as it takes no measures to prevent repeat infringers from creating multiple new accounts in order to continue their infringing activity.  Defendant relies solely upon e-mail addresses to track repeat infringers in spite of the fact that e-mail addresses are easily, anonymously and freely available. Furthermore, Defendant is not eligible for the safe harbor it seeks, because the infringing Flash and .jpg files it created were not put on Defendant's system by users but by Defendant.

Defendant argues that 17 U.S.C. §512(c)(1)(B) is different and significantly narrower than the test for vicarious liability at common law, but there is no support for this argument. Defendant received a financial benefit directly attributable to the infringing activity and had the right and

---

[1] Both parties have in their respective motions for summary judgment set forth the standards for summary judgment in a substantially similar fashion. Plaintiff will not repeat those standards here, but reminds the Court that Defendant has only moved for summary adjudication on the issue of whether it is entitled to safe harbor protection under 17 U.S.C. 512(c). To the extent Defendant wishes to raise other defenses, it must fully support their factual basis in it Opposition to Plaintiff's Motion for Summary Judgment.

ability to control that activity. Defendant was also aware of facts and circumstances from which infringing activity was apparent. Thus, Defendant loses any entitlement to safe harbor under 17 U.S.C. §512(c).

Defendant makes a baseless claim that Io Group filed this suit in an effort to demand a windfall settlement from Defendant (Defendant's Motion for Summary Judgment at 1:11-21) suggesting that Plaintiff is alone in its challenge to the legitimacy of Defendant's operations. Defendant's characterization fails to acknowledge litigation by other copyright holders against enterprises similar to Defendant's (*See Viacom International, Inc. v. YouTube, Inc.*, No. 07-2103 (S.D.N.Y. filed Mar. 13, 2007); *Tur v. YouTube, Inc.*, No. 06-4436 (C.D. Cal. filed Aug. 14, 2006), and Defendant's own recently filed declaratory judgment action in the face of alleged threats of litigation from another copyright holder - Universal Music. *Veoh Networks, Inc. v. UMG Recordings, Inc, et al.,* No. 07-1568 (S.D.Cal. filed Aug. 9, 2007).

Io Group is a small business subject to extensive government regulation due to the nature of the content it produces. Because the adult film industry has historically been reluctant to protect its creative works, the industry as a whole was ill prepared to face the new piracy challenges that arose in the age of the Internet. Even in an era that may be perceived as accepting of erotic material, many consumers turn to piracy in order to obtain such material not only freely, but also anonymously. Unlike the motion picture and recording industries, the adult entertainment industry has no trade association working collectively to protect creative works from piracy. Ruoff Decl. in Support of Opposition at ¶2.

Recognizing that piracy would have a devastating impact on its business and having no support elsewhere, Io Group several years ago began allotting considerable resources towards anti-piracy measures including, but not limited to, bringing litigation. *Id*. at ¶3.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

A majority of the actions Plaintiff brings result in uncollectible default judgments. Only a few actions resulted in recoveries greater than the cost of bringing the action. Io Group's anti piracy efforts are designed to deter other would-be infringers, not to generate income. *Id*. at ¶4.

Despite Io Group's efforts, massive infringement continues, often made possible by large companies that reap financial rewards while espousing a twisted interpretation of the purpose and applicability of 17 U.S.C. §512. Defendant makes a weak attempt to cast a shadow over Plaintiff by suggesting that it is engaged in a sleazy high-tech shakedown, but Defendant's assertions in this regard are simply incorrect and unwarranted.

**II.      Veoh Does Not Qualify for Immunity under 17 U.S.C. §512, because It Has Not Shown That Its Repeat Infringer Policy and the Implementation Thereof, Satisfies the Requirements of 512(i)(1)(B).**

As Defendant noted in its Motion for Summary Judgment, in order to be eligible for immunity under 17 U.S.C. §512 (a) - (d), a service provider must first meet the eligibility requirements of §512(i). 17 U.S.C. §512 (i).  Safe harbor provisions will only apply if the service provider "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network are repeat infringers.  *Id*.

Veoh has failed to establish facts that it has reasonably implemented such a policy. According to Defendant's testimony, Defendant's written policy in June of 2006 was to terminate "repeat infringers (i.e., persons found to have uploaded copyright infringing User Material on more than two occasions." Defendant's Motion for Summary Judgment 5:4-16 and evidence cited therein. While this may have been Defendant's written policy, Defendant failed to reasonably implement the policy as required under 17 U.S.C. §512(i)(1)(A). In short, Defendant implemented

-3-

its repeat infringer policy in such a way that makes it impossible to determine if an individual has previously submitted infringing material, because Defendant does not track the identity of its submitting users- only the e-mail address the users provide.

Defendant implemented its repeat infringer policy by canceling the accounts of repeat infringers and adding the e-mail addresses associated with the accounts to a black list so the infringers could not "register for a new user id *with that e-mail address*." Dunning Declaration in Support of Defendant's Motion for Summary Judgment ("Dunning Decl.") at ¶11, emphasis added. In other words, once Defendant identifies a user as a repeat infringer, Defendant does not block that *user* from submitting additional video clips, rather Defendant only blocks one of the user's *e-mail addresses* –the address associated with the user's account.

An e-mail address is not an adequate means for identifying anyone.  An unscrupulous user, who has twice engaged in copyright infringement, can continue his infringing spree simply by obtaining a new e-mail address and reregistering with Veoh using a new user name. It is common knowledge that the number of free and anonymous e-mail addresses a person can obtain is only limited by the creativity required to select a unique set of characters. For example, Plaintiff's Vice-President, Keith Ruoff recently applied for the yahoo e-mail address FauxUser01@yahoo.com using the pseudonym John Doe. He then used that e-mail address to register a new account with Veoh. Ruoff Decl. Supporting Plaintiff's Opposition at ¶ 7. Making it that much easier for users to continue to anonymously infringe, Defendant does not even verify user submitted e-mails. Dunning Depo. at 72:14-23. In other words, a person may not even need to obtain a new e-mail address before reregistering with Veoh, he can simply make one up.

In the *Napster* litigation the district court denied defendant's motion for summary judgment in part, because Napster's repeat infringer policy blocked a user's account rather than

blocking a user's IP address.  Thus there was a triable issue of fact as to whether defendant could

establish the requirements of 17 U.S.C. §512(i). *A & M Records, Inc. v. Napster, Inc.*, 2000 U.S.

Dist. LEXIS 6243 at *28. (N.D. Cal. 2000)("Summary adjudication is also inappropriate because

Napster has not shown that it reasonably implemented a policy for terminating repeat infringers).

