1   RUSSELL J. FRACKMAN (SBN 49087), rjf@msk.com
    KARIN G. PAGNANELLI (SBN 174763), kgp@msk.com
2   MARC E. MAYER (SBN 190969), mem@msk.com
    MITCHELL SILBERBERG & KNUPP LLP
3   11377 West Olympic Boulevard
    Los Angeles, California 90064-1683
4   Telephone: (310) 312-2000
    Facsimile:  (310) 312-3100
5
    Attorneys for *Amici Curiae*
6   Viacom International Inc. and NBC Universal, Inc.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11   IO GROUP, INC.,                        CASE NO.  C 06-3926 HRL

12              Plaintiff,                  The Honorable Howard R. Lloyd

13        v.                               **BRIEF OF *AMICI CURIAE* VIACOM
                                           INTERNATIONAL INC. AND NBC
14   VEOH NETWORKS, INC.,                  UNIVERSAL, INC. RE: MOTION FOR
                                           SUMMARY JUDGMENT OF VEOH
15              Defendant.                  NETWORKS, INC.**

16                                         Date:   September 4, 2007
                                           Time:   10:00 a.m.
17                                         Ctrm:  2

18

19

20

21

22

23

24

25

26

27

Mitchell
Silberberg &  28
Knupp LLP

1491793.DOC
                                                    CASE NO. C 06-3926 HRL
                          Brief of *Amici Curiae*

Dockets.Justia.com

## TABLE OF CONTENTS

Page(s)

I.      BACKGROUND AND POSITION OF *AMICI CURIAE* .................................................. 1

II.     THE BALANCE AND PROTECTIONS OF THE DMCA WILL BE
        ELIMINATED IF VEOH IS GRANTED "SAFE HARBOR" UNDER
        SECTION 512(c) ............................................................................................................. 5

III.    VEOH HAS THE BURDEN OF PROVING THAT IT MEETS THE
        REQUIREMENTS OF SECTION 512(c) ......................................................................... 7

        A.      Veoh Misconstrues The Elements of Direct Financial Benefit And
                The Right and Ability To Control Infringing Activity ...................................... 8

        B.      Whether Veoh Lacks Knowledge Of Infringement Or Has Adopted
                An Effective "Repeat Infringer" Policy Are Factual Issues On
                Which Veoh Bears The Burden ......................................................................... 13

IV.     SECTION 512(c) DOES NOT PROTECT COMMERCIAL WEBSITES
        SUCH AS VEOH THAT COLLECT, PROVIDE, DISSEMINATE, AND
        PROFIT FROM COPYRIGHTED WORKS ..................................................................... 15

CONCLUSION ........................................................................................................................... 19

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>FEDERAL CASES</u>

<u>A&M Records, Inc. v. Napster, Inc.</u>,
    114 F. Supp. 2d 896 (N.D. Cal. 2000) ......................................................... 9, 10

<u>A&M Records, Inc. v. Napster, Inc.</u>,
    54 U.S.P.Q.2d 1746 (N.D. Cal. 2000)........................................................ 6, 15

<u>A&M Records, Inc. v. Napster, Inc.</u>,
    239 F.3d 1004 (9th Cir. 2001)..................................................................... 9, 12

<u>ALS Scan, Inc. v. RemarQ Communities, Inc.</u>,
    239 F.3d 619 (4th Cir. 2001)............................................................................ 5

<u>Chess Music, Inc. v. Sipe</u>,
    442 F. Supp. 1184 (D. Minn. 1977) ............................................................... 10

<u>Corbis Corp. v. Amazon.com, Inc.</u>,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004) ................................................ 15, 18

<u>CoStar Group, Inc. v. Loopnet, Inc.</u>,
    164 F. Supp. 2d 688 (D. Md. 2001) ............................................................... 19

<u>Doe v. GTE Corp.</u>,
    347 F.3d 655 (7th Cir. 2003)......................................................................... 16

<u>Ellison v. Robertson</u>,
    357 F.3d 1072 (9th Cir. 2004)..................................................................... 5, 10

<u>Fame Publ'g Co. v. Alabama Custom Tape, Inc.</u>,
    507 F.2d 667 (5th Cir. 1975).......................................................................... 5

<u>Fonovisa, Inc. v. Cherry Auction, Inc.</u>,
    76 F.3d 259 (9th Cir. 1996).......................................................................... 9, 11

<u>Fonovisa v. Napster, Inc.</u>,
    No. 3:01-02669, 2002 WL 398676 (N.D. Cal. Jan. 28, 2002) ............................ 13

<u>Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.</u>,
    443 F.2d 1159 (2d Cir. 1971)......................................................................... 11

<u>Hendrickson v. Amazon.com, Inc.</u>,
    298 F. Supp. 2d 914 (C.D. Cal. 2003)................................................... 7, 18, 19

<u>Hendrickson v. eBay, Inc.</u>,
    165 F. Supp. 2d 1082 (C.D. Cal. 2001)........................................................... 18

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

ii

CASE NO. C 06-3926 HRL

Brief of *Amici Curiae*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Jarvis v. K2 Inc.,
    486 F.3d 526 (9th Cir. 2007)..................................................................... 17

Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,
    545 U.S. 913 (2005) ........................................................................... 11, 12

Perfect 10, Inc. v. CCBill, LLC,
    488 F.3d 1102 (9th Cir. 2007)................................................ 8, 14, 15, 17, 18, 19

Perfect 10, Inc. v. Cybernet Ventures, Inc.,
    213 F. Supp. 2d 1146 (C.D. Cal. 2002)........................................... 9, 12, 14, 15

Perfect 10, Inc. v. Google, Inc.,
    416 F. Supp. 2d 828 (C.D. Cal. 2006)................................................................ 10

Playboy Enters., Inc. v. Russ Hardenburgh, Inc.,
    982 F. Supp. 503 (N.D. Ohio 1997) ..................................................................... 9

Playboy Enters., Inc. v. Webbworld, Inc.,
    968 F. Supp. 1171 (N.D. Tex. 1997) ..................................................................... 9

Playboy Enters., Inc. v. Webbworld, Inc.,
    991 F. Supp. 543 (N.D. Tex. 1997) ..................................................................... 17

Realsongs v. Gulf Broadcasting Corp.,
    824 F. Supp. 89 (M.D. La. 1993) ..................................................................... 9

Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.,
    907 F. Supp. 1376 (N.D. Cal. 1995) ..................................................................... 12

Rossi v. Motion Picture Ass'n of America, Inc.,
    391 F.3d 1000 (9th Cir. 2004)..................................................................... 8

Shapiro, Bernstein & Co. v. H. L. Green Co.,
    316 F.2d 304 (2d Cir. 1963) ..................................................................... 11

Sony Corp. of America v. Universal City Studios, Inc.,
    464 U.S. 417 (1984) ..................................................................... 17

