1   Michael S. Elkin (admitted *pro hac vice*)
    WINSTON & STRAWN LLP
2   200 Park Avenue
    New York, NY 10166-4193
3   Telephone:    212-294-6700
    Facsimile:    212-294-4700
4   Email: melkin@winston.com

5   Jennifer A. Golinveaux (SBN: 203056)
    Matthew A. Scherb (SBN: 237461)
6   WINSTON & STRAWN LLP
    101 California Street
7   San Francisco, CA 94111-5894
    Telephone:    415-591-1000
8   Facsimile:    415-591-1400
    Email: jgolinveaux@winston.com; mscherb@winston.com

9
    Attorneys for Defendant
10  VEOH NETWORKS, INC.

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14  IO GROUP, INC.                          Case No. C 06-3926 HRL

15              Plaintiff,                   DECLARATION OF MATTHEW SCHERB
                                             IN SUPPORT OF DEFENDANT VEOH
16          vs.                              NETWORKS, INC.'S OPPOSITION TO
                                             PLAINTIFF'S MOTION FOR SUMMARY
17  VEOH NETWORKS, INC.                      JUDGMENT

18              Defendant.                   Date:     September 4, 2007
                                             Time:     10:00 a.m.
19                                           Place:    Courtroom 2

20

21

22

23

24

25

26

27

28

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111-5894*

DECLARATION OF MATTHEW SCHERB IN SUPPORT OF DEFENDANT VEOH NETWORKS, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. C 06-3926 HRL

Dockets.Justia.com

1    I, Matthew Scherb, declare under penalty of perjury that the following statements, made from

2    personal knowledge, are true and correct:

3        1.    I am an attorney licensed to practice in the State of California.  I am an associate with

4    the law firm of Winston & Strawn LLP, counsel to Defendant, Veoh Networks, Inc.

5        2.    The following documents, attached to this Declaration as exhibits, support Defendant

6    Veoh Networks, Inc.'s Opposition to Plaintiff's Motion for Summary Judgment.

7            A.    **Exhibit A** is a true and correct copy of excerpts of Plaintiff's Response to

8    Defendant's First Set of Requests for Admissions.

9            B.    **Exhibit B** is a true and correct copy of excerpts of the deposition transcript

10   from May 21, 2007 deposition of Dmitry Shapiro taken in this case.

11           C.    **Exhibit C** is a true and correct copy of excerpts of the deposition transcript

12   from the May 22, 2007 (Day Two) deposition of Joseph Papa taken in this case.

13           D.    **Exhibit D** is a true and correct copy of Plaintiff's Responses to Defendant's

14   Third Set of Requests for Admissions.

15           E.    **Exhibit E** is a true and correct copy of excerpts of the deposition transcript

16   from the May 24, 2007 deposition of Keith Ruoff.

17           F.    **Exhibit F** is a true and correct copy of excerpts of the deposition transcript

18   from the March 16, 2007 deposition of Ted Dunning taken in this case.

19           G.    **Exhibit G** is a true and correct copy of excerpts of the deposition transcript

20   from the May 21, 2007 (Day One) deposition of Joseph Papa taken in this case.

22   Executed this 14th day of August, 2007, in San Francisco, California.

Matthew Scherb

DECLARATION OF MATTHEW SCHERB IN SUPPORT OF DEFENDANT VEOH NETWORKS, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. C 06-3926 HRL

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

SF:180432.2

# EXHIBIT <u>A</u>

GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 849
San Francisco, California 94114
Telephone: (415) 378-2625
legal@titanmedia.com

Attorney for Plaintiff
IO GROUP, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| IO GROUP, INC., a California corporation, | ) CASE NO.: C-06-3926 (HRL) |
| | ) |
| Plaintiff, | ) PLAINTIFF IO GROUP INC.'S RESPONSE |
| | ) TO DEFENDANT'S FIRST SET OF |
| | ) REQUESTS FOR ADMISSIONS |
| vs. | ) |
| | ) |
| VEOH NETWORKS, Inc, a California Corporation, | ) |
| | ) |
| DEFENDANT. | ) |

PROPOUNDING PARTY:    VEOH NETWORKS, INC.

RESPONDING PARTY:    IO GROUP, INC.

SET NUMBER:    ONE

     Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule 36, Plaintiff Io Group, Inc. hereby responds to Defendant's First Set of Requests for Admissions through the undersigned counsel, as follows:

-1-

# **GENERAL OBJECTIONS**

Io Group expressly incorporates the following General Objections as if set forth fully in response to each and every request for admission contained in Veoh's First Set of Requests for Admissions.

1.      Io Group objects to each request for admission to the extent it seeks information outside Io Group's possession, custody, or control.

2.      Io Group objects to each request for admission to the extent it seeks information protected by attorney-client privilege, the work product privilege and/or any other applicable privilege.  Such information will not be disclosed.  Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.      Io Group objects to each request for admission and to Defendant's instructions to the extent that they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.      Io Group objects generally to each request for admission to the extent it seeks information not reasonably related to the claims or defenses in this matter.

5.      Io Group objects to these requests for admission to the extent they are premature, and Io Group's responses to these requests for admission in response to these requests for admission are without prejudice to this objection.

6.      Io Group objects to each request for admission to the extent that either on its face or in combination with definitions provided by Defendant the request for admission is compound.

7.      Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

-2-

**REQUEST FOR ADMISSION NO. 6:**

Admit that you do not seek to hold Veoh liable for contributory or vicarious infringement based on direct infringement by Veoh users of your rights under 17 U.S.C. § 106(4).

**RESPONSE TO REQUEST NO. 6:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it seeks information outside Io Group's possession, custody, or control and the request is otherwise vague and ambiguous.

**REQUEST FOR ADMISSION NO. 7:**

Admit that you do not seek to hold Veoh liable for contributory or vicarious infringement based on direct infringement by Veoh users of your rights under 17 U.S.C. § 106(6).

**RESPONSE TO REQUEST NO. 7:**

Admit.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the Veoh website is capable of non-infringing uses.

**RESPONSE TO REQUEST NO. 8:**

Admit.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the Veoh website is capable of substantial non-infringing uses.

**RESPONSE TO REQUEST NO. 9:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it seeks information outside Io Group's possession, custody, or control and the request is otherwise vague and ambiguous and because Io Group does not know upon what standard Defendant intends the term "substantial" to be based.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the Veoh website is a staple article of commerce.

**RESPONSE TO REQUEST NO. 10:**

Deny.

-4-

**REQUEST FOR ADMISSION NO. 57:**

Admit that at some time prior to the infringements you allege in this action, you created and provided copies, whether complete, modified, or excerpted, of copyrighted works claimed by you in this action which copies you directly or indirectly made available for free without explicitly asserting that viewers may not violate your copyrights in that copy.

**RESPONSE TO REQUEST NO. 57:**

Io Group objects that the term "provided copies' is vague and ambiguous and that the request is otherwise unintelligible. Io Group further objects that the request is compound. For these reasons Io Group cannot truthfully admit or deny this statement.

Dated: April 13, 2007

GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

-18-

EXHIBIT <u>B</u>

CONFIDENTIAL

Certified Copy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IO GROUP, INC., a California )

Corporation,                 )

                             )

            Plaintiff,       )

                             )

    vs.                      ) Case No. C-06-3926(HRL)

                             )

VEOH NETWORKS, Inc., a       )

California Corporation,      )

                             )

            Defendant.       )

_____  )

HIGHLY CONFIDENTIAL

DEPOSITION OF DMITRY SHAPIRO

SAN DIEGO, CALIFORNIA

MAY 21, 2007

REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101

**Peterson** Reporting
Truth and Technology, Transcribed.

530 B Street
Suite 350
San Diego, CA
92101

800 649 6353 toll free
619 260 1069 tel
619 688 1733 fax

bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1      A.    No.  I was present on a phone call at one

2    time, although I don't remember specifics of the

3    phone call.  But the primary drafting was done

4    between our attorneys and Dr. Dunning, who you have

5    met.

6      Q.    Are users required to agree to Veoh's terms

7    of use when they register with Veoh?

8      A.    Yes.  I believe their registration states

9    that they are agreeing to the terms of use by

10   registering.

11     Q.    And is registration required before an

12   individual could upload a video file to the Veoh

13   network?

14     A.    Yes, it is.

15     Q.    So I think that is an example of a

16   transitive property, if I recall from my high school

17   days.  If someone places a file on the Veoh system,

18   then they would have had to agree with Veoh's terms

19   of use in order to do that?

20     A.    I think that is fair to say.

21     Q.    They have to register.  In order to

22   register, they have to agree to terms of use.

23     A.    Yes, they do.

24     Q.    Thank you.

25     A.    You are right.  That is the transitive

23

1     question?

2          MS. GOLINVEAUX:  You can answer subject to

3     the objections.

4          THE WITNESS:  Yes, I believe that, you

5     know, what was stated in these documents is what the

6     users agreed to.

7     BY MR. SPERLEIN:

8     Q.    Okay.  That is fine.  Thank you.

9          Does Veoh license material for distribution

10    through the Veoh system from individuals or

11    organizations other than the standard user of the

12    Veoh system?

13         MS. GOLINVEAUX:  I'm sorry.  Can you repeat

14    the question, please?  Read back the question,

15    please.

16         (Record read.)

17         THE WITNESS:  We have a content group, as

18    it is called, that does -- we call them deals -- with

19    content owners, some content owners.

20    BY MR. SPERLEIN:

21    Q.    How long has the content group been in

22    existence?  Is that something that has existed since

23    the beginning of Veoh or something that started

24    later?

25    A.    No.  It is something started later.  I am

33

1    of the content group?

2        A.    I am actually not sure if there were any

3    other deals.

4        Q.    After the content group was formed, have

5    they made deals to put content on the Veoh system?

6        A.    Yes, they have.

7        Q.    Can you give me a few examples of some of

8    the deals that you might consider to be one of the

9    more important ones?

10       A.    Sure.

11             CBS, Us Magazine, Road and Track Magazine,

12   Car and Driver Magazine, United Talent Agency.

13       Q.    Are all of those deals similar to the

14   Turner deal in that there's no payment by one side or

15   the other for the transaction?

16       A.    Yes, I believe so.

17       Q.    What content did CBS have a deal to --

18       A.    So it is not launched yet.  It is a new

19   deal for us, but it is shows from CBS.

20       Q.    Do you want this portion to be marked?

21             MS. GOLINVEAUX:  I was going to ask should

22   this -- would you like this portion to be designated

23   confidential?  Is this public knowledge?

24             THE WITNESS:  No.  It is public knowledge.

25   It has been announced.

37

1      that I don't have any follow-up questions for you.

2             I know that this timing could have maybe

3      allowed us a little more time with other folks,

4      but -- so give us a few minutes, maybe even a little

5      bit more than usual.  I want to make sure, because

6      this will be the last opportunity I have to ask you

7      questions, and I want to see if I have anything else

8      for you, any clarifications.  And then we will wrap

9      up.

