Michael S. Elkin (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:    212-294-6700
Facsimile:    212-294-4700
Email:  melkin@winston.com

Jennifer A. Golinveaux (SBN: 203056)
Matthew A. Scherb (SBN: 237461)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email:  jgolinveaux@winston.com; mscherb@winston.com

Attorneys for Defendant
VEOH NETWORKS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

IO GROUP, INC.

        Plaintiff,

    vs.

VEOH NETWORKS, INC.

        Defendant.

Case No. C 06-3926 HRL

**DEFENDANT VEOH NETWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Date:    September 4, 2007
Time:    10:00 a.m.
Place:   Courtroom 2

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5894

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

I.  INTRODUCTION .........................................................................................................1

II.  VEOH MEETS THE THRESHOLD REQUIREMENTS FOR DMCA SAFE HARBOR ......................................................................................................................2

III.  VEOH QUALIFIES FOR SECTION 512(c) SAFE HARBOR BECAUSE THE ALLEGEDLY INFRINGING MATERIAL RESIDED ON VEOH'S SYSTEM AT THE DIRECTION OF USERS.........................................................................................5

IV.  THE TWO CONDITIONS OF SUBSECTION 512(c)(1)(B) ARE NOT IDENTICAL TO THE COMMON LAW ELEMENTS OF VICARIOUS INFRINGEMENT, AND REGARDLESS, IO CANNOT PREVAIL UNDER EITHER STANDARD. .........................7

    A.  Section 512(c)(1)(B) Is Not Identical to the Common Law Standard For Vicarious Liability ..............................................................................................7

    B.  Veoh Lacked the Right and Ability to Control the Allegedly Infringing Activity ................................................................................................................9

    C.  Veoh Does Not Receive a Financial Benefit Directly Attributable to the Alleged Infringing Activity..............................................................................15

V.  THERE IS NO ISSUE OF FACT THAT VEOH MEETS ALL THE REQUIREMENTS OF SUBSECTION 512(c)(1)(A) .....................................................17

VI.  CONCLUSION.............................................................................................................18

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## TABLE OF AUTHORITIES

CASES

*A & M Records, Inc. v. Napster, Inc.*,
    No. C 99-05183, 2000 U.S. Dist. LEXIS 6243 (N.D. Cal. May 5, 2000) ...................... Passim

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ....................................................................10, 16

*Adobe Sys. Inc. v. Canus Productions, Inc.*,
    173 F. Supp. 2d 1044 (C.D. Cal. 2001) ...........................................16

*Arista Records, Inc. v. Flea World, Inc.*,
    356 F. Supp. 2d 411 (D.N.J. 2005) ..............................................12

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004)......................................... Passim

*CoStar Group Inc. v. LoopNet, Inc.*,
    164 F. Supp. 2d 688 ...................................................... 6, 10, 14-15

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) .......................................................16

*Hendrickson v. eBay*,
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) ...............................................9, 14

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102, 2007 U.S. App. LEXIS 12508 (9th Cir. May 31, 2007).................... 3, 8-9, 17

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    No. 05-15170, 2007 U.S. App. LEXIS 15824 (9th Cir. July 3, 2007) .............................12, 14

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    No. 05-15170,  App. LEXIS 15824, at *8 n.2 (9th Cir. July 3, 2007)................................7, 14

*Perfect 10 v. Amazon.com*,
    487 F.3d 731 (2007)........................................................................10

*Stoner v. eBay Inc.*,
    56 U.S.P.Q.2d 1852 (Cal. Super. Ct. 2000) ............................................13

*Sundance Assocs., Inc. v. Reno*,
    139 F.3d 804 (10th Cir. 1998) ...........................................................13

*Wyatt v. Terhune*,
    315 F.3d 1108 (9th Cir. 2003) ............................................................4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## STATUTES

17 U.S.C. §512(k)(1)(A) ........................................................................................................6

17 U.S.C. §512(i)(1)(A) ..................................................................................................... 2-4

17 U.S.C. §512(c)(1)(A)(iii) ................................................................................................6

17 U.S.C. §512(c)(1)(B) ................................................................................................ Passim

17 U.S.C. §512(c)(1) ........................................................................................................5, 9

17 U.S.C. §512(m) ........................................................................................................ 11-12

17 U.S.C. §512(m)(1) ........................................................................................................14

18 U.S.C. §2257(a) ............................................................................................................13

18 U.S.C. §2257(h)(3) .......................................................................................................13

18 U.S.C. §2257 ................................................................................................................13

Cal. Penal Code §653aa(a) .................................................................................................13

Cal. Penal Code §653w(a) ..................................................................................................13

Section 230 of the Communications Decency Act, 47 U.S.C. Sec. 230 ...........................13

## OTHER AUTHORITIES

H.R. Rep. 105-551 (1998) ..............................................................................................3, 15

S. Rep. 105-190 (1998) .............................................................................................3, 8, 15

Melville B. Nimmer & David Nimmer, Nimmer on Copyrights §12B.04[A][2] ...............8

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**Winston & Strawn LLP**
101 California Street
San Francisco, CA 94111-5894

## I.     INTRODUCTION

This is a clear case for DMCA section 512(c) safe harbor. Io chose to sue Veoh without notifying Veoh of a single alleged infringement.  It is undisputed that Veoh lacked knowledge of the alleged infringements when it independently decided to disable access to all adult content, including any alleged infringements of Io's content, before Io filed this lawsuit.

In a strained attempt to defeat Veoh's motion, Io argues that Veoh nonetheless should have known of the alleged infringements and that, in any event, Veoh had the right and ability to control the alleged infringements.  With respect to the requirement of section 512(c)(1)(A), Io spends less than a page discussing knowledge and in effect concedes that it was fatally lacking here.  Io instead pushes a vicarious liability theory under section 512(c)(1)(B), arguing that Veoh had the right and ability to control the alleged infringements and received a financial benefit directly attributable to the allegedly infringing activity.  Io spends a significant part of its opposition arguing that the standards for section 512(c)(1)(B) and for common law vicarious liability are identical.  While the logical extension of Io's argument is that section 512(c) does not provide a safe harbor from vicarious liability, a result clearly not intended by Congress, in this case Io's arguments fail under either standard.

