GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 849
San Francisco, California 94114
Telephone: (415) 378-2625
legal@titanmedia.com

Attorney for Plaintiff
IO GROUP, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| IO GROUP, INC., a California corporation, | ) CASE NO.: C-06-03926 (HRL) |
|  | ) |
|  | ) **REPLY TO DEFENDANT'S OPPOSITION** |
| Plaintiff, | ) **TO PLAINTIFF'S MOTION FOR** |
|  | ) **SUMMARY JUDGMENT** |
| vs. | ) |
|  | ) |
|  | ) |
| VEOH NETWORKS, Inc., a California | ) DATE: September 4, 2007 |
| Corporation, | ) TIME: 10:00 a.m. |
|  | ) COURTROOM: 2 |
| Defendant. | ) |
|  | ) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

## MEMORANDUM OF POINTS AND AUTHORITIES

I.     SUMMARY OF ARGUMENT ...................................................... 1

II.    FURTHER STATEMENT OF FACTS.......................................... 2

III.   PLAINTIFF HAS ESTABLISHED COPYING OF ITS REGISTERED WORKS. ...................................................................................... 2

IV.   DEFENDANT ENGAGES IN VOLITIONAL ACTS THAT CLEARLY ESTABLISH DIRECT INFRINGEMENT.................................... 4

V.    DEFENDANT'S CREATION OF SCREEN CAPTURES DOES NOT CONSTITUTE FAIR USE. ......................................................... 8

VI.   DEFENDANT IS VICARIOUSLY LIABLE FOR THE INFRINGING ACTIVITY OF ITS USERS. ................................................... 12

VII.  DEFENDANT FAILS TO ADEQUATELY REBUT THAT IT HAD CONSTRUCTIVE KNOWLEDGE OF THE INFRINGING ACTIVITY.......... 18

VIII. CONCLUSION................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) .............................................. 14, 17

*Bret Michaels v. Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998) ........ 12

*CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004) .................................... 7

*Feldman v. Google, Inc.*, 2007 U.S. Dist. LEXIS 22996 (E.D. Pa. 2007) ................................... 13

*Fonovisa, Inc. v. Napster, Inc.*, 2002 U.S. Dist. LEXIS 4270 (N.D. Cal. 2002) ...................... 14

*Hotmail Corp. v. Van$ Money Pie*, 1998 U.S. Dist. LEXIS 10729 (N.D. Cal. 1998) ................. 13

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)................................................ 10

*Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, (D.C.C.2005) ...................................... 7

*Parker v. Google*, 42 F. Supp.2d 492, 498 (E.D.Pa. 2006), aff'd by No. 06-3074, 2007

U.S. App. LEXIS 1630 (3d Cir. July 10, 2007) ........................................................ 6

*Perfect 10 v. CCBill, LLC*, 481 F.3d 751 (9th Cir. 2007) ............................................. 12

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007)................................10, 13-14

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 2007 U.S. App. LEXIS 15824 (9th Cir. 2007) ........14-15

*Playboy Enterprises Inc. v. Webbworld, Inc.* 991 F.Supp. 543 (N.D. Tex. 1997)...................... 12

*Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503 (N.D. Ohio 1997) ........ 12

*Polygram Int'l Publishing v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1329 (D. Mass. 1994) ........ 13

*Religious Technology Center v. Netcom On-Line Communications Services, Inc.,* 373 F.

3d 544 (N.D. Cal. 1995)................................................................................ 5, 6

*Sega Enters. v. Sabella,* No. C93-04260, 1996 U.S.Dist. LEXIS 20470 (N.D.Cal.

Dec. 18, 1996) ...................................................................................... 6

*Shapiro Bernstein & Co., Inc. v. H.L. Green Company, Inc.,* 316 F.2d 304 (2nd Cir. 1963)........ 12

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (U.S. 1984) ............................ 19

*Tur v. YouTube, Inc.*, 2007 U.S. Dist. LEXIS 50254 (C.D. Cal. filed Aug. 14,

2006)........................................................................................................ 12

*Veoh Networks, Inc. v. UMG Recordings, Inc, et al.,* No. 07-1568 (S.D.Cal. filed Aug. 9,

2007)                                                                                    17

REPLY TO OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

# STATUTES

17 U.S.C. § 512(a)................................................................................................. 5, 6

17 U.S.C. § 512(c)............................................................................................... 12, 18

17 U.S.C. §107....................................................................................................... 9

18 U.S.C. §2257................................................................................................... 18, 19

18 U.S.C. §2257(f)(4)........................................................................................... 18

REPLY TO OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      SUMMARY OF ARGUMENT

Parties have filed cross motions for summary judgment, Plaintiff on the issue Defendant's liability for direct, contributory and vicarious infringement of Plaintiff's creative works, and Defendant solely on its asserted entitlement to safe harbor under 17 U.S.C. §2257(c). In Defendant's Opposition it contends that this is not even a close case. Plaintiff agrees. Defendant's liability is clear and based on many of the same facts, its DMCA defense fails.

