```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4

 5    _____
                                      )
 6    IO GROUP, INC., a California    )
      corporation,                    )
 7                                    )
                         Plaintiff,   )
 8         vs.                        )  Case No. C-06-03926 (HRL)
                                      )
 9    VEOH NETWORKS, INC., a          )
      California Corporation,         )
10                                    )
                         Defendants.  )
11    _____)

12

13

14                    DEPOSITION OF TED DUNNING

15                      SAN DIEGO, CALIFORNIA

16                         MARCH 16, 2007

17

18

19

20

21    REPORTED BY RITA BURGESS, CSR NO. 8374

22

23

24

25
```

Peterson Reporting, Video & Litigation Services    1

```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                          SAN JOSE DIVISION

 4

 5    _____
                                     )
 6    IO GROUP, INC., a California   )
      corporation,                   )
 7                                   )
                          Plaintiff, )
 8          vs.                      )  Case No. C-06-03926 (HRL)
                                     )
 9    VEOH NETWORKS, INC., a         )
      California Corporation,        )
10                                   )
                         Defendants. )
11    _____)

12

13

14                  DEPOSITION OF TED DUNNING,

15    taken by the Plaintiff, commencing at the hour of 9:00 a.m.

16    on Friday, March 16, 2007, at 530 "B" Street, Suite 350,

17    San Diego, California, before Rita Burgess, Certified

18    Shorthand Reporter, in and for the State of California.

19

20

21

22

23

24

25
```

```
 1     APPEARANCES:

 2         For the Plaintiff:

 3             THE LAW OFFICES OF GILL SPERLEIN
               BY:  GILL SPERLEIN
 4             584 Castro Street, Suite 849
               San Francisco, California  94114
 5

 6         For the Defendants:

 7             WINSTON & STRAWN, LLP
               BY:  JENNIFER A. GOLINVEZUX
 8             101 California Street
               San Francisco, California  94111-5894
 9
           Also Present:
10
               Keith Webb
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                MS. GOLINVEAUX:  Object to the form of the
 2    question.
 3    BY MR. SPERLEIN:
 4         Q.    Could you answer the question, please?
 5         A.    He manages several engineers.
 6         Q.    Okay.  The developers that you mentioned, this
 7    is -- is that the entire development team -- well, let me
 8    strike that.
 9                Could you describe what a developer does?
10         A.    He writes software.
11         Q.    Okay.  So the three people that you mentioned
12    before write software for Veoh?
13         A.    That's correct.
14         Q.    And do they report directly to you?
15         A.    Yes.
16         Q.    Veoh.  And how long have you been working for
17    Veoh?
18         A.    Since before it was a company so, you know, from
19    the first phase.
20         Q.    Okay.
21         A.    I don't remember the exact date.
22         Q.    Do you remember what year or month?
23         A.    It would be 2005, but I don't recall exactly
24    which month.
25         Q.    But you were there from the beginning, before the
```

```
 1   beginning?
 2        A.   Yes.
 3        Q.   Did you know Dimitry Shapiro prior to coming
 4   together for this project?
 5             MS. GOLINVEAUX:  Object to the form of the
 6   question.
 7   BY MR. SPERLEIN:
 8        Q.   You can answer.
 9        A.   No.
10        Q.   Did Mr. Shapiro contact you and ask you if you
11   would work with him on this project?
12        A.   Yes.
13        Q.   Are you familiar with Veoh's policies regarding
14   copyrighted material?
15        A.   Some of the policies.
16        Q.   And are you familiar with Veoh's policies
17   concerning sexually explicit material?
18        A.   Some of the policies.
19        Q.   Will you describe briefly in your own words what
20   Veoh Network does, what its mission statement is?
21             MS. GOLINVEAUX:  Object to the form of the
22   question; it's compound.
23   BY MR. SPERLEIN:
24        Q.   You can go ahead and answer.
25        A.   The mission statement?
```

