```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5    _____
                                 )
 6    IO GROUP, INC., a          )
      California Corporation,    )
 7                               )
             Plaintiff,          )
 8                               )
      vs.                        )  CASE NO. C-06-3926(HRL)
 9                               )
      VEOH NETWORKS, INC., a     )
10    California Corporation,    )
                                 )
11           Defendant.          )
      _____)
12

13

14

15

16                   DEPOSITION OF JOHN STYN

17                    SAN DIEGO, CALIFORNIA

18                         MAY 31, 2007

19

20

21

22    REPORTED BY REGINA L. GARRISON, CSR NO. 12921

23

24

25
                                                             1
```

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5    _____
                                    )
 6    IO GROUP, INC., a             )
      California Corporation,       )
 7                                  )
              Plaintiff,            )
 8                                  )
      vs.                           )  CASE NO. C-06-3926(HRL)
 9                                  )
      VEOH NETWORKS, INC., a        )
10    California Corporation,       )
                                    )
11            Defendant.            )
      _____)
12

13

14

15

16          DEPOSITION OF JOHN STYN, taken on behalf of

17    the Plaintiff, at 530 B Street, Suite 350, San Diego,

18    California, on Thursday, May 31, 2007, at 9:57 a.m.,

19    before Regina L. Garrison, Certified Shorthand

20    Reporter, in and for the County of San Diego, State of

21    California.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2
           FOR THE PLAINTIFF:
 3
                THE LAW OFFICES OF GILL SPERLEIN
 4               BY GILL SPERLEIN
                69 Converse Street
 5              San Francisco, California 94103
                (415) 487-1211, Ext. 32
 6
           FOR THE DEFENDANT:
 7
                WINSTON & STRAWN LLP
 8               BY JENNIFER A. GOLINVEAUX
                101 California Street
 9              San Francisco, California 94111-5894
                (415) 591-1506
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          A.   No.
 2          Q.   Did you do it with personal conversations,
 3     either face-to-face or telephone?
 4          A.   Yes, and e-mail.
 5          Q.   And e-mail.
 6               And how about message boards?
 7          A.   Yes.
 8          Q.   What type of programs did you suggest that
 9     people develop?
10          A.   I would often just brainstorm, because it
11     could be anything.  I convinced someone to do a
12     painting show, how to oil paint.  Someone was going to
13     do a cooking show.  Whatever their interests were.
14          Q.   You just gave me two examples of programming
15     that you suggested, and then people actually --
16          A.   Created.
17          Q.   -- created --
18          A.   Sorry.
19          Q.   Let me clarify that one.  You said that
20     someone did do an oil painting show.  You said someone
21     was going to do a cooking show.  Do you know if they
22     actually did the cooking show?
23          A.   The person I was talking to did not.
24          Q.   Do you have any recollection of any people
25     who you recommended an idea to that then went forward
```

```
 1     and created your idea and submitted it to VEOH?
 2          A.   I believe that Yanks Cash, or yanks.com, did
 3     a -- I suggest they put interviews of their talent on
 4     VEOH.  And I believe they did that.
 5          Q.   Is yanks.com an adult site?
 6          A.   Yes.
 7          Q.   Let me remind you once more to kind of wait
 8     until I finish my question.  You know, it's a natural
 9     thing, especially for someone who enjoys communicating
10     with people, to kind of engage that way, so it's kind
11     of hard to break that habit.
12               Did you suggest to people the idea of talking
13     with older people in their neighborhood or something
14     like that and putting it on -- making a video from
15     that?  Do you have a recollection of that?
16          A.   I don't recall specifically.  Certainly
17     sounds like something I would say.
18          Q.   Do you have a recollection of making a
19     suggestion that people view just the face of someone
20     when they were having an orgasm and putting those
21     together as part of a video collection for publication
22     on VEOH?
23          A.   I do remember saying that.  I don't remember
24     when.  I still think it's a good idea.
25          Q.   You indicated that you -- your involvement
```

```
 1      where that statute, 18 USC 2257, played any role
 2      whatsoever?
 3           A.   Yes.
 4           Q.   What website is that?
 5           A.   I had a site called "pinkgasm.com" that had
 6      adult content on it.  But it was myself on it, so 2257
 7      was less relevant.  I didn't have too many records to
 8      keep.  And I have -- I think I've had -- posted other
 9      adult pictures or links where I linked to 2257, pages
10      of other companies.
11           Q.   On the website that you just described, did
12      you put a label on that website anywhere that indicated
13      where the records were kept?
14           A.   On Pinkgasm?
15           Q.   Yes.
16           A.   Yes.
17           Q.   And why did you do that?
18           A.   I was copying what people were doing.
19           Q.   Was it your understanding that that was a
20      requirement of the law?
21           A.   It was my understanding that that was the
22      safest route.
23           Q.   Let me assure you, most people do exactly the
24      same thing, get their legal advice by seeing what other
25      people are doing in the arena.
```