This issue was not addressed in any of the subsequent *Napster* litigation.

Here, Defendant's policy is essentially the same and thus it fares no better. Defendant's

system of only using a previous e-mail address as a means of blocking repeat infringers, rather

than taking measures to block the actual infringer, or at least the infringer's IP address, is mere lip

service and tantamount to not implementing its policy at all. Veoh's implementation of its policy

cannot be deemed to be a reasonable implementation and thus Defendant fails to meet the

threshold requirements of 17 U.S.C. §512(i)(1)(A).

Plaintiff believes that the Court can resolve this issue in its favor since the implementation

of the policy is unreasonable on its face. At a minimum Defendant's failure to establish that its

system was reasonably implemented creates a triable issue of fact and a basis for denying

Defendant's Motion for Summary Judgment.

### III.    Defendant Is Not Eligible for the Safe Harbor Provision of 17 U.S.C §512(c) because the Infringement of Plaintiff's Works Was Not "by reason of the storage at the direction of a user".

Defendant is only eligible for the safe harbor provisions of 17 U.S.C. § 512(c), for

infringements that result from information residing on its system or network at the direction of

users. 17 U.S.C. § 512(c).

As explained more fully in Plaintiff's Motion for Summary Judgment, Defendant actually

prepares two types of new works from the video files it acquires from its users. *See*, Plaintiff's

Motion for Summary Judgment § II-D. One of the new works is a Flash format version of the

-5-

originally submitted video file. Defendant creates these works on its Flash conversion servers in Los Angeles and then transfers the newly created works to its servers in San Diego where they reside indefinitely. Dunning Depo. 40:5-11. Defendant also extracts frames from the video files and creates new still image .jpg files. Papa Depo. 155:16-24. Defendant alone chooses the specifications for these newly created files including the bit rate, frame size, frame rate, and the codec. Papa Depo.126:1-129:18.

Nowhere on Defendant's website or in its Terms of Use does Defendant inform users that it will create these new files. Ruoff Decl. Supporting Opposition at ¶6. Nor does Defendant obtain permission to create these new works, other than the blanket license it obtains to exploit the works on the Veoh system generally. Shapiro Depo. 23:6-14, 24:6-26:18, Ex 5; Papa Depo. 12:2-5, 31:14-19. Users may not even realize that these files have been created.

These new Flash and .jpg files were created by Defendant on its own volition. Users never instructed Defendant to create these files and only gave them permission to do so in the broadest sense. These files were never even in the possession of the users. Therefore, Defendant has not established, as it must, that these files were placed on Defendant's system at the direction of the users.  The safe harbor provision of 17 U.S.C. §512(c) is not available to the Defendant for these new Defendant-created files. Liability for the infringing Flash and .jpg files must be evaluated entirely under a traditional copyright infringement analysis. At a minimum, the issue of whether the Flash and .jpg files were on the system at the direction of the users or as a result of the actions of Defendant is an issue of fact that cannot be resolved on Summary Judgment.

**IV.    Veoh Does Not Meet the Conditions of 512(c)(1)(B) because Defendant Receives a Financial Benefit Directly Attributable to the Infringing Activity and Has the Right and Ability to Control Such Activity.**

        **A.    The Standards for 512(c)(1)(B) Are the Same as the Common Law Standard for Vicarious Copyright Infringement.**

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

1

2          "The concept of vicarious copyright liability was developed in the Second Circuit as an

3  outgrowth of the agency principles of *respondeat superior*. The landmark case on vicarious

4  liability for sales of counterfeit recordings is *Shapiro Bernstein and Co. v. H. L. Green Co.*, 316

5  F.2d 304 (2d Cir. 1963)" *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-262 (9th Cir.

6  1996).  The Second Circuit clearly articulated the standard in *Gershwin Publishing Corp. v.*

7  *Columbia Artists Management, Inc.,* providing the language that courts have universally adopted.

8  "[O]ne may be vicariously liable if he has the right and ability to supervise the infringing activity

9  and also has a direct financial interest in such activities." *Gershwin Publishing Corp. v. Columbia*

10  *Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971).  *See*, *Fonovisa, Inc. v. Cherry*

11  *Auction, Inc.,* 76 F.3d 259, 262 (9th Cir. 1996); *Religious Tech. Ctr. v. Netcom On-Line Commun.*

12  *Servs.*, 907 F. Supp. 1361, 1382 (D. Cal. 1995); *Polygram Int'l Publishing v. Nevada/TIG, Inc.*,

13  855 F. Supp. 1314, 1333 (D. Mass. 1994)("Polygram"); *Warner Bros., Inc. v. O'Keefe*, 468 F.

14  Supp. 16, 20 (D. Iowa 1977).

15          In order to be eligible for the safe harbor provision of §512(c) a service provider must "not

16  receive a financial benefit directly attributable to the infringing activity, in a case in which the

17  service provider has the right and ability to control such activity." 17 USC§512(c)(1)(B). By

18  inserting this language into the DMCA, Congress clearly intended to adopt the exact common law

19  standard as described above.

20          In fact, Defendant acknowledges in its moving papers that 17 U.S.C. §512(c)(1)(B) is

21  borrowed from the common law standard for vicarious copyright infringement. Def.'s Motion for

22  Summary Judgment at 21:24-26. The Ninth Circuit has found that the "financial benefit" prong of

23  512(c)(1)(B) should be considered identical to and analyzed in the same manner as the "financial

24  benefit" prong from the common law doctrine. *Perfect 10 v. CCBill, LLC*, 481 F.3d 751, 767 (9th

25  Cir. 2007). The same reasoning applies to the "right and ability to control" prong.

-7-

Defendant cites *CoStar Group, Inc. v. Loopnet*, *Inc.* to support its argument that the vicarious infringement language codified at 17 U.S.C. §512(c)(1)(B) requires less of a service provider than the exact same language used at common law. *CoStar, Group,Inc. v. Loopnet*, *Inc.,* 373 F.3d 544 (4th Cir. 2004). Defendant overstates the *CoStar* holding. In dictum the Fourth Circuit merely said that even if an ISP is liable for infringement at common law, it can turn to the safe harbor provisions of the DMCA. This is true since some (but not all) provisions of the DMCA offer protections that were unavailable at common law. Most notably, ISPs that meet the requirements of §512(a) cannot be held vicariously liable, although they might be liable at common law. 17 U.S.C. § 512(a). There may be other sections of the DMCA that provide protections for ISPs not available at common law, but §512(c)(1)(B) is not one of them.