Tur v. YouTube, Inc.,
    Case No. CV 06-4436 FMC,
    2007 WL 1893635 (C.D. Cal. June 20, 2007)........................................... 2, 3, 12

Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.,
    478 F. Supp. 2d 607 (S.D.N.Y. 2007) ..................................................................... 17

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

**TABLE OF AUTHORITIES**
(continued)

Page(s)

UMG Recordings, Inc. v. MP3.com, Inc.,
 92 F. Supp. 2d 349 (S.D.N.Y. 2000) .................................................................. 17

UMG Recordings, Inc. v. Sinnott,
 300 F. Supp. 2d 993 (E.D. Cal. 2004) ............................................................ 12

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,
 192 F. Supp. 2d 321 (D. N.J. 2002) ................................................................ 17


**FEDERAL STATUTES AND LEGISLATIVE HISTORY**

17 U.S.C. § 512(c) ............................................................................................. *passim*

17 U.S.C. § 512(i) ........................................................................................... 13, 14

17 U.S.C. § 512(n) ................................................................................................ 6

H.R. Rep. No. 551, pt. I, 105th Cong., 2d Sess. (1998) ........................................ 7, 8, 17

S. Rep. No. 190, 105th Cong., 2d Sess. (1998) ........................................... 5, 6, 14, 16


**OTHER AUTHORITIES**

3 M. & D. Nimmer, Nimmer On Copyright (2006 ed.) .................................... 6, 8, 9, 13

A New Copyright Battlefield: Veoh Networks, CNET News.com, Feb. 21, 2007 ...................... 14

Heidi P. Salow, *Liability Immunity for Internet Service Providers – How Is It
 Working?*, 6 J. Tech. Law & Policy 1 (2001) ................................................... 16

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

iv                                   CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1      Viacom International Inc. ("Viacom") and NBC Universal, Inc. ("NBCU") submit this

2 brief as *Amici Curiae* in regard to the Motion for Summary Judgment of Defendant Veoh

3 Networks, Inc. ("Veoh").

4

5 **I.      BACKGROUND AND POSITION OF *AMICI CURIAE***

6      *Amici Curiae* Viacom and NBCU are two of the world's leading creators, producers, and

7 distributors of media content.  Viacom and NBCU own the copyrights in thousands of works,

8 including some of the most successful, popular, and critically acclaimed motion pictures and

9 television programs in the United States.  *Amici* have a broad interest in the development of the

10 law of intellectual property generally, and a particular interest in the Digital Millennium Copyright

11 Act ("DMCA") and its application to services such as Veoh, whose business is based on the

12 intellectual property of others. Viacom and NBCU do not have any pecuniary interest in the

13 outcome of this lawsuit, but they have a specific and tangible interest in the legal issues raised in

14 Veoh's Motion.  (Viacom's and NBCU's copyrighted works have appeared, and continue to

15 appear, repeatedly on the <u>veoh.com</u> website and on other video-sharing websites that operate

16 similarly to Veoh.)

17      The central issue raised in Veoh's Motion, namely, whether Veoh qualifies for the DMCA

18 limitations on liability for its copying, performance, and dissemination of copyrighted works on its

19 commercial website, is a critically important issue of first impression.  This issue is the subject of

20 scholarly and industry debate.  This issue also is at the heart of no fewer than six lawsuits,

21 including a putative class action, currently pending against so-called video-sharing websites:

22 <u>Veoh Networks, Inc v. UMG Recordings, Inc.</u>, No. 07 1568 (S.D. Cal., filed Aug. 9, 2007); <u>The</u>

23 <u>Football Ass'n Premier League Limited and Bourne Co. v. YouTube, Inc.</u>, No. 07 Civ. 03582

24 (S.D.N.Y., filed May 4, 2007); <u>Viacom Int'l, Inc. v. YouTube, Inc.</u>, No. 1:2007 CV 02103

25 (S.D.N.Y., filed Mar. 13, 2007); <u>UMG Recordings, Inc. v. Grouper Networks Inc.</u>, No. CV 06-

26 06561 (C.D. Cal., filed Oct. 16, 2006); <u>UMG Recordings, Inc. v. Bolt Inc.</u>, No. CV 06-06577

27 (C.D. Cal., filed Oct. 16, 2006); <u>Tur v. YouTube, Inc.</u>, No. CV 06-4436 (C.D. Cal., filed July 14,

28 2006).  Viacom, as well as UMG Recordings (the largest record company in the United States),

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

1                  CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1  the United Kingdom's Premier Football League and the Finnish Football League Association are

2  plaintiffs in these lawsuits.  (NBCU is not a plaintiff in any of those cases.)  The resolution of

3  Veoh's Motion may have a far-reaching impact on *Amici* and other content creators, as well as on

4  the pending lawsuits and any future litigation against enterprises like Veoh, YouTube, and others.

5        Viacom and NBCU request to be heard as *Amici* and offer this brief to apprise the Court of

6  the broader context in which this case arises, to offer the Court the benefit of Viacom and NBCU's

7  perspective on the important legal issues raised by Veoh's Motion, and to request that the Court

8  take this broader context into account in ruling on Veoh's Motion.  In making this request, *Amici*

9  emphasize that they do so as friends of the Court, solely to address the legal issues presented in

10  Veoh's Motion.  *Amici* do not take a position on other issues in this case or on its ultimate

11  outcome.  Certainly, the works that underlie this action may be offensive to many, and *Amici*'s

12  legal arguments here should not be misconstrued as an endorsement of such material.  But

13  Congress has not established separate copyright laws for adult-oriented and family-friendly works.

14  The DMCA is content-neutral, and Plaintiff's legitimate claims to copyright protection deserve

15  equal consideration and enforcement.  Indeed, anyone concerned about the indiscriminate

16  profusion and availability of Plaintiff's content should support Plaintiff's efforts to confine

17  distribution of its owned works to its lawful, paying subscribers, and to police infringement of

18  those works by websites that make them available without authorization for free to anyone in the

19  world.

20        NBCU recently was permitted to file a brief and appear as *amicus* in the Central District of

21  California in <u>Tur v. YouTube, Inc.</u>, No. CV 06-4436 (C.D. Cal., filed July 14, 2006), a case that

22  raised issues quite similar to those at bar.  In that case, YouTube, a website that, among other

23  functions, allows users to upload and then disseminates digital video files, moved for summary

24  judgment, making many of the same arguments under the DMCA as does Veoh.  After extensive

25  briefing and a lengthy hearing, the Court denied YouTube's Motion, finding that "there is a

26  significant amount of maintenance and management that YouTube exerts over its website" and

27  that although "YouTube [] asserts that its system does not have the technical capabilities needed to

28  detect and prescreen allegedly infringing videotapes [] there is insufficient evidence before the

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

2                                         CASE NO. C 06-3926 HRL
*Brief of Amici Curiae*

1   Court concerning the process undertaken by YouTube from the time a user submits a video clip to

2   the point of display on the YouTube website." Tur v. YouTube, Inc., 2007 WL 1893635 at *3

3   (C.D. Cal. June 20, 2007).  Thus, the Court held that, on an issue central to Veoh's motion here,

4   YouTube had not met its burden of proving, for purposes of summary judgment, that it lacked the

5   right and ability to control infringing activity, and thus that it qualified for DMCA protection.