10            MS. GOLINVEAUX:  Okay.

11            (Recess.)

12     BY MR. SPERLEIN:

13       Q.   Mr. Shapiro, earlier you talked about the

14     way that you envisioned a process for reviewing video

15     files before publication on Veoh network.

16            My question to you now is why did you

17     eventually not come to implement such a procedure?

18       A.   Well, again, as we started kind of looking

19     at the system and how it was going to scale primarily

20     was the concern -- there's no way that we felt that

21     we could build a system that could do that.

22       Q.   And what were the -- where were the

23     limitations on doing the system?

24       A.   Well, the ability for our editors to

25     correctly identify copyrighted content and the

84

1    ability to deal with volume.

2        Q.   And focusing in just on the correctly

3    identifying copyrighted content, did you consider

4    that you might be able to at least reduce some

5    copyright infringement, if not catch all the

6    copyright infringement?

7        A.   I don't know if we specifically thought of

8    it that way.  You know, we are engineers, if you

9    deduced a bit.  We try to build systems that work --

10   program adequately.  And so we just felt that we

11   couldn't do it.

12       Q.   Okay.  And going back to the idea that you

13   had a vision for the company that you expressed

14   publicly that in the end may not have come to

15   fruition, specifically around reviewing for copyright

16   infringement, when you approached venture capitalists

17   and sought funding for veoh.com, did you present that

18   same vision to the venture capitalists?

19           MS. GOLINVEAUX:  Object to the form.

20           THE WITNESS:  So in the Series A in the

21   first one, you know, before we launched, I believe

22   that I did.  I presented the entire vision.  I

23   believe by the Series B I didn't.  But I can't recall

24   when.

25   BY MR. SPERLEIN:

85

1    I, NICOLE R. HARNISH, Certified Shorthand Reporter

2    for the State of California, do hereby certify:

3

4    That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the

6    whole truth and nothing but the truth in the

7    foregoing cause; that the deposition was taken by me

8    in machine shorthand and later transcribed into

9    typewriting, under my direction, and that the

10   foregoing contains a true record of the testimony of

11   the witness.

12

13   Dated:   This ___8th___ day of ___June    2007___

14   at San Diego, California.

15

16

17

18                              _____NRH._____

19                              NICOLE R. HARNISH

20                              C.S.R. NO. 13101

21

22

23

24

25

EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IO GROUP, INC., a California )
Corporation,                 )
                             )
            Plaintiff,       )
                             )
    vs.                      ) Case No. C-06-3926(HRL)
                             )
VEOH NETWORKS, Inc., a       )
California Corporation,       )        **CONFIDENTIAL**
                             )
            Defendant.       )
_____)


HIGHLY CONFIDENTIAL

DEPOSITION OF JOSPEH PAPA

VOLUME II

SAN DIEGO, CALIFORNIA

MAY 22, 2007


REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101



**PETERSON** Reporting
Truth and Technology, Transcribed.

530 B Street
Suite 350
San Diego, CA
92101

800 649 6353 toll free
619 260 1069 tel
619 688 1733 fax

bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1          THE WITNESS:  At what time?

2     BY MR. SPERLEIN:

3          Q.   After the user uploads a new video file

4     onto the Veoh system.

5          A.   After a user uploads a new video, we verify

6     that the codec is one that we support.

7          Q.   And after that is a Flash file generated?

8               MS. GOLINVEAUX:  Object to the form.

9               THE WITNESS:  A Flash file is generated

10    after we confirm the version is supported.

11    BY MR. SPERLEIN:

12         Q.   And is that Flash file created on a

13    computer or a computer that is owned and operated by

14    Veoh?

15         A.   Yes.

16         Q.   At around that same time when the Flash

17    file is being generated, are there also screen

18    captures generated?

19               MS. GOLINVEAUX:  Object to the form.

20               THE WITNESS:  Yes.

21    BY MR. SPERLEIN:

22         Q.   Are screen captures generated for every

23    video file?

24         A.   Yes.

25         Q.   Has it always been the case that screen

155

1    reason.  Why did Veoh add this feature?

2              MS. GOLINVEAUX:  Object to the form.  And

3    it assumes facts not in evidence.

4              THE WITNESS:  Prior to the launch of

5    Veoh.com there was no video preview.  The screen caps

6    feature provided a way to get a little bit more

7    information about the content of the video, prior to

8    downloading it.

9    BY MR. SPERLEIN:

10       Q.   At that time, prior to the launch of

11   Veoh.com, were there any other reasons that Veoh

12   thought the screen capture feature would be

13   beneficial?

14       A.   I am not aware of any.

15       Q.   And then once the veoh.com site was

16   launched, at that time is it your recollection that

17   at that time there were 32 screen captures available

18   for each video file?

19       A.   Yes.

20       Q.   And at that time did Veoh believe that

21   there was some benefit to having 32 screen captures

22   for each video file on the Veoh system?

23             MS. GOLINVEAUX:  Object to the form.

24             THE WITNESS:  I can't speak for all of

25   Veoh.

                                                    158

1      Q.   And the screen captures that they see, are

2   they the screen captures that are set in the original

3   pixel resolution?

4      A.   No.

5      Q.   Are the screen captures that they see in

6   the reduced pixel resolution?

7      A.   Yes.

8      Q.   Are the screen captures that are in the

9   original pixel resolution available for an end user

10  to view at all?

11     A.   No.

12     Q.   Where do they reside?

13     A.   On Veoh storage system.

14     Q.   So to be clear, there are 16 screen

15  captures that are generated that reside on the Veoh

16  system that users cannot view at all; is that

17  correct?

18     A.   That is accurate.

19     Q.   Are any of the screen captures made

20  available to users in a larger size on the Veoh Web

21  site anywhere?

22          MS. GOLINVEAUX:  Object to the form.

23          THE WITNESS:  No.

24  BY MR. SPERLEIN:

25     Q.   If an end user points his cursor over top

161

1    other high resolution images could be sent to the

2    community editors that we had talked about for

3    reviewing video files?

4        A.    No.

5        Q.    That wasn't one of the reasons that Veoh

6    decided to generate 16 high resolution images?

7        A.    No.

8        Q.    Can you tell me why Veoh generated 15 high

9    resolution images that viewers could not view?

10       A.    We automatically select the image that

11   appears on the video details page.  And by generating

12   16 we had a larger sample set of the selection.

13       Q.    So 16 images were generated by an automated

14   system.  One of those images was selected to

15   represent the video file on the video details page;

16   is that accurate?

17       A.    That is accurate.

18       Q.    I want to go back for a second to the idea

19   of LimeLight and see if I can get a better

20   understanding.

21            When an end user is using the veoh.com Web

22   site and accesses a page with a video file, does the

23   Veoh interface go through a process that is roughly

24   as I am about to describe?  Does the system first ask

25   LimeLight to display or play the video file, and if

166

1    change the rating?

2         A.   In the course of their -- can you repeat

3    the question?

4         Q.   In the normal course of their job, if they

5    see a video file that contains offensive material,

6    but was not checked with the offensive material box,

7    are they permitted to change that rating?

8              MS. GOLINVEAUX:  Object to the form of the

9    question.

10             THE WITNESS:  Yes.

11   BY MR. SPERLEIN:

12        Q.   And if an employee sees a video file that

13   contains nudity, can they change the rating on that

14   file if it doesn't have a proper rating?

15        A.   Yes.

16        Q.   If an individual sees a video file that

17   they deem to be an obvious violation of copyright are

18   they permitted to delete that video file?

19             MS. GOLINVEAUX:  Object to the form of the

20   question.

21             THE WITNESS:  What would constitute an

22   "obvious copyright"?

23   BY MR. SPERLEIN:

24        Q.   Based on the individual's own personal

25   estimation?

                                                      203

1          MS. GOLINVEAUX:  Object to the form of the

2      question.

3          THE WITNESS:  If any employee encounters

4      blatantly copyrighted material, they can take it down

5      in compliance with our DMCA policy.

6      BY MR. SPERLEIN:

7          Q.    I have handed you Exhibit 14 -- 006417 it

8      is marked "highly confidential.  Attorneys eyes

9      only," but by stipulation of counsel it's been

10     reduced designation to confidential.  Will you take a

11     few minutes to look over the document.

12          (Plaintiff's Exhibit No. 14 was marked.)

13          THE WITNESS:  Yes.  Okay.

14     BY MR. SPERLEIN:

15         Q.    And is this a section of wiki?

16         A.    Yes.

17         Q.    And I was told if I say "the wiki," I will

18     sound like George Bush saying "the Internets."

19     That's why I was asking yesterday.

20          Under "copyright violations," do you see

21     that section?

22         A.    Yes.

23         Q.    It says "Veoh always responds immediately

24     to DMCA compliant takedown notices.  These will

25     generally come from Dmitry or Francis.  In addition,

233

1    Veoh is obligated to respond to blatant copyright

2    violation.  In other words, any copyright violations

3    that are 'flagged' in the Veoh system should be taken

4    down if it is a clear violation.  In general usage of

5    the site, one encounters blatantly copyrighted

6    material, it too should be taken down."

7              Did I read that accurately?

8        A.   Yes.

9        Q.   And if we go looking back up towards the

10   top of the page, is there header typed information

11   that indicates that this was put on wiki by you?

12       A.   Yes.

13       Q.   On 6/28/2006; is that correct?

14       A.   That's correct.

15       Q.   And was this an accurate statement of Veoh

16   policies at the time?

17       A.   Yes.

18       Q.   And when you wrote the phrase "blatantly

19   copyrighted material," did you have something in mind

20   when you wrote that?  Can you describe what that

21   means to me?

22       A.   To me blatantly copyrighted material -- or

23   determining if something is blatantly copyrighted

24   depends on a variety of factors, duration being one

25   of those factors.  If I have specific knowledge that

234

1      Because we didn't negotiate.

2              MR. SPERLEIN:  We won't take a lot of time.

3      We can keep the clock running.

4              MS. GOLINVEAUX:  Okay.  Fine.

5              (Recess.)

6              MR. SPERLEIN:  Handing the court reporter

7      another exhibit, which I will ask her to mark as

8      Exhibit 17.  You guys may see it.

9              MS. GOLINVEAUX:  That is a good idea.

10     BY MR. SPERLEIN:

11         Q.   This exhibit bears Defendant's Document

12     Production No. 00120.  It is an e-mail from

13     Joseph Papa to Ted Dunning copied to Jarrod Cuzens or

14     Cuzens.  It is from May 23rd, 2006, and the subject

15     line is "gay vs straight."  I am going to read this

16     out loud, if you will read it to yourself along with

17     me.

18              "Ted, can you take a crack at separating

19     gay from straight porn, via tags, publisher, and

20     other metadata?  I would rather not have to ask as

21     part of the upload process thanks, Joe."