To prop up its feeble argument that Veoh *did* have the right and ability to control the alleged infringements, Io ignores DMCA case law and relies largely upon the *Napster* decision, without acknowledging a critical point of distinction: the Ninth Circuit found that Napster had the ability to identify and police infringing conduct by searching its index for song titles provided by content owners.  Here, Io never bothered to provide Veoh with titles for which to search.  Even if it had, nearly none of the alleged infringements uploaded to Veoh contained titles even remotely matching those of Io's alleged works.  Veoh could not possibly have controlled alleged infringements it had no practical ability to discern.

Io's alternative argument, that Veoh does not meet threshold eligibility requirements for safe harbor, is equally weak.  Its position that Veoh failed to "reasonably" implement its strict repeat infringer policy is half hearted and unsupported.  Io's more radical argument, that Veoh is not eligible for safe harbor because the alleged infringements were "not by reason of storage at the

1   direction of a user" is contrary to all authority and would render section 512(c)'s safe harbor

2   meaningless.

3       With the DMCA safe harbors, Congress carefully balanced the rights and responsibilities of

4   content providers and Internet service providers.  Veoh has fully lived up to its obligations and is

5   entitled to safe harbor.  Io, on the other hand, seeks to shift the entire burden of policing for

6   infringements onto Veoh without providing Veoh the basic information required to enable it to do

7   so.  Io's reading of the law would disqualify a service provider from safe harbor eligibility based

8   merely upon the fact that it hosts user content and intends to generate advertising revenue.  This is

9   not what Congress had in mind.

10      Io has failed to present any viable issue of fact regarding Veoh's eligibility for safe harbor,

11  and the Court should grant Veoh's motion for summary judgment.

12  **II.    VEOH MEETS THE THRESHOLD REQUIREMENTS FOR DMCA SAFE HARBOR**

13      Io concedes that Veoh meets most of the threshold requirements of DMCA safe harbor.  Io

14  does not dispute that Veoh is a service provider as defined by subsection 512(k)(1)(B).  *See* Def's.

15  Motion for Summary Judgment ("Def's. Mot.") at 12.  Nor does Io dispute that Veoh accommodates

16  and does not interfere with standard technical measures pursuant to subsection 512(i)(1)(B), or that

17  Veoh has an appointed agent to receive infringement notifications pursuant to subsection 512(c)(2).

18  *See id.* at 15-16.

19      Io also concedes that Veoh meets most of the requirements of subsection 512(i)(1)(A),

20  concerning repeat infringer policies.  *See id.* at 13.  This subsection requires adoption, reasonable

21  implementation, and communication of a repeat infringer policy.  17 U.S.C. §512(i)(1)(A).  Io does

22  not contest that Veoh "adopted" a repeat infringer policy and does not contest that Veoh "informed"

23  its users of this policy.  Io has saved only one issue for debate, having conceded every other point

24  regarding qualification for the safe harbor.  Io rests its entire case on the allegation that Veoh has not

25  "reasonably implemented" the policy.  Pl's. Opp. to Def's. Mot. for Summary Judgment ("Pl's.

26  Opp.") at 3-5.

27      Moreover, Io offers only one reason why Veoh implementation is supposedly unreasonable:

28  although Veoh blocks registration of new accounts of repeat infringers using user IDs and email

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2

addresses, Dunning Declaration in Support of Veoh's Motion for Summary Judgement ("Dunning

Decl.") ¶ 11, Io argues that Veoh should *also* block registration of new Veoh accounts when a new

user attempts to access Veoh from a computer or network with an Internet Protocol ("IP") address of

a computer or network previously used by a terminated user.

Neither the language of the statute nor decisions interpreting the requirement require service

providers to block IP addresses, which are merely network or machine identifiers, as opposed to

usernames, which identify persons.[1]  Section 512(i)(1)(A) requires only a "reasonably implemented .

. . policy that provides for the termination in appropriate circumstances of subscribers . . . who are

repeat infringers."  The statute imposes no specific obligation beyond reasonableness.  *Cf.* H.R. Rep.

105-551, part 2, at 61; S. Rep. 105-190, at 52 (by requiring a repeat infringer policy, Congress was

not "suggesting that a provider must investigate possible infringements, monitor its service, or make

difficult judgments as to whether conduct is or is not infringing").

Not one decision interpreting this subsection has required that service providers block IP

addresses.  For example in *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1104 (W.D.

Wash. 2004), Corbis presented evidence that a user Amazon had terminated was able to create new

accounts with a slightly different user name. Corbis argued that this proved Amazon's policy was

not reasonably implemented under the DMCA.  *Id.* at 1103-04.  The court disagreed.  *Id.* at 1104.

The court held that Corbis failed to present evidence to meet its summary judgment burden and

noted that the "silence" was "telling."  *Id.* ("The mere fact that Posternow [a customer/subscriber]

appeared on zShops under a different user name and identity does not, by itself, create a legitimate

question of fact regarding the procedural implementation of Amazon's termination policy.").  The

court also noted that the DMCA required a policy implementation that was "reasonable," not perfect.