Defendant attempts to avoid responsibility for its infringing activities (which go well beyond copying) by asserting that all of its acts were automated. The law simply does not support this position. Defendant's volitional acts constitute direct infringement. As to the infringing screen capture images, Defendant compares its actions to that of an Internet search engine, which it simply is not. Defendant is not entitled to a fair use defense for these infringing acts.

Moreover, Io Group has established that Defendant is liable as a vicarious infringer because it receives a direct finical benefit from the infringing use of Plaintiff's works, and Defendant has the right and ability to control the infringing activity well within the traditional bounds of vicarious infringement. Defendant is also contributorily liable, since it materially contributed to the infringing activity, especially by means of the index it maintained, and it should have been aware of the infringing activity based on numerous red flags.

For the reasons set forth herein and in Plaintiff's Opposition to Defendant's Summary Judgment Motion, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion.

## II.    FURTHER STATEMENT OF FACTS

Testimony of Defendant and its employees acknowledges that Defendant can identify infringing video files yet declines to fully implement a system for identifying infringing files and removing them from its system unless it receives a formal DMCA take down notice.

Defendant instructs employees that if they encounter "blatantly copyrighted material, then they can take it down." Papa Depo. 99:10-100:18, 203:16-206:10, 231:17-233:5. Defendant admits that some factors might indicate a video file on its system is infringing.  Among those factors are: 1) whether a movie is still in theaters; 2) the length of the video file; 3) whether it would be a stretch for one of Veoh's users to own the rights to the file; and 4) whether or not the Defendant had a relationship with the producer. Papa 100:24-105:21.

Prior to the filing of the Complaint in this matter, Defendant included on its flagging feature a menu selection that users could click to bring to Defendant's attention any video file users believed might represent an infringing use.  However, shortly after the filing of this suit, Defendant changed its policy (Papa Depo. 174:7-18) and removed the flag feature menu selection "appears to contain copyright material". Papa Depo 168:11-169:20.  Defendant refuses to provide an explanation as to why it once asked users to bring potentially infringing video files to its attention, but later removed their ability to do so. Papa Depo. 174:7-178:6.

## III.    PLAINTIFF HAS ESTABLISHED COPYING OF ITS REGISTERED WORKS

Keith Ruoff has testified that he witnessed content taken directly from Plaintiff's works being displayed on www.veoh.com. Ruoff Summary Judg. Decl. at ¶¶ 13-15. With regard to the display of the Flash versions of the video files through www.veoh.com, Plaintiff is not aware of any technological means of downloading the Flash versions to its own computers. Thus, Plaintiff

has already provided the best available testimony in the form of Keith Ruoff's declaration and the printouts he made while the Flash files were in the process of streaming from www.veoh.com. *Id*.

With regard to files that were available for download from www.Veoh.com (*i.e.* copies of the files users originally submitted to Defendant), Io Group was able to download and save copies. Io Group made those files available to Defendant in discovery along with copies of Io Group's corresponding registered works. Ruoff Rely Decl. at ¶¶ 5and 6. Defendant had ample time and opportunity to compare Plaintiff's registered works with the infringing files downloaded from www.veoh.com and the printouts of pages from www.veoh.com documenting the Flash streaming presentation of the works, and to question Plaintiff about those works in discovery. Having completed its thorough investigation, Defendant does not challenge Plaintiff's assertion that the Flash streaming and original format video files found on www.veoh.com are comprised entirely of Plaintiff's registered works. Nor has Defendant presented any evidence to support such a challenge. Veoh raises this issue only as a red herring and a diversion from the real issues at play in this matter. This is not a "substantially similar" case; the files on www.veoh.com contain the same content as Plaintiff's works, albeit in different file formats. There is no need for a side by side comparison of the works, especially in light of the fact that Defendant has not challenged Plaintiff's ownership of the infringed works.

However, in the event that the Court finds it necessary to engage in a side by side comparison, Plaintiff has lodged the material with the Court along with its Motion to File Under Seal. Plaintiff seeks to seal the works because the files contain sexually explicit material not appropriate for general public access which would create possible exposure to minors. Defendant believes it is not proper to file the works under seal, in spite of the fact that Defendant consistently refers to Plaintiff's sexually explicit works using the legally imprecise but inflammatory word

REPLY TO OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)

"pornography". Perhaps this is not surprising since Defendant chose to commercially exploit sexually explicit material, while ignoring concomitant legal and moral responsibilities such as ensuring proper labeling (in order to ensure the actors are over eighteen) and keeping the material out of the hands of children.