1       Q.    Yes, sir.
2       A.    Our goal is to allow people to publish video on
3    the internet.
4       Q.    And how do you accomplish that?  How does Veoh
5    accomplish that goal?
6       A.    We write software that helps them download videos
7    that other people have published and software that manages
8    that video so that it can be presented in an efficient
9    fashion.
10      Q.    Okay.  And specifically, how does that operate?
11   Do you -- does Veoh operate a web site?
12      A.    Yes.
13      Q.    And what is your URL for that web site?
14      A.    The primary group domain for that is
15   www.veoh.com.
16      Q.    And Veoh uses computers in the -- in its efforts
17   to allow people to publish videos; is that correct?
18      A.    Yes, we use computers.
19      Q.    Okay.  Are there -- can your computer systems be
20   divided into several different systems?
21            Do you want me to clarify a little bit what
22   I'm --
23      A.    I would love you to.
24      Q.    Okay.  Veoh.com is a web site, and presumably is
25   run from some sort of server; is that correct?

```
 1          A.      That's correct.
 2          Q.      Do you have a separate network at Veoh that you
 3   use for -- within the office for the exchange of e-mails or
 4   accounting systems, things like that?
 5               MS. GOLINVEAUX:  Object to the form of the
 6   question.
 7               THE WITNESS:  There are many sub networks as is
 8   typical in any network environment.
 9   BY MR. SPERLEIN:
10          Q.      Would you tell me what you would consider the
11   primary three or four networks?
12          A.      Primary, in what sense?
13          Q.      Primary as in the most important to the company.
14          A.      The most important would of course be the
15   external internet.  Secondary would be the internal networks
16   at the co-location facilities.  That would definitely be the
17   top three or four.
18          Q.      Will you explain briefly what a co-location
19   facility is?
20               MS. GOLINVEAUX:  I'm sorry.  Could you repeat the
21   question?
22   BY MR. SPERLEIN:
23          Q.      Will you explain briefly what a co-location
24   facility is?
25          A.      It is a computer facility maintained by a company
```

```
 1   which rents out space and access to networking.
 2        Q.   And in that situation, does -- they just provide
 3   the computer space, but does Veoh control how that -- how
 4   those computer systems are programmed?
 5             MS. GOLINVEAUX:  Object to the form of the
 6   question.
 7             THE WITNESS:  A co-location facility provides
 8   space, and whoever rents the space controls whatever
 9   computers that they place in the space.
10   BY MR. SPERLEIN:
11        Q.   Okay.  I want to go through now what happens when
12   someone wants to publish a video on the Veoh system.
13             What is the first step that if I were an
14   individual and I had a video file that I wanted to publish,
15   what would I have to do to publish it through the Veoh
16   system?
17        A.   There are two primary mechanisms.  One is you can
18   upload smaller videos using a browser.  Larger videos require
19   the use of software that we have written in order to manage
20   the upload in the event of network errors and similar
21   corruptions.
22        Q.   Starting with the first type that you mentioned,
23   smaller videos, is there a size limitation on that?
24        A.   I don't know if there are precise size
25   limitations on that.
```