```
 1                    When you got involved with VEOH, when you
 2           talked about VEOH with Dmitry, were you aware of
 3           whether or not video clips containing sexual explicit
 4           material would be allowed on VEOH.com?
 5                A.   Yes.
 6                Q.   And at the time that you made that
 7           realization, did you think to yourself as to whether or
 8           not there may be issues regarding 2257?
 9                A.   My client that I work with is not US based,
10           so I don't have a good understanding.  But I do
11           remember thinking that it was -- it should be an issue.
12           And -- and, yeah, I remember thinking that that is
13           something that VEOH will have to address.
14                Q.   So after you had those thoughts, did you
15           bring that topic up with Dmitry?
16                A.   Yes.
17                Q.   And do you remember when you had that
18           conversation?
19                A.   Not specifically.  I know it was before there
20           was any 2257 prosecutions or actions.  It was still a
21           theoretical idea, and I remember just mentioning it as,
22           definitely, it was the "sky is falling" hot button of
23           the adult industry.
24                Q.   How did you know that there weren't any
25           prosecutions or actions?
```

```
 1          A.   I'm active on the adult message boards.
 2          Q.   Earlier, I asked if you had any conversations
 3     about 2257.  Did you actively read up on 2257 on the
 4     adult message boards?
 5          A.   No.
 6          Q.   But did you read to some degree?  I mean, you
 7     just said that you learned there were no legal
 8     prosecutions through adult message boards; is that
 9     accurate?
10          A.   Yes.
11               MS. GOLINVEAUX:  I'll object to the form.
12     It's compound.
13     BY MR. SPERLEIN:
14          Q.   Was the part accurate where you said you
15     learned about the lack of prosecutions through message
16     boards?
17          A.   Yes.  I tried to stay informed enough that
18     it -- what degrees is it an issue.
19          Q.   And then at some point, you had at least one
20     conversation with Dmitry about your concerns as far as
21     the applicability of 2257 to VEOH; is that accurate?
22          A.   Yes.
23          Q.   Did you have more than one conversation with
24     Dmitry?
25          A.   No.
```

1       Q.   And again, do you recall when the one
2    conversation you did have with Dmitry took place?
3       A.   No.
4       Q.   Do you recall whether it was prior to your
5    becoming a consultant for them?
6       A.   I don't think it was before that.  I don't
7    think I was a consultant at the time.
8       Q.   And what did Dmitry tell you at that point
9    about -- what was his reaction to you bringing this
10   concern to his attention?
11      A.   He said he had -- I don't know his exact
12   words, but he had talked to his lawyers about it.
13      Q.   And did he indicate that he didn't think it
14   was a problem after having talked to his attorneys?
15      A.   He seemed to think it was -- whatever he was
16   doing, he was comfortable with that act.  And with my
17   limited understanding of 2257, I wasn't going to --
18   that was -- the conversation was over.  I just wanted
19   to make sure that he knew about it.
20      Q.   You brought it to his attention --
21      A.   He said he knew.
22      Q.   It's okay.
23           Do you recall if he said anything -- do you
24   recall any specific words?  Like, did he say it was
25   under control or just what you've told me:  "I talked

47

```
 1    to my lawyers.  It's okay."  Any more specific words?
 2              MS. GOLINVEAUX:  If you recall.  Don't
 3    speculate about what Dmitry said.
 4              THE WITNESS:  I don't remember specific
 5    words.
 6    BY MR. SPERLEIN:
 7         Q.   But the gist of the conversation was that he
 8    had explored the issue and was aware of it?
 9         A.   That he was aware of it and that his legal
10    team was aware of it.  I didn't get the sense there was
11    resolution or that it was -- it was -- the people that
12    needed to know knew, and they were doing whatever they
13    were doing about it.
14         Q.   Do you know if VEOH, at some point, changed
15    its policy regarding allowing sexually explicit
16    material to appear on VEOH.com?
17         A.   Yes.
18         Q.   And how did you become aware of that?
19         A.   I believe Dmitry told me that the board made
20    the recommendation, and it was going to happen.
21         Q.   And do you recall when Dmitry had that
22    conversation with you?
23         A.   No.  Prior to the change.
24         Q.   Did Dmitry tell you the basis for the change?
25         A.   Just that the -- the board, you know, wanted
```

```
1    STATE OF CALIFORNIA
2    COUNTY OF SAN DIEGO
3
4         I, REGINA L. GARRISON, a Certified Shorthand
5    Reporter for the State of California, CSR No. 12921, do
6    hereby certify:  That the proceedings were taken before
7    me at the time and place herein named; that the said
8    proceedings were reported by me in shorthand and
9    transcribed through computer-aided transcription, under
10   my direction; and that the foregoing is a true record
11   of the testimony elicited at proceedings had at said
12   proceedings to the best of my ability.
13        I do further certify that I am a disinterested
14   person and am in no way interested in the outcome of
15   this action or connected with or related to any of the
16   parties in this action or to their respective counsel.
17        In witness whereof, I have hereunto set my hand
18   this _21st_ day of _____June_____, 2007.
19
20
21           _____Regina Garrison_____
22              REGINA L. GARRISON, CSR NO. 12921
23
24
25
```