Defendant attempts to argue that notice requirements found elsewhere in 17 U.S.C. §512 are some how relevant or applicable to 17 U.S.C. §512(c)(1)(B). However, it's clear that Congress crafted this provision to mirror vicarious infringement elements found at common law and Congress specifically elected not to add a knowledge requirement or notice provision, although it could have easily done so. Examination of other sections of 17 U.S.C. §512 show that Congress was capable of inserting carefully crafted notice provisions where it wanted them. *See,* notification requirements at 17 U.S.C. §512 (c)(1)(C) and detailed elements of such notice at §512(c)(3). Defendant cites the Ninth Circuit's ruling in *Perfect 10 v. CCBill* to support its argument that it does not have the right and ability to control, and cites the court's opinion as follows, "([T]he burden of policing copyright infringement -- identifying the potentially infringing material and adequately documenting infringement –[rests] squarely on the owners of the copyright." Def's Motion for Summary Judgment 20:2-4, citing *Perfect 10 v. CCBill,* 2007 U.S. App. LEXIS 12508, at *21. The opening phrase of the court's statement, which Defendant cunningly omitted, makes it very clear that the Court was discussing the DMCA *notice* procedures and not CCBill's right and ability to control direct infringers. "*The DMCA notification procedures place* the burden of policing copyright infringement -- identifying the potentially infringing material and adequately documenting infringement -- squarely on the owners of the copyright. *Perfect 10, Inc. v. CCBill LLC*, 481 F.3d at 762, (emphasis added). The court's initial limiting explanation in the above

-8-

1    passage, which Defendant excluded, is essential to understanding the court's position, especially

2    in light of the fact that the court never even addressed CCBill's right and ability to control.

3    (Because the Court found that CCBill did not receive a direct financial benefit, it never reached

4    the "right and ability to control" issue.) *Id.*

5        Similarly, Defendant incorrectly asserts that *Perfect 10 v. CCBill* supports its position that

6    the DMCA does not require a service provider to review content at any stage. Once more

7    Defendant misstates the dictum of the court. The discussion from which Defendant quotes

8    specifically addresses the issue of whether or not CCBill implemented a reasonable policy for the

9    termination of repeat infringers. The Ninth Circuit wrote that in order to prove it has implemented

10   a reasonable repeat infringer policy, an internet service provider does not have an affirmative duty

11   to investigate and uncover the repeat infringers on its own. This has nothing to do whatsoever,

12   with whether or not Defendant has the right and ability to control the actions of direct infringers

13   when the service provider receives a direct financial benefit from the infringing activity. *Perfect*

14   *10 v. CCBill* simply did not address 17 U.S.C. §512(c)(1)(B) and Defendant's reliance upon it is

15   intellectually dishonest at best.

16       In §512(c)(1)(B), Congress elected to maintain the common law standard for vicarious

17   liability and made its intentions clear by adopting the precise common law language,

18   unequivocally and without qualification.

19           **B.    Knowledge Is Not an Element of Common Law Vicarious Copyright**
20                 **Infringement or 17 U.S.C. §512(c)(1)(B).**

21       At every turn Defendant attempts to inject a scienter requirement into 17 U.S.C.

22   §512(c)(1)(B) that simply is not there.  Knowledge has never been an element of vicarious

23   infringement at common law and Congress did not add any language to suggest a new knowledge

24
25   requirement when it wrote and passed §512(c)(1)(B).

26       Often courts analyze a defendant's liability under both contributory infringement and

27   vicarious infringement. *See e.g.*, *Gershwin Publishing Corp. v. Columbia Artists Management,*

28   *Inc.*, 443 F.2d 1159 (2d Cir. 1971), *A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir.

2001)("*Napster II*"). "However, care must be taken to note the distinctions between the two types of secondary infringement. Contributory infringement requires knowledge and substantial participation in addition to direct infringement by a third party. Vicarious infringement requires control and financial benefit and direct infringement by a third party." *Fonovisa, Inc. v. Napster, Inc.*, 2002 U.S. Dist. LEXIS 4270 at *28 (N.D. Cal. 2002). There have been opinions in which courts have intertwined their discussions and used the terms contributory and vicarious interchangeably, leading to some confusion. *See, e.g. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (U.S. 1984). However, an understanding of the genesis and history of vicarious infringement and the policy considerations behind it make it clear that vicarious infringement is separate and distinct from contributory infringement. The two require separate analysis and imposition of vicarious infringement does not require a finding of knowledge.

Vicarious copyright infringement emerged from a line of "dance hall cases" and is based on the common law principle of *respondeat superior*. *See Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354 (7th Cir. 1929). The central holding of the dance hall cases was that a dance hall operator could be held liable when an orchestra publicly performed copyrighted works without authorization, even if the band leader and orchestra members were not employees, and even if the operator did not know of the infringing acts. *Id.*; *See also*, *Buck v. Pettijohn*, 34 F. Supp. 968 (E.D. Tenn. 1940)(night club liable for orchestra's infringement even though no admission was charged and the club did not know what songs the orchestra would play or whether those performances were infringing); *Buck v. Crescent Gardens Operating Co.*, 28 F. Supp. 576 (D. Mass. 1939)(defendant liable even though it did not know what songs the orchestra would play); *Irving Berlin, Inc. v. Daigle*, 26 F.2d 149 (E.D. La. 1928)(defendant dance pavilion guilty for infringing acts of orchestra even though it did not make song selections and *had no way of knowing orchestra did not have permission to perform the infringed works*); *Chess Music, Inc. v. Sipe*, 442 F. Supp. 1184, 1185 (D. Minn. 1977)(tavern owner liable for infringing performances of

1    band *even though he instructed them not to play copyrighted music* and had no knowledge of what

2    songs were played or whether any songs performed were copyrighted).

3        Similarly, where a department store licensed a third party vender to operate a record

4    concession, the department store was found liable for the vendor's infringing record sales because

5    it had the right and ability to control the activity of the vender and it received a financial benefit

6    from the infringing record sales. *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d

7    Cir. 1963)("*Shapiro*"). In recent years, the same principles have been applied to flee market

8    operators, when vendors sold pirated music (*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259

9    (9th Cir. 1996)("*Fonovisa*"); *Arista Records, Inc. v. Flea World, Inc.*, 2006 U.S. Dist. LEXIS

10   14988 (D.N.J. 2006) and to an Internet based company, when individuals used its database index

11   to trade infringing MP3 music files. *Napster II*, 239 F.3d at 1023.

12       In none of these cases was the finding of vicarious infringement dependant upon the

13   defendant's ability to determine if the actions were infringing and the analysis never rested on

14   whether or not the defendant knew particular actions were infringing.