6        As set forth below, Veoh's arguments that it is qualified for the DMCA Section 512(c) safe

7   harbor similarly rest on an erroneous, overly narrow, and unsupported view of the law and of the

8   burdens that Section 512(c) imposes on Veoh to show, among other things, that it has no direct

9   financial interest or ability to control infringement that takes place on its own website and through

10  its own server.  Veoh cannot carry its burden merely by claiming that it did not sell advertising

11  during the time period at issue or that it cannot (or will not) control what its users upload.  Veoh

12  directly benefits from the number of users who visit its website and cannot legitimately dispute

13  that at least some (if not the majority) of those users are drawn by infringing content.  Veoh also

14  possesses the legal right and practical ability to control the content on its own premises (i.e., its

15  website) because, among other things, it collects, maintains, distributes, indexes, reformats, and

16  edits that content.

17       To the extent the Court decides to reach beyond this dispositive issue, this brief also

18  discusses Veoh's burden of proving the other elements of its safe harbor affirmative defense,

19  including that it lacks constructive or "red flag" knowledge of infringement and effectively

20  implements a repeat infringer policy.  If, as *Amici* respectfully urge, this Court rules narrowly and

21  denies Veoh's Motion based on Veoh's inability to satisfy all the requirements of the DMCA safe

22  harbor, then this Court will not need to confront the more fundamental question of whether the

23  safe harbor provisions ever can apply to an entity like Veoh.  However, in the event this Court

24  believes it must confront that question, this brief explains, in the alternative, that Veoh cannot

25  qualify for safe harbor protection because it is not the type of Internet service provider

26  contemplated by Congress to be covered by Section 512(c), the only safe harbor Veoh invokes.

27       If Veoh's interpretation of the DMCA is credited, Veoh would be free to set up a business

28  that knowingly infringes copyrighted works on a massive scale by copying, publicly performing,

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

3                    CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1  displaying, and distributing those works.  Under its view, Veoh could continue to profit from

2  infringement while imposing on copyright owners such as *Amici* the costs of constantly attempting

3  to monitor the Veoh website and invoking the ineffective process of repeatedly demanding

4  removal of infringing works.  This game of "cat and mouse" would continue perpetually;

5  copyright owners would have to send new DMCA notices every time a user uploads an infringing

6  video and Veoh copies it to its own server, with Veoh profiting from infringement all the while.

7  Indeed, under its view, Veoh could actively encourage its users to commit infringement and still

8  claim DMCA protection simply by its after-the-fact response to "takedown" notices, and after

9  considerable harm to copyright owners.  Congress did not intend such a patently unjust result, and

10  yet this result is the necessary consequence of Veoh's claim that the DMCA provides blanket

11  protection so long as it responds to takedown notices.[1]

12       Irrespective of this Court's ultimate decision on these issues, *Amici* submit that the

13  particular facts of this case (including the nature and amount of the content at issue, the fact that

14  Veoh no longer permits videos such as Plaintiff's to be posted to its website, and Plaintiff's

15  apparent decision not to give DMCA notice) make this an inappropriate "test" case to make broad

16  conclusions about how the DMCA should apply to Internet media aggregators and content

17  providers such as Veoh.  Additionally, there are numerous unsettled questions specifically as to

18  how Section 512(c) of the DMCA applies to websites such as Veoh.  The answers to those

19  questions may differ depending on what a particular record shows about the nature of a website's

20  business model, the extent of the website (or its operators') knowledge of infringement (including

21  its intention to infringe or willful blindness to obvious evidence of infringement), the ability of the

22

23  [1]  Veoh claims (which *Amici* do not concede) that it removes infringing material ***after*** receiving
     DMCA notice.  However, Veoh omits that first the copyright holder must locate the infringing
24  material, which is indexed by Veoh and located ***on its own server,*** provide Veoh with notice, and
     then wait for Veoh to process the notice and remove the infringing material.  During this time, the
25  infringing material remains available.  This process then must constantly be repeated. The DMCA
     recognized these realities by providing the separate requirements for safe harbor protection in
26  addition to, and not in place of, notice.  The facts of this case are unusual – and perhaps *sui*
     *generis* – in that this case involves content that Veoh itself took down as the result of a business
27  decision to purge its system of adult content, rather than in response to a notice.  That is not the
     situation with respect to *Amici*, whose works currently can be found on the Veoh system and
28  ***repeatedly*** are uploaded to and performed and distributed by Veoh.

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

4                    CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

website (or its operators) to take active steps to prevent infringement from which it obtains a direct financial benefit, and whether a policy has been implemented that effectively prevents repeat infringers among its users from continuing to infringe. These considerations strongly counsel for deciding the summary judgment motions before the Court on the narrowest possible grounds. See Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004) (affirming summary judgment because "the record lack[ed] evidence" on a particular aspect of the DMCA); see also Fame Publ'g Co. v. Alabama Custom Tape, Inc., 507 F.2d 667, 670 (5th Cir. 1975) (statutory exceptions to copyright holder's exclusive rights "construed narrowly").[2]

## II.     THE BALANCE AND PROTECTIONS OF THE DMCA WILL BE ELIMINATED IF VEOH IS GRANTED "SAFE HARBOR" UNDER SECTION 512(c).

Contrary to Veoh's suggestion, the DMCA is not a one-sided framework that exists only to shield Internet service providers ("ISPs") from liability. Veoh Motion at 10. Rather, Section 512(c) of the DMCA was designed to strike a careful balance between the interests of copyright owners and the interests of ISPs. Indeed, Congress recognized that "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet *without reasonable assurance that they will be protected against massive piracy*." S. Rep. No. 190, 105th Cong., 2d Sess., at 8 (1998) (emphasis added). Accordingly, the statute grants protection only to "innocent" service providers, ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 625 (4th Cir. 2001), and applies only where they are acting in an entirely passive mode, making no active use themselves of copyrighted material.

The DMCA likewise does not shelter Veoh merely because Veoh claims to "act[] responsibly upon obtaining information indicating an infringement" (an assertion which apparently is contested). Veoh Motion at 2. Veoh repeats throughout its Motion that Plaintiff did not provide DMCA notice, seeking to imply that this alone confers on Veoh the safe harbor or

---

[2] *Amici* take no position on Plaintiff's Motion for Summary Judgment, except insofar as it necessarily implicates Veoh's DMCA affirmative defense.