22              (Plaintiff's Exhibit No. 17 was marked.)

23              THE WITNESS:  Yes.

24     BY MR. SPERLEIN:

25         Q.   Can you explain why you would rather not

                                                    240

1    ask that as part the upload process?  And that, I

2    assume, being you did not want to ask video uploaders

3    to identify material as gay or straight during the

4    upload process.  Is that what you meant by that

5    second sentence?

6        A.   Yes.

7        Q.   And why were you reticent to ask that?

8        A.   The simple way of implementing that

9    question would be to present it on the page for all

10   uploaders.  I didn't want to do that, because I

11   didn't want to reinforce the level of pornographic

12   content that was coming into Veoh.

13            A preferable way of implementing that would

14   have been to implement an additional upload step,

15   where, had a user elected to rate their content

16   adult, they would then be given a secondary page to

17   select whether or not it was gay or straight.  And I

18   just simply didn't want to spend the engineering

19   resources to implement that.

20       Q.   So the other solution that you are asking

21   Dr. Dunning to look at, by way of this e-mail, is to

22   take existing metadata associated with adult files

23   and based on that metadata make a determination as to

24   if something is more likely to fall in a gay category

25   than a straight category; is that accurate?

241

1       A.    That is accurate.

2       Q.    And did you ever implement such a system?

3       A.    No.

4       Q.    Did you implement one of the other systems

5    that you described earlier, namely either having a

6    separate place to indicate it on the upload page or

7    to have a secondary page asking just that one

8    question?  Did you pick from one of those two?

9       A.    We did not pick from one of those two.

10       Q.    Did you come up with some other way of

11    separating gay adult video files from straight adult

12    video files?

13       A.    We presented on the adult category page a

14    tag search for gay and a tag search for straight.

15    And that, I believe, successfully reinforced amongst

16    the community that if they tagged their videos gay or

17    straight it would go into the correct bucket.

18       Q.    Was that division into gay and straight by

19    those two sole tags administered prospectively so

20    that all previous video files that had been uploaded

21    onto the Veoh system were separated into those two

22    tags if they contained those tags?

23       A.    If they contained those tags, they went

24    into one of those groups.  And if they contained

25    neither or both, then there was another category.

242

1      Q.    And is that the way -- do you know when

2    that system went into effect?

3      A.    I would guess that that went into effect in

4    a matter of weeks before we decided to change our

5    terms of service to disallow explicit content.

6      Q.    All right.  This e-mail is on May 23rd, and

7    by June 21st content was gone.  So somewhere in that?

8      A.    Yeah.

9      Q.    Why separate it into gay and straight?  Was

10   that something that you felt was beneficial to the

11   end user?

12     A.    Yes.

13     Q.    And how was it beneficial to the end user?

14     A.    There were a number of e-mails that

15   indicated that commingling those was a bad

16   experience.

17     Q.    Just to clarify, when someone uploaded a

18   video file to the Veoh system, did they at that time

19   specifically direct Veoh whether to put their

20   sexually explicit video file into a gay category or a

21   straight category?

22     A.    If a video was tagged gay or straight, that

23   tag could be added at upload time or it could be

24   added after upload by the publisher or the community

25   member.

243

1       Q.   Did the upload page indicate to users that

2   if they wanted their material to appear in the gay

3   category, they needed to add a tag that said gay; or

4   conversely with the straight?

5       A.   My recollection is no.

6       Q.   Did anyone from Veoh ever review adult

7   video files and add either the word gay or straight

8   so that tag searches would put the -- a video file

9   into a corresponding group, the gay group of videos

10  or the straight group?

11      A.   Yes.

12      Q.   And under what circumstances would people

13  do that -- Veoh employees make those changes?

14      A.   The other category which could contain

15  neither gay or straight or both would be separated

16  periodically.

17      Q.   So let me see if I understand this

18  correctly.  Would Veoh employees go and look at video

19  files that were in the other category and determine

20  whether they would be more appropriate in straight or

21  gay and then adjust the tags so that they would go

22  into those other categories?

23      A.   It is essentially the same process as the

24  recently published process, recently published videos

25  that had no tag or both tags -- excuse me -- recently

244

1    tagged videos, not recently published videos.  But

2    recently tagged videos that had both or neither would

3    periodically be cleaned so that they would fall into

4    one or the other category.

5        Q.   And was that something that was done in

6    your department at the time?

7        A.   Yes.

8        Q.   Did you personally do that from time to

9    time?

10       A.   On rare occasion.

11       Q.   Did you have other employees that did that?

12       A.   Yes.

13       Q.   And when I say "that," I mean go into the

14   recently tagged section and look at video files that

15   were in the other category and separate them using

16   tags into straight and to gay?

17       A.   Yes.

18           MR. SPERLEIN:  That is all I have.  Thank

19   you for your time.  Send the original to

20   Ms. Golinveaux.  But be sure to notify me when you

21   send it to her.  Can you send a copy to me at that

22   same time?

23           MS. GOLINVEAUX:  And as I said yesterday,

24   both witnesses would like the opportunity to review

25   their transcripts, and the entire transcript will be

245

1   I, NICOLE R. HARNISH, Certified Shorthand Reporter

2   for the State of California, do hereby certify:

3

4   That the witness in the foregoing deposition was by

5   me first duly sworn to testify to the truth, the

6   whole truth and nothing but the truth in the

7   foregoing cause; that the deposition was taken by me

8   in machine shorthand and later transcribed into

9   typewriting, under my direction, and that the

10  foregoing contains a true record of the testimony of

11  the witness.

12

13  Dated:  This _____ day of _____

14  at San Diego, California.

15

16

17

18  _____

19            NICOLE R. HARNISH

20            C.S.R. NO. 13101

21

22

23

24

25

# EXHIBIT D

℮ ⁄

1  GILL SPERLEIN (172887)
   THE LAW OFFICE OF GILL SPERLEIN
2  584 Castro Street, Suite 849
3  San Francisco, California 94114
   Telephone: (415) 378-2625
4  legal@titanmedia.com

5  Attorney for Plaintiff
6  IO GROUP, INC.

7

8                    UNITED STATES DISTRICT COURT
9                  NORTHERN DISTRICT OF CALIFORNIA
10                         SAN JOSE DIVISION

11                                    )
                                      )  CASE NO.: C-06-3926 (HRL)
12  IO GROUP, INC., a California corporation,  )
                                      )  PLAINTIFF IO GROUP INC.'S RESPONSE
13      Plaintiff,                    )  TO DEFENDANT'S THIRD SET OF
                                      )  REQUESTS FOR ADMISSIONS
14          vs.                       )
                                      )
15                                    )
16  VEOH NETWORKS, Inc, a California  )
    Corporation,                      )
17                                    )
18      DEFENDANT.                    )
                                      )

19
20  PROPOUNDING PARTY:   VEOH NETWORKS, INC.

21  RESPONDING PARTY:    IO GROUP, INC.

22  SET NUMBER:          THREE

23

24      Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Civil Rule

25  36, Plaintiff Io Group, Inc. hereby responds to Defendant's First Set of Requests for Admissions

26  through the undersigned counsel, as follows:

27

28

                                   -1-

                                        PLAINTIFF'S RESPONSE TO VEOH'S
                                        THIRD SET OF REQUESTS FOR ADMISSIONS
                                        C-06-3926 (HRL)

## GENERAL OBJECTIONS

Io Group expressly incorporates the following General Objections as if set forth fully in response to each and every request for admission contained in Veoh's First Set of Requests for Admissions.

1.    Io Group objects to each request for admission to the extent it seeks information outside Io Group's possession, custody, or control.

2.    Io Group objects to each request for admission to the extent it seeks information protected by attorney-client privilege, the work product privilege and/or any other applicable privilege.  Such information will not be disclosed.  Any inadvertent disclosures of such information shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity recognized by statue or case law.

3.    Io Group objects to each request for admission and to Defendant's instructions to the extent that they purport to impose any requirement or discovery obligations on Io Group other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

4.    Io Group objects generally to each request for admission to the extent it seeks information not reasonably related to the claims or defenses in this matter.

5.    Io Group objects to these requests for admission to the extent they are premature, and Io Group's responses to these requests for admission in response to these requests for admission are without prejudice to this objection.

6.    Io Group objects to each request for admission to the extent that either on its face or in combination with definitions provided by Defendant the request for admission is compound.

7.    Io Group objects to the defined term "you" or "your" as overly broad to the extent it seeks information from other entities and is outside Io Group's possession, custody or control.

-2-

## OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 61:**

Admit that you never sent any notice to Veoh regarding infringements of your copyrights, apart from communications in connection with this action.

**RESPONSE TO REQUEST NO. 61:**

Admit

**REQUEST FOR ADMISSION NO. 62:**

Admit that at some time prior to June 21, 2006, you uploaded to Veoh a copy or copies of a work, or portion thereof, alleged by you in this action.

**RESPONSE TO REQUEST NO. 62:**

Deny

**REQUEST FOR ADMISSION NO. 63:**

Admit that at some time prior to June 21, 2006, you uploaded to the Internet a copy or copies of a work, or portion thereof, alleged by you in this action.

**RESPONSE TO REQUEST NO. 63:**

Plaintiff cannot truthfully admit or deny this statement for the reason that it is vague and ambiguous as to the terms "uploaded" and "Internet".

**REQUEST FOR ADMISSION NO. 64:**

Admit that at some time prior to June 21, 2006, you gave away for free DVDs or other media containing a copy or copies of a work, or portion thereof, alleged by you in this action.

**RESPONSE TO REQUEST NO. 64:**

Admit.

**REQUEST FOR ADMISSION NO. 65:**

Admit that of the files on the disk you produced labeled 200282, 17 are video files with run times of less than one minute.

-3-

**RESPONSE TO REQUEST NO. 65:**

Admit.

**REQUEST FOR ADMISSION NO. 66:**

Admit that the six files whose names begin with "GWMShort" on the disk you produced labeled 200282 are each videos with a runtime of approximately five seconds or less.

**RESPONSE TO REQUEST NO. 66:**

Admit.

**REQUEST FOR ADMISSION NO. 67:**

Admit that the eight files whose names begin with "piss," except for the files named "piss31.mpg" and "piss12.wmv" on the disk you produced labeled 200282, are each videos with a runtime of approximately six seconds or less.

**RESPONSE TO REQUEST NO. 67:**

Admit.

**(Defendant did not submit a Request No. 68 )**

**REQUEST FOR ADMISSION NO. 69:**

Admit that the file named "piss31.mpg" on the disk you produced labeled 200282 is a video with a run time of approximately 13 seconds or less.

**RESPONSE TO REQUEST NO. 69:**

Admit.

**REQUEST FOR ADMISSION NO. 70:**

Admit that the file named "piss12.wmv" on the disk you produced labeled 200282 is a video with a run time of approximately 30 seconds or less.