*Id.*  The evidence of Amazon's efforts to terminate the users' new accounts when put on notice

showed that Amazon's repeat infringer policy was working well.  *Id.* 1104 n.7; *see also Perfect 10,*

*Inc. v. CCBill LLC*, 488 F.3d 1102, 2007 U.S. App. LEXIS 12508, at *10-11 (9th Cir. May 31,

---

[1] It is apparent why IP address screening is an <u>inappropriate</u> tool for blocking repeat infringers.  One computer has one IP address but can have multiple users (mom, dad, sister, friend).  Many computers on one network, such as a company or school network, or coming from one internet service provider, can all appear as coming from one IP address.  *See* Def's. Req. for Judicial Notice (attaching current Wikipedia entry explaining IP addresses).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    2007) (holding that "[t]o identify and terminate repeat infringers, a service provider need not

2    affirmatively police its users for evidence of repeat infringement."). The plaintiff in *Corbis* at least

3    attempted to offer evidence on this point, even though inadequate. Io does not even bother to offer

4    any evidence that terminated repeat infringer were able to create new accounts on Veoh.[2] Io offers

5    no evidence that Veoh's current policy is unreasonable. It offers no evidence that restricting access

6    based on IP address is either feasible or a requirement of a reasonable implementation of a repeat

7    infringer policy.

8    To support its far-fetched theory that blocking IP addresses should be a requirement of any

9    reasonable repeat infringer policy, Io relies largely on an unpublished *Napster* district court decision,

10    *A & M Records, Inc. v. Napster, Inc.*, No. C 99-05183, 2000 U.S. Dist. LEXIS 6243, at *28-29 (N.D.

11    Cal. May 5, 2000), that does not support Io's position. That decision denied Napster summary

12    judgment as to DMCA section 512(a) safe harbor because plaintiffs submitted expert testimony

13    raising doubts about the reasonableness of Napster's particular policy implementation. *Id.* The

14    district court denied summary judgment on the ground that plaintiff had presented a triable issue of

15    fact. The court reached no conclusion about whether IP address screening should have been required

16    of Napster, or even whether IP address screening is feasible or effective. Even if it had, a finding of

17    fact by another court in another litigation cannot substitute for evidence that Io must produce to this

18    Court to meet its summary judgment burden. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir.

19    2003) ("Factual findings in one case ordinarily are not admissible for their truth in another case. . .

20    .").

21    There is no evidence in the record to justify denying summary judgment to Veoh. To the

22    contrary, the undisputed evidence shows Veoh terminated more than 1,000 users for alleged repeat

23    copyright violations, even in the absence of proof of <u>actual</u> repeat violations. Dunning Decl. ¶ 12.

24    In fact, Veoh goes well beyond the requirements of section 512(i)(1)(A) and when it receives notice

25    of an alleged infringement, uses the unique hash of that file to terminate access to any other identical

26    files, and prevents additional identical files from being uploaded to Veoh in the future *by any user*.

27    _____

28    [2] Io's assertion that its Vice President Keith Ruoff could obtain a second account on Veoh, Pl's.
    Opp. at 4, is not evidence of a failed policy, as there is no evidence that Mr. Ruoff is a repeat
    infringer and should have been blocked.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Dunning Decl. ¶ 13.

2        Io has failed to raise a triable issue of fact as to the reasonableness of Veoh's implementation

3    of its repeat infringer policy.

4    **III.    VEOH QUALIFIES FOR SECTION 512(c) SAFE HARBOR BECAUSE THE**
         **ALLEGEDLY INFRINGING MATERIAL RESIDED ON VEOH'S SYSTEM AT THE**
5        **DIRECTION OF USERS.**

6        Io, without citation to any legal authority, very briefly argues that Veoh is not entitled to

7    section 512(c) safe harbor for "two types of new works from the video files it acquires from its

8    users." Pl's. Opp. at 5-6. Io argues that, as to both (1) files that are automatically transcoded into

9    Flash format and (2) thumbnails extracted from video files uploaded by users, Veoh is not entitled to

10   safe harbor because those files do not reside on Veoh's system at the direction of users as required

11   by section 512(c)(1).

12       Both the plain language of section 512, and the interpreting case law doom Io's argument.

13   Veoh is not disqualified because of its automated processing of user uploaded files so that other

14   users can actually *view* such files (Flash format), and *find* such files (thumbnails). Because any

15   service provider must engage in basic processing of user provided content in order for it to be

16   available to other users, the result urged by Io would mean no service provider could be eligible for

17   section 512(c) safe harbor.

18       Veoh's automated Flash formatting, using widely employed third-party software, is a

19   necessary part of the process of making users' videos available to other users. User-submitted

20   videos may arrive at Veoh's computers in any of "several hundred" formats. Dunning Dep. Tr.

21   62:19 to 63:5. The videos are automatically transcoded into Flash format for compatibility purposes,

22   as the vast majority of Web users have software that play videos in Flash format. The process is

23   entirely automated. Decl. of Ted Dunning Submitted in Supp. of Def. Veoh Networks, Inc.'s Opp.

24   to Pl's. Mot. for Summary ("Dunning Opp. Decl.") ¶ 3. Io's argument that Veoh's automated

25   extraction of thumbnails, to allow users to find videos uploaded by other users, takes Veoh outside

26   the 512(c) safe harbor for those files is irrational. It makes no sense to provide a safe harbor for

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

hosting material that no one can find.[3]  Both Flash conversion and thumbnail extraction are the kinds of basic and automatic processing of user material by a service provider that Congress intended to protect with the section 512(c) safe harbor.

The DMCA permits service providers seeking section 512(c) safe harbor to do more than merely store bits of data.  Subsection 512(c)(1)(A)(iii) makes plain that service providers do not lose safe harbor by providing access to content.  17 U.S.C. §512(c)(1)(A)(iii) (presupposing access and requiring service providers "remove, or *disable access to*" infringing material) (emphasis added).  Service providers for purposes of the 512(c) hosting safe harbor, (unlike for purposes of the 512(a) conduit safe harbor), may also modify content and still qualify, as evidenced by the different definitions of "service provider" applicable to these sections.  *Compare* 17 U.S.C. §512(k)(1)(A) (defining "service provider" for 512(a) purposes as "an entity offering the transmission . . . of material of the user's choosing, *without modification* to the content") (emphasis added), with *id.* §512(k)(1)(B) (defining the term for 512(c) purposes without the italicized language).