Should the Court elect not to exercise its authority to seal these documents, Plaintiff requests that they be immediately filed unsealed so that the Court may access them if necessary to establish that the infringing works were indeed copies of Plaintiff's registered works.

## IV.    DEFENDANT ENGAGES IN VOLITIONAL ACTS THAT CLEARLY ESTABLISH DIRECT INFRINGEMENT.

There is no dispute that Defendant copied, displayed and distributed video files containing Plaintiff's works and even made derivative works from those video files. Defendant simply argues that it cannot be held accountable because its actions are automated rather than volitional. In an era when nearly every aspect of human life is affected by computer automation, such a position taken to its logical conclusion, is nothing short of absurd. It is difficult to imagine an unlawful act that could not be achieved entirely through computer automation and robotics. The law does not allow wrongdoers to avoid culpability merely because they are clever enough to develop a system that automatically performs operations which would otherwise subject them to liability. Indeed, one's actions can be both automated and volitional, since any automated system must be created and maintained.

The cases Defendant relies on to support its "everything automated is ok" argument, do not go so far as Defendant would have the Court believe. Those cases hold only that in well defined situations, Internet access providers will not be held liable for automatic *copying*. Defendant's activity goes well beyond mere automatic copying and includes distribution, public performance and display, creation of derivative works, and indexing of the works for its own commercial gain.

-4-

*Religious Technology Center v. Netcom On-Line Communications Services, Inc.,* is widely

regarded as the case that established the principle that access providers should not be held

accountable for certain automated copying necessary for the smooth operation of the Internet.

*Religious Technology Center v. Netcom On-Line Communications Services, Inc.,* 373 F. 3d 544

(N.D. Cal. 1995)("Netcom"). In *Netcom*, the defendant was not accused of engaging in any

activity other than copying. *Id*. at 1370. Netcom was not accused of public display, distribution or

creating derivative works. The Court did not hold that access providers would be absolved of

infringing activities resulting from the automation of other rights exclusive to copyright holders.

Indeed the court was careful to clarify this. "[P]laintiffs do not argue that Netcom is liable for its

public distribution of copies. Instead, they claim that Netcom is liable because its computers in

fact made copies." *Id*. The narrow holding of the court was that "the storage on a defendant's

system of infringing copies and retransmission to other servers is not a direct infringement by the

BBS operator of the exclusive right to *reproduce* the work where the copies are uploaded by an

infringing user." *Id*. at 1371 (emphasis added).

Post *Netcom,* Congress took a similar approach in the enactment of 17 U.S.C. §512(a)

which established specific automated acts that would receive blanket immunity, apparently

adopting the reasoning set forth in *Netcom* that certain acts are necessary to the smooth operation

of the Internet. In 17 U.S.C. §512(a) these action are referred to as "transitory digital network

communications". The definition of Service Provider for the purposes of subsection (a) is

narrower than in other provisions of the DMCA. 17 U.S.C. 512(k)(1)(A). Under subsection (a)

providers are not liable for copyright infringement if the provider's actions were similar to

Netcom's actions, that is if the actions involved "transmitting, routing, or providing connections"

and 1) the "transmission of the material was initiated by or at the direction of a person other than

-5-

the service provider", 2) the transmission or storage was automated, 3) the ISP does not select the recipients of the material, 4) if no copy of the material is maintained on the system for longer than necessary and 5) if the material is transmitted without modification to the content. 17 U.S.C. §512(a).

Although Defendant does not assert a defense under subsection (a) for the purposes of this Summary Judgment Motion, the language of the statute helps one understand the Court's reasoning in *Netcom*. The automated actions described in *Netcom* and 512(a) are fundamental requirements for the most basic operation of the Internet.

However, when an entity's actions go beyond the basic automated copying, storage and transmission functions described in *Netcom* the fact that other functions operate automatically is no longer relevant. For example, when an enterprise takes an interest in the content and makes that content available to others for commercial purposes as Defendant does here, those functions go beyond automated copying, storage and transmission of information, as Described by the court in *Netcom*.

Automatic or not, Defendant is responsible not only for making copies of video files, but also for, distributing those copies, making new Flash versions of those files, displaying those files publicly through its website, and making other derivative works in the form of still image screencaps. Like the court in *Netcom*, *Sega Enters. v. Sabella* holds that a BBS operator who controls servers which members use to upload and download infringing *copies* is not liable for direct infringement when there is no evidence that the operator uploaded or downloaded the works. *Sega Enters. v. Sabella,* No. C93-04260, 1996 U.S.Dist. LEXIS 20470 at *20 (N.D.Cal. Dec. 18, 1996). In *Parker v. Google,* the court held that Googles' automatic *copying* and temporary caching of websites was not direct infringement. *Parker v. Google,* 42 F. Supp.2d 492,

498 (E.D.Pa. 2006), aff'd by No. 06-3074, 2007 U.S. App. LEXIS 1630 (3d Cir. July 10, 2007). In *Newborn v. Yahoo!, Inc*., the plaintiff did not even allege direct infringement, and the court merely made a passing reference to direct infringement in a footnote. *Newborn v. Yahoo!, Inc*.,391 F. Supp. 2d 181, 186 n.3 (D.C.C.2005).