1     Q.    If I went to the web site -- let me back up just
2     a moment.
3           If I wanted to upload a smaller video file, would
4     I have to go to the Veoh.com web site?
5     A.    If you would like to upload a small video file,
6     you can go to the Veoh web site.
7     Q.    And what would other possibilities be for
8     uploading a small video file?
9     A.    If you already have our software, you can use our
10    software.
11    Q.    If I were using the web site would I first have
12    to register with Veoh.com?
13          MS. GOLINVEAUX:  Object to the form of the
14    question.
15          THE WITNESS:  I believe there's some registration
16    requirements.  I'm not sure of the details.
17    BY MR. SPERLEIN:
18    Q.    Do you know any of the procedure at all?
19    A.    I have not uploaded a video in many months.
20    Q.    Would the process of registration be something
21    that would be programmed by someone in your department?
22    A.    Any registration process would be programmed by
23    somebody.
24    Q.    Would it be someone from your developing --
25    development team?

```
 1   Media digital rights management has ever been hacked or -- if
 2   I use that terminology, will you understand what I'm asking?
 3   Has anyone ever been able to break that system and copy
 4   videos that were protected with it to your knowledge?
 5        A.    I know that at least one version of Windows Media
 6   audio has been hacked.  I don't know if other versions have
 7   been hacked, and I don't know if video has been hacked.
 8   Generally, I know it's a fairly secure system.
 9        Q.    If a publisher elects to have his video
10   protected, then Veoh attaches the Windows DRM protection; is
11   that correct?
12        A.    Yes.
13        Q.    And when that occurs, then, if other users
14   download that video to their system, they, in theory, are not
15   able to make a copy of that video file; is that correct?
16              No, it's not.  Let me rephrase the question.
17              There are limitations on how and when a video
18   file would be copied; is that correct?
19        A.    No.  It's generally incorrect as well.  Copying
20   itself is not constrained.  It's usually playing, which is
21   constrained.
22        Q.    A little bit later we're going to get in to some
23   questions about how Veoh has handled video files that contain
24   sexually explicit material, but for right now I just want to
25   ask you a couple of questions relating to that.
```

```
 1              Was there a time when Veoh allowed publishers to
 2      submit and publish video files that contain sexually explicit
 3      material?
 4          A.   There was a time.
 5          Q.   And was there a time when Veoh ceased permitting
 6      sexually explicit videos on its system?
 7          A.   There was also a time that we ceased to.
 8          Q.   At that time when Veoh elected to prohibit adult
 9      videos or sexually explicit videos from being on the Veoh
10      system, did Veoh use the function that we're talking about,
11      whereby they could go to a user's computer and have a video
12      file deleted and thereby erase existing adult video files
13      from users who had already downloaded it?
14          A.   I think so, because I think we got some
15      complaints about that happening, so I didn't -- I didn't
16      perform that take down, but I think I saw complaints about it
17      happening.
18          Q.   Would you know how Veoh would have identified the
19      adult material that they wanted to remove from the system?
20          A.   There's a database flag which indicates,
21      presumably indicates, whether or not something is explicit.
22          Q.   When you say a database tag, this is different
23      from --
24          A.   Flag.
25          Q.   Flag.  Okay.
```

1  an intermediate and a sexually explicit?
2      A.   The number of active levels has varied.  It's an
3  integer, so there's a very large number of potential levels.
4  Currently there are two levels and neither of them is
5  explicit, because we do not allow explicit material.
6      Q.   Okay.  So currently when a producer is going
7  through the data entry process, you said there are two levels
8  that they are allowed to choose from; is that correct?
9      A.   I believe so.
10     Q.   Do you know what those are?
11     A.   I think that they are suitable for all audiences,
12 or contains -- and I don't know what the language is, but
13 some material that would not be suitable for all audiences.
14     Q.   Contains nudity or --
15     A.   I don't know what the details are, but there are
16 presumably non-sexually explicit things that are not
17 appropriate for all audiences.  I don't know how to say that
18 well.  It's a difficult thing to say.
19     Q.   That's okay.  I think we got the idea.
20          If a user currently selects the second one that
21 you described, it may have material that's not suitable for
22 all ages, does Veoh then review the video clip to make sure
23 there's no explicit, sexually explicit material on it?
24     A.   No.
25     Q.   Does Veoh or somebody else, do they engage some

1  I, RITA BURGESS, Certified Shorthand Reporter for the State
2  of California do hereby state under penalty of perjury:
3
4
5  That the witness in the foregoing deposition was by me first
6  duly sworn to testify to the truth, the whole truth and
7  nothing but the truth in the foregoing cause; that the
8  deposition was taken by me in machine shorthand and that the
9  foregoing contains a true record of the testimony of the
10  witness.
11
12
13  Dated this ___31st___ day of ___March___, 2007, at
14  San Diego, California.
15                                            _____
                                              RITA BURGESS
16                                            C.S.R. No. 8374