15       The Second Circuit in *Shapiro* reasoned that like the proprietors in the dance hall cases, it

16   was sound policy and a correct application of the law, to place the burden for preventing

17   infringement with the department store, because it financially benefited from the concession

18   operator's activities, and had the right and ability to control the actions of the concession operator.

19   *Shapiro*, 316 F.2d at 308.

20       The result in these cases is justified when one considers the policy considerations behind

21   *respondeat superior* in general and its application to copyright infringement through the theory of

22   vicarious infringement specifically. "Modern decisions, when explaining policy justifications for

23   vicarious liability rather than merely citing precedent, commonly refer to risk allocation. When an

24   individual seeks to profit from an enterprise in which identifiable types of losses are expected to

25   occur, it is ordinarily fair and reasonable to place responsibility for those losses on the person who

26   profits, even if that person makes arrangements for others to perform the acts that foreseeably

27   cause the losses. The law of vicarious liability treats the expected losses as simply another cost of

28   doing business. The enterprise and the person profiting from it are better able than either the

-11-

innocent injured plaintiff or the person whose act caused the loss to distribute the costs and to shift them to others who have profited from the enterprise. In addition, placing responsibility for the loss on the enterprise has the added benefit of creating a greater incentive for the enterprise to police its operations carefully to avoid unnecessary losses." *Polygram Int'l Publishing v. Nevada/TIG, Inc.*, 855 F. Supp. at 1325.

Copyright is a strict liability statute because if one could insulate himself from liability by "merely refraining from inquiry" copyright protection would be of little value. *Shapiro* 316 F.2d at 308, citing *De Acosta v. Brown*, 146 F.2d 408, 413 (2d Cir. 1944). For much the same reasons, the imposition of vicarious liability, even when the defendant does not have knowledge of the infringing activity, cannot be deemed unduly harsh or unfair, because the party found strictly liable is often in a position to police the conduct of the primary infringer. *Id.* If it were to require knowledge as an element of vicarious infringement, the Second Circuit wrote, then defendants who could otherwise police the conduct of infringers would shield their eyes from the possibility of copyright infringement in order to create a buffer against liability while reaping the proceeds of infringement. *Id.* at 309. Defendant appears to be doing just that.

Congress understood the policy concerns for imposing the brand of liability when it included the common law standards at 17 U.S.C. §512(c)(1)(B) in order to exclude vicarious infringers from the protections of the DMCA. Defendant's attempt to equate inability to recognize infringing works with the right and ability to control the acts of a direct infringer, is a desperate attempt to interject a knowledge requirement that clearly was not an element at common law and is not an element of 17 U.S.C. §512(c)(1)(B).

### C. Defendant Receives a Direct Financial Benefit from the Infringing Activity.

Defendant states that Veoh Networks, Inc. was founded to provide a forum for the efficient sharing of high-quality, user created video content on the Internet. Defendant's Motion for Summary Judgment at 1:6-7. However, Defendant refers to itself as an Internet Television Network (Shapiro Depo. 53:24-54:1) and like any television network it was founded to earn advertising revenue through the draw of consumers to view compelling video entertainment.

Q: "Was Veoh designed to earn revenue from ad sales?"

1       A: "We envisioned Veoh to –yes, to be able to earn revenue from ad sales." Shapiro

2  Deposition 59:19-22.

3       Q: "Is there a correlation between how many users come to veoh.com and how much

4  revenue Veoh is able to earn?"

5       Ms. Golinveaux: "Object to the form of the question."

6       A: "There will be a correlation between how much video a –yes, how much video a viewer

7  watches and revenue, we believe.  Again, don't have real data on it, but that is the assumption." *Id*.

8  61:15-23

9       Q: "If Veoh has more content on its site, is it more likely that some of that content will

10  appeal to any given individual user?

11       Ms. Golinveaux: "Object to the form."

12       A: "Yes." *Id*. 62:19-23.

13       Veoh earns revenue by acquiring video files from its users, broadcasting and distributing

14  those video files on its website and selling adjacent space to advertisers.  Its operation is based on

15  the same principles of traditional television whereby advertising revenue is generated by offering

16  free entertainment as a draw for consumers. The more compelling and desirable the free content,

17  the more consumers are drawn to the site to view the content. In turn, more advertising revenue

18  can be generated. Just as with traditional television, individuals are drawn to www.veoh.com for

19  the sole purpose of watching entertainment online or downloading video files for later viewing.

20  Every time a person comes to www.veoh.com, Defendant receives an incremental but direct

21  financial benefit.

22       Courts have routinely held that, "financial benefit exists where the availability of the

23  infringing material acts as a draw for customers." *Napster II,* 239 F.3d at 1023 (quoting *Fonovisa*).

24  Moreover, the Ninth Circuit in *Napster II* recognized that current draw is sufficient if it affects

25  *future* revenue. The court wrote, "[a]mple evidence supports the district court's finding that

26  Napster's *future* revenue is directly dependent upon 'increases in user-base.' More users register

27  with the Napster system as the 'quality and quantity of available music increases.'" *Id*.

28  Defendant's business is substantially similar to Napster's in this regard. The deposition excerpts

-13-

cited above indicate that like Napster, Defendant relies entirely on content to draw viewers to www.veoh.com and in turn earns revenue by advertising to those viewers.

It does not matter that Veoh persuaded thousands of people to provide the content without compensation. Those individuals may not be employees, but they are rendering a service to Defendant nonetheless. Nor, does it matter that the infringement occurred before Defendant began actually placing advertising on its website. Direct financial benefit does not require earned revenue, so long as the defendant has economic incentives for tolerating unlawful behavior. *A&M Records, Inc. v. Napster,* 114 F. Supp. 2d 896, 921 (N.D.Cal. 2000). In support of its reasoning in Napster the district court cited *Major Bob Music v. Stubbs ("Major Bob's")*, 851 F.Supp. 475 (S.D. Ga. 1994), a case in which "a bar derived direct financial benefit from infringing musical performances on its premises." *A&M Records, Inc. v. Napster*, 114 F. Supp. 2d at 921. In *Major Bob's* "[t]he court noted that 'an enterprise is considered to be 'profit-making' even if it never actually yields a profit.'" *Id.* (citing *Major Bob's,* 851 F. Supp. at 480*).* The court also cited *Walden Music, Inc. v. C.H.W., Inc*. 1996 U.S. Dist. LEXIS 6622, 1996 WL 254654, at *5 (D.Kan.1996) ("The fact that defendant' entrepreneurial enterprise is not profiting is not a defense to the plaintiffs' copyright infringement claims.") and *Broadcast Music, Inc. v. Hobi, Inc.*, 1993 WL 404152, at *3 (M.D. La 1993)(holding defendant vicariously liable because it operated with goal of making a profit, even though it did not actually make one). The Ninth Circuit agreed with the district court's analysis and holding and adopted it in full in *Napster II. Napster II*, 239 F.3d at 1023.