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

1  refutes any attempt to disqualify it from safe harbor protection.  See, e.g., Veoh Motion at 1

2  ("Rather than send Veoh a notice"); 9 ("Plaintiff never notified Veoh of any alleged infringements

3  prior to filing suit"); 18 ("Despite ample opportunity to do so, Plaintiff never provided Veoh with

4  any notice of alleged infringements").  But DMCA notice is not a prerequisite to an infringement

5  claim.  3 M. & D. Nimmer, Nimmer On Copyright § 12B.04[A][3] at 12B-58 (2006 ed.)

6  (hereinafter, "Nimmer") ("[C]opyright owners are not obligated to give notification of claimed

7  infringement in order to enforce their rights.").  The DMCA generally (and Section 512(c)

8  specifically) expressly and unambiguously denies safe harbor for any one of multiple reasons:  for

9  example, when an entity has not acted responsibly to stop infringement it knows about or is aware

10  of facts or circumstances from which such infringement is apparent; when an entity financially

11  benefits from infringing activity that it has the right and ability to control; or when an entity does

12  not maintain and enforce a policy against repeat infringers.  The failure to respond to DMCA

13  notice is just one **additional** disqualifying factor.  It is in all of these various requirements (which

14  Veoh downplays behind its arguments concerning DMCA notice) that Congress built into Section

15  512(c) protection for copyright owners as well as for genuine ISPs.  Specifically, the structure of

16  the DMCA requires that an ISP claiming safe harbor must establish affirmatively each of the

17  following elements:

18      (1)    That it falls within the definition of one of the four narrowly described safe harbors

19  (for transmission, caching, storage, and linking).  17 U.S.C. § 512(a)-(d).  Veoh here seeks refuge

20  only under Section 512(c), for "information storage"; **and**

21      (2)    That the **particular functions** of the ISP that are alleged to be the cause of

22  infringement qualify for safe harbor.  Thus, simply because one function of an ISP qualifies for

23  safe harbor does not confer blanket immunity for all its other functions that go beyond the

24  specifically covered function.  17 U.S.C. § 512(n); see A&M Records, Inc. v. Napster, Inc., 54

25  U.S.P.Q.2d 1746, 1750-51 (N.D. Cal. 2000) (denying motion for summary adjudication, in part

26  because safe harbor does not cover all functions of the allegedly infringing system); S. Rep. No.

27  105-190 at 55 ("Section 512's limitations on liability are based on functions, and each limitation is

28  intended to describe a separate and distinct function.").  Here, to the extent Veoh provides any

Mitchell
Silberberg &
Knupp LLP
1491793.DOC

Section 512(c) storage function, that is but one small aspect of its business, and not the entirety of its service.  It is the remainder of its copying, performance, adaptation, and dissemination functions that are infringing, and not covered; *and*

(3)    Even if an ISP meets the above criteria, it may claim the benefit of the DMCA safe harbor only if it proves four additional things: (a) that it does not have a direct financial benefit from and the ability to control infringement; (b) that it does not have actual knowledge of infringement or is not aware of facts or circumstances from which infringing activity is apparent; (c) that upon notice it expeditiously removes infringing material; and (d) that it has and implements a "repeat infringer" policy.  17 U.S.C. § 512(c)(1).

In view of the numerous fact-specific issues involved and the broad ramifications of any ruling on Veoh's ability to invoke the safe harbors of the DMCA, *Amici* respectfully urge the Court to decide this Motion on narrow grounds that focus on the record before the Court, and to avoid broad rulings that may have an impact on future claims against Veoh or litigation against other similar websites.

## III.    VEOH HAS THE BURDEN OF PROVING THAT IT MEETS THE REQUIREMENTS OF SECTION 512(c).

The DMCA safe harbor protection that Veoh asserts is an affirmative defense.  Thus, Veoh must satisfy its heavy burden of proving that it is entitled to that safe harbor because it has complied with *each and every one* of the Section 512(c) requirements that Congress included in the DMCA to protect copyright owners.  Hendrickson v. Amazon.com, Inc., 298 F. Supp. 2d 914, 915 (C.D. Cal. 2003) ("[B]ecause Amazon is asserting an affirmative defense on the vicarious liability claim, it must establish all elements of the safe harbor rule under the DMCA."); H.R. Rep. No. 551, pt. I, 105th Cong., 2d Sess. at 26 (1998) ("The exemption and limitations provided in this subsection are affirmative defenses….  [A] defendant asserting this exemption or limitation as an affirmative defense in such a suit bears the burden of establishing its entitlement.").

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

7    CASE NO. C 06-3926 HRL

*Brief of Amici Curiae*

**A.    Veoh Misconstrues The Elements of Direct Financial Benefit And The Right and Ability To Control Infringing Activity.**

In order to avail itself of the safe harbor of Section 512(c), Veoh must prove that it "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Veoh's arguments on this question hinge on a clearly incorrect view of the applicable law. While Veoh concedes that "the language of subsection 512(c)(1)(B) mirrors that of the common law doctrine," it nevertheless argues that "the DMCA must require less of a service provider than the common law." Veoh Motion at 19. The Ninth Circuit now firmly has rejected that contention. See Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1117 (9th Cir. 2007) ("Based on the 'well-established rule of construction that where Congress uses terms that have accumulated settled meaning under common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms,' we hold that 'direct financial benefit' should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability.") (citations omitted), quoting Rossi v. Motion Picture Ass'n of America, Inc., 391 F.3d 1000, 1004 n.4 (9th Cir. 2004); see also H.R. Rep. No. 105-551, Pt. I at 25-26 ("The financial benefit standard … is intended to codify and clarify the direct financial benefit element of vicarious liability … The 'right and ability to control' language…codifies the second element of vicarious liability.").[3]  Applying the two prongs of Section 512(c)(1)(B) as they have been interpreted and defined by the Ninth Circuit, Veoh's arguments that that it meets each prong of the test are deeply flawed.

**Direct Financial Benefit:**  Veoh argues that it has not received a direct financial benefit from the infringing content based entirely on its claim that, at the time the Plaintiff's content was

---

[3]  Veoh's strained assertion that vicarious liability cannot be imposed here because there is no "special relationship" between Veoh and its users (equivalent to the employer-employee or principal-agent relationship), Veoh Motion at 21-22, also misstates the common law of vicarious liability.  See 3 Nimmer § 12.04[A][2] at 12-81 ("[V]icarious liability exceeds the traditional scope of the master-servant theory… [A] party may be liable as a related defendant even in the absence of an employer-employee relationship, as long as the two elements of vicarious liability are present.").