**RESPONSE TO REQUEST NO. 70:**

Admit.

**REQUEST FOR ADMISSION NO. 71:**

Admit that the file named "Rough Sex.mpg" on the disk you produced labeled 200282 is a video with a run time of five minutes and approximately 15 seconds or less.

-4-

1  **RESPONSE TO REQUEST NO. 71:**

2      Admit.

3  **REQUEST FOR ADMISSION NO. 72:**

4      Admit that the file named "Hot bear sex 2.mpg" on the disk you produced labeled 200282

5  is a video with a run time of approximately five minutes and 15 seconds or less.

6  **RESPONSE TO REQUEST NO. 72:**

7      Admit.

8  **REQUEST FOR ADMISSION NO. 73:**

9      Admit that the file named "Military Men-1.wmv" on the disk you produced labeled 200282

10 is a video with a run time of approximately eight minutes and seven seconds or less.

11 **RESPONSE TO REQUEST NO. 73:**

12     Admit.

13 **REQUEST FOR ADMISSION NO. 74:**

14     Admit that the file named "Military Men 1.wmv" on the disk you produced labeled 200282

15 is a video with a run time of approximately eight minutes and seven seconds or less.

16 **RESPONSE TO REQUEST NO. 74:**

17     Admit.

18 **REQUEST FOR ADMISSION NO. 75:**

19     Admit that the file named "Hot Boys.wmv" on the disk you produced labeled 200282 is a

20 video with a run time of approximately 18 seconds or less.

21 **RESPONSE TO REQUEST NO. 75:**

22     Admit.

23 **REQUEST FOR ADMISSION NO. 76:**

24     Admit that the file named "boner.mpg" on the disk you produced labeled 200282 is a video

25 with a run time of approximately one minute and 40 seconds or less.

26 **RESPONSE TO REQUEST NO. 76:**

27     Admit.

28

PLAINTIFF'S RESPONSE TO VEOH'S
THIRD SET OF REQUESTS FOR ADMISSIONS
C-06-3926 (HRL)

1  **REQUEST FOR ADMISSION NO. 77:**

2      Admit that the file named "Falcon Boner.mpg" on the disk you produced labeled 200282 is

3  a video with a run time of approximately 28 minutes or less.

4  **RESPONSE TO REQUEST NO. 77:**

5      Admit.

6  **REQUEST FOR ADMISSION NO. 78:**

7      Admit that the file named "Gay Porn Dont Ask Dont Tell Mi.mpg" on the disk you

8  produced labeled 200282 is a video with a run time of approximately 31 minutes or less.

9  **RESPONSE TO REQUEST NO. 78:**

10      Admit.

11  **REQUEST FOR ADMISSION NO. 79[sic]:**

12      Admit that you employ no "standard technological measures," as defined by 17 U.S.C.

13  §512(i)(2).

14  **RESPONSE TO REQUEST NO. 79:**

15      Deny.

16

17

18  Dated: May 30, 2007

19

20

21

22  GILL SPERLEIN
    Attorney for Plaintiff Io Group, Inc.

23

24

25

26

27

28

-6-

EXHIBIT <u>E</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVSION

---oOo---

IO GROUP, INC., a California )
corporation, )
 )
            Plaintiff, )
 ) No. C-06-3926 HRL
vs. )
 )
 )
VEOH NETWORKS, INC., a )
California corporation, )
 )
            Defendant. )

**CERTIFIED COPY**

CONFIDENTIAL SECTION, PAGES 23 - 34

Deposition of

KEITH RUOFF

———————————

Thursday, May 24, 2007

Reported by:

GEORGE SCHUMER, CSR 3326                    (395992)

M E R R I L L   L E G A L   S O L U T I O N S

575 Market Street, 11th Floor
San Francisco, CA 94105

415.357.4300

www.merrillcorp.com/law

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 09:50:32 | 1 | RESUME NON-CONFIDENTIAL SECTION |
| 09:50:37 | 2 | MR. ELKIN:  Q.  I assume that your company |
| 09:50:38 | 3 | attempts to promote its products; right? |
| 09:50:40 | 4 | A.  We tend to focus more on the brand, than |
| 09:50:46 | 5 | individual products or title. |
| 09:50:47 | 6 | Q.  Let me ask you some specific questions. |
| 09:50:52 | 7 | Do you advertise? |
| 09:50:53 | 8 | A.  Yes. |
| 09:50:53 | 9 | Q.  Do you provide snippets or trailers or teasers, |
| 09:51:10 | 10 | to entice consumer interest? |
| 09:51:12 | 11 | MR. SPERLEIN:  Objection to the form. |
| 09:51:13 | 12 | MR. ELKIN:  I'll break it down. |
| 09:51:14 | 13 | Q.  Do you provide any trailers to entice consumer |
| 09:51:18 | 14 | interest? |
| 09:51:18 | 15 | A.  What do you mean by "provide"? |
| 09:51:20 | 16 | Q.  Do you enable your licensees to provide free |
| 09:51:26 | 17 | portions -- portions of your content -- to market them to |
| 09:51:35 | 18 | the public? |
| 09:51:36 | 19 | MR. SPERLEIN:  Objection to the form.  It is |
| 09:51:37 | 20 | vague. |
| 09:51:38 | 21 | THE WITNESS:  We do allow trailers to be shown, |
| 09:51:42 | 22 | but they have to be either provided by Io Group, that |
| 09:51:46 | 23 | contain our 2257 mark; our logos, as well as embedded |
| 09:51:51 | 24 | metadata about the product.  Or they will have to be |
| 09:51:54 | 25 | approved by us before they are allowed to be used. |

Merrill Legal Solutions
(800) 869-9132

KEITH RUOFF        May 24, 2007

| | | |
|---|---|---|
| 10:15:18 | 1 | corrections to two previous statements I made. |
| 10:15:19 | 2 | One of them is regarding the films being covered |
| 10:15:23 | 3 | under all of the licenses.  And two of the films -- Prowl |
| 10:15:27 | 4 | 3, and Don't Ask, Don't Tell -- are actually only covered |
| 10:15:31 | 5 | under the Sureflix licensing agreement, and not covered |
| 10:15:35 | 6 | under any of the other licensing agreements. |
| 10:15:37 | 7 | The second thing was you asked about "provided |
| 10:15:42 | 8 | free copies."  We do provide free copies of DVD's to |
| 10:15:47 | 9 | reviewers in magazines, to be able to allow them to write |
| 10:15:52 | 10 | reviews of our films. |
| 10:15:54 | 11 | MR. ELKIN:  Q.  How did those corrections come to |
| 10:15:56 | 12 | your attention? |
| 10:15:57 | 13 | MR. SPERLEIN:  I caution the witness not to |
| 10:16:01 | 14 | reveal the contents of any attorney-client communications. |
| 10:16:04 | 15 | But to the extent you can respond -- |
| 10:16:06 | 16 | MR. ELKIN:  I'm not asking you to reveal what |
| 10:16:08 | 17 | Mr. Sperlein told you during the break, but: |
| 10:16:12 | 18 | Q.  It came as a result of a conversation between you |
| 10:16:15 | 19 | and Mr. Sperlein; correct? |
| 10:16:17 | 20 | A.  Correct.  He asked me to think a little harder. |
| 10:16:27 | 21 | Q.  Let me ask you a couple of followups on those -- |
| 10:16:30 | 22 | and I appreciate you bringing that to my attention. |
| 10:16:33 | 23 | With regard to the free copies, as it were, what |
| 10:16:37 | 24 | exactly is given to the publishers?  And what was the |
| 10:16:46 | 25 | other -- |

44

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 10:32:24 | 1 | player. |
| 10:32:26 | 2 | You downloaded the material that you believed you |
| 10:32:29 | 3 | owned; right? |
| 10:32:30 | 4 | A.  Yes. |
| 10:32:30 | 5 | Q.  With regard to the material that you downloaded |
| 10:32:34 | 6 | that you believed you owned, did you ever see a reference |
| 10:32:37 | 7 | to Titan Media? |
| 10:32:42 | 8 | A.  Within the audio-visual work itself?  That's what |
| 10:32:48 | 9 | you are asking? |
| 10:32:49 | 10 | Q.  Yes. |
| 10:32:49 | 11 | A.  I'm trying to understand, so I can answer you |
| 10:32:53 | 12 | correctly. |
| 10:32:54 | 13 | From the files that I downloaded -- and when we |
| 10:33:01 | 14 | reviewed them, I don't remember seeing any reference to |
| 10:33:03 | 15 | Titan Media within those audio-visual works that I |
| 10:33:07 | 16 | downloaded through Veoh. |
| 10:33:09 | 17 | Q.  So with regard to the screen shots, was there any |
| 10:33:13 | 18 | reference contained in those screen shots of the -- I |
| 10:33:16 | 19 | guess stills -- to Titan Media or Io? |
| 10:33:21 | 20 | A.  Yes. |
| 10:33:21 | 21 | Q.  Let's first take Io.  Was there any reference to |
| 10:33:25 | 22 | Io in that portion of the screen shot that reflected your |
| 10:33:34 | 23 | material? |
| 10:33:35 | 24 | A.  You are talking about the video details page? |
| 10:33:40 | 25 | Q.  No, I'm actually referring to -- now you took |

55

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:33:44 | 1 | shots; right, of -- we talked about the downloading of the |
| 10:33:50 | 2 | video stuff; the audio-visual stuff.  Now we're talking |
| 10:33:55 | 3 | about the screen shots themselves. |
| 10:33:56 | 4 | You want to describe what that is again, so you |
| 10:34:00 | 5 | and I are reading from the same playbook? |
| 10:34:02 | 6 | A.  As in earlier depositions this week on Veoh, the |
| 10:34:05 | 7 | page that plays the flash review of a video file is called |
| 10:34:10 | 8 | a video details page. |
| 10:34:11 | 9 | Q.  Is that what you are referring to, that you |
| 10:34:13 | 10 | captured? |
| 10:34:13 | 11 | A.  Yes, and the video details page is what I made |
| 10:34:17 | 12 | printout copies of, that shows the embedded flash player, |
| 10:34:20 | 13 | as well as the associated metadata for that file. |
| 10:34:23 | 14 | Q.  So the video details page:  Does the video |
| 10:34:28 | 15 | details page reflect any photographic image of your work? |
| 10:34:36 | 16 | A.  Yes. |
| 10:34:36 | 17 | Q.  So the following questions refer only to the |
| 10:34:41 | 18 | photographic image of your work. |
| 10:34:43 | 19 | A.  Okay. |
| 10:34:44 | 20 | Q.  Was there any indication, in the photographic |
| 10:34:49 | 21 | image of the work, that the work was owned by Io? |
| 10:34:53 | 22 | A.  No, because there were screen captures, and in a |
| 10:35:01 | 23 | movie there's no running -- no overlay showing the name of |
| 10:35:06 | 24 | the company that owns the movie. |
| 10:35:07 | 25 | Q.  Thank you.  And then with respect to the |