Unsurprisingly, cases construing DMCA safe harbor apply it to service providers who automatically process, recast, and provide access to user-submitted materials.  In *Corbis*, Amazon users would use Amazon's software to create web pages to advertise the sale of products, and Amazon allowed users to upload images to help make the sale.  351 F. Supp. 2d at 1094.  Corbis sued Amazon based on Amazon's users' use of allegedly infringing images.  *Id.* at 1096-97.  The court recognized Amazon's entitlement to safe harbor.  *Id.* at 1110-11.  That Amazon's software automatically created the web pages incorporating Corbis's images, images that made it possible for buyers to find the products they wished to purchase, did not deprive Amazon of safe harbor.  *See also CoStar Group Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 692 & n.2, 703 (D. Md. 2001) (safe harbor would apply when service provider hosted real estate listings with allegedly infringing photographs submitted by users, allowed other users to view those listings, and sold advertising

---

[3] While Veoh's automatic thumbnail extraction and use of those thumbnails for search purposes clearly fall within section 512(c), they also fall within the information location tool safe harbor provided by section 512(d) (protecting use of directories, pointers, and references to online content). Also, as Veoh argues in its Opposition to Io's summary judgment motion, both Flash preview generation and thumbnail extraction are automatic acts done without volition.  Def's. Opp. to Io's Summary Judgment Motion ("Def's. Opp.") at 7-13.  Moreover, any thumbnail generation is not infringement, but a fair use.  *Id.* at 13-16.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  space on its website).

2      Under Io's view, no Internet service provider could qualify for section 512(c) safe harbor,

3  including user content sites like Veoh and the very chatrooms Congress specifically singled out for

4  protection.  Congress intended the DMCA to facilitate the robust development of electronic

5  communications, not destroy it.  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, No. 05-15170,  App.

6  LEXIS 15824, at *8 n.2 (9th Cir. July 3, 2007) (The DMCA's purpose was to "facilitate the robust

7  development and world-wide expansion of electronic commerce, communications, research,

8  development, and education in the digital age") (quoting S. Rep. 105-190, at 1-2).  The automated

9  transcoding of files into Flash format and the automated creation of thumbnails both fall within

10  section 512(c) safe harbor.

11  **IV.    THE TWO CONDITIONS OF SUBSECTION 512(c)(1)(B) ARE NOT IDENTICAL**
      **TO THE COMMON LAW ELEMENTS OF VICARIOUS INFRINGEMENT, AND**
12    **REGARDLESS, IO CANNOT PREVAIL UNDER EITHER STANDARD.**

13      Io wrongly argues that section 512(c) simply does not provide any safe harbor from vicarious

14  liability.  Pl.'s Opp. at 8 ("There may be other sections of the DMCA that provide protection for

15  ISPs not available at common law, but §512(c)(1)(B) is not one of them").  This argument is

16  inconsistent with the plain language of section 512, the expressed intent of its drafters, and with the

17  need to give section 512(c) meaningful effect.  It therefore must fail.  As demonstrated below, even

18  assuming *arguendo* the standard set forth in section 512(c)(1)(B) is identical to the common-law

19  standard for vicarious liability, the cases interpreting the common-law standard in the context of

20  Internet service provider liability also make clear that Veoh (a) did not have the right and ability to

21  control the infringements alleged in this case and (b) did not receive a financial benefit directly

22  attributable to, the alleged infringements.

23      **A.    Section 512(c)(1)(B) Is Not Identical to the Common Law Standard For**
              **Vicarious Liability**
24

25      Io attempts to divert the Court's attention from the section 512(c) safe harbor and the

26  relevant case law interpreting section 512(c), by instead arguing that, despite the contrary authority,

27  section 512(c) does not provide a service provider safe harbor from vicarious liability at all.

28      To qualify for section 512(c) safe harbor, a service provider must "not

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   receive a financial benefit directly attributable to the infringing activity, in a case in which the

2   service provider has the right and ability to control such activity." 17 U.S.C. §512(c)(1)(B).  While

3   the language of subsection 512(c)(1)(B) is similar to the two prongs of common law vicarious

4   liability, Congress clearly intended for the DMCA to shield against vicarious infringement.

5   "*Subsection (c)* limits the liability of qualifying service providers for claims of direct, *vicarious* and

6   contributory infringement."  S. Rep. 105-190, at 43 (emphasis added); *see also CCBill*, 2007 U.S.

7   App. LEXIS 12508, at *28 (quoting verbatim the legislative history approvingly).[4]  Io's argument

8   that section 512(c) does not provide safe harbor from vicarious liability, Pl.'s Opp. at 8, is at odds

9   with the legislative history specifically discussing the section 512(c) safe harbor.

10          To support its argument that the DMCA provides no safe harbor for vicarious liability, Io

11   cites to the Ninth Circuit's decision in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 2007 U.S.

12   App. LEXIS 12508 (9th Cir. May 31, 2007). While Io claims that the "Ninth Circuit has found that

13   the 'financial benefit' prong of 512(c)(1)(B) should be considered *identical to and analyzed in the*

14   *same manner as* the 'financial benefit' prong from the common law doctrine" (Pl.'s Opp. at 8

15   (emphasis added)), Io misleadingly misstates *CCBill*'s holding and discussion of the financial

16   benefit prong. First, *CCBill* specifically affirms that the section 512(c) safe harbor limits the liability

17   of service providers for claims of vicarious infringement.  2007 U.S. App. LEXIS 12508, at *28

18   ("Section 512(c) limits the liability of qualifying service providers for claims of direct, vicarious,

19   and contributory infringement.").  With regard to the "financial benefit directly attributable to the

20   infringing activity" inquiry, contrary to Io's assertion *CCBill* <u>does not</u> say that it should be

21   considered "identical to and analyzed in the same manner as" (Opp. at 7) the financial benefit prong

22   from the common law doctrine, but merely that it "should be interpreted *consistent with* the

23   similarly-worded common law standard for vicarious copyright liability" 2007 U.S. App. LEXIS

24   12508, at *28 (emphasis added).  *CCBill* held that the plaintiff failed to raise a genuine issue of fact

25   that defendant received a direct financial benefit from infringing activity.  *Id.*  Accordingly, the

26   *CCBill* case did not reach the right and ability to control of subsection 512(c)(1)(B) and held that

27   ―――――――――――

28   [4] Commentators writing in the years following the DMCA's enactment make this clear.  *See* 3
     Melville B. Nimmer & David Nimmer, Nimmer on Copyrights §12B.04[A][2] ("The legislative
     history clearly intends to extend this safe harbor to vicarious liability.").