The strongest authority for Defendant's position that all automated activity is exempt from claims of direct infringement is *CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544 ("CoStar"). However, even there the court described the defendant's system as an electronic infrastructure designed and managed as a conduit of information that connects users over the Internet. *Id*. at 551. "They are conduits from or to would be copiers and have *no interest in the copy* itself" *Id*. (emphasis added). "[T]he entire system functions *solely to transmit* the user's data to the Internet. Under such a system, the ISP provides a system that automatically transmits users' material but is itself *totally indifferent to the materials' content*." *Id*. (emphasis added). Clearly Defendant's system is no such operation. As an Internet Television Network, Defendant takes a great deal of interest in the content on its system and in fact Defendant significantly modifies the content to serve its commercial purposes. The eventual elimination of adult content evidences the degree to which Defendant takes an interest in what content it will allow.

*CoStar* is often quoted for its passage that an ISP that automatically makes copies is analogous to a copy machine. *Id*. at 550. However, Defendant's system is not merely designed to copy. The maker of a copy machine would be liable if he commercially exploited the copies made by others on his machine, even if he engineered a way to achieve it through automation. Defendant's actions go beyond mere copying and Defendant's commercial exploitation of the works through automated infringement of other exclusive rights are volitional acts that establish Defendant's liability for direct infringement.

-7-

### V.    DEFENDANT'S CREATION OF SCREEN CAPTURES DOES NOT CONSTITUTE FAIR USE.

Defendant, perhaps intentionally, blurs the distinction between three different types of still images it creates from each video file – 16 full resolution screen captures, 16 lower resolution screen captures and a thumbnail image generated from one those screen captures.

When Defendant acquires a video file from a user, it extracts sixteen full-size frames from the video and creates derivative works in the form of .jpg screen captures ("screencaps"). From those sixteen still frames, defendant creates two 16-image sets of screencaps. Papa Depo at 164:5-165:24. Defendant creates the first set of 16 images in the same full-size resolution as the incoming video file. *Id*. Defendant testified that these full-resolution .jpgs reside on Defendant's storage system but are never viewable by users. *Id*. In earlier versions of Defendant's business model, when Defendant did not display video files in Flash streaming from its website, Defendant planned to present one of these high-resolution screencap images to depict what appeared in the corresponding video file. *Id*. at 166:8-17.

Defendant also creates a second set of 16 images in reduced resolution, approximately 120 by 90 pixels[1]. These "screencap" images are viewable by clicking on the screencaps link from the video detail page. They are described in Dr. Dunning's Opposition Declaration at pg 3:9-11. In Defendant's pre-website based business model, these 16 low-resolution screencaps were to be displayed to give a user an understanding of what appeared on the video file before it was downloaded. When Defendant introduced streaming Flash presentation of video files through its website, it continued to display the 16 lower-resolution (120 x 90) screencaps, even though they served no function. Defendant acknowledges that the creation of the screencaps is legacy

-8-

programming the usefulness of which was greatly diminished once users could immediately view the streaming Flash versions of video file through www.veoh.com. Papa Depo. 157:20-159:19.

Finally, Defendant selects the most interesting screencap and generates a much smaller version called a "thumbnail". Dunning Depo. 133:4-14. Defendant displays the thumbnail along with the name of the video file in search results. *Id*. The thumbnail is approximately 96 x 72 pixels. Ruoff Reply Decl. at ¶2. Only this single small image can properly be referred to as a "thumbnail" because it is a version that is exactly the same file format as the larger "screencap" except it is smaller in size. For the purposes of this Summary Judgment Motion, Plaintiff does not seek to hold Defendant liable for the generation of the single small "thumbnail".

Plaintiff *does* allege that the set of 16 full-resolution screencaps which are created but not displayed, and the set of 16 lower-resolution screencaps which are created *and* displayed but serve no functional purpose, represent direct acts of infringement which are not subject to a fair use defense. To the extent Defendant seeks to apply its fair use defense to the thirty-two screencaps it created rather than the one "thumbnail" generated and used for indexing purposes, the fair use defense surely fails.[2]

In order to be eligible for a fair use defense under 17 U.S.C. §107, the use of the work must be "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. §107. Defendant's creation of screencaps from Plaintiff's video works was not for any of those purposes. Moreover, applying the fair use factors to Defendant's creation of screencaps is not identical to applying the fair use

---

[1] Joe Papa testified that he believed these images were approximately 90 x 60 pixels but was unsure. Papa Deposition 155:159:24 – 160:4. Examination of www.veoh.com shows that the resolution was actually 120x90 pixels.