Moreover, drawing individuals to the website prior to advertising serves the added benefits of 1) building a large user base which in turn increases internet 'buzz' about the site, encourages investment and creates interest from future advertisers; and 2) testing the operational limits of the system through "beta" testing. Styn Depo. at 19:12-20:25 (on the value of beta testing generally).

Defendant seeks to end run the holding in *Napster II* by relying on *CoStar*, a Maryland District Court case where the court held that there can be no direct financial benefit when users don't pay to use the site. *CoStar Group,Inc. v. Loopnet, Inc.,* 164 F. Supp.2d 688, 705 (D.Md. 2001). When the Fourth Circuit reviewed the case, the application of 17 U.S.C. §512(c)(1)(B) was

1   not among the issues reviewed. *CoStar, Group,Inc. v. Loopnet, Inc.,* 373 F3d 544 (4th Cir. 2004).

2   The district court case reflects a misunderstanding of the financial benefit of increased traffic or an

3   increased user base to a website, particularly a website that advertises or plans to advertise.  Such

4   reasoning is not only unsound; it is in direct conflict with current Ninth Circuit law as set forth in

5   *Napster II. Napster II*, 239 F.3d at 1023. *See also, Fonovisa, Inc. v. Napster, Inc*., 2002 U.S. Dist.

6   LEXIS 4270 at *26. (N.D. Cal. 2002)

7          In any event, there is no support in common law or the 17 U.S.C. §512(c) for Defendant's

8   argument that it did not receive a financial benefit from the infringing activity, because it never

9   "attempted to capitalize on providing infringing content" or that its business model is not

10  "premised on infringing activity." Once more this argument reflects Defendant's attempt to inject

11  a knowledge element into the vicarious infringement analysis, where it does not belong. While

12  Defendant's argument might be relevant to a defense against a claim of inducement (a form of

13  contributory infringement), Defendant's state of mind has simply never been an element of

14  vicarious infringement analysis. For example, the dance hall operators in the cases reviewed *supra*

15  did not intend to profit from infringing performances.  In fact, in some cases the dance hall

16  operators instructed the performers *not* to play infringing music. *See Chess Music, Inc. v. Sipe*,

17  442 F. Supp. 1184, 1185 (D. Minn. 1977).

18         Defendant also relies on *Ellison* to support its "no direct financial benefit" argument. In

19  *Ellison*, defendant AOL (described by the court as a behemoth online service provider) provided

20  the type of service most typically associated with an ISP – access to the Internet. *Ellison v.*

21  *Robertson.*, 357 F. 3d 1072 (9th Cir. 2004)("*Ellison*"). One of the services available to AOL

22  subscribers was access to the USENET, a collection of organizations and individuals whose

23  computers connect to one another and exchange messages posted by USENET users. *Id*. at 1074,

24  n.1. Someone had distributed infringing copies of Ellison's books through a USENET group,

25  thereby making the books available to anyone with USENET access (not just AOL subscribers).

26  The infringing copies passed through AOL's servers but only remained there for a period of

27  fourteen days. *Id*. at 1075. The district court found that there was no direct financial benefit

28  because USENET access only accounted for a small percentage of subscriber usage and only a

small amount of the material available was infringing. *Ellison v. Robertson*, 189 F. Supp. 2d 1051, 1060 (C.D.Cal. 2002).

The Ninth Circuit flatly rejected the district court's reasoning, specifically ruling that the amount of infringing material in a forum is not relevant. *Ellison*, 357 F.3d at 1078. The Court of Appeals found there was no showing of direct financial benefit - not because the small amount of infringement, but rather because there was insufficient evidence to prove that access to the USENET group served as a draw for AOL subscribers. *Id*. at 1079. Draw was difficult to establish because AOL users purchased subscriptions for a myriad of different services and access to the infringing USENET group was available from other Internet access providers. *Id*. The salient question was not how much infringing material appeared in any given forum, but whether facts could be established linking the forum where the infringing activity took place and the revenue generating aspects of the operation.

Veoh's business model is far closer to the Napster model than the AOL model.  In fact, it is nearly identical. Like *Napster*, Defendant seeks merely to draw people to their website, not to persuade them to purchase a subscription. Moreover, access to video files is no small part of Defendant's offerings; it is the entirety of its operation. The percentage of infringing material available at www.veoh.com may be smaller than that in *Napster*, but *Ellison* clearly holds that direct financial benefit can be established even if there is only a small amount of infringing material. *Id*.

The uncontroverted evidence shows that Defendant received a financial benefit from the infringing activity. Defendant admits that video files serve as a draw to www.veoh.com and that Defendant benefits when users come to their website. These facts alone are sufficient to establish a draw. Even further, not only were customers drawn to www.veoh.com to view videos generally, or adult videos specifically, they were drawn to www.veoh.com precisely to view Plaintiff's works. Viewers specifically selected Plaintiff's video files for viewing. In fact, one of Plaintiff's works was viewed nearly 10,000 times, was rated by viewers with four and one half stars out of five, received thirty-nine "favorite" votes from viewers and on June 13, 2006 was ranked as the 21st most popular gay adult video on www.veoh.com. Ruoff Decl. in Support of Plaintiff's Motion for

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

Summary Judgment at ¶17 and Exs. D and H. Clearly, individuals were drawn to www.veoh.com to view Plaintiff's material.

Defendant received a direct financial benefit from making video files available to the public through www.veoh.com because free video, including Plaintiff's videos, drew individuals to the site.

### D.  Defendant Has the Right and Ability to Control the Infringing Activity

Courts have found the right and ability to control where there is a set of rules or regulations (occasionally in the form of a license or contract) which govern the conduct of the direct infringer coupled with the vicarious infringer's ability to police or enforce those rules. *See Shapiro,* 316 F.2d 304; *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259; *Napster II,* 239 F.3d 1004.

In *Shapiro* the Second Circuit found that the department store's relationship with the company it licensed to run a record concession created a right and ability to control because the store could impose rules on the licensee and could discharge licensee's employees if those rules were not followed. *Shapiro,* 316 F.2d at 306. In *Polygram*, the court found that trade show organizers had the right and ability to control exhibitors at a computer show because the exhibitors were bound to certain rules and regulations, the organizers had the authority to prohibit the exhibitors from playing any music at all, and the organizers walked the aisles to ensure compliance with rules. *Polygram,* 855 F. Supp. at 1328.