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

8                                    CASE NO. C 06-3926 HRL
_Brief of Amici Curiae_

1    available on its website, Veoh did not "realize any advertising revenue from its service" and

2    "generated no revenue."  Veoh Motion at 23.  Veoh's argument rests on an incorrect and overly

3    narrow view of the "direct financial benefit" test.

4        For a website to receive a "direct financial benefit" from the presence of infringing

5    content, it is not necessary that it have received ***any*** revenue, including advertising revenue.  See

6    A&M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896, 902 (N.D. Cal. 2000) (Napster received

7    a direct financial benefit from the presence of infringing content even though it "currently collects

8    no revenues and charges its clientele no fees; it is a free service"), aff'd, 239 F.3d 1004 (9th Cir.

9    2001); Realsongs v. Gulf Broad. Corp., 824 F. Supp. 89, 92 (M.D. La. 1993) ("Defendants still

10   have a direct financial interest in the infringing activity if the [radio] station is a for-profit

11   enterprise and defendants benefit from its operation.  The fact that [the radio station] may not be

12   making a profit does not make it a non-profit organization.").  As Professor Nimmer explains, the

13   "direct financial benefit" test is extremely broad, and is "understood to encompass a possible,

14   indirect benefit."  3 Nimmer § 12.04[A][2] at 12-82.

15       Nor is it necessary that Veoh "capitalize" on providing infringing material.  All that is

16   required is that the infringing content be a "draw" that "enhance[s] the attractiveness of the venue"

17   to the website's customers.  Napster, 239 F.3d at 1023, quoting Fonovisa, Inc. v. Cherry Auction,

18   Inc., 76 F.3d 259, 263-64 (9th Cir. 1996); see Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F.

19   Supp. 2d 1146, 1171 (C.D. Cal. 2002) ("Cybernet benefits from the draw posed by the existence

20   of [plaintiff's] works provided at a cost far below that provided by the copyright owner.");

21   Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp. 503, 513 (N.D. Ohio 1997) ("the

22   quantity of adult files available to customers increased the attractiveness of the service"); Playboy

23   Enters., Inc. v. Webbworld, Inc., 968 F. Supp. 1171, 1177 (N.D. Tex. 1997) (photographs

24   "enhanced the attractiveness of the [defendant's] website to potential customers").

25       Regardless of whether it was selling advertising at the time the infringement took place,

26   Veoh's ability to draw users by offering content has a direct impact on the value of the website

27   and on its ability to monetize its business – including by ***later*** selling advertising and "premium

28

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

9                    CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1   content" to its user base.  See Papa Decl., ¶¶ 3-4 (discussing ways in which Veoh currently derives

2   revenue).  As this Court noted in Napster:

> Napster, Inc. currently collects no revenues and charges its clientele
> no fees; it is a free service.  However, it has never been a non-profit
> organization.  It plans to delay the maximization of revenues while it
> attracts a large user base…. Defendant eventually plans to
> "monetize" its user base.  Potential revenue sources include targeted
> email; advertising; commissions from links to commercial websites;
> and direct marketing of CDs, Napster products, and CD burners and
> rippers. Defendant also may begin to charge fees for a premium or
> commercial version of its software. The existence of a large user
> base that increases daily and can be "monetized" makes Napster,
> Inc. a potentially attractive acquisition for larger, more established
> firms.

10  114 F. Supp. 2d at 902 (citations omitted).

11      It certainly is "likely that at least some users are drawn to [Veoh] because they know that

12  copies of [infringing videos] can be viewed for free, and it is indisputable that [Veoh] does stand

13  to benefit the more users visit and use [Veoh]."  See Perfect 10, Inc. v. Google, Inc., 416 F. Supp.

14  2d 828, 857 (C.D. Cal. 2006), aff'd in part, rev'd in part, 487 F.3d 701 (9th Cir. 2007).  The

15  amount of this draw, either in the abstract or as a proportion of Veoh's overall content, is

16  irrelevant to the vicarious liability analysis.  Ellison, 357 F.3d at 1078-79 (rejecting argument that

17  there was no financial benefit because access to infringing USENET group "constituted a

18  relatively insignificant draw when cast against AOL's vast array of products and services.").

19  Veoh's attempt to analogize the financial benefit to its service of infringing content to a "one-time

20  set up fee" or "flat periodic payments," see Ellison, 357 F.3d at 1079, is meritless.  That is not

21  Veoh's business model.  Veoh cannot legitimately dispute that the value of its service is directly

22  related to the number of visitors it attracts.[4]

23

24  _____

25  [4]  Veoh's argument that infringing material is not a draw because "Veoh has always prohibited
    infringing content and has acted expeditiously to remove it **when put on notice**" (Veoh Motion at
    23; emphasis added) is a *non sequitur*.  That such material appears on Veoh and is repeatedly

26  viewed and downloaded by Veoh users *despite* the fact that it is "prohibited" by Veoh's terms of
    use actually proves that it is a draw for many users.  In any event, Veoh cannot avoid liability for

27  infringement merely by stating that it has instructed its users not to infringe.  See Chess Music,
    Inc. v. Sipe, 442 F. Supp. 1184, 1185 (D. Minn. 1977) ("Sipe should not profit at the expense of

28  these song composers by instructing musical groups not to play copyrighted music and by

(…continued)

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

10                          CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1    **Right And Ability To Control:**  Under the applicable vicarious liability standard, the

2    right and ability to "limit" infringement is sufficient ability to control.  Fonovisa, 76 F.3d at 263.

3    That ability need not be exercised and it need not be absolute.  Metro-Goldwyn-Mayer Studios

4    Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) (defendant infringes vicariously "by profiting

5    from direct infringement while declining to exercise a right to stop *or limit* it.") (emphasis added).

6    Veoh does not and cannot dispute that it possesses the legal right to limit or control

7    infringement on its system.  See Fonovisa, 76 F.3d at 263 ("Cherry Auction had the right to

8    terminate vendors for any reason whatsoever and through that right had the ability to control the

9    activities of vendors on the premises."); Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d

10   304, 306 (2d Cir. 1963) (agreements required that infringer "abide by, observe and obey all rules

11   and regulations promulgated" by the defendant).