56

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 10:35:11 | 1 | photographic image embedded in this Veoh details page, was |
| 10:35:21 | 2 | there any identification that Titan Media owned the work? |
| 10:35:26 | 3 | A.  Are you referring to -- |
| 10:35:32 | 4 | Q.  It is the very same question I just asked you. |
| 10:35:35 | 5 | A.  I'm just trying to make sure I understand what |
| 10:35:37 | 6 | you are referring to. |
| 10:35:37 | 7 | Q.  Sure. |
| 10:35:38 | 8 | A.  Is that the 16-thumbnail screen capture images |
| 10:35:43 | 9 | that Veoh provides on that video details page?  Is that |
| 10:35:47 | 10 | what you are referring to? |
| 10:35:48 | 11 | Q.  Yes. |
| 10:35:49 | 12 | A.  In those screen capture images, no, there is no |
| 10:35:52 | 13 | indication of ownership by Titan Media. |
| 10:35:53 | 14 | Q.  Let me ask you this:  Through what period of time |
| 10:36:04 | 15 | did you collect evidence of your material, in June of |
| 10:36:12 | 16 | 2006? |
| 10:36:12 | 17 | A.  From approximately June 13th or 14th, through the |
| 10:36:20 | 18 | 22nd or 23rd, when all the adult material was removed. |
| 10:36:24 | 19 | Q.  Now from the time when you first gained knowledge |
| 10:36:32 | 20 | that your material was accessed through Veoh -- accessible |
| 10:36:46 | 21 | through Veoh -- did you ever provide a notice to Veoh to |
| 10:36:58 | 22 | take down your material? |
| 10:37:00 | 23 | A.  No. |
| 10:37:01 | 24 | Q.  From time to time, you notice that companies -- |
| 10:37:31 | 25 | without your permission -- distribute or make copies of |

57

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 10:40:28 | 1 | A.  Demand for payment... |
| 10:40:32 | 2 | Q.  Right. |
| 10:40:38 | 3 |     Now the lawsuit was filed in this case |
| 10:40:41 | 4 | approximately on June 23, 2006.  Does that seem right? |
| 10:40:45 | 5 | A.  That sounds correct. |
| 10:40:47 | 6 | Q.  Now you became aware, on June 22 -- at least by |
| 10:40:54 | 7 | June 22, 2006 -- that Veoh made a decision to remove adult |
| 10:40:58 | 8 | content; correct? |
| 10:41:00 | 9 | A.  22nd; 23rd-ish, yes. |
| 10:41:04 | 10 | Q.  But prior to filing the lawsuit, you were made |
| 10:41:08 | 11 | aware of that? |
| 10:41:09 | 12 | A.  Because all of a sudden everything disappeared, |
| 10:41:12 | 13 | while I was in the middle of cataloging it. |
| 10:41:15 | 14 | Q.  So you were aware of it; right? |
| 10:41:17 | 15 | A.  Yes. |
| 10:41:17 | 16 | Q.  And you nevertheless filed a lawsuit; correct? |
| 10:41:24 | 17 | A.  Correct. |
| 10:41:24 | 18 | Q.  Did you consider not filing a lawsuit, once you |
| 10:41:31 | 19 | found out they weren't providing adult material, or you |
| 10:41:35 | 20 | could not access adult material through their site? |
| 10:41:41 | 21 | A.  No. |
| 10:41:51 | 22 | Q.  Can you think of any good reason why you didn't |
| 10:41:54 | 23 | send them a take-down notice before filing the lawsuit? |
| 10:41:57 | 24 |     MR. SPERLEIN:  Object to the form. |
| 10:42:00 | 25 |     THE WITNESS:  Can you repeat it? |

60

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 10:42:02 | 1 | MR. ELKIN:  Q.  Can you think of any good reason |
| 10:42:04 | 2 | for why you didn't send them a take-down notice before |
| 10:42:08 | 3 | filing the lawsuit? |
| 10:42:08 | 4 | A.  Because of the fact we had no idea of the extent, |
| 10:42:11 | 5 | and it made no sense to send a take-down notice for each |
| 10:42:15 | 6 | file that we were able to identify. |
| 10:42:17 | 7 | Plus, also, because of the fact that we had to |
| 10:42:20 | 8 | download the full file before we could actually review the |
| 10:42:24 | 9 | entirety, to ensure that it was our file.  And the |
| 10:42:28 | 10 | download process through the Veoh clients -- which I |
| 10:42:31 | 11 | believe was using the Bit Torrent, or whatever process it |
| 10:42:34 | 12 | was using to transfer the file -- it took an amount of |
| 10:42:37 | 13 | time for the files to actually download before we could |
| 10:42:41 | 14 | review them. |
| 10:42:41 | 15 | Q.  You went up on the web site, and you spent |
| 10:42:44 | 16 | somewhere in the neighborhood of 6 to 12 hours of time |
| 10:42:47 | 17 | examining your content.  You made copies of the material |
| 10:42:52 | 18 | that you could see up there.  You captured the thumbnails. |
| 10:42:57 | 19 | And that wasn't sufficient notice to you to |
| 10:43:00 | 20 | actually send them a take-down notice?  Is that what you |
| 10:43:03 | 21 | are saying? |
| 10:43:04 | 22 | A.  We were not finished with our investigation. |
| 10:43:06 | 23 | Q.  So you were going to file the lawsuit, and finish |
| 10:43:08 | 24 | your investigation thereafter?  Is that correct? |
| 10:43:11 | 25 | A.  We filed the lawsuit so quickly afterwards to |

61

KEITH RUOFF     May 24, 2007

| | | |
|---|---|---|
| 11:47:03 | 1 | A. Yes. |
| 11:47:04 | 2 | Q. What does that mean: "Free Week of Porn"? |
| 11:47:08 | 3 | A. It is a one-week trial membership that required |
| 11:47:17 | 4 | credit card authorization, but would not be billed until |
| 11:47:21 | 5 | the end of the week, and would start auto-rebilling at the |
| 11:47:29 | 6 | full monthly rate. |
| 11:47:30 | 7 | Q. So if somebody signs up, they can get a free week |
| 11:47:33 | 8 | of porn without paying any money for that week; right? |
| 11:47:37 | 9 | A. Correct. |
| 11:47:38 | 10 | Q. How many films could they see during that week, |
| 11:47:41 | 11 | potentially? As much as they want? |
| 11:47:43 | 12 | A. As much as they want in the back room, yes. |
| 11:47:46 | 13 | Q. How regular do you run that kind of promotion, |
| 11:47:50 | 14 | free week of porn? |
| 11:47:51 | 15 | A. It was a promotion to promote some new |
| 11:47:55 | 16 | functionality on our web site. |
| 11:47:56 | 17 | Q. Have you done that from time to time, though -- |
| 11:47:59 | 18 | offered a free week of porn? |
| 11:48:00 | 19 | A. I believe maybe once or twice; that type of |
| 11:48:06 | 20 | promotion. |
| 11:48:07 | 21 | Q. Do you restrict how participants can access the |
| 11:48:12 | 22 | free porn? |
| 11:48:12 | 23 | A. Yes, it is the same type of thing, where you have |
| 11:48:16 | 24 | to get a credit card authorization; you have to get a user |
| 11:48:20 | 25 | name and password. It has DRM; same type of thing. |

90

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 11:57:16 | 1 | Q. Did you have any discussion with anyone else |
| 11:57:31 | 2 | about your possible interest in peer-to-peer? |
| 11:57:33 | 3 | A. I believe these are the only ones that I have had |
| 11:57:37 | 4 | discussions with. They are the only company that does |
| 11:57:40 | 5 | this type of thing that would actually talk to us, because |
| 11:57:44 | 6 | we're adult. |
| 11:57:44 | 7 | Q. Did you yourself explore any other peer-to-peer |
| 11:57:55 | 8 | technologies? Peer-to-peer applications. |
| 11:57:59 | 9 | A. I'm not sure I understand. |
| 11:58:03 | 10 | Q. Did you ever consider any other peer-to-peer |
| 11:58:05 | 11 | applications to promote or distribute your works? |
| 11:58:08 | 12 | A. No, I don't believe so. |
| 11:58:10 | 13 | Q. Would there be anyone else in your organization |
| 11:58:16 | 14 | that would have the responsibility for looking after such |
| 11:58:20 | 15 | new forms of marketing and distribution? |
| 11:58:22 | 16 | A. No. |
| 11:59:58 | 17 | MR. ELKIN: Next is 9. |
| 12:00:01 | 18 | (Document referred to herein marked for |
| 12:00:03 | 19 | identification Defendant Exhibit 9) |
| 12:00:03 | 20 | MR. ELKIN: Q. Mr. Ruoff, the court reporter has |
| 12:00:05 | 21 | just handed you a document that has been marked for |
| 12:00:08 | 22 | identification as Defendant Exhibit 9. Can you identify |
| 12:00:13 | 23 | what this is? |
| 12:00:14 | 24 | A. I believe this was the response to a production |
| 12:00:19 | 25 | request from Veoh, regarding profit and expenses related |

96

KEITH RUOFF      May 24, 2007

| | | |
|---|---|---|
| 12:00:24 | 1 | to the works. |
| 12:00:24 | 2 | Q.  Was this created as a result of the request? |
| 12:00:30 | 3 | A.  Yes. |
| 12:00:30 | 4 | Q.  Who prepared it? |
| 12:00:31 | 5 | A.  Myself and Stephen Mounce, our general manager. |
| 12:00:38 | 6 | Q.  Does he have responsibility, effectively, as the |
| 12:00:42 | 7 | CFO of the company? |
| 12:00:44 | 8 | A.  Bruce Lahey is actually the CFO of the company, |
| 12:00:50 | 9 | but Stephen manages accounting. |
| 12:00:52 | 10 | Q.  Can you just tell me how the figures on this |
| 12:00:55 | 11 | piece of paper came together?  I assume you reviewed your |
| 12:00:59 | 12 | books and records together, and then you sat down, and the |
| 12:01:01 | 13 | two of you created this? |
| 12:01:07 | 14 | A.  Yes.  So as an example, if we start with "Boner," |
| 12:01:11 | 15 | which is the first title, and it says "hard sales," which |
| 12:01:13 | 16 | are hard product sales -- either DVD or VHS -- and hard |
| 12:01:16 | 17 | sales, DVD and VHS, we keep sales by title. |
| 12:01:19 | 18 | Q.  Correct. |
| 12:01:20 | 19 | A.  So we looked at -- that's an actual hard number |
| 12:01:24 | 20 | of actual dollars generated from hard-sale product. |
| 12:01:31 | 21 | Q.  These are real numbers.  $20,240, for example, |
| 12:01:37 | 22 | under the column "2004" adjacent to hard sales under |
| 12:01:41 | 23 | Boner; correct? |
| 12:01:42 | 24 | A.  Correct.  And then for each year. |
| 12:01:46 | 25 | Q.  There seems to be a trend where the costs are |