8

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    defendant would be entitled to section 512(c) safe harbor so long as it met the threshold

2    requirements. *Id.*

3        Section 512(c) unambiguously provides safe harbor from vicarious liability, and the relevant

4    case law makes clear that Veoh meets the requirements of subsection 512(c)(1)(B) because it lacked

5    both the right and ability to control the allegedly infringing activity in this case, and did not receive a

6    financial benefit directly attributable to the activity.

### B.    Veoh Lacked the Right and Ability to Control the Allegedly Infringing Activity

8        Io has failed to raise any genuine issues to challenge the inescapable conclusion that Veoh

9    lacked the practical ability to control the alleged infringements in this case.  Both the DMCA cases

10   cited by Veoh in its opening brief and the cases interpreting the right and ability to control prong at

11   common law make this abundantly clear.

12       Under Io's formulation, the mere fact that a service provider hosts content at the direction of

13   its users gives the service provider the right and ability to control any alleged infringements.  Its

14   position flies in the face of both statutory language and the cases interpreting section 512(c).  The

15   statute's language itself establishes that the mere ability to control a website in general does not

16   translate into the ability to control infringement.  Io's assertion that Veoh "has the right and ability to

17   decide *what users can and cannot do on its system*" and therefore has an ability to control

18   infringement is misplaced.  *See* Pl.'s Opp. at 22 (emphasis added).  Under section 512(c), any

19   service provider that qualifies for safe harbor *controls* its system by definition:  section 512(c) only

20   applies to "material that resides on a system or network *controlled or operated* by or for the service

21   provider."  17 U.S.C. §512(c)(1) (emphasis added).   Io has failed to present any evidence that Veoh

22   had the ability to control the allegedly *infringing* activity in this case, and has failed to raise a

23   material issue of fact on this prong.

24       If when Io says that Veoh controls its users Io means that Veoh can remove content or

25   terminate accounts, this argument fails as well.  Courts have routinely held that 'the right and ability

26   to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of

27   a service provider to remove or block access to materials posted on its website or stored in its

28   system."  *Corbis*, 351 F. Supp. 2d at 1110; *accord Hendrickson v. eBay*, 165 F. Supp. 2d 1082, 1094,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1096 (C.D. Cal. 2001)   Courts have reached the same conclusion when applying the common-law

standard for vicarious liability.  *CoStar*, 164 F. Supp. 2d at 704 (citing *Hendrickson* and applying

common law vicarious test).  Io has no sufficient answer to these cases but must instead resort to

cases decided outside the DMCA context that nonetheless still fail to support its position.

While Io relies heavily upon the Ninth Circuit's discussion of the common-law elements of

vicarious liability in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), that

decision is readily distinguishable upon the facts, and *Napster* supports a finding of no right and

ability to control here.  In *Napster* the Ninth Circuit explained that the district court "failed to

recognize that the boundaries of the premises that Napster 'controls and patrols' are limited. . . .   Put

differently, Napster's reserved 'right and ability' to police is cabined by the system's current

architecture."  *Napster*, 239 F.3d at 1023-24.  The Ninth Circuit went on to find that Napster's

system had the "ability" to locate infringing material listed on its file name indices, and it accepted

the district court's conclusion that plaintiffs had demonstrated a likelihood of success on the merits

of their vicarious copyright infringement claim.  *Id.* at 1024.  The Ninth Circuit specifically stayed

the preliminary injunction of the district court as overbroad, however, because the district court

placed "on Napster the entire burden of ensuring that no 'copying, downloading, uploading,

transmitting, or distributing' of plaintiffs' works occur on the system.  As stated, we place the

burden on plaintiffs to provide notice to Napster of copyrighted works and files containing such

works available on the Napster system before Napster has the duty to disable access to the offending

content."  *Id.* at 1027.

The Ninth Circuit recently explained, in analyzing the "control" element of common law

vicarious liability, that Napster "had the ability to identify and police infringing conduct by

searching its index for song titles".  *Perfect 10 v. Amazon.com*, 487 F.3d at 731 (9th Cir. May 16,

2007).  "[U]nder *Grokster,* a defendant exercises control over a direct infringer when he has both a

legal right to stop or limit the directly infringing conduct, *as well as the practical ability to do so.*

*Id.* at 730 (emphasis added).

In this case, Io has presented no evidence that Veoh had the practical ability to control the

allegedly infringing works.  Io admits it never notified Veoh about the alleged infringements.  Decl.

1   of Matthew Scherb in Support of Pl.'s Mot. for Summary Judgment ("Scherb Decl."), Ex. L, RFA

2   No. 61; *id.* Ex. K, RFA Nos. 21, 22, 24.  Io never provided Veoh with the names of any titles for

3   which to search, and even if it had, the record shows that the allegedly infringing files bore titles, in

4   almost every case, that did not match the actual titles of Io's alleged works.  *Compare* Ruoff Decl. ¶¶

5   13-14 (listing works claimed), *with id.* Exhs. D & E (showing titles of allegedly infringing works).

6   Io admits that none of its alleged works contained copyright notices, *id.* Ex. J, RFA No. 58, or

7   identified Io as the author, except for one work that contained a Titan Media logo some four minutes

8   into the clip.  Ruoff Decl., Ex. F at 2.  Moreover, the allegedly infringing works in this case were

9   hardly "blatant" infringements in terms of labeling and length, as Io claims.  Io has admitted that

10  nearly all of the allegedly infringing works were less than a minute in length, and the majority of

11  these were less than about six seconds in length.  Scherb Opp. Decl., Ex. D, (Pl's. Resp. to Def's.