2 Plaintiff does not concede that the thumbnail is entitled to a fair use defense.

factors to "thumbnails" in *Perfect 10 v. Amazon* or *Kelly v. Arriba Soft* and does not produce the same result. *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)

In *Perfect 10 v. Amazon* and *Kelly v. Arriba Soft*, the court specifically found fair use for *Internet search engines* not for *websites* generally. The generation of thumbnails by Internet search engines is a transformative use in that the newly generated thumbnails serve to assist people in locating information on the Internet. *Perfect 10 v. Amazon* and *Kelly v. Arriba Soft* do not apply here because Defendant is not an Internet search engine and the purpose of the screencaps it creates is different from the purpose of the thumbnails generated by Google (in *Perfect 10 v. Amazon*) and *Arriba Soft*. In the matter before the Court, Defendant creates the new screencaps in .jpg format from video files maintained on its servers for its own commercial purposes; it does not generate thumbnails from already existing images residing on third party websites.

Thus, the purpose and character of the use does not weigh in favor of Defendant. Defendant's entirely commercial use of the screencaps it creates solely benefit Defendant and its audience. They do not help people to locate information on the Internet. Moreover, the newly created screencaps do not even assist individuals to locate video files on Defendant's system. By the time a person reaches the video details page where the screencaps are displayed, the Flash file streaming version of the video file is already playing on the users' computer screen.

As Defendant acknowledges, the works are creative in nature and thus are "closer to the core of intended copyright protection than are more fact-based works. *Perfect 10 v. Amazon*, 487 F.3d at 723 (citing *Kelly v. Arriba Soft).* Thus this factor weighs in favor of Io Group.

Defendant's analysis of the amount and substantiality of the portion used is fundamentally flawed. Defendant fails to evaluate, how much of the work is necessary to achieve the purported purpose of the new works. Defendant creates thirty-two new .jpg files. Sixteen of these are not even available for users to view and thus those files are completely unnecessary. Moreover, if the purpose is to generate a thumbnail of one of the screen captures to display with search results, than Defendant only needs to create one screencap. The remaining fifteen screencaps serve no indexing purpose whatsoever and Defendant has set forth no other purpose for the creation of the screencaps. Thus the creation of two 16-image sets of screen captures (32 images total) goes well beyond what is required to serve the purported purpose of Defendant's use and this factor weights heavily in favor of Io Group.

The fourth factor, effect of use on the market, also weighs in favor of Io Group, Inc. In addition to selling DVDs, Defendant also sells access to still images as part of the material available to customers who subscribe to Io Group's website at www.titanmen.com. Ruoff Reply Dec. at ¶13. Defendant's display and distribution of this material without charge decreases the value those still images would otherwise add to a subscription. Defendant also fails to acknowledge the value normally associated with promotional activities. For example, the DVDs Io Group gives away to reviewers result in published reviews of the works, which are likely to generate increased sales of the works. *Id.* at ¶14. Plaintiff requires individuals wishing to view promotional trailers to confirm they are adults, supply a verified e-mail address, and agree to accept future promotional e-mails from Io Group before they are permitted to view the trailers, which are carefully edited to pique the viewer's interest. *Id.* at ¶15. Such verified e-mail addresses are extremely valuable since the viewer has already expressed interest in Io Group's product and unsolicited e-mail is unlawful. *Id.* On the other hand, Defendant's unlawful creation of screen

captures offers no benefit because users have no way of determining where to purchase the corresponding videos or images.

Defendant also fails to recognize that unlike heavily plot or character driven movies and television, even small portions of adult material have value. "Still images and short video clips are the stock-in-trade of Internet adult entertainment businesses." *Bret Michaels v. Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998)(finding use of small portions of adult work were not fair use); (Citing *Playboy Enterprises Inc. v. Webbworld, Inc.* 991 F.Supp. 543 (N.D. Tex. 1997) and *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503 (N.D. Ohio 1997). Defendant has a licensing agreement to distribute still images through cell phones and other mobile devices. Defendant's creation and display of screencaps could also have a negative impact on Io's ability to sell its content through these channels, especially since Defendant does not take measures to prevent the copying and downloading of the screencaps it creates and displays. *Id.* 16.