Courts also found conditions to satisfy the "ability to control" prong in the flea market cases. In *Fonovisa*, right and ability to control was established by the broad contracts the operator of a flea market had regulating the behavior of the vendors, as well as, the operator's ability to police the vendors in order to enforce the rules. *Fonovisa,* 76 F.3d at 263. The operator of another flea market was found to have control over vendors based on the operator's rules allowing inspection of goods for sale and the right to cancel space if rules were violated, as well as, the operator's rules prohibiting the sale of certain classes of goods such as food and beverage, firearms and ammunition. *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 1001(E.D. CA 2004).  Rather interestingly, in a third flea market case, the court found control based in part on a

-17-

1   limitation on "vendors' rights to display certain materials, *such as pornography*." *Arista Records,*

2   *Inc. v. Flea World, Inc.*, LEXIS 14988 at *33(emphasis added).

3       The uncontroverted evidence establishes that these elements of control are present in the

4   matter before the Court. Defendant requires users to agree to a litany of rules and regulations as set

5   forth in its Terms of Use and Acceptable Use Policy.  Users are not allowed to submit videos that

6   infringe on intellectual property rights. Defendant also prohibits users from making unsolicited

7   offers, or sending advertisements, proposals or junk mail. Also, Defendant prohibits is users from

8   impersonating other people, misrepresenting the source of material, or harassing, abusing,

9   defaming, threatening or defrauding other users.  In fact, the rules go beyond regulating the nature

10  of the content users submit by also prohibiting certain actions such as linking to password

11  protected areas of the site or spidering material on the site. The rules even set the venue and choice

12  of law if disputes arise. *See* Ruoff Declaration in Support of Plaintiff's Motion for Summary

13  Judgment, Ex. B - Defendant's Terms of Use, and Ex. C - Defendant's Acceptable Use Policy.

14      The Terms of Use also specifically permit Defendant to police the Veoh System. "Veoh

15  and its agents shall have and do reserve the right to monitor any User Material from time to time

16  for any lawful purpose.  Veoh may, without notice to you, remove or block content of any User

17  Material from the Veoh Service, including disabling access to such User Material that you have

18  downloaded through the Veoh Service."  *Id*. As explained in detail in Plaintiff's Motion for

19  Summary Judgment, and admitted in Defendant's moving papers, Defendant did police the

20  system, removed content and canceled accounts for violations. *See* Plaintiff's Motion for

21  Summary Judgment at §II-G; Defendant's Motion for Summary Judgment at 4:6-10 (Veoh

22  employees spot check for terms of use compliance and for proper categorization.) Clearly,

23  Defendant controls all facets of its users' activity relating to www.veoh.com.

24      Perhaps more salient however, are the similarities of the facts in the matter currently before

25  the court and the elements of control the Ninth Circuit deemed relevant in the *Napster II*. In

26  *NapsterII* the defendant facilitated the transmission of MP3 files between and among users

27  through peer-to-peer file sharing.  Napster's system allowed "its users to: (1) make MP3 music

28  files stored on individual computer hard drives available for copying by other Napster users; (2)

-18-

search for MP3 music files stored on other users' computers; and (3) transfer exact copies of the contents of other users' MP3 files from one computer to another via the Internet. These functions are made possible by Napster's MusicShare software, available free of charge from Napster's Internet site, and Napster's network servers and server-side software." *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1011 (9th Cir. 2001). The index resided on Napster's servers, but the infringing files remained on the home computers of Napster's users. Napster expressly reserved the right to control access to its system and reserved the right to refuse service and terminate accounts for any reason. The Ninth Circuit upheld the district court's finding that Napster's right to exclude users from its service alone was likely to be sufficient to establish the right and ability to control. The Court wrote without equivocation, "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster II*, 239 F.3d. at 1023. Here Defendant not only can control its users' activity through control of the index, it actually has control of all of the infringing material because the video files reside on Defendants servers along with the index.

Defendant relies heavily on *Hendrickson v. eBay* in support of its assertion that it does not have the right and ability to control the actions of its users, in spite of the Ninth Circuit's ruling in *Napster II. Hendrickson v. Ebay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001)("*Hendrickson*"). However, *Hendrickson* is inapposite since Plaintiff does not seek to establish Defendant's right and ability to control *merely* upon Defendant's ability to remove infringing files. Defendant's high level of control is in complete contrast to the facts in *Hendrickson. Id.* For all of its reliance on *Hendrickson*, Defendant fails to explain the basis for the court's holding. *Hendrickson* involved the selling of infringing DVDs through eBay. The *pro per* plaintiff, a copyright holder, sued eBay, and eBay moved for summary judgment under 17 U.S.C. §512(c) as Defendant does here. The court found that eBay did not have the right and ability to control the infringing activity because, "eBay never has possession of, or opportunity to inspect, such items because such items are only in the possession of the seller". *Id*. at 1094.

Defendant also relies on a Washington District Court's ruling that was based on *Hendrickson, Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (D. Wash.

2004)("*Corbis*"). *Corbis* also found that Defendant Amazon did not have the right and ability to control when the infringing sale took place off line and Amazon never had possession of the pirated goods. *Id.* at 1110 ("Amazon is never in possession of the products sold by zShops vendors."). Unlike *Hendrickson* and *Corbis,* where the infringing items were physical products never in the possession of the defendants, Veoh took possession of the infringing works and processed, copied, made new versions and displayed the works *entirely on its own servers*.

The other decision Defendant relies on to establish its lack of control is *Perfect 10 v. Cybernet Ventures*. *Perfect 10 v. Cybernet Ventures*, 213 F. Supp.2d 1146 (C.D. Cal. 2002)("*Cybernet*"). Cybernet charged customers a fee to access affiliate websites for the purposes of viewing adult photographs. The infringing works resided on the affiliate member websites. The court agreed with *Hendrickson* and *CoStar* that closing the safe harbor based on the mere ability to exclude users from the system is inconsistent with the statutory scheme. *Cybernet* at 1181. Nonetheless, the court found that there were sufficient facts to establish control, rendering a 17 U.S.C. §512(c) defense unlikely for Cybernet. This was true even though the infringing material resided not on defendant's servers, but on the servers of the affiliate websites. The elements indicative of control included prescreening of the affiliated sites, extensive advice to affiliate sites, prohibition of identical sites on its system, and *prohibition of certain kinds of images. Id.* at 1160, 1181. Here defendant's actions go further than the defendant in *Cybernet.* Defendant purported to license the works through its terms of use, reviewed the materials at various times, created infringing copies, created infringing Flash format versions of the works, extracted frames in order to create infringing .jpg files, and indexed the works. Moreover, the infringing works resided on Defendant's servers rather than on the servers of affiliates as in *Cybernet*.