12   Veoh also has the practical ability to control infringement.  See Gershwin Publ'g Corp. v.

13   Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1163 (2d Cir. 1971) (defendant was "in a position to

14   police" infringement); Fonovisa, 76 F.3d at 263 (same).  Veoh's argument that it cannot control

15   material being uploaded (because it claims it is not feasible to "screen" every user submission) and

16   cannot determine whether material being uploaded is infringing (even if assumed, without

17   conceding it, to be true) blurs the issue of the ability to control the *uploading* of content with the

18   ability to control the use, exploitation, and further dissemination of that content *after* the material

19   has been copied on Veoh's server.  One court expressly emphasized this distinction:

20   > There is insufficient evidence regarding YouTube's knowledge and
ability to exercise control over the infringing activity *on its site.*
21   > There is clearly a significant amount of maintenance and
management that YouTube exerts over its website, but the nature
22   > and extent of that management is unclear.  YouTube also asserts that
while it is able to remove clips once they have been uploaded and
23   > flagged as infringing, its system does not have the technical
capability to detect and prescreen allegedly infringing videotapes.
24   > However, there is insufficient evidence before the Court concerning
the process undertaken by YouTube *from the time a user submits a*
25   > *videoclip to the point of display on the YouTube website.*

26

27   (…continued)

28   claiming ignorance as to their program.  He is deemed to have acquiesced in the musicians'
performance as he allowed the musicians the discretion to select the program.").

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

11                          CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1    Tur, 2007 WL 1893635 at *3 (emphasis added).

2         Even leaving aside the issue of whether Veoh can screen the works uploaded to and copied

3    on its server,5 there can be little dispute that websites like Veoh have the practical ability to police

4    their own premises (i.e., their websites) and thereby limit infringement thereon.  See, e.g.,

5    Grokster, 545 U.S. at 930-31; Napster, 239 F.3d at 1023 ("The ability to block infringers' access

6    to a particular environment for any reason whatsoever is evidence of the right and ability to

7    supervise"); Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., 907 F. Supp. 1361, 1376

8    (N.D. Cal. 1995) (ability to delete infringing postings – even if not exercised – is ability to

9    control); see also UMG Recordings, Inc. v. Sinnott, 300 F. Supp. 2d 993, 1001-02 (E.D. Cal.

10   2004) (summary judgment against operator of flea market finding right and ability to control

11   vendors within his own premises).  Review of Veoh's website and basic operation alone confirms

12   that, among other activities, Veoh collects, reformats, copies, and indexes the infringing material.

13   The infringing videos, the infringing thumbnail images it makes, and its index all reside on its

14   server.  Veoh acts as the gateway and roadmap to infringing material.  See Napster, 239 F.3d at

15   1023-24 (ability to police infringement by searching its index for song titles).  Veoh also provides

16   the means and mechanism to perform videos directly from its website, to embed them in third-

17   party websites, to e-mail them to others, and to download the videos to a home computer.  Veoh

18   performs and streams the infringing material from its server.  It creates its own web pages,

19   including placing advertising (or other material) around the infringing material.  It purports to

20   acquire rights from its users to exploit without limitation the videos they upload.  Veoh also

21   enables and encourages the dissemination of infringing videos by its users.  Each of these

22   activities is within Veoh's "premises" and within its control, and goes far beyond the ability to

23   limit infringement merely by removing selected infringing content.

24   _____

25   5  Veoh admits that it can, and does, spot-check and edit the content on its website for its own
     business reasons.  See, e.g., Veoh Motion at 4 (Veoh "spot checks" videos after publication for
26   "terms of use compliance and proper categorization"), 8 (Veoh disabled access to adult content).
     See Cybernet Ventures, 213 F. Supp. 2d at 1173 (defendant monitored some images and blocked
27   others: "This ability to control other types of images belies any attempt to argue that Cybernet
     does not exercise sufficient control over its webmasters to monitor and influence their conduct or
28   to deny copyright offenders the benefits of its service.").

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

12          CASE NO. C 06-3926 HRL
Brief of Amici Curiae

B.     **Whether Veoh Lacks Knowledge Of Infringement Or Has Adopted An Effective "Repeat Infringer" Policy Are Factual Issues On Which Veoh Bears The Burden.**

Veoh's inability to meet the requirements of Section 512(c)(1)(B) would mandate denial of its motion.  In addition, Veoh's own papers raise serious questions as to whether it also can satisfy its burden of proving that it (1) lacks knowledge of infringement or awareness of facts or circumstances from which infringing activity is apparent (§ 512(c)(1)(A)); and (2) has adopted and "reasonably implemented" a repeat infringer policy (§ 512(i)).  To the extent these issues need to be decided at all, they should be decided only in a narrow manner that takes into account the specific record in this case.

1.     Knowledge.  Section 512(c)(1)(A) permits a service provider to claim safe harbor only where the ISP shows it "does not have actual knowledge" that material or activity on its system is infringing or "in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent."  Veoh's claim that it was unaware of "facts or circumstances from which infringing activity is apparent" is based largely (if not entirely) on Veoh's claim (apparently contested) that Plaintiff did not give DMCA notice and the infringing material did not contain a copyright notice.  But DMCA notice is not a prerequisite for an infringement claim – much less for "red flag" constructive notice.  3 Nimmer § 12B.04[A][3] at 12B-58 ("[C]opyright owners are not obligated to give notification of claimed infringement in order to enforce their rights.  They may instead prevail if they prove that a provider ignored a 'red flag' that was waving in its face…").  Veoh's suggestion that there can be no "red flag" knowledge of infringement without formal DMCA notice reads Section 512(c)(1)(A)(ii) (the "facts and circumstances" provision) out of the statute, because such notice would, of course, give *actual* knowledge of infringement.  See Fonovisa v. Napster, Inc., No. 3:01-02669, 2002 WL 398676 at *9 (N.D. Cal. Jan. 28, 2002) (distinguishing between notice and knowledge acquired in other ways, either of which is sufficient for copyright infringement).

Veoh's assertion that the infringed works did not contain a copyright notice also is not dispositive.  At best, it is one fact to be considered amongst the surrounding facts and

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

13                    CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

circumstances (many of which are noted in Plaintiff's Motion), including that the massive

infringement of the works of *Amici* and others on video-sharing websites such as Veoh has been

discussed at length in major media.  See, e.g., A New Copyright Battlefield: Veoh Networks,

CNET News.com, Feb. 21, 2007 (http://news.com.com/2100-1026_3-6160860.html) ("A review

of Veoh found an extensive list of professionally made shows, including an hour-long animated

feature produced by Disney called *Cinderella III: A Twist in Time* … and a two-hour video of a

soccer match between England and Spain.").  Veoh also certainly is aware of the visible action

taken against video sharing websites, including Viacom's lawsuit against YouTube and Google.

Veoh's CEO has publicly acknowledged that he is aware of infringement on his website.  Id.

("We're all inventing a new medium.[]  When you start off you have some issues, but all of us in

this industry are working to solve those issues.").

     2.     Repeat Infringer Policy.  *All* ISPs, as a "condition[] for eligibility," must "adopt[]

and reasonably implement[]… a policy that provides for the termination in appropriate

circumstances of subscribers and account holders of the service provider's system or network who

are repeat infringers."  17 U.S.C. § 512(i).  This requirement is designed so that "those who

repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual

property rights of others should know that there is a ***realistic*** threat of losing that access."  S. Rep.