97

KEITH RUOFF    May 24, 2007

| | | |
|---|---|---|
| 12:01:49 | 1 | going down on an annual basis.  Is that because -- |
| 12:01:53 | 2 | A.  I'm sorry? |
| 12:01:55 | 3 | Q.  Let me just ask -- I'll withdraw that, and let me |
| 12:01:59 | 4 | ask other questions. |
| 12:02:01 | 5 | You've got a pro rata share of on-line sales. |
| 12:02:05 | 6 | How did that pro rata number come about? |
| 12:02:07 | 7 | A.  What we did was since on-line sales -- which are |
| 12:02:11 | 8 | membership sales -- we don't keep sales generated broken |
| 12:02:18 | 9 | down by title, because of the fact that it is a membership |
| 12:02:20 | 10 | area.  We don't sell it by the piece. |
| 12:02:23 | 11 | We took whatever percentage of hard sales was to |
| 12:02:26 | 12 | the total.  We used that same percentage, and allocated |
| 12:02:29 | 13 | that percentage to the on-line sales, to come up with an |
| 12:02:33 | 14 | on-line sales number. |
| 12:02:34 | 15 | Q.  Let me ask you:  Did you include in this number |
| 12:02:38 | 16 | any fees associated from the license content? |
| 12:02:40 | 17 | A.  Yes. |
| 12:02:41 | 18 | Q.  So in this number here you've got your licensing |
| 12:02:45 | 19 | revenues, together with a percentage of your hard sales. |
| 12:02:51 | 20 | Is that correct? |
| 12:02:51 | 21 | A.  (No response) |
| 12:02:53 | 22 | Q.  What comprises this number, pro rata share of |
| 12:02:58 | 23 | on-line sales?  It is your licensing fees -- is |
| 12:03:01 | 24 | automatically included? |
| 12:03:02 | 25 | A.  Correct. |

98

## CERTIFICATE OF REPORTER

I, George Schumer, a Certified Shorthand Reporter of the State of California, hereby certify that the witness in the foregoing matter was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said proceeding was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of said witness or proceeding was thereafter reduced to typewriting under my direction and supervision;

That before completion of the deposition, review of the transcript ✓ was ____ was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties in this case, nor in any way interested in the event of this cause; further, that I am not related to any of the parties thereof.

DATED: _____June 1_____, 2007

_____
George Schumer, CSR

EXHIBIT F

1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

5

6  IO GROUP, INC., a California     )
     corporation,                    )

7                         )
                Plaintiff,   )

8     vs.                )  Case No. C-06-03926 (HRL)

9  VEOH NETWORKS, INC., a       )
     California Corporation,     )

10                        )
              Defendants.   )  **CONFIDENTIAL**

11                        )

12

13

14           DEPOSITION OF TED DUNNING

15            SAN DIEGO, CALIFORNIA

16              MARCH 16, 2007

17

18

19

20

21  REPORTED BY RITA BURGESS, CSR NO. 8374

22


**PETERSON** Reporting
Truth and Technology, Transcribed.

530 B Street    800 649 6353 toll free
Suite 350      619 260 1069 tel
San Diego, CA   619 688 1733 fax
92101

bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1    average constraints of that bit rate over the small period of

2    time.

3        Q.    And what type of encoder is used during Veoh's

4    process of changing from the original file format into Flash

5    formats?

6        A.    I don't know the exact encoder used.

7        Q.    Was it be a particular brand or is it a

8    particular type, what distinguishes one encoder from another

9    encoder?

10        A.    That's -- I mean, there are many things that

11    distinguish different encoders.

12        Q.    But what I'm getting at is, are there -- are

13    there different classes of encoders or are encoders more or

14    less defined by a particular -- the company that creates it,

15    for example, you know, Flash as you mentioned before is made

16    by Adobe, is -- would this encoder be identified by the

17    company that produces it or more by the type of process it

18    uses?

19        A.    There are several hundred video formats at least,

20    and if you include mix and match options, the number is huge.

21    Many video formats are defined by international standards

22    organization.  MPEG is the acronym for the motion picture

23    experts group.  It's an international group of experts in

24    video encoding.  MPEG-1, 2, 4 are all video encoding

25    standards just defined by the MPEG committee.  Other video

1    encoding standards are defined for proprietarily by

2    individual companies.  Adobe bought Macromedia, who

3    contracted with other companies that I don't even know the

4    names of to use proprietary and general purpose encoders and

5    decoders in their Flash products.

6        Q.    Okay.

7        A.    So what I'm saying there is I can't answer that

8    question.

9        Q.    Are the Flash files on to Veoh system, do they

10   all contain a standard key frame rate or -- let me strike

11   that.

12            Does the key frame rate for Flash video files

13   being played to its users change based on the capacity of the

14   individual users computer?

15            Does it sniff the capability of the users

16   computer and thereby adjust the key frame rate for better

17   experience?

18       A.    What do you mean by key frame rate?

19       Q.    Do you have an understanding of what a key frame

20   rate is?

21       A.    This is a very specific technical term.

22       Q.    Could you describe what that is?

23       A.    Key frames are used in several different

24   applications but in many encoding and compression algorithms,

25   there is an uncompressed or a statically compressed image in

1    hint.

2        Q.    In those situations, will Veoh then go and take a

3    look at the video file to determine if this statement is

4    accurate, that it does appear on its face to infringe a

5    copyright?

6        A.    It depends a little bit, but only a little bit.

7    If they refer to a video in a form specific enough for us to

8    find it at all, then we absolutely will look at it.  We got a

9    notice the other day where they had typed a video identifier

10   and not provided a title.  It was almost unfindable.  I did

11   quite a few database searches and looked at all variants of

12   how they might have mistyped it, and I found one that

13   appeared to be the one they were talking about.  So

14   neglecting that one corner case, which is relatively rare, if

15   they identify a video that we can understandably go to look

16   at it, we do -- well, sorry.  Not in all cases.  If it's a

17   formal DMCA notice from somebody who's large, we have heard

18   of them, and they seem to understand how to give us reliable

19   links, we will take down almost no questions, anything they

20   tell us.  So in those cases, I do those take downs.  I

21   wouldn't even look at the material, except after I have done

22   the take down.  I will do a random sampling to verify the

23   technical means I use actually took down with high likelihood

24   all the videos that were notified, or we were notified about.

25        If it's an informal notice, there is a much

1   higher chance that it's not an identifiable video. But if it

2   comes through the flagging system, then there is included a

3   link to the thing, which is essentially guaranteed to be

4   resolved to a video owner. And there I will look, if I get

5   that e-mail or if somebody else forwards it to me, I will

6   follow that link and look at it, and see what -- what I

7   think. It's sometimes a difficult judgement. Sometimes it's

8   an easy judgement. There have been cases where people were

9   feuding with each other so they said, everything they are

10  doing is copyright infringement. They sent it back. Those

11  are child, you know, school yard taunts more than anything.

12          In other cases, it's very very clear that it's,

13  say, a movie or something. There's a copyright notice on the

14  front. The user's name does not match or there's an apparent

15  effort to obscure what that is, and there's an immediate take

16  down in that case.

17          Q.    What other types of things would help you

18  identify something that was clearly a case of copyright

19  infringement? Let me try to recap the things that you

20  mentioned in your last answer. You said something about it

21  being a movie. By that, do you mean a -- you mean, a long

22  play, a Hollywood type movie, not -- as opposed to an amateur

23  production. Is that what you intended when you said movie?

24          A.    Yes. Movie is, as you pointed out, ambiguous.

25  And I was referring to the extreme case where it's an hour

1    taunting back and forth, what do you do in those cases?

2            MS. GOLINVEAUX:  I object to this line of

3    questioning to the extent it calls for Dr. Dunning to make a

4    determination as to whether certain content is or is not

5    infringing, because he's not an attorney that would call for

6    it.

7            MR. SPERLEIN:  I'm not asking him for whether

8    those statements are accurate or not.  I'm just asking what

9    you go -- the process that you go through, and you said that

10   this is something that you do.  So I want to ask you some

11   questions about that.

12   BY MR. SPERLEIN:

13       Q.    So my question to you is, again, in a case where

14   it doesn't seem obvious to you, you make a call whether to

15   take that video down or to leave it up; is that correct, or

16   do you error on the side of taking it down?

17       A.    Well, you are correct that ultimately there has

18   to be some decision because there are some cases which aren't

19   clearly one way or clearly the other, which means they're on

20   middle ground as well.  And I try, and we try, to error

21   strongly on the side of taking it down if there's any

22   plausible reason that it's material that would be

23   copyrighted.  We have an objection process where an owner can

24   say, you took this down inaccurately, so that makes us much

25   more willing to take down first, and let somebody else ask

1    questions later.

2        Q.    Thank you.  At this point in time, currently,

3    does Veoh do any review of video files some time between

4    their submission -- when they are submitted by the user,

5    publisher, and the time that it's published throughout the

6    Veoh system, does Veoh do any review to determine whether the

7    material might be infringing on someone's copyright or not?

8        A.    No.

9        Q.    If you -- if you chose to do that for one

10   particular video, would you have the ability to do that?

11            MS. GOLINVEAUX:  I object to the extent that it

12   calls for Dr. Dunning to make a legal conclusion as to what

13   is and is not infringing material.

14            THE WITNESS:  I can't answer that I could make a

15   conclusion about whether it's infringing material.

16   BY MR. SPERLEIN:

17       Q.    Earlier you said when something was brought to

18   your attention, you review it, and you decide whether it

19   should come down or not.  Understanding that the publisher

20   had an opportunity to make a counterclaim later on, is there

21   anything preventing you from doing that review prior to

22   publication on the Veoh system?

23            MS. GOLINVEAUX:  Same objection.

24            THE WITNESS:  And I did not say that I made a

25   determination of whether or not something was copyright

```
 1    infringement.
 2    BY MR. SPERLEIN:
 3         Q.    You make a determination of whether it --
 4         A.    Should be taken down.
 5         Q.    Should be taken down or not.
 6         A.    I think it would be completely infeasible to
 7    review everything.
 8         Q.    Has -- by you personally, is that what you mean?
 9         A.    By any reasonable multiple me personally.
10         Q.    And by multiple of you, do you literally mean
11    people with your experience and knowledge or do you just mean
12    a number of -- any number of people, it would be impossible
13    to review materials before it was published?
14         A.    I mean any number of people that is feasible for
15    us to martial to the task.
16         Q.    Has Veoh ever done any sort of study as to --
17    strike that.
18              It's your testimony here today that Veoh doesn't
19    do any review on a regular basis of video files that are
20    submitted by users prior to the publication process; is that
21    correct?
22              MS. GOLINVEAUX:  Could you repeat the question,
23    please?
24              (The record was read).
25              THE WITNESS:  It's correct, but prior to
```

1    title and a description, and they can select tags.  That's

2    what we talked about before.  Is that -- the things that I

3    just covered, is that entirely of what the entering the meta

4    data is involved?