12  Third Set of Requests for Admissions, Nos. 65-78).

13          The fact that Veoh lacked the ability to control the alleged infringements is underscored by

14  the fact that Io *itself* initially identified a work as having been infringed, and then changed its mind

15  months later and conceded that it had not been infringed after all, Veoh's Motion for Summary

16  Judgment at 21, another point to which Io fails to respond.  If Io could not itself accurately identify

17  whether user submitted works infringed Io's works, it is unclear how Veoh could possibly have had

18  the ability to do so.

19          Veoh has always controlled its system to the limits of the system's architecture, and there is

20  no evidence to the contrary.  Veoh fully implemented its DMCA takedown and repeat infringer

21  policies.  Dunning Decl. ¶¶ 9-12.  Veoh's ability to terminate access to certain files only evidences

22  an ability to control access to material on its system, not an ability to identify and terminate

23  *infringing material*.

24          While Io argues that it was Veoh's obligation to review every user submission, Io does not

25  explain how this would have given Veoh the ability to identify and control the alleged infringements.

26  In any event, as explained in Veoh's opening brief, section 512 and the interpreting case law make

27  clear that a service provider need not monitor its users submissions under any circumstances.

28  Moreover, section 512(m) specifically states in relevant part "[n]othing in this section shall be

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

11

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   construed to condition the applicability of subsections (a) through (d) on—a service provider

2   monitoring its service or affirmatively seeking facts indicating infringing activity, except to the

3   extent consistent with a standard technical measure complying with the provisions of subsection (i). .

4   . .  17 U.S.C. §512(m).

5          While Io claims Veoh improperly attempts to inject knowledge as an element of

6   512(c)(1)(B), Opp. at 9-12, Io misses the point.  There is no ability to control infringing content that

7   a service providers lacks the practical ability to discern.  Io's suggestion that Veoh should either

8   decrease the number of submissions it processes to a manageable number which it can review or

9   question its "legitimate existence", Pl's. Opp. at 21-22, reveals Io's misapprehension of both the

10  control requirement and the balance struck by the DMCA.  *See also* 2007 U.S. App. LEXIS 15824,

11  *41-42 n.17 ("there are many providers of essential services who could limit infringement by

12  refusing to offer those services," be they "software operators, network technicians, or even utility

13  companies," but they are not be vicariously liable.)  .

14         Io's attempt to rely upon vicarious liability cases concerning flea-markets and dance halls, in

15  lieu of discussing DMCA or even Internet cases, is even more desperate than its reliance on *Napster*.

16  The *Arista* litigation to which Io cites, Pl's. Opp. at 21, perfectly illustrates Io's improper reliance on

17  those cases.  An earlier, published decision in the *Arista* case distinguished the real-world flea

18  market scenario from an Internet service provider scenario, simultaneously showing why flea-market

19  and dance hall cases have no application to this case while underscoring why section 512(c)(1)(B) of

20  the DMCA is not a proxy for the vicarious liability prongs.  *Arista Records, Inc. v. Flea World, Inc.*,

21  356 F. Supp. 2d 411, 417 (D.N.J. 2005).  The court rejected a flea-market's attempt to avail itself of

22  the DMCA:

23         The public policy creating a safe harbor for ISPs is informed by considerations of lack of ISP
           control and knowledge of the millions of items of data flowing daily through the providers
24         facilities; these considerations are absent in this matter's lessor/lessee relationships arising
           from the rental of real market space to vendors on Defendants' premises. For these reasons,
25         Defendants' ninth affirmative defense will remain stricken.

26  *Id.*

27         Io throws out several other arguments as to why Veoh had the right and ability to control the

28  alleged infringements without much explanation, apparently hoping that something will stick. Each

12

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    of these is easily disposed of.  First, contrary to Io's characterization, Veoh's automatic generation of

2    Flash previews and thumbnail extractions as part of the video publication process, Pl.'s. Opp. at 20,

3    do not confer the right and ability to control.  Even Io does not explain this argument.  The

4    undisputed evidence shows that Veoh's automated publication process does not involve human

5    intervention and does not give Veoh the right or ability to control infringements.  Dunning Opp.

6    Decl. at 3-4.  Io has offered no evidence to the contrary.  Second, Io's reference to 18 U.S.C. §2257

7    and claim that Veoh failed to comply with the section's labeling requirement, Pl.'s. Mot. at 24, are

8    irrelevant.  Section 2257 has nothing to do with a right or ability to control infringements, let alone

9    copyright, and does not even apply to Veoh.[5]  In fact, this Court denied discovery concerning section

10    2257 as irrelevant in its Order dated April 13, 2007 (docket no. 63), stating that Io "has not

11    convincingly demonstrated that Veoh's compliance (or not) with that statute is relevant or

12    reasonably calculated to lead to the discovery of admissible evidence.").[6]

13           In addition to lacking the practical ability to control alleged infringements, Veoh also does

14    not have the type of relationships with its users that give it the *right* to control the alleged