## VI. DEFENDANT IS VICARIOUSLY LIABLE FOR THE INFRINGING ACTIVITY OF ITS USERS.

The standards for vicarious infringement are identical to the standards set forth at 17 U.S.C. (C)(1)(B). *Perfect 10 v. CCBill, LLC*, 481 F.3d 751, 767 (9th Cir. 2007). Thus a defendant is liable for vicarious copyright infringement and is unqualified for a 17 U.S.C. 512§(c) affirmative defense if it 1) receives a financial benefit directly attributable to the infringing activity, in a case in which it has the right and ability to control such activity. 17 U.S.C. 512(c)(1)(B); *Shapiro Bernstein & Co., Inc. v. H.L. Green Company, Inc.,* 316 F.2d 304 (2nd Cir. 1963)("Shapiro"). Plaintiff has more fully briefed the application of these standards in its Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment, which Io Group incorporates herein in accordance with Federal Rules of Civil Procedure 10(c).

-12-

Unlike the situation in *Tur v. YouTube*, where the Court denied defendant's motion for summary judgment because there was insufficient evidence, here the parties have engaged in significant discovery and have fully briefed the issue to the court. *Tur v. YouTube, Inc.*, 2007 U.S. Dist. LEXIS 50254 at *10 (C.D. Cal. filed Aug. 14, 2006). The factual record clearly establishes that Defendant has the right and ability to control the infringing activity.

Before a user can submit a video file, he must first agree to Veoh's Terms of Use and the parties thereby enter a legally binding contract. See, *Hotmail Corp. v. Van$ Money Pie*, 1998 U.S. Dist. LEXIS 10729 *16 (N.D. Cal. 1998)(clickwrap creates binding contract); *Feldman v. Google, Inc.*, 2007 U.S. Dist. LEXIS 22996 at *15 (E.D. Pa. 2007)(clickwrap agreements are enforceable). Courts have consistently held that a contract that allows control over the infringing behavior creates the requisite control for a finding of vicarious liability. *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 306 (2d Cir. 1963); *Polygram Int'l Publishing v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1329 (D. Mass. 1994).

Defendant retains the right to police and monitor the system and to remove videos that violate its terms of use. Defendant freely exercises all of these rights, including its right to review and remove files that violate its terms of use. One of the most powerful examples of this right is Defendant's ability to reach into users' home computers and without cause, notice and or justification, remove files previously downloaded through its system. Veoh exercised this powerful example of control in June 2006 when it purged sexually explicit material from its network. Long after users had downloaded these files to their home computers, Defendant had the legal right and the technical ability to reach into their users' home computers and remove these files.

Defendant turns to *Perfect 10 v. Amazon* to support it argument that it cannot control infringing activity without image-recognition technology. Defendant once again is off mark.  In *Perfect 10 v. Amazon*, defendant's Internet search engine automatically culled images residing on third party websites and servers with whom it had no relationship. Here, Defendant has an ongoing contractual relationship with the submitting users and the content resides on Defendant's own servers, not on third party websites.

Defendant argues that its inability to discern acts of infringement distinguishes it from *Napster*. Defendant argues that Napster could police its index only after the music industry plaintiffs provided it with notice as to which songs were infringing. Here again, Defendant sings its familiar tune that it cannot be held liable for vicarious infringement unless it receives notice. But the tune plays flat. Defendant relies on the Ninth Circuit's Decision in *Napster* which narrowed the scope of a preliminary injunction order requiring the music industry to supply a list of song titles to Napster for the purposes of the injunction. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001). Finding itself a defendant again, Napster made the argument Defendant makes here in *Fonovisa, Inc. v. Napster, Inc.* The district court flatly rejected it. *Fonovisa, Inc. v. Napster, Inc.*, 2002 U.S. Dist. LEXIS 4270 at *28 (N.D. Cal. 2002). This burden shift in *A&M Records v. Napster* was affective only for the purposes of the preliminary injunction, where the court is given broad equitable discretion, but must take care to avoid prohibiting legitimate conduct prior to resolution at trial or summary judgment. *Id.* at *30. The modification of the injunction did not create a burden shift under the law. *Id*. In fact, "[t]his argument turns copyright law on its head and encourages the worst form of willful blindness." *Id*. at 31. Besides, Defendant admitted in deposition that that even if Io Group had supplied it with copies of its

works and a list of its titles Defendant would have taken no action to prevent its works from appearing on the veoh system. Papa Depo. 222:25-230:20.