Unlike any of the above cases Defendant has the added element of control in that it actually engaged in directly infringing acts by creating the Flash versions of the works and the still-frame .jpg images. This is analogous to the dance hall operators "automatically" recording the evening's entertainment to audio cassette and giving patrons a copy to take home, or the flea market operators offering to transform their vendors' infringing records into audio cassettes or CDs because the new format would be easier for the vendors and their customers to use.

-20-

By its Terms of Use, to which all users must accent, Defendant, "reserves the right to terminate [users] use of the Veoh Service if [Defendant] determine[s] that [users] have violated these Terms or the Acceptable Use Policy." Ruoff Decl. in Support of Plaintiff's Motion for Summary Judgment at ¶9 and Ex. B. Defendant admits that it has terminated 1,096 users for copyright infringement and 646 users for other terms of service related violations. Dunning Decl. at ¶12. Clearly Defendant imposes and enforces rules regarding the use of its system.

Defendant also attempts to inject a knowledge requirement into 17 U.S.C. §512(c)(1)(B) by way of its argument that it does not have the right and ability to control, because "it is not feasible for Veoh to review every user submission before it is made available on the Veoh System." Defendant's Motion for Summary Judgment at 19:27-28. Moreover, this self-serving statement should be given no weight whatsoever, as Defendant has offered no evidence to support its assertion that review is not feasible. Moreover, when examined about this issue, at deposition, Defendant admitted that its evaluation of the feasibility of a review process consisted only of "informal", "off the cuff", "back of the envelope level" discussions that relied only on "guesstimates" and "speculation". Papa Deposition 141:12 - 145:3. When asked if Defendant considered whether or not it could reduce, as opposed to eliminate infringement, Defendant's CEO testified, "We just *felt* that we couldn't do it". Shapiro Depo. at 84:10-11 (emphasis added). Finally, even if Defendant could support its statement that review is not feasible, such an argument does not establish an inability to control. An organization financially benefiting from infringing activity cannot complain that its premises is too large to police. *Arista Records, Inc. v. Flea World, Inc*. 2006 U.S. Dist LEXIS 14988 at *37 (N.J.D., March 31, 2006)("[T]he Court is not persuaded by Defendants' argument that the Market is too large to police, because such an argument makes no sense. Defendants alone control the size of their market."). Defendant is in a position to decrease the number of submissions it processes to a number that it can reasonably manage, or add additional resources as needed. "If a business cannot be operated within the bounds of the

-21-

1    Copyright Act, then perhaps the question of its legitimate existence needs to be addressed."

2    *Playboy Enters. v. Webbworld, Inc.*, 968 F. Supp. 1171, 1175 (N.D. Tex. 1997).

3
4         The uncontested facts establish that Defendant has the right and ability to decide what
5    users can and cannot do on its system, including but not limited to, what type of files users can
6    submit and what type of content can be contained within those files. Further, it has been clearly
7    established that Defendant can and does police its system and removes or blocks users from its
     service for violations to its rules.

8
9         Even if the legal standard required that Defendant be able to make a determination as to
10   whether video files are "copyrighted" or "infringing" in order to find "the right and ability to
11   control", which it does not, Defendant still has not set forth sufficient facts to establish its lack of
     control.

12
13        Defendant argues that it cannot control the infringing activity because it cannot determine
14   if any given video clip is infringing. However, this misstates the nature of the inquiry.
15   Defendant's examination of a video file does not occur in a vacuum.  Rather, Defendant is asked
16   to determine authenticity in the context of acquiring the video file *from someone*.  The question is
17   whether under those circumstances, Defendant is able to take steps to determine if the individual is
18   authorized to provide the material. The answer is yes. However, rather than make an inquiry,
19   defendant turns a blind eye, allowing users to submit content with no explanation as to how they
20   obtained it. Defendant does not ask who the submitting party is, who produced or created the
21   video, who currently holds the rights to the video, how the submitting party came to acquire the
22   authority to submit the video or any other question that might put it in a better position to
23   determine if the user holds the copyright holder's authorization. Dunning Depo. 72:2-13. Later
24   Defendant complains that it cannot determine if material is infringing simply by looking at it.
25   Defendant cannot refuse to make even a basic inquiry and then complain that it is unable to
     determine whether or not a video file is infringing just by looking at the content.

26
27        Forty-six states (including California), the District of Columbia and Puerto Rico have
28   recognized the importance of obtaining identifying information in determining the authenticity of
     copyrighted recordings. These states have passed laws (generally referred to as "true name and

                                          -22-

address statutes") that make it an offense to sell music (or sometimes video) recordings without a label identifying the name and street address of the manufacturer.[2]  Twenty-two of these states also require the label to contain the name of the performer. These statutes are designed to reduce piracy. *See Anderson v. Nidorf*, 26 F.3d 100, 103 (9th Cir. 1994)(The legislative history of Cal. Civ. Code §653w indicates one of its purposes is to prevent tape and record piracy). Thus if Defendant wished to reduce piracy on its system, it could simply require the submitter to provide additional information. Requiring the name of the submitting user would also provide the further benefit of enabling Defendant to enforce the indemnification clause included in its Terms of Use which reads as follows: "You agree to indemnify and hold Veoh harmless from and against any liability, claims, losses, demands or damages arising out of or relating to your violation of these Terms or the Acceptable Use Policy." Ruoff Decl. in Support of Plaintiff's Motion for Summary Judgment at ¶9 and Ex. B (bates page 200030, ¶2). These laws are not voilative of the First Amendment. *Anderson v. Nidorf*, 26 F.3d at 104. In fact Defendant's Terms of Use already require users to provide *complete* and accurate information, they simply do not currently enforce this policy. Ruoff Decl. in Support of Plaintiff's Motion for Summary Judgment at ¶9, Ex. B (Defendant's Terms of Use, pg. 200030, final paragraph)("When creating an account you must provide accurate and complete information."); but Dunning Depo. 72:2-13 (Users may, *but not required to.* enter their given name during registration).