No. 105-190 at 52 (emphasis added).

     This case is unusual because Veoh, for business reasons apparently unrelated to Plaintiff's

claims, does not now permit adult videos to be copied to its server.  However, whether a "repeat-

infringer" policy is effective and "reasonably implemented" is not dependent on whether

infringing material has been removed or blocked, but whether infringing ***users***' access to the

system has been terminated.  Cybernet Ventures, 213 F. Supp. 2d at 1177 ("[S]ection 512(i) is

focused on infringing users, whereas 512(c) is focused primarily on the infringing material

itself.").  In evaluating a repeat infringer policy, the Court must consider not just its response to

Plaintiff's claims, but also the "actions towards copyright holders who are not a party to the

litigation."  CCBill, 488 F.3d at 1111.

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

14     CASE NO. C 06-3926 HRL
*Brief of Amici Curiae*

1    Review of Veoh's papers and its website reflect that there are issues as to whether Veoh's

2    purported repeat infringer policy gave its users any "realistic threat of losing [their] access" to the

3    Veoh system.  Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1101 (W.D. Wash.

4    2004); see also Napster, 54 U.S.P.Q.2d at 749 (triable issues concerning implementation of repeat

5    infringer policy).  Despite its purported "robust" policy, a quick review of Veoh's website reveals

6    many statements by users who boast that they repeatedly have posted infringing works (even after

7    prior infringing postings have been deleted) but their accounts have not been terminated.  See, e.g.,

8    Ex. A ("Hey guys, here's a few more clips for your enjoyment…glad Veoh hasn't taken me

9    down."); ("sorry about my other episodes getting deleted").  Veoh apparently does not terminate

10   accounts upon discovery that a user has posted multiple infringing works (a true repeat *infringer*)

11   but rather only terminates an account after multiple *warnings*.  Dunning Decl., ¶ 10; Cybernet

12   Ventures, 213 F. Supp. 2d at 1177 (ISP must terminate users when confronted with "sufficient

13   evidence to create actual knowledge of blatant, repeat infringement by particular users").

14        Veoh's policy also cannot be effective because its operating methods prevent copyright

15   holders from detecting infringement of their works.  While Veoh has access to everything that it

16   copies, indexes, and performs from its servers, copyright holders do not, as Veoh enables its users

17   to restrict the audience able to view videos they upload.  Thus, while Veoh could locate infringing

18   videos on its server, copyright holders cannot always do the same.  See CCBill, 488 F.3d at 1110

19   ("[A] repeat infringer policy is not implemented [] if the service provider prevents copyright

20   holders from providing DMCA-compliant notifications.").

21

22   **IV.    SECTION 512(c) DOES NOT PROTECT COMMERCIAL WEBSITES SUCH AS**
23   **VEOH THAT COLLECT, PROVIDE, DISSEMINATE, AND PROFIT FROM**
     **COPYRIGHTED WORKS.**

24        Veoh devotes only two conclusory sentences to the issue of whether it qualifies for the

25   safe-harbor of Section 512(c) as an information storage facility.  Motion at 11 ("Veoh allows users

26   to upload and share video content.  The material is stored on Veoh's servers at the direction of

27   Veoh's users.").  The preceding discussion establishes that for independent reasons, Veoh cannot

28   prevail on its Motion even assuming, *arguendo*, that Veoh is providing (and only providing) a

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

15                    CASE NO. C 06-3926 HRL
                     Brief of *Amici Curiae*

1   function that Section 512(c) protects.  Therefore, the Court need not decide the more fundamental

2   question of whether Veoh qualifies for Section 512(c) protection at all.   Since a ruling on that

3   issue could have a broad impact on numerous other lawsuits in this Circuit and beyond, *Amici*

4   respectfully urge the Court to avoid, or at least defer, such a ruling if it is not necessary to

5   disposition of the instant motions.

6         If the Court approaches this case via this threshold path, Veoh cannot meet the qualifying

7   definition of a Section 512(c) ISP.  Section 512(c) limits the liability of an ISP solely and

8   exclusively "for infringement of copyright ***by reason of the storage*** at the direction of a user of

9   material that resides on a system or network controlled or operated by or for the service

10  provider…." (emphasis added).  It is intended to limit liability only to the extent it arises from

11  basic storage functions, such as "providing server space for a ***user's*** web site, for a chatroom, or

12  other forum in which material may be posted at the direction of users."  S. Rep. No. 105-190, at 43

13  (emphasis added); <u>see</u>, <u>e.g.</u>, Heidi P. Salow, *Liability Immunity for Internet Service Providers –*

14  *How Is It Working?*, 6 J. Tech. Law & Policy 1 (2001) ("Examples of such storage include

15  providing server space for a user's web site (web hosting) or for a chat room."); <u>see also</u> <u>Doe v.</u>

16  <u>GTE Corp.</u>, 347 F.3d 655, 661 (7th Cir. 2003) (web host is like a delivery service or phone

17  company, an intermediary that profits from the sale of server space and bandwidth).

18        From Veoh's self-descriptions and from the observable characteristics of its website, its

19  conduct largely, if not entirely, falls outside the limited functions protected under Section 512(c).

20  Veoh is not a mere provider of "server space."  Its acts of direct infringement do not arise solely

21  "by reason of" storage functions.  It is not a passive "host" to others' websites.  And it is not

22  simply storing content at the direction of its users.  To the contrary, Veoh actively manipulates and

23  modifies the content in ways that the uploading user clearly does not, including by copying,

24  reformatting, and adapting the works, surrounding them with other material (including links to

25  other videos and advertising), further disseminating them, and providing functionality that permits

26  them to be downloaded, e-mailed, and embedded in other websites.  Veoh has created and rapidly

27  expanded its own commercial website business, <u>veoh.com</u>, by engaging in these activities and

28  thereby becoming a self-proclaimed "video network."  By bundling together and making

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

16                                    CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1   collectively available the millions of videos copied onto its servers, providing functions that allow

2   users to locate the videos they want to see, "featuring" and touting the "most popular" videos on

3   its website, surrounding the display and performance of those videos with its own logo (and, now,

4   advertisements) and then allowing users to e-mail, "embed," and download the videos, Veoh's

5   operations are very different from the kinds of passive, innocent service provider conduct that was

6   before Congress when it enacted the DMCA.  See Sony Corp. of Am. v. Universal City Studios,

7   Inc., 464 U.S. 417, 431 (1984) ("[W]e must be circumspect in construing the scope of rights

8   created by a legislative enactment which never contemplated such a calculus of interests.").