5         A.    I couldn't say that's all of it, but that's some

6    very important parts of it.

7         Q.    Okay.  And from there, they select the video file

8    from wherever it resides on their computer and they somehow

9    deliver it electronically to the Veoh system; is that

10   correct?

11        A.    That's correct.

12        Q.    And can you tell me from there what happens once

13   that file in the meta data that the user inputed is delivered

14   to Veoh, what happens there?

15        A.    Meta data has to be stored in the database, the

16   meta data must be indexed.  The technical particulars of the

17   video have to be examined.

18        Q.    Let me stop you right there.  What does that

19   mean, the technical particulars of the video have to be

20   examined?

21        A.    Which Kodak is used, which envelope format is

22   used.  How many seconds is it.  What the frame rate is.  What

23   the audio Kodak that are used are.  It's like 30 or 40

24   separate pieces of information that need to be extracted from

25   the file and verified for usability.

1          Q.    Is that done entirely by an electronic process

2     with no human input?

3          A.    Entirely, automatically.

4          Q.    And after that information is extracted, what is

5     the next step in the process?

6          A.    I don't remember if I said indexes of meta data,

7     that occurs contemporaneously with the extraction of

8     technical information about the video.  Then frames are

9     extracted for use as thumbnails.  One of those, the most

10    seemingly interesting is selected as the single thumbnail to

11    be represented for search results.  The Flash preview is

12    copied from the original video file.  These various pieces of

13    data are positioned on the correct servers, not just for

14    internal access, but for external access.

15         Q.    Let me stop you there for just a second.  I want

16    to clarify something.

17              With regard to both the meta data and the

18    original video file, is there a key entry point where they

19    come to Veoh and then get distributed to different places for

20    these processes, or does that happen instantaneously as the

21    user submits them?  And if you would like, I can give you an

22    example of what I mean.  You said that the meta data has to

23    go to the indexing system, which we know resides in four

24    servers here in San Diego.  Does that information go directly

25    there, or does it go to a kind of central processing area

1    times, I might go, oh yes --

2        Q.    That's okay.

3        A.    -- there's something there.

4        Q.    Let me focus a little bit on the actual --

5        A.    I'm sorry.  I knew there was.  Of course

6    transport to all of the cashing layers does not occur

7    until -- except on demand.  That is effectively part of the

8    publishing process, but it is done as late as possible,

9    meaning the first time something is accessed as opposed to

10   being caused by.  Some things are caused by the users

11   submitting the video.  Some things are caused by the first

12   access of the video.  Some things are caused by the tenth

13   access.  But the process of publishing is not complete just

14   because things stop happening after submission of the video

15   file itself.

16       Q.    Does Veoh or any employee of Veoh actually look

17   at any of the video material or the video content on a video

18   file during that publication process?

19       A.    No.  We do have automated systems that look in

20   the back log of number of videos that have been submitted,

21   the number have gone up, you know, available, so that we can

22   detect system failures, and somebody's phone will ring if

23   there's a failure and things are coming in but not

24   publishing.

25       Q.    And at that point would anyone physically look at

1    the video?

2        A.    They wouldn't look at the content, they would

3    look more along the lines of how many files are there, what

4    phase of the automated process did they get stuck in.

5    There's at least a dozen steps on two dozen different

6    computers or more where this -- this process is happening.

7    And so any one of those -- not any one of them, but many

8    steps can cause a hang up.

9        Q.    I understand.

10            Once the video publishing process is complete and

11   the video is now on the Veoh servers and available to other

12   users, does Veoh currently review any of those videos by

13   physically looking at the videos prior to some sort of flag

14   or ownercation from a user that it should be looked at?

15       A.    We look at prominent pieces of our site, the

16   front page, the featured videos, things like that to make

17   sure that we're not as an introductory experience, showing

18   something that's lude by very strict standards, you know.

19   Kind of the lowest common denominator community standards.

20   But that primarily involves a quick glance at a screen full

21   of thumbnails.

22       Q.    If you see something that is appearing on the

23   front page of Veoh as part of this automated process that you

24   think is not something that you want the public, or the first

25   glance of Veoh to be some nudity or you mentioned ludness, is

1    there some way that you can prevent those video files from

2    appearing on the front page without removing it entirely from

3    the Veoh system?

4        A.    We can rate them mature content.

5        Q.    And if something is -- if a video file is rated

6    as mature content, it will not appear on the front page of

7    the web site; is that correct?

8        A.    That's correct.

9        Q.    And there are other places on the web site where

10   it will not appear; is that correct?

11       A.    Presumably.  Web site is a very fluid thing

12   because the viewer filters and things like that influence the

13   way it looks.

14       Q.    Okay.  Earlier you mentioned that if a viewer

15   indicates they think of video is infringing, that you'll take

16   a look at it and possibly remove it.  If during this review

17   of what is currently appearing on the front page, you saw a

18   Twentieth Century Fox logo that you believe might be

19   infringing, would you move that to another part of the web

20   site or take it down completely?

21           MS. GOLINVEAUX:  Object; calls for speculation.

22           THE WITNESS:  Simply seeing a logo or parity of a

23   logo could mean many things.  I wouldn't comment on whether

24   or not that's infringing, but if I think that there's any

25   credible claim of infringement, I take it down.  I don't move

1    it.  I just disablize it.

2    BY MR. SPERLEIN:

3        Q.    Okay.  At any other time prior to -- we have been

4    talking about what your current process is.  At any other

5    time were videos systematically reviewed before they were

6    made available to other users on the Veoh system?

7        A.    I wouldn't call it a systematic review, but we

8    all watched the first 10 because we were so excited that

9    anything worked.  So I am sure we all watched all those.

10   Since then, no, there's no system to review.

11       Q.    Is there any review at all?

12       A.    There are the automated reviews that we talked

13   about.

14       Q.    As far as a person actually reviewing files for

15   some -- whatever reason it might be, prior to the files going

16   out to the general user base?

17       A.    No.

18            MS. GOLINVEAUX:  Object to the form of the

19   question.

20            THE WITNESS:  Oh, excuse me.

21            There is no systematic review by humans before

22   the general public can see videos.

23   BY MR. SPERLEIN:

24       Q.    Going back to the current system, is it correct

25   that Veoh no longer allows sexually explicit video files to

1    I, RITA BURGESS, Certified Shorthand Reporter for the State

2    of California do hereby state under penalty of perjury:

3

4

5    That the witness in the foregoing deposition was by me first

6    duly sworn to testify to the truth, the whole truth and

7    nothing but the truth in the foregoing cause; that the

8    deposition was taken by me in machine shorthand and that the

9    foregoing contains a true record of the testimony of the

10   witness.

11

12

13   Dated this ___31 St___ day of ___March___ , 2007, at

14   San Diego, California.

15                                    _Rita Burgess_
                                      RITA BURGESS
16                                    C.S.R. No. 8374

17

18

19

20

21

22

23

24

25

EXHIBIT <u>G</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IO GROUP, INC., a California )
Corporation,                 )
                             )
            Plaintiff,       )
                             )
     vs.                     ) Case No. C-06-3926(HRL)
                             )
Veoh NETWORKS, Inc., a       )
California Corporation,       )
                             )
            Defendant.       )
_____ )

**CONFIDENTIAL**


HIGHLY CONFIDENTIAL

DEPOSITION OF JOSEPH PAPA

VOLUME I

SAN DIEGO, CALIFORNIA

MAY 21, 2007


REPORTED BY:  NICOLE R. HARNISH, CSR No. 13101


**Peterson** Reporting
Truth and Technology, Transcribed.

530 B Street          800 649 6353 toll free
Suite 350             619 260 1069 tel
San Diego, CA         619 688 1733 fax
92101
bookadepo.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

1    A.    Okay.

2    Q.    Before the user is able to pick a video

3    file off of their system and upload it to Veoh, are

4    they required to register with Veoh?

5    A.    Yes.

6    Q.    And are they required to download the Veoh

7    client onto their system before they can upload a

8    video?

9    A.    No.

10    Q.    Are users only able to upload video files

11    to the Veoh system as opposed to any other type of

12    file?

13    A.    Only video.

14    Q.    Only video.

15    If a user attempted to upload a software

16    file, what would happen?

17    A.    It would be rejected.

18    Q.    Would they get a message that said it was

19    being rejected?

20    A.    Yes.

21    Q.    Do you know exactly what that message would

22    say -- or I shouldn't say "exactly."  Do you know

23    approximately what the message would say?

24    A.    Approximately it says "unknown codec."

25    Q.    So is the codec what the system would look

12

1    for to determine if a file was in a proper format to

2    be loaded?

3        A.    Can you clarify "proper format to be

4    loaded"?

5        Q.    That it was in a file format that the

6    system could accept.

7            MS. GOLINVEAUX:   Object to the form of the

8    question.

9    BY MR. SPERLEIN:

10       Q.    You can go ahead and answer as best you

11   can.

12       A.    Can you just repeat it?

13       Q.    You said earlier that if a user attempted

14   to upload a software file, that the user would get a

15   message that would say "improper codec" or something

16   to that affect; is that correct?

17       A.    That's correct.

18       Q.    For what reason would that message be

19   generated?

20       A.    To communicate to the user that the file

21   they uploaded is not a video file.

22       Q.    Do all video files have a codec associated

23   with it?

24       A.    Yes.

25       Q.    Let's take a moment to clarify what a codec

13

1    is.  Could you tell me, in relatively simple layman's

2    terms as you can, what a codec is?

3         A.   A codec is a compression scheme.

4         Q.   So codec is used to compress video files so

5    that it can be transferred more quickly; is that an

6    accurate statement?

7         A.   Yes.

8         Q.   Do files that are not video files ever

9    contain codecs?

10        A.   Yes.

11        Q.   Are the codecs that are used with video

12   files unique to video files?

13        A.   They can be.

14        Q.   Are there some codecs that work with both

15   video and other types of files?

16        A.   Yes.

17        Q.   Can you give me an example?

18        A.   MPEG-2.

19        Q.   An MPEG-2 is able to be used with video

20   files as well as some other type of file?

21        A.   Correct.

22        Q.   And what type of file is that?

23        A.   Audio.

24        Q.   If a user were to attempt to upload an

25   audio file that had an MPEG-2 codec, would the user

                                                  14

1    get the same message from Veoh rejecting the file?

2         A.   Yes.

3         Q.   And how is the system able to determine

4    that that is an audio file and therefore reject it as

5    opposed to a video file?