15    _____

      [5] 18 U.S.C. §2257 is a statue that requires the maintenance of certain records in connection with the
16    *creation* of adult content.  It is plain on the face of the statute that Section 2257's reporting
      requirements apply only to one who "produces" sexually explicit conduct, and would not apply to
17    Veoh.  18 U.S.C. §2257(a).  "Produces . . . ***does not*** include mere distribution or any other activity
      which does not involve hiring, contracting for managing, or otherwise arranging for the participation
18    of the performers depicted."  18 U.S.C. §2257(h)(3) (emphasis added); *see also Sundance Assocs.,
      Inc. v. Reno*, 139 F.3d 804, 807-08, 810-11 (10th Cir. 1998) (invalidating Attorney General's
19    regulation that attempted to broaden the definition of "produces").  Veoh has never produced adult
      content.
20    [6] Just as section 2257 is irrelevant to Veoh's right and ability to control infringing activity, so are the
      plethora of state statutes regarding labeling requirements for recordings to which Io string cites.
21    Pl.'s. Opp. at 23 & n.2.  For example, the two California statutes that Io cites, both criminal laws, are
      irrelevant to this case.  Section 653w prohibits the knowing possession of a "physical embodiment"
22    of an audiovisual work that does not identify the manufacturer and author.  Cal. Penal Code
      §653w(a).  On its face it does not apply to electronic dissemination, is irrelevant to this case, and
23    certainly does not demonstrate Veoh's right and ability to control infringement.  To the contrary, the
      statute specifically makes knowledge a prerequisite for a violation.  In addition, the statute does not
24    apply to service providers like Veoh.  Veoh only republishes the title and description provided by its
      users, which makes it immune from liability under section 230 of the Communications Decency Act,
25    47 U.S.C. Sec. 230., which preempts inconsistent state laws  *Stoner v. eBay Inc.*, 56 U.S.P.Q.2d
      1852 (Cal. Super. Ct. 2000) (holding section 653w does not apply to eBay because of section 230).
26    In addition, section 653aa prohibits the knowing, widespread electronic dissemination of an
      audiovisual work, but only by those who do not provide a valid email address for contact.  Cal. Penal
27    Code §653aa(a).  Obviously, Veoh provides valid contact information through its website.  Finally,
      the statute <u>explicitly does not apply to service providers at all</u>.  *Id.* §653aa(f) (excepting service
28    providers).

------------------------------------------------------------

13

1    infringements.  Io argues the right to control exists simply because Veoh's users agree to a Terms of

2    use that prohibit certain activities, including the submission of infringing content, and gives Veoh

3    the right to remove infringing material.  Pl's. Opp. at 18.  Such policies alone clearly do not evidence

4    a right to control.  *E.g.*, *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, No. 05-15170, 2007 U.S. App.

5    LEXIS 15824, at *33 (9th Cir. July 3, 2007).  In *Visa*, defendant's policies prohibited its members

6    from providing services to "merchants engaging in certain illegal activities" and required members

7    to "investigate merchants suspected of . . . illegal activity and to terminate" violators.  *Id.* at *33.

8    The Ninth Circuit held that, "even with all reasonable inferences drawn in Perfect 10's favor," the

9    existence of defendant's policies "cannot support a finding" of the right and ability to control prong

10   of vicarious infringement.  *Id.*

11       Moreover, policies, such as Veoh's, that prohibit infringement, provide for removal of

12   infringing content, and provide for termination of repeat infringers are *required* by the DMCA.  It

13   would truly be an absurd result for Veoh to lose DMCA safe harbor for adopting and implementing

14   the very policies that the DMCA requires.  In *Hendrickson*, 165 F. Supp. 2d at 1094, 1096, the court

15   granted eBay's summary judgment motion based on DMCA safe harbor despite eBay's "limited

16   monitoring" of its website for and removal of apparent infringements acknowledging that Congress

17   wanted to encourage such monitoring.  *Id.* at 1094; 17 U.S.C. §512(m)(1) (making clear that all

18   DMCA safe harbors are available to a service provider regardless of whether it is "monitoring its

19   service or affirmatively seeking facts indicating infringing activity").  Further, the court noted that,

20   because the DMCA requires disabling access to infringing content upon notice, "Congress could not

21   have intended for courts to hold that a service provider loses immunity under the safe harbor

22   provision of the DMCA because it engages in acts that are specifically required by the DMCA."  *Id.*

23   at 1093-94.  Other courts reach the same conclusion.  *E.g.*, *CoStar*, 164 F. Supp. 2d at 704 (citing

24   *Hendrickson*); *Corbis*, 351 F. Supp. 2d at 1110 (same).[7]  The undisputed evidence shows Veoh lacks

25

26   _____

     [7] That *Hendrickson* concerned alleged direct infringers who used a website to sell content offline in
     no way make that case's pronouncements approving monitoring and DMCA policies any less viable.

27   *Cf.* Pl's. Mot. at 19-20 (futilely attempting to distinguish *Hendrickson*).  Moreover, both *Corbis* and
     *CoStar* involved online content, despite Io's contrary argument concerning *Corbis*.  *Compare* Pl's.

28   Opp. at 20, *with Corbis*, 351 F. Supp. 2d at 1094, 1096-97 (discussing the uploading of Corbis
     allegedly copyrighted images).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1 the right and ability to control under subsection 512(c)(1)(B).

2 **C.     Veoh Does Not Receive a Financial Benefit Directly Attributable to the Alleged Infringing Activity**

4 Because Veoh lacks the right and ability to control the alleged infringement, the Court need

5 not reach the financial benefit question.  However, Veoh also satisfies section 512(c)(1)(B) because

6 it "does not receive a financial benefit directly attributable to the infringing activity."  Despite the

7 fact that the statute requires that the "financial benefit" be "directly attributable" to the infringing

8 activity, Io argues that Veoh receives a sufficient financial benefit merely because "video files serve

9 as a draw to veoh.com" and "Defendant benefits when users come to their website."  Pl.'s Opp. at

10 16.  Io asserts that "[t]hese facts alone are sufficient to establish a draw."  *Id.*  Under Io's

11 formulation, if any infringing material is ever posted to a commercial service provider's website, the

12 service provider would be deemed to have received  a financial benefit under section 512(c)(1)(B).

13 Again Io ignores the language of the statute, the legislative history and the case law.

14 Io fails even to address the relevant legislative history cited in Veoh's motion:

15 In general, a service provider conducting a legitimate business would not be considered to
16 receive a "financial benefit directly attributable to the infringing activity" where the infringer makes the same kind of payment as non-infringing users of the provider's service.