Defendant's heavy reliance on *Perfect 10 v. Visa* and *Perfect 10 v. Amazon* is similarly misplaced. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 2007 U.S. App. LEXIS 15824 (9th Cir. 2007)("*Visa*"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007)("*Amazon*"). In those cases the Ninth Circuit held that Google and Visa did not have the right and ability to control infringing activity occurring on websites *they did not own, operate or control* because even if the defendants discontinued their participation (Google generating thumbnails and directing traffic to infringing websites and Visa supplying payment services for infringing websites) the infringing activity could continue.  *Visa* LEXIS 15824 at *34 (citing Amazon). That's just not the case here. The infringement occurs entirely on Defendant's servers and if Defendant turns off its servers, the infringement stops. Defendant has the exact authority and ability that Visa and Google lacked. The courts have been careful not to extend vicarious infringement when a defendant truly does not have control over the direct infringer or his infringing activities. The courts should be equally careful to hold a defendant accountable when it has control and should not give way to clever arguments that attempt to borrow the knowledge element from contributory infringement and insert it into a vicarious infringement analysis.

Even if the ability to identify infringing acts were required under the law, which it is not, Defendant's assertion that it cannot identify infringing video files is contradicted by the facts. Defendant clearly contemplates that at least some infringing videos are identifiable, yet it elects to avoid any proactive attempt to identify infringing videos and remove them from the system. Rather, Defendant relies on its misapplication of the DMCA, avoids detecting possible infringing

activity and only removes infringing files if it first receives a formal take down notice from the owner of a video file or his agent.

Defendant acknowledges that early plans called for an "eyes on" review of every video file it acquired, in order to cull out videos that violated Defendant's Terms of Use including its copyright policies. Shapiro Depo. 57:20-58:2. See Plaintiff's Motion for Summary Judgment at § VI(B)(vi). Thus, Defendant clearly contemplated reducing infringement by reviewing content even though it never implemented its policy. Moreover, Defendant's inclusion of the "appears to be copyrighted" choice on the flag function menu which formerly allowed users to bring potentially infringing videos to Defendant's attention (Papa Depo. 174:7-18) shows that Defendant contemplated that even people with no training could identify at least some potential acts of infringement. Finally, Defendant had a policy of removing "blatantly infringing" files when it discovered them, (Papa Depo. 99:10-100:18, 203:16-206:10, 231:17-233:5.) but declined to systematically review files in order to identify files that were "blatantly infringing". As discussed previously, Defendant also declined to obtain information from its uploading users that could help Defendant determine if the user was authorized to submit the material. Dunning Depo. 72:2-13.

Although prior to the filing of the complaint in this matter, Veoh had a mechanism that allowed users to easily flag potentially infringing video file's and thereby bring them to the attention of Defendant, shortly after the filing of this suit, Defendant changed its policy. Papa Depo. 174:7-18. Veoh removed the "appears to contain copyright material" selection from the flag feature and instead only allows formal DMCA take down notices which can only be submitted by the copyright owner or an authorized agent. Papa Depo 168:11-169:20. Defendant has refused to provide an explanation as to why it removed this function. Papa Depo. 174:7-178:6. However, it is clear that the change corresponds to Defendant's argument that it cannot be deemed to have

control of the infringing activity because it cannot detect infringing acts. If this or any other court were to accept Defendant's "ability to detect" argument, it would change the very essence of vicarious liability and the result will be that similarly situated website operators will take the same approach. That is, they will be motivated to avoid detecting infringing activities rather than being motivated to detect and remove acts of infringement. This is precisely why the right and ability to control has never meant the ability to detect infringing acts, but rather the right and ability to control the acts that result in infringement.

Plaintiff has also clearly established that Defendant receives a direct financial benefit from the infringing activity. See Plaintiff's Motion for Summary Judgment §VI(A); Plaintiff's Opposition at §IV(C).

With regard to financial benefit, Defendant has failed to present a cogent argument as to how it can overcome the Ninth Circuit's ruling in *Napster*, which is directly on point. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001). Defendant argues with no support that it cannot be deemed to have gained a direct financial benefit from the infringing activity, because only a small portion of the material on its website is infringing. That is not the law. Even if it were, Defendant's acknowledgement that it has received complaints in connection with less than seven percent of user submitted materials establishes that Defendant does benefit from quite a bit of infringing activity. Dunning's Opposition Decl. at ¶6. If Defendant has received complaints relating to seven percent of hundreds of thousands of videos, then it has received a direct financial benefit from a minimum of tens of thousands of infringing videos. Furthermore, the amount of actual infringement is obviously significantly higher since there are clearly many infringements that go unreported, either because: 1) they are not detected; 2) copyright holders cannot review massive amounts of videos published daily by Veoh, YouTube and a multitude of similar

-17-

websites; 3) copyright holders don't understand their legal rights; or 4) copyright holders do not

believe the DMCA is applicable and therefore refuse to submit DMCA notices. For example, in

it's recently filed declaratory action in the Southern District of California, Defendant alleges that

UMG Recordings has threatened Defendant with litigation based on alleged massive infringement

of its works, yet  UMG "has never delivered any notice or instruction to Veoh to take down

allegedly infringing material." *Veoh Networks, Inc. v. UMG Recordings, Inc, et al.,* No. 07-1568

(S.D.Cal. filed Aug. 9, 2007)(Complaint ¶¶4 and 63). In their proposed amicus brief NBC

Universal, Inc. and Viacom International, Inc. also allege massive infringement on

www.veoh.com. Proposed Brief of *Amici Curiae* 1:12-16 and n. 1.