---

[2] *See* Al Code § 13A-8-83; Ak Stat. § 45.50.900(a)(2); Az Rev. Stat. Ann. § 13-3705 (A)(3); Ar Code Ann. § 5-37-510(c); Ca Pen. Code §653w; Ca Pen. Code 653aa; Co Rev. Stat. § 18-4-604; Ct Gen. Stat. § 53-142c; De Code Ann. tit. 11, § 922; Dc Code § 22-3214.01; Fl Stat. Ann§ 540.11(3)(a)(3); Ga Code Ann. § 16-8-60 (b); Id Code Ann. § 18-7603; 720 Il Comp. Stat. Ann. 5/16-8; In. Code Ann. § 24-4-10-4; Ia Code Ann §714.15(2); Ks Stat. Ann. § 21-3750; Ky Stat. Ann.§ 434.445(4); La. Rev. Stat. Ann. § 14: 223.6; Md. Code Ann., Crim. Law § 7-308; Ma Gen. Laws Ann. ch. 266, §143 and 143C; Mi Comp. Laws Ann. § 752.1053; Mn Stat. Ann. § 325E.18; Ms Code Ann. § 97-23-89; Mo Stat. Ann. § 570.240; Mt Code Ann. §30-13-144; Ne Rev Stat. Ann. § 28-1324; Nv. Rev. Stat. Ann. § 205.217; Nh Rev. Stat. Ann. 352-A:3; Nj Stat. Ann. § 2C: 21-21; Nm Stat. Ann. § 30-16B-4; Ny Penal Law § 275.35; Nc Gen. Stat. § 14-435; Nd Cent. Code § 47-21.1-03; Oh Rev. Code Ann. 1333.52; Ok. Stat. Ann. Tit.21 §§ 1979-1980; Or Rev. Stat. § 164.868 (sound), 164.872 (video); 18 Pa Cons. Stat. Ann. § 4116(e); Pr Laws Ann. tit. 33, § 2168; Ri Gen. Laws § 6-13.1-15; Sc Code Ann. §§ 16-11-930 to 940; Sd Codified Laws § 43-43A-3; Tn Code Ann. § 39-14-139; Tx Bus. & Com. Code Ann. § 35.94; Ut Code Ann. § 13-10-8; Va. Code Ann. § 59.1-41.3 to .4; Wash. Rev. Code § 19.25.040; Wv Code § 61-3-50(a); Wi Stat. Ann. § 943.209; and Wy Stat. Ann. 6-3-610.

Moreover, because the particular infringements at issue in this matter contain sexually explicit content, they are regulated under 18 U.S.C. §2257(f). This law prohibits the transfer of sexually explicit content unless it is labeled with the business address of the producer (who in turn is required to maintain age verification records for all individuals appearing in the video). Not only does the Defendant have the right and ability to control these sexually explicit video files, it is mandated by federal statute to exercise control over the files and to make sure they are properly labeled.

The uncontested facts clearly establish that Defendant has the right and ability to control the infringing activity. Coupled with the direct financial benefit Defendant receives, Defendant may not rely on 17 U.S.C. §512(c) for an affirmative defense.

## V. Defendant Does not Meet the Conditions of 512(c)(1)(A)(ii) because Defendant Was Aware of Facts and Circumstances from Which Infringing Activity was Apparent.

Under 17 U.S.C. §512(c)(1)(A)(ii) a service provider loses its eligibility for safe harbor if it is aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. §512(c)(1)(A)(ii). Indeed infringing activity was apparent for all of the reasons Plaintiff advanced supporting its contention that Defendant had knowledge or constructive knowledge under a contributory infringement analysis. *See,* Plaintiff's Motion for Summary Judgment §VII-B.

The infringed works were professionally created works, at least one of which was labeled with Plaintiff's trademark (contrary to Defendant's assertion otherwise). None of the works were labeled as required under 18 U.S.C. §2257(f)(4), thereby calling into question the uploading user's authority to provide the content. Nothing in the submitting individual's user name or e-mail address suggest a relationship with a professional adult film production company. There was no website or store location listed on the videos to direct potential customers to a location where they could purchase the films and therefore no plausible business explanation for authorized distribution on www.veoh.com. *Id*.

Plaintiff's copyright registrations also provide constructive knowledge of Plaintiff's ownership of their copyrighted works. 17 U.S.C. §205(c); *Saenger Org., Inc. v. Nationwide Ins.*

*Licensing Assocs., Inc.,* 119 F.3d 55, 66 (1ˢᵗ Cir. 1997)("A copyright registration certificate…serves to put the world on constructive notice as to the ownership of the copyright").

These details present a typical red flag scenario by which Defendant should be consider to have been aware of facts or circumstances from which infringing activity was apparent.

## VI.    Conclusion

Even if Defendant could establish that it fulfilled the threshold requirements for immunity under 17 U.S.C. §512(c), Defendant loses its eligibility because it both received a financial benefit directly attributable to the infringing activity and had the right and ability to control that activity. Defendant separately loses eligibility because it was aware of facts and circumstances from which infringing activity was apparent. Having failed to establish its affirmative §512(c) defense, the infringing activity must be examined under a traditional copyright infringement analysis which clearly establishes defendant's liability for direct, contributory and vicarious infringement of Plaintiff's copyrighted works as briefed in full in Plaintiff's Motion for Summary Judgment.

Even if Defendant had established that it met the requirements under 17 U.S.C. §512(c) safe harbor, its Motion for Summary Judgment must fail because it has not established that it has meet several threshold requirements for eligibility, in that the infringing Flash and .jpg files were placed on its system though Defendants own acts and not those of its users, and Defendant failed to reasonably implement its repeat infringer policy. The facts are sufficient for these issues to be decided in Plaintiff's favor, or at a minimum, there is insufficient evidence such that Defendant has not met its burden of proof and its summary judgment motion must fail.

Dated: *August 14, 2007*

/s/ Gill Sperlein

_____

GILL SPERLEIN
THE LAW OFFICE OF GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

-25-

## CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of 18 years, and not a party to the action within. My business address is 69 Converse Street, San Francisco, California, 94103. On August 14, 2007 I served the within documents:

- **PLAINTIFF IO GROUP INC.'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
- **GILL SPERLEIN'S DECLARATION IN SUPPORT OF PLAINTIFF IO GROUP INC.'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
- **KEITH RUOFF'S DECLARATION IN SUPPORT OF PLAINTIFF IO GROUP INC.'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

by causing a true and correct copy of the above to be placed with Special -T Delivery Service for personal delivery in a sealed envelope with postage prepaid, addressed as follows:

JENIFER A. GOLINVEAUX
WINSTON & STRAWN LLP
101 CALIFORNIA STREET, SUITE 3900
SAN FRANCISCO, CA 94111-5894

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 14, 2007.

/s/ Stephen Mounce

_____
Stephen Mounce

I hereby attest that this is the declaration of Stephen Mounce and the original with Stephen Mounce's holographic signature is on file for production for the Court if so ordered, or for inspection upon request by any party. Pursuant to the laws of the United States, I declare under penalty of perjury the foregoing is true and correct.

Dated: *August 14, 2007*

/s/ Gill Sperlein
GILL SPERLEIN,
Counsel for Plaintiff Io Group, Inc.

-1-