9        In operating its own commercial website, Veoh engages in activities that are reserved to

10  the copyright holder.  See, e.g., Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp., 478

11  F. Supp. 2d 607, 618 (S.D.N.Y. 2007) (copying); Video Pipeline, Inc. v. Buena Vista Home

12  Entm't, Inc., 192 F. Supp. 2d 321, 331-32 (D. N.J. 2002), aff'd, 342 F.3d 191 (3d Cir. 2003)

13  (publicly performing); Jarvis v. K2 Inc., 486 F.3d 526, 532 (9th Cir. 2007) (adapting); Playboy

14  Enters., Inc. v. Webbworld, Inc., 991 F. Supp. 543, 551-52 (N.D. Tex. 1997), aff'd, 168 F.3d 486

15  (5th Cir. 1999) (displaying, distributing).  Neither the legislative history nor the caselaw supports

16  the application of Section 512(c) to such acts of direct infringement by commercial websites.  See

17  CCBill, 488 F.3d at 1120 n.6 (DMCA offers "no immunity for infringement" for displaying

18  infringing images on a website); H.R. Rep. No. 105-551, pt. I, at 11 (DMCA intended to "rule[]

19  out" direct infringement liability only for "passive, automatic acts engaged in through a

20  technological process initiated by another"); cf. UMG Recordings, Inc. v. MP3.com, Inc., 92 F.

21  Supp. 2d 349, 350 (S.D.N.Y. 2000) (in non-DMCA context, "defendant seeks to portray its service

22  as the 'functional equivalent' of storing its subscribers' CDs, in actuality defendant is re-playing

23  for the subscribers converted versions of the recordings it copied").

24       Veoh's position that Section 512(c) applies to its *entire* business and various uses of

25  copyrighted material amounts to the contention that, because the content it provides originated

26  from its users – from whom it purports to obtain a perpetual, irrevocable, and transferable license

27  – it is engaged in "storage."  Veoh apparently claims that once it "stores" any user-uploaded

28  content, it can do whatever it wants with that content and continue to be eligible for safe-harbor

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

Brief of *Amici Curiae*

1   protection.  That position would provide unqualified, broad immunity for infringing services

2   when, at best, only a small part of their functions might qualify.  The safe-harbors of the DMCA

3   cannot so easily be invoked.  <u>CCBill</u>, 488 F.3d at 1117 ("Even if CCBill's provision of a

4   hyperlink is immune . . . CCBill does not receive blanket immunity for its other services.").

5        Review of the few cases that have applied the safe-harbor of Section 512(c) to an Internet

6   website illustrates the vast differences between Veoh and those activities that have been held

7   within Section 512(c).  Each of those related to websites whose only involvement in infringement

8   was that they permitted third-parties to post notices offering infringing products for sale directly

9   from the third parties.  <u>See</u> <u>Corbis</u>, 351 F. Supp. 2d at 1110 (Section 512(c) applied to the posting

10   by Amazon.com of a "zShops" advertisement for infringing posters: "Amazon is never in

11   possession of the products sold ….  Furthermore, Amazon does not preview the products prior to

12   their listing, does not edit the product descriptions, does not suggest prices or otherwise involve

13   itself in the sale.")[6]; <u>Hendrickson v. Amazon.com, Inc.</u>, 298 F. Supp. 2d at 918 ("the infringing

14   activity is the sale of the unauthorized work, not the posting of the listing… [The defendant] never

15   possessed the [infringing] DVD, and never had the opportunity to inspect the item.  Amazon

16   merely provided the forum for a third-party seller to list and sell his merchandise.  Amazon was

17   not actively involved in the listing, bidding, sale or delivery of the DVD."); <u>Hendrickson v. eBay,</u>

18   <u>Inc.</u>, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001) (an auction notice for infringing product was

19   posted on eBay: "the infringing activities at issue are the sale and distribution of pirated copies of

20   [a video] by various eBay sellers – which are consummated 'offline' and not the display of any

21   infringing material on eBay's website. … [I]t does not have any control over the allegedly

22   infringing items – the pirated films.  The evidence also shows that eBay never has possession of,

23   or opportunity to inspect, such items because such items are only in possession of the seller."). <u>Cf.</u>

24

25

26

---

27   [6] Where Amazon **did** combine actual copyrighted images with advertising, Section 512(c) was not even claimed to be applicable.  <u>Corbis</u>, 351 F. Supp. 2d at 1093 (claims concerning use of images directly on Amazon's IMDb website remained in case).

28

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

18      CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*

1    CCBill, 488 F.3d at 1102 (Section 512 applied to Internet services that provided web hosting,

2    "connectivity," and billing technology).[7]

3        Not one of these prior cases involved a defendant like Veoh that was alleged to have

4    copied, performed, or displayed infringing material on its website.  Their websites were not

5    "Internet Television Broadcasting Systems," as Veoh claims to be.  Unlike those websites, Veoh

6    has possession of the infringing material, has the opportunity to inspect it, has control over the

7    infringing material, and is involved directly in its performance and dissemination.

8        Veoh incorrectly contends that the DMCA permits it to avoid any responsibility for the

9    content on its commercial website and completely shift the burden to content owners to discover

10   and notify it of infringements.  See Hendrickson v. Amazon.com, 298 F. Supp. 2d at 917 ("[I]t is

11   [] against the spirit of the DMCA if the entire responsibility lies with the copyright owner to

12   forever police websites in search of possible infringers.").  In the meantime, the presence of the

13   infringing content draws users to the Veoh website. Congress certainly did not intend that the

14   DMCA be used to escape liability for commercial activities of the nature engaged in by Veoh.

15   Therefore, even if Veoh could carry its burden with respect to all of the other requirements of the

16   DMCA, Veoh cannot meet the qualifying definition of a Section 512(c) ISP.

17

18   **CONCLUSION**

19       *Amici* respectfully request that the Court deny Veoh's motion for summary judgment or, in

20   the alternative, narrowly base any ruling on the specific facts and record in this case.

21

22       I attest that I have on file all holograph signatures for any signatures indicated by a

23   "conformed" signature (/S/) within this efiled document.

24

25

26   ――――――――――――――

27   [7]  Veoh also cites the district court opinion in CoStar Group Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688 (D. Md. 2001), aff'd, 373 F.3d 544 (4th Cir. 2004).  However, the district court's discussion of Section 512(c) was solely in the context of the allegations of contributory infringement.  That discussion was not adopted by the Fourth Circuit, and thus is of limited (if any) precedential value.

28

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

1    DATED: August 14, 2007                          RUSSELL J. FRACKMAN
                                                     KARIN G. PAGNANELLI
2                                                    MARC E. MAYER
                                                     MITCHELL SILBERBERG & KNUPP LLP
3

4
                                                 By: /s/ Russell J. Frackman
5                                                    Russell J. Frackman
                                                     Attorneys for *Amici Curiae*
6                                                    Viacom International Inc. and NBC
                                                     Universal, Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

1491793.DOC

20                          CASE NO. C 06-3926 HRL
Brief of *Amici Curiae*