6         A.   An audio file doesn't contain a video

7    codec.

8         Q.   Just for clarification, the audio file can

9    contain a codec that is an MPEG-2 codec?

10        A.   Correct.

11        Q.   And can MPEG-2 codec be either audio or

12   video?

13        A.   Correct.

14        Q.   Okay.  Thank you.

15             So to just summarize this area and clarify,

16   Veoh does not accept any files that are not video

17   files; is that correct?

18             MS. GOLINVEAUX:  Object to the form of the

19   question.

20             THE WITNESS:  Can you clarify "accept"?

21   BY MR. SPERLEIN:

22        Q.   Can users upload any files that are not

23   video files to the Veoh system?

24             MS. GOLINVEAUX:  Object to the form.

25             THE WITNESS:  Users can upload anything

15

1    they choose.  If it is not a video file, they will

2    get the "unknown codec" message.

3    BY MR. SPERLEIN:

4        Q.   Will the Veoh system accept any files that

5    a user attempts to upload that are not video files?

6            MS. GOLINVEAUX:  Object to the form of the

7    question and still vague and ambiguous.

8            THE WITNESS:  Can you clarify what you mean

9    by "accept"?

10   BY MR. SPERLEIN:

11       Q.   By "accept" I mean allow the file to be

12   transferred onto the Veoh system.

13           MS. GOLINVEAUX:  Sorry.  With that

14   clarification can you read back the question?

15           MR. SPERLEIN:  I will ask it once more.

16           MS. GOLINVEAUX:  Sure.

17   BY MR. SPERLEIN:

18       Q.   If a user attempts to upload a file that is

19   not a video file, will the Veoh system allow that

20   video file to transfer to the Veoh system?

21       A.   Yes.

22       Q.   And if it is not a video file, what will

23   the Veoh system do at that time with that file?

24           MS. GOLINVEAUX:  Asked and answered.

25   BY MR. SPERLEIN:

16

1      Q.    Would you answer the question?

2      A.    It will attempt to recognize the audio and

3    video codec in the file.

4      Q.    Okay.  And if it is not a codec that is

5    associated with video, what will the Veoh system then

6    do with that file?

7      A.    The file stays in the video system and is

8    marked as "unknown codec."

9      Q.    And how long will the Veoh system continue

10    to keep that file on the system?

11      A.    Our current policy is 90 days.

12      Q.    After 90 days -- strike that.

13            Is there anything that might occur during

14    that 90 days that would cause Veoh to maintain the

15    file beyond that 90 days?

16      A.    For a file that has been deemed "codec

17    unknown"?

18      Q.    Correct.

19      A.    90 days is our policy, but we don't have a

20    guarantee that it happens at the 90-day mark.  No

21    less than 90 days is the policy.

22      Q.    What is the reason for maintaining those

23    files at all?

24            MS. GOLINVEAUX:  I would object.  To the

25    extent the answer would call for the witness to

17

1         MS. GOLINVEAUX:  Object to the form.

2         THE WITNESS:  I don't know the answer to

3    that.

4    BY MR. SPERLEIN:

5         Q.   Going back to individual users that upload

6    content onto the Veoh system.  Does Veoh ask those

7    users if they have permission -- strike that.

8         Does Veoh ask users if they own the content

9    that they're uploading onto the Veoh system?

10        MS. GOLINVEAUX:  Objection to the form.

11        THE WITNESS:  "Ask"?  What do you mean by

12   "ask"?

13   BY MR. SPERLEIN:

14        Q.   During the upload process, are users

15   required to respond to any questions about the video

16   file that they are attempting to upload?

17        MS. GOLINVEAUX:  Object to the form.

18        THE WITNESS:  Users have to agree to our

19   terms of service prior to uploading.

20   BY MR. SPERLEIN:

21        Q.   Okay.  And earlier you said that users are

22   required to input a title for the video file before

23   they uploaded it; is that correct?

24        A.   That's correct.

25        Q.   And you also said earlier that users have

31

1        Q.   Does Veoh review user submitted video files

2    during the upload process?

3             MS. GOLINVEAUX:  Object to the form.

4             THE WITNESS:  Can you clarify "review"?

5    BY MR. SPERLEIN:

6        Q.   Does an employee of Veoh actually look at

7    each video file during the upload process?

8        A.   No.

9        Q.   Does a Veoh employee actually look at the

10   video files once the upload process is complete?

11            MS. GOLINVEAUX:  Object to the form.

12            THE WITNESS:  Can you repeat it?

13   BY MR. SPERLEIN:

14       Q.   Let me clarify.

15            Does Veoh actually look at every video file

16   that is uploaded onto the system during the upload

17   process?

18            MS. GOLINVEAUX:  Object to the form.

19            THE WITNESS:  No.

20   BY MR. SPERLEIN:

21       Q.   After the upload process is complete, does

22   Veoh look at every video file?

23            MS. GOLINVEAUX:  Object to the form.

24            THE WITNESS:  No.

25   BY MR. SPERLEIN:

35

1    been reviewed and which had not been reviewed?

2        A.   No.

3        Q.   So, for example, if any given day you

4    decided that you wanted to take some time to review

5    video files, how would you start along that process?

6        A.   I would navigate to the most recent page.

7        Q.   And then what would you do?

8        A.   I would look at the metadata presented.

9        Q.   And was that metadata at the time the same

10   metadata that we talked about earlier, namely the

11   title -- actually, let me strike that.

12            Could you tell me what metadata was

13   available to you through the most recently published

14   page?

15       A.   The thumbnail, the title, the rating,

16   star's rating, user's rating.  And the time of

17   published, was presented as well.

18       Q.   Was the publisher's name available at that

19   point?

20       A.   Yes.  The publisher's name was available.

21       Q.   Number of views, was that available?

22       A.   Cannot recall.

23       Q.   And would you start your review process

24   with the video file that appeared as the most

25   recently published video file?

50

1    process?

2         A.   Yes.

3         Q.   Are all video files that are submitted to

4    Veoh transcoded into Flash format?

5         A.   No.

6         Q.   In what circumstances would a video file

7    not be transcoded into Flash format?

8         A.   If the format of the video file is not

9    compatible.

10        Q.   And in that case it would be -- it would be

11   marked as noncompatible and possibly maintained for

12   up to 90 days?

13        A.   Correct.

14        Q.   If a video file is in a compatible format,

15   is that video file then transformed into Flash

16   format?

17        A.   Yes.

18        Q.   Are there any other exceptions to what

19   would be -- what video files would be transcoded into

20   Flash format?

21        A.   All valid videos are encoded into Flash

22   format.

23        Q.   All what kind of videos?

24        A.   Valid videos.

25        Q.   Is the entire video file transcoded into

124

1    Flash format?

2         A.    Currently, yes.

3         Q.    Was there a different policy in the past

4    where the entire video file was not transcoded into

5    Flash format?

6         A.    Yes.

7         Q.    Why are video files transcoded into Flash

8    format after they are submitted to Veoh?

9         A.    Adobe's Flash player has something like

10   98 percent penetration in the browser market, so a

11   video formatted into Flash can be played by just

12   about anybody on the Web.

13        Q.    When a viewer views a video file through

14   the web-based application at veoh.com, is the video

15   file the person is viewing in Flash format?

16        A.    Is the video file in Flash format?  Yes.

17        Q.    Does Veoh make more than one flash -- does

18   Veoh make more than one Flash formatted file for

19   playing through the Veoh system for each video file?

20        A.    Under some circumstances, yes.

21        Q.    Are some video files transcoded into a

22   higher and a lower resolution version?

23        A.    Some files are, yes.

24        Q.    Is it ever anymore than two versions?

25        A.    Only two Flash versions.

                                              125

1          Q.    Does Veoh use preset specifications from

2    Flix?

3          A.    We have a standard format for both the low

4    and high res.

5          Q.    What bit rate are the Flash files set up

6    in?

7          A.    512 kilobits per second is the maximum bit

8    rate.  They are variable.

9          Q.    And does Veoh set the frame size?

10         A.    Correct.

11         Q.    And what frame size is it set at?

12         A.    For the low res version it is 320 by 240.

13    The high res version is escaping me.  It is the same

14    aspect ratio, 4 by 3.  So it is approximately 400 by

15    300.

16         Q.    So that would appear larger on a user

17    screen when they see it?

18         A.    No.

19         Q.    Would it appear the same size on the user

20    screen?

21         A.    Yes.

22         Q.    But would it appear sharper image than --

23         A.    Yes.

24         Q.    And to be clear, the frame size is -- does

25    Veoh set that frame size, or is it set by -- as a

                                                          127

1    preset in the Flix software?

2        A.   We can control the frame size.  That's the

3    output of the Flix engine, and we elect to set it at

4    those sizes.

5        Q.   And is that the same for the bit rate?

6        A.   Correct.

7        Q.   And what about the frame rate?  Do you set

8    the frame rate?

9        A.   We do.

10       Q.   And what do you set the frame rate at?

11       A.   I don't know.

12       Q.   Is it different for the two different

13   versions?                                    /

14       A.   It is likely higher in the high res

15   version.

16       Q.   Can a user tell Veoh what frame rate they

17   want the video file set at when it is transcoded into

18   Flash?

19       A.   No.

20       Q.   Can a user instruct Veoh on any of the

21   other specifications?

22       A.   No.

23       Q.   Does the Flix software allow Veoh to track

24   any user viewing statistics?

25       A.   No.

                                                    128

1        Q.    And does Veoh sniff a user's bandwidth to

2    determine if a different bit rate should be used for

3    that viewer?

4        A.    No.

5        Q.    So it's -- for whatever -- for a particular

6    video file that has been transcoded into Flash, it

7    would have the same bit rate regardless of what user

8    viewed video file on the system?

9        A.    That's correct.

10        Q.    And currently once a video file is

11    submitted and then transcoded into Flash format the

12    entire video file is transcoded into Flash; is that

13    your testimony?

14        A.    Currently, yes.

15        Q.    And is the entire Flash version of that

16    file then available to users using the veoh.com

17    interface?

18        A.    Yes.

19        Q.    And at some time in the past was something

20    other than the full video file transcoded into Flash

21    format?

22        A.    Yes.

23        Q.    And when was that change made?

24        A.    October of '06.

25        Q.    And prior to that was it a smaller version

129

1    I, NICOLE R. HARNISH, Certified Shorthand Reporter

2    for the State of California, do hereby certify:

3

4    That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the

6    whole truth and nothing but the truth in the

7    foregoing cause; that the deposition was taken by me

8    in machine shorthand and later transcribed into

9    typewriting, under my direction, and that the

10   foregoing contains a true record of the testimony of

11   the witness.

12

13   Dated:  This _8th_ day of _June    2007_

14   at San Diego, California.

15

16

17

18                        _NRH._

19                        NICOLE R. HARNISH

20                        C.S.R. NO. 13101

21

22

23

24

25