17 H.R. Rep. No. 105-551, pt. 2, at 50; S. Rep. No. 105-190, at 44 (same).  There is no evidence that

18 Veoh received revenue from the alleged infringements different in kind from any revenue from non-

19 infringing material.  In its motion Veoh cited to the district court opinion in *CoStar*, which held that,

20 since no users made any payments for use of a service provider's site, there could be no direct

21 financial benefit as a result of the infringing conduct and therefore safe harbor was appropriate.  164

22 F. Supp. 2d at 705.  Io is wrong when it says that *CoStar* is inconsistent with *Napster* and other

23 Ninth Circuit precedent.  Pl's. Opp. at 15.  *CoStar* is a DMCA case analyzing the requirements for

24 section 512(c) safe harbor while all of the Ninth Circuit cases to which Io cites are analyzing the

25 elements of common law vicarious liability.

26 While the financial benefit addressed in section 512(c)(1)(B) is not "identical" to the

27 common law standard for financial benefit under the common-law of vicarious liability for the

28 reasons addressed in Section IV.A. above,  Io is also wrong even under the common-law standard.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

15

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    The *Napster* decision upon which it relies is readily distinguishable from *CoStar* and from this case.

2    Napster operated a file sharing service *devoted* to trafficking in unauthorized audio works, and it

3    refused to respond to takedown notices concerning those works; therefore, the infringing works were

4    found to be a "draw." *Napster*, 239 F.3d at 1023. Neither the *Costar* defendant nor Veoh operate a

5    site devoted to unauthorized works, a point which Io effectively concedes. Pl's. Opp. at 16 ("The

6    percentage of infringing material available at www.veoh.com may be smaller than that in Napster.").

7    Moreover, Napster's view of direct financial benefit must be read in light of the Ninth

8    Circuit's more recent decision in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004). *Ellison*

9    explains that there must be a "causal relationship between the *infringing activity* and any financial

10    benefit." *Id.* at 1079 (emphasis added). A link between other activities and financial benefit will not

11    do. Therefore, when users complained to AOL about losing access to a USENET group that

12    contained some infringing content, that was not evidence that users were drawn to infringing

13    content, but to the USENET group. *Id.* Similarly, in this case, Io's contention that users were drawn

14    to video content or adult video content, for which Io offers no evidence, Pl's. Opp. at 16, does not

15    support a conclusion that users were drawn to the allegedly infringing content. In addition, at the

16    time of the alleged infringements in this case, Veoh generated no revenue from its service, and <u>no</u>

17    financial benefit directly attributable to the alleged infringing activity. Papa Decl. in Support of

18    Veoh's Motion for Summary Judgment ("Papa Decl.") ¶¶ 2, 10.

19    The undisputed evidence shows that, both before and after Veoh changed its adult content

20    policy, infringing content has never been a draw for Veoh. To the contrary, Veoh has always

21    prohibited infringing content and has acted expeditiously to remove it when aware of alleged

22    infringements. These actions make clear that Veoh does not use such content as a draw. *Adobe Sys.*

23    *Inc. v. Canus Productions, Inc.*, 173 F. Supp. 2d 1044, 1052 (C.D. Cal. 2001) (denying summary

24    judgment to plaintiff when defendant stated its reputation would be harmed by existence of

25    infringing content at its trade shows and when defendant "expelled" vendors for "providing

26    adulterated and infringing products").

27    Both because Veoh lacked the right and ability to control the alleged infringing activity, and

28    did not receive a financial benefit directly attributable to alleged infringing activity, Veoh meets the

16

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    requirements of subsection 512(c)(1)(B) and is entitled to safe harbor. There is no genuine factual

2    dispute on that point.

## V.    THERE IS NO ISSUE OF FACT THAT VEOH MEETS ALL THE REQUIREMENTS OF SUBSECTION 512(c)(1)(A)

Acknowledging the weakness of its position, Io devotes less than a page of its opposition to

subsection 512(c)(1)(A), and focuses this portion of its argument entirely on subsection

512(c)(1)(A)(ii).  Pl's. Opp. at 24-25.  Io thus concedes that Veoh lacked actual knowledge of

infringement pursuant to subsection 512(c)(1)(A)(i), and that Veoh, "upon obtaining such

knowledge or awareness, acts expeditiously to remove, or disable access to," infringing material

pursuant to subsection 512(c)(1)(A)(iii).  Io contends only that Veoh was "aware of facts or

circumstances from which infringing activity is apparent," *id.* §512(c)(1)(A)(ii), and should lose safe

harbor on that basis.  In fact, by conceding that Veoh meets the requirements of 512(c)(1)(A)(i) and

(iii), Io concedes that Veoh meets the requirements of 512(c)(1)(A), because even if Veoh fails

512(c)(1)(A)(ii), it is still entitled to safe harbor if, when aware of infringing material, it

expeditiously removes it, pursuant to subsection (c)(1)(A)(iii), which Io has conceded.

Io's fails to cite any authority to support its contention that Veoh was aware of facts or

circumstances from which the alleged infringements were apparent.  Io fails even to address the

*CCBill* case, which rejected out of hand the type of "red flag" arguments upon which Io continues to

rely.  *Compare* Def's. Mot. for Summary Judgment at 17-18 (raising *CCBill* and arguments

concerning subsection 512(c)(1)(A)(ii)), *with* Pl's. Opp. at 24-25.  Io summarily refers the Court to

its own motion for summary judgment, to which Veoh has responded.

There is no genuine factual dispute as to whether Veoh meets the requirements of

512(c)(1)(A), and Veoh is entitled to safe harbor as a matter of law.

/ / /

/ / /

/ / /

/ / /

/ / /

17

1   */ / /*

2 **VI.**    **CONCLUSION**

3       For these reasons, Veoh respectfully requests that the Court grant summary judgment that

4 Veoh is entitled to DMCA section 512(c) safe harbor as to all of Io's claims in this case.

5 Dated:  August 21, 2007              WINSTON & STRAWN, LLP

6

7                           By:_____/s/_____

                                Michael S. Elkin

8                                   Jennifer A. Golinveaux

                                  Matthew A. Scherb

9                                   Attorneys for Defendant

                                  VEOH NETWORKS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5894

18