Thus Plaintiff has established vicarious liability and Defendant has failed to establish its

eligibility for the safe harbor provisions of 512(c). Plaintiff believes that the facts relating to these

standards are not in dispute and that a determination on the issues of financial benefit and right

and ability to control can and should be made on summary judgment.

**VII.    DEFENDANT FAILS TO ADEQUATELY REBUT THAT IT HAD
CONSTRUCTIVE KNOWLEDGE OF THE INFRINGING ACTIVITY**

Not only were there red flags that should have given Defendant notice of infringing

activity, but there is evidence that Defendant engaged in willful blindness.

Defendant once again is dismissive of Plaintiff's reference to 18 U.S.C.§ 2257 and directs

the Court to an irrelevant subsection of the statute, upon which Plaintiff does not rely. While the

record keeping requirements to which Defendant refers may only apply to primary producers, 18

U.S.C. §2257 subsection (f)(4) applies to *anyone* who knowingly transfers sexually explicit

content, including Defendant and its users. 18 U.S.C. §2257(f)(4). The provision applies to both

professional and amateur sexually explicit material.  Defendant knew it was unlawful to transfer

sexually explicit content without a §2257 label, but nonetheless knowingly accepted, copied, and

-18-

distributed unlabeled sexually explicit material - perhaps to avoid being exposed to the identity of the producer of the works, or perhaps because requiring the label would virtually eliminate the large amount of unauthorized sexually explicit material being submitted.

Plaintiff acknowledges that this law was not designed to prevent copyright infringement, however, nonetheless it is relevant to this matter. Defendant's Director of Product Development testified that he sought out information on blogs and message boards regarding §2257 (Papa Depo at 191:14-193:16), and Defendant's paid advisor John Styn previously operated adult sites upon which he had properly attached §2257 labeling. Styn Depo at 43:25-44:15. Both men discussed §2257 with CEO Dmitry Shapiro. Papa Depo. at 195:19-196:3; Styn Depo at 45:6 to 46:22  As an entity intimately involved with the adult entertainment industry ( which Veoh was at the time), and having researched and discussed the issue, Defendant should have known that it is unheard of in the industry to transfer sexually explicit content without a proper §2257 label. Ruoff Reply Decl at ¶¶ 11 and 12. The fact that individuals submitted this material to www.veoh.com without a §2257 label was a clear red-flag signal that the license and transfer was not authorized by a legitimate copyright holder. Indeed based on this knowledge, it is clear that practically none of the adult material that appeared on www.veoh.com was legitimately provided, as virtually none of the sexually explicit files that were available through www.veoh.com contained the industry standard and federally required §2257 label. Ruoff Reply Decl. at ¶17. Also, the statute is evidence that control over this material is not only possible, but it is mandated by federal law, which goes to Defendant's right and ability to control. See Plaintiff's Opposition §IV(D).

Defendant has also demonstrated its willingness to willfully blind itself to facts suggesting infringement by removing the "appears to contain copyrighted material" selection from its flagging feature function as described above.

In response to other arguments raised by Defendant in its Opposition, Plaintiff points out that this is not a staple article of commerce case. Defendant did not create a staple article of commerce like a typewriter, recorder or camera, and put it into the stream of commerce without further direct involvement with purchasers. *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 426 (U.S. 1984). The system and website used for infringement stays in Defendant's control at all times. Whether or not Defendant's system is capable of non-infringing uses, substantial or not, is of no importance whatsoever. Similarly, for the purposes of this Summary Judgment Motion, Plaintiff has not advanced a contributory infringement theory based on inducement and thus *MGM v. Grokster* is inapplicable. Defendant materially contributed to the infringing activity for the reasons advanced in Plaintiff's Motion for Summary Judgment.

## VIII.   CONCLUSION

Plaintiff has established that Defendant has engaged in direct infringement. Alternatively, Defendant is vicariously or contributorily liable for the direct infringing acts of its users. Defendant's affirmative defense under 17 U.S.C. §512(c) fails as does its fair use defense. The Court should deny Defendant's Motion for Summary Judgment and Grant Plaintiff's Summary Judgment Motion of the issue of liability.

Dated: *August 21, 2007*

Respectfully Submitted,

*/s/ Gill Sperlein*

_____
GILL SPERLEIN
THE LAW OFFICE OF GILL SPERLEIN
Attorney for Plaintiff Io Group, Inc.

REPLY TO OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
C-06-03926 (HRL)