1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11  IO GROUP, INC.,                              No. C06-03926 HRL

12              Plaintiff,

13       v.                                      **ORDER ON PARTIES' CROSS-
                                                 MOTIONS FOR SUMMARY
                                                 JUDGMENT**

14  VEOH NETWORKS, INC.,

15              Defendant.                       **[Re: Docket Nos. 77 and 78]**

16  _____/

17          This is a civil action for alleged copyright infringement.  Presently before this court are

18  the parties' cross-motions for summary judgment.[1]  Plaintiff Io Group, Inc. moves for summary

19  judgment on liability.  Defendant Veoh Networks, Inc. seeks judgment that it qualifies for "safe

20  harbor" under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.  Following

21  the motion hearing, the parties were permitted to, and did, file supplemental briefs.  Upon

22  consideration of the moving and responding papers, as well as the arguments of counsel, this

23  court now issues its order, focusing first (for reasons to be explained) on defendant's safe

24  harbor defense.

25

26

27

28

---

[1]        Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have
expressly consented that all proceedings in this matter may be heard and finally adjudicated
by the undersigned.

United States District Court
For the Northern District of California

# I. BACKGROUND

For purposes of resolving the instant motion, and except as otherwise indicated, the following facts are not materially disputed.[2]

## A. **The Parties**

Plaintiff Io Group, Inc. ("Io"), doing business as Titan Media, produces, markets and distributes a variety of adult entertainment products, including audiovisual works. It holds and owns a number of registered copyrights for its films.

Defendant Veoh Networks, Inc. ("Veoh") is a self-described "Internet Television Network," which provides software and a website (veoh.com) that enables the sharing of user-provided video content over the Internet – from job interviews, to family gatherings, to films by aspiring filmmakers. Since its website launch in February 2006, users have uploaded and shared hundreds of thousands of videos on Veoh. Veoh says that it has received notices of alleged copyright infringement with respect to less than seven percent of those videos. (Dunning Decl. in Opp. to Plaintiff's MSJ, ¶ 6).

In addition to user-submitted content, users may also access videos from Veoh's content partners, including Turner, CBS, Us Magazine, Road and Track Magazine, Car and Driver Magazine, and United Talent Agency. (See Scherb Decl. ¶2, Ex. A (Shapiro Depo. at 33:17-19, 37:11-16)). Veoh itself creates and uploads promotional videos to its system. And, in some instances, Veoh's content partners have given video files to Veoh, in which case Veoh's employees upload those files on their behalf. (Sperlein Decl. ISO Plaintiff's MSJ, ¶¶ 2, 4, Ex. A (Papa Depo. at 29:19-30:11); Ex. F (Shapiro Depo. at 36:19-23)). There is no allegation that Veoh employees have submitted and uploaded infringing content to veoh.com; and, the only content in question here is material that was submitted to Veoh by its users.

Once video files are uploaded to Veoh's system, Veoh's employees can and do select videos to be featured on the "Featured Videos" portion of Veoh's website. (See Sperlein Decl. ISO Plaintiff's MSJ, ¶ 3, Ex. E (Dunning Depo. at 194:17-21)).

---

[2]     Unless otherwise indicated, all record citations are to the parties' submissions filed in connection with defendant's motion for summary judgment.

Veoh now offers advertising opportunities and participates in certain Google-sponsored ad programs. (See Papa Decl., ¶ 3; see also Scherb Decl., ¶ 2, Ex. C (Papa Depo. (Vol. 1) at 118:17-19)). Additionally, Veoh has implemented a "premium content" program in which users who upload content may choose to charge for viewing the content, and Veoh receives a portion of the proceeds. (See Papa Decl., ¶ 4). However, during the time period encompassed by the complaint, Veoh did not charge users for viewing videos, or impose any membership or subscription fee. Also, there was no advertising on Veoh. (See Papa Decl., ¶ 2).

**B.      Alleged Infringement**

Between June 1, 2006 and June 22, 2006, Io says it discovered that clips from ten of its copyrighted films had been uploaded and viewed on veoh.com without its authorization. Several of the allegedly infringing video files are less than one minute long, and some were less than six seconds in length. (See Scherb Decl. ISO Opp. to Plaintiff's MSJ, ¶ 2, Ex. D (Plaintiff's responses to RFA Nos. 65-78)). A couple of files were longer than 20 minutes; and, at oral argument, plaintiff's counsel clarified that, in some instances, there was a series of six-second clips for a particular work (or, on average, about 20 minutes of clips per movie). He further represented that the longest clip is about 40 minutes long. However, none of the clips contained copyright notices, save for one work that displayed the Titan Media trademark several minutes into the clip. (Ruoff Decl. ISO Plaintiff's MSJ ¶15, Ex. F at p. 2).

When it discovered the presence of the allegedly infringing files, Io did not tell Veoh that it believed its copyrights were being violated. Veoh's first notice of the claimed infringement was Io's filing of the instant lawsuit on June 23, 2006. Coincidentally, Veoh had already independently decided that it would no longer permit adult content on veoh.com. By the time this suit was filed, access to all adult content on Veoh's website – including any content allegedly infringing Io's copyrights – had been terminated.

**C.      Veoh's Policies**

Veoh has established Terms of Use and Acceptable Use policies, which are posted on its website. Before users can upload video content to veoh.com, they must register with Veoh and

3

agree to abide by those policies.  During the relevant period of time encompassed by the

complaint, Veoh's Terms of Use required users to agree that:

> any User Material that you make available to the Veoh Service may be made freely available by Veoh through the Veoh Service, including without limitation for download by other users, and that this permission is made and granted in consideration of your use of the Veoh Service and is nonexclusive, perpetual, royalty-free, irrevocable and transferable.

(Papa Decl. ¶5, Ex. A).  The Terms of Use further advised:

> Veoh shall have no obligation to monitor any User Material.  However, Veoh and its agents shall have and do reserve the right to monitor any User Material from time to time for any lawful purpose.  Veoh may, without notice to you, remove or block content of any User Material from the Veoh Service, including disabling access to such User material that you have downloaded through the Veoh Service.  Veoh reserves the right to terminate your use of the Veoh Service if we determine that you have violated these Terms or the Acceptable Use Policy.

> Veoh requires all users of the Veoh Service to comply with copyright and other intellectual property laws.  Accordingly, you may not publish or make available any User Material that constitutes an infringement of third party intellectual property rights, including rights granted by U.S. copyright law, or that otherwise violates the Acceptable Use Policy.  You represent and warrant that you have all rights necessary to publish and distribute any User Material made available by you through the Veoh Service and that such User Material conforms to the Acceptable Use Policy.  You agree to indemnify and hold Veoh harmless from and against any liability, claims, losses, demands or damages arising out of or relating to your violation of these Terms or the Acceptable Use Policy.

> As explained above, Veoh does not permit copyright infringing activities on the Veoh Service and reserves the right to terminate access to the Veoh Service, and remove all User Materials posted, by any persons who are found to be repeat infringers (i.e., persons found to have uploaded copyright infringing User Material on more than two occasions).

(Papa Decl. ¶5, Ex. A).

Similarly, Veoh's Acceptable Use Policy advised users that:

> Veoh respects the rights of copyright owners to control commercial uses of their material, and expects our users to do the same.  You are responsible for complying with all federal and state laws applicable to the content available through the Veoh Services, including copyright laws.

> Accordingly, Veoh reserves the right to terminate the service account of anyone who it learns is using the Veoh Services in violation of copyright law.

(Papa Decl. ¶ 6, Ex. G).

Veoh also reminds users of its policies during the upload process.  When a user now

begins to upload a video, the system displays a message stating, "Do not upload copyrighted,

pornographic, obscene, violent, or any other videos that violate Veoh Publisher Terms and Conditions." (See Papa Decl. ¶ 8, Ex. I). Veoh says that it gave a substantially similar warning (presumably without the reference to pornographic material) to users during the relevant period encompassed by the complaint. (Id.).

Veoh has a designated Copyright Agent to receive notification of claimed violations and provides information about how and where to send notices of claimed infringement. (See Papa Decl., Exs. A, C, D, F and G). When Veoh receives notice that a user has uploaded infringing content after a first warning, then the user's account is terminated, all content provided by that user is disabled (unless the content was also published by another non-terminated user and is not the subject of a DMCA notice), and the user's email address is blocked so that a new account cannot be opened with that same address. (See Dunning Decl. ¶¶ 10-12; Scherb Decl. ¶ 2, Ex. C (Papa Depo., Vol.1, 98:3-7)). Veoh also has the ability to disable access to such material on its users' hard drives (assuming their computers are still connected to the Internet). Additionally, Veoh has adopted means for generating a digital "fingerprint" for each video file, which enables Veoh to terminate access to any other identical files and prevent additional identical files from ever being uploaded by any user. (Dunning Decl. ¶ 13).

**D.      Uploading Video Content on Veoh.com**

**1.      User-Submitted Videos**

As noted above, users must register with Veoh before they can upload video content to the website. In the registration process, users are required to provide a user name, an email address and a password. (See Dunning Decl., ¶ 4, Ex. A). They may, but are not required to, give their actual names. (See Scherb Decl. ¶ 2, Ex. B (Dunning Depo., 72:2-13)).

When users upload a video file to Veoh's system, they are asked to (a) provide a title and description; (b) enter key words or "tags"; (c) select up to four categories which best describe the video; and (d) select a content rating. (See Dunning Decl. ¶5, Exs. B and C; Ruoff Decl. ISO Plaintiff's MSJ ¶¶ 24-25, Ex. G). Users then select the video file (from wherever it resides on their computers) and upload it to the Veoh system. (See Scherb Decl., ¶2, Ex,. B

(Dunning Depo. at 132:7-11); Sperlein Decl. ISO Plaintiff's MSJ, ¶ 3, Ex. E (Dunning Depo. at 40:4-11)).

When the Veoh system receives a video submission, its computers first confirm that the submitted file is, in fact, a video file with a compatible "codec" (or compression format). (Sperlein Decl. ISO Plaintiff's MSJ, ¶ 2, Ex. A (Papa Depo. at 12:10-17:21)).[3] If the submission is a compatible video file, the Veoh system automatically extracts certain metadata from it (e.g., file format and length), assigns a unique video identification number to it, indexes the user-entered information and stores the information in a database on Veoh's servers. (See Scherb Decl., ¶2, Ex. B (Dunning Depo. at 132:7-133:3; Sperlein Decl. ISO Plaintiff's MSJ, ¶ 3, Ex. E (Dunning Depo. at 20:14-21:10)). Users can then conduct searches (e.g., by title, description, genre, etc.) of the database in order to find videos they wish to view. (Sperlein Decl. ISO Plaintiff's MSJ, ¶ 3, Ex. E (Dunning Depo. at 22:18-23:18; 28:1-29:1)). The database also automatically indexes video files into a series of lists, such as "Most Recent;" "Top Rated," "Most Popular," "Most Discussed" and "Top Favorite." (Sperlein Decl. ISO Plaintiff's MSJ, ¶ 2, Ex. A (Papa Depo. 39:10-40:9); Ruoff Decl. ISO Plaintiff's MSJ, ¶ 26).

### 2. "Flash" Files[4] and Screencaps[5]

As part of the uploading process, when Veoh receives a video file from a user, its system also automatically (a) converts each user-submitted video into Flash format; and (b) extracts several still images from each file.

---

[3] Incompatible files are, in effect, rejected. Such files are marked incompatible by Veoh's system and maintained for only a limited time. (Sperlein Decl., ISO Plaintiff's MSJ, ¶ 2, Ex. A (Papa Depo. at 12:10-24, 124:3-13)).

[4] Neither side explained precisely what a Flash file is, but this court understands it to be the name of a file format used to transmit videos over the Internet. See http://en.wikipedia.org/wiki/Flash_format.

[5] Defendant refers to the still-image screen captures as thumbnails. Plaintiff disputes whether all of the still images are true thumbnails, or reduced-size screenshots. This court does not find the discrepancy to be material. For present purposes, it will simply refer to these images as still images or screencaps.

### a.     Flash Files

Users submit video files in a variety of formats.  A "bit-for-bit" equivalent of the user-submitted video resides on Veoh's servers indefinitely in its original format.  (Sperlein Decl. ISO Plaintiff's MSJ, ¶3,  Ex. E (Dunning Depo. at 42:1-11)).  If users download Veoh's "Veoh Client" software, then they may download a copy of the video file in its original format to their computer hard drive.  (Id. at 40:1-21).

Veoh says that the vast majority of Internet users now have software that can play videos in "Flash" format.  So, as part of the uploading process, when the Veoh system receives a user-submitted video, its computers use third-party software to automatically convert each user-submitted video into Flash format.  (See Scherb Decl., ¶ 2, Ex. C (Papa Depo., Vol. 1 at 124:3-125:12); Sperlein Decl. ISO Plaintiff's MSJ, ¶3, Ex. E (Dunning Depo. at 47:3-9)).  Veoh selects certain parameters (e.g., frame rate, bit rate and frame size) which it says are default values within a range of parameters set by the third party software used in the process.  (Scherb Decl. ¶2, Ex. E (Veoh's Supplemental Responses to Interrogatory No. 6); Dunning Decl. in Opp. to Plaintiff's MSJ, ¶¶ 3-4).  The creation of the Flash files is entirely automated.

Before October 2006, and during the period of time encompassed by the complaint, videos that were shorter than ten minutes in length would be converted into Flash format.  For videos longer than ten minutes, the Veoh system would create a three-minute Flash preview clip.  (Sperlein Decl. ISO Plaintiff's MSJ, ¶2,  Ex. A (Papa Depo. at 129:10-130:18)).  Since October 2006, Veoh's system has converted all video files to Flash format without limitation as to length.  (Id.).

### b.     Screencaps

During the upload process, Veoh's system also automatically extracts several still images from each file – i.e., 16 full resolution screen captures, or "screencaps," in the same resolution as the incoming video and 16 lower resolution screencaps.  (See Scherb Decl. ¶2, Ex. B (Dunning Depo. at 133:6-14), Ex. D (Papa Depo. at 155:22-24, 159:25-161:18; 166:8-17)).  Screencaps in the original video resolution reside on the Veoh system but are not available for users to view or access.  (See id., Ex. D (Papa Depo. at 160:21-161:18).

Of the 16 lower-resolution images, one is used to represent the video in a search result. (Scherb Decl., ¶2, Ex. D (Papa Depo. at 166:8-17); Sperlein Decl. ISO Plaintiff's MSJ ¶3, Ex. E (Dunning Depo. at 133:4-14)).  Thus, when users search for videos on Veoh, the search results are shown in a grid, with each result represented by a still image extracted from a video. (Dunning Decl. in Opp. Plaintiff's MSJ, ¶ 5; Ruoff Decl. ISO Plaintiff's MSJ ¶ 26, Ex. H). When users click on a specific image on the search results page, they see a "Video Details Page" containing the video and a link called "Video Screencaps."  (Dunning Decl. in Opp. Plaintiff's MSJ, ¶ 5; see also Ruoff Decl. ISO Plaintiff's MSJ ¶ 26, Ex. E).  By clicking on the "Video Screencaps" link, users can see the 16 lower-resolution screenshots from the video. (Dunning Decl. in Opp. to Plaintiff's MSJ, ¶ 5; Ruoff Decl. ISO Plaintiff's MSJ, ¶13, Ex. D). Veoh says that the screencaps help users understand what a video likely contains before they download it.  However, it acknowledges that the value of the screencaps was diminished by the advent of Flash previews on Veoh.  (Sperlein Decl. ISO Plaintiff's MSJ, ¶2, Ex. A (Papa Depo. at 157:20-159:19)).  The creation of the screencaps is entirely automated.

### 3. Post-Publication "Spot Check"

Veoh employees occasionally "spot check" videos after publication for compliance with Veoh's policies and to ensure accuracy in the description and categorization of the content. (See Scherb Decl. ¶2, Ex. B (Dunning Depo. at 136:10-138:22)).  For example, Veoh has, on occasion, edited the video description field.  And, when adult content was still permitted on veoh.com, Veoh employees sometimes reviewed files to ensure proper ratings on any file containing sexually explicit material and reviewed sexually explicit files to determine whether they should be identified as "gay" or "straight" and added tags as needed.  (See Sperlein Decl. ISO Plaintiff's MSJ ¶2, Ex. A (Papa Depo. at 203:4-15, 244:6-245:17); Sperlein Supplemental Decl. ISO Plaintiff's MSJ, Ex. A (Papa Depo. at 110:10-111:16)).  Additionally, if a "spot check" reveals an instance of blatant copyright infringement, Veoh disables access to such material.  For example, Veoh has, in at least one instance, removed videos of a movie known to have been released in only theaters.  (Sperlein Decl. ISO Plaintiff's MSJ ¶2, Ex. A (Papa Depo. at 100:24-101:6)).

Veoh's policies previously stated that all video content was approved by editors; and, the record indicates that Veoh's employees may have watched the first ten videos submitted to veoh.com by users. However, Veoh claims that the policy was never implemented because it was not feasible to do so given the number of user submissions that have since been made. (See Scherb Decl., ¶2, Ex. A (Shapiro Depo. at 10:17-17:10; Ex. B (Dunning Depo. at 129:24-130:15, 138:4-22); Ex. C (Papa Depo., Vol. 1 at 35:6-24)).

Io now seeks summary judgment on liability for direct, contributory and vicarious copyright infringement. Veoh contends that it qualifies for "safe harbor" under DMCA, Section 512(c).

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See FED. R. CIV. P. 56(e)(2); Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See FED. R. CIV. P. 56(e)(2). A genuine issue of fact is one that could reasonably be resolved in favor of either

1   party.  A dispute is "material" only if it could affect the outcome of the suit under the governing

2   law.  Anderson, 477 U.S. at 248.

3       "When the nonmoving party has the burden of proof at trial, the moving party need only

4   point out 'that there is an absence of evidence to support the nonmoving party's case.'"

5   Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at

6   325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere

7   allegations or denials, but must present evidence sufficient to demonstrate that there is a

8   genuine issue for trial.  Id.

9                           **III.  DISCUSSION**

10      Ordinarily, issues concerning liability would be examined before determining whether

11  any safe harbor applies.  However, while the DMCA safe harbors do not immunize online

12  service providers from liability, they provide copyright owners with only limited injunctive

13  relief.  Under the circumstances presented here, the court finds it appropriate and more efficient

14  to first address Veoh's motion as to the applicability of the safe harbor under DMCA section

15  512(c).  See Corbis Corp. v. Amazon.com, Inc., 351 F. Supp.2d 1090, 1098 (W.D. Wa. 2004)

16  ("[E]ven if [plaintiff's] copyright infringement claims can bare [sic] fruit, [defendant's] liability

17  protection ensures that the claims will wither on the vine"); see also CoStar Group, Inc. v.

18  Loopnet, Inc., 164 F. Supp.2d 688, 699 (D. Md. 2001) ("On summary judgment, it is often

19  appropriate for a court to decide issues out of the traditional order because a dispute of fact is

20  only material if it can affect the outcome of proceeding.").

21      As discussed more fully below, even assuming that plaintiff's infringement claims pass

22  summary judgment muster, this court concludes that Veoh is eligible for safe harbor protection

23  from damages and, further, that the limited injunctive relief provided under the DMCA is moot.

24  **A.      The DMCA**

25      Enacted in 1998, the DMCA was "designed to facilitate the robust development and

26  world-wide expansion of electronic commerce, communications, research, development, and

27  education in the digital age."  S. Rep. No. 105-190, at 1-2 (1998).  "Difficult and controversial

28  questions of copyright liability in the online world prompted Congress to enact Title II of the

1  DMCA, the Online Copyright Infringement Liability Limitation Act (OCILLA)." Ellison v.

2  Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004). In order to strike a balance between their

3  respective interests, OCILLA seeks to "preserve[] strong incentives for service providers and

4  copyright owners to cooperate to detect and deal with copyright infringements that take place in

5  the digital networked environment." S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at

6  49 (1998). "Congress hoped to provide 'greater certainty to service providers concerning their

7  legal exposure for infringements that may occur in the course of their activities.'" Ellison, 357

8  F.3d at 1076 (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(II), at 49-50 (1998)).

9         OCILLA enables qualifying service providers to limit their liability for claimed

10  copyright infringement under four "safe harbors." See 17 U.S.C. § 512(a)-(d). "These safe

11  harbors provide protection from liability for: (1) transitory digital network communications; (2)

12  system caching; (3) information residing on systems or networks at the direction of users; and

13  (4) information location tools." Ellison, 357 F.3d at 1076-77. "These safe harbors limit

14  liability but 'do not affect the question of ultimate liability under the various doctrines of

15  direct, vicarious, and contributory liability.'" Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102,

16  1109 (9th Cir. 2007) (quoting Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F. Supp.2d 1146,

17  1174 (C.D. Cal. 2002)). That is, they protect qualifying service providers from liability for all

18  monetary relief for direct, vicarious and contributory infringement, leaving copyright owners

19  with limited injunctive relief. Corbis Corp., 351 F. Supp.2d at 1098-99. Further, the safe

20  harbor provisions are not exclusive of any other defense an accused infringer might have.

21  CCBill LLC, 488 F.3d at 1109 ("'[N]othing in the language of § 512 indicates that the

22  limitation on liability described therein is exclusive.'") (quoting CoStar Group, Inc. v. LoopNet,

23  Inc., 373 F.3d 544, 552 (4th Cir. 2004)). "Far short of adopting enhanced or wholly new

24  standards to evaluate claims of copyright infringement against online service providers,

25  Congress provided that OCILLA's 'limitations of liability apply if the provider is found to be

26  liable *under existing principles of law*.'" Ellison, 357 F.3d at 1077 (quoting S. Rep. 105-190,

27  19 (1998)).

28

With these principles in mind, the court now considers whether Veoh is entitled to safe harbor with respect to the alleged infringing activity here.

## B.    DMCA Threshold Requirements

To avail itself of any of the four safe harbors, Veoh must first satisfy certain threshold requirements.  That is, it must be a "service provider" (see 17 U.S.C. § 512(k)) and it must adopt, reasonably implement and inform subscribers of a policy providing that it may, in appropriate circumstances, terminate the accounts of repeat infringers.  See 17 U.S.C. § 512(i)(1)(A); Ellison, 357 F.3d at 1080.  Further, the service provider is obliged to accommodate, and must not interfere with, "standard technical measures"[6] used by copyright owners to identify or protect copyrighted works."  See 17 U.S.C. § 512(i)(1)(B); Ellison, 357 F.3d at 1080.

Io does not dispute that Veoh is a "service provider" as defined by DMCA Section 512(k)(1)(B).[7]  Nor does it dispute that Veoh (a) has adopted and informed account holders of its repeat infringer policy and (b) accommodates, and does not interfere with, "standard technical measures" used to protect copyrighted works.  However, Io contends that there is a triable issue whether Veoh implements its repeat infringer policy in a reasonable manner.

---

[6]     "Standard technical measures" are defined as "technical measures that are used by copyright owners to identify or protect copyrighted works" and which:

> (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;
>
> (B) are available to any person on reasonable and nondiscriminatory terms; and
>
> (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

17 U.S.C.§ 512(i)(2)(A)-(C).

[7]     DMCA Section 512 contains two definitions of the term "service provider." See 17 U.S.C. § 512(k).  Because Veoh's motion is based only on its claimed eligibility for safe harbor under Section 512(c), the broader definition under Section 512(k)(1)(B) applies. Under that provision, "the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)."  17 U.S.C. § 512(k)(1)(B).

12

The DMCA does not say what "reasonably implemented" means. Nonetheless, the Ninth Circuit has held that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." CCBill LLC, 488 F.3d at 1109. "The statute permits service providers to implement a variety of procedures, but an implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright." Id.

As discussed above, Veoh's evidence indicates that it has a working notification system and a procedure for dealing with copyright infringement notices:

- Since at least April 2006, and at all times encompassed by the complaint, Veoh's policies have identified its designated Copyright Agent to receive notification of claimed violations and provide information about how and where to send notices of claimed infringement. (See Papa Decl., Exs. A, C, D, F and G).

- Veoh often responds to infringement notices the same day they are received, or at most, within a few days. (Dunning Decl. ¶ 9).

- When Veoh receives notice that a user has uploaded infringing content after a first warning, then the account is terminated, *all* content provided by that user is disabled (unless the content was also published by another non-terminated user and is not the subject of a DMCA notice), and the user's email address is blocked so that a new account cannot be opened with that same address. (See Dunning Decl. ¶¶ 10-12; Scherb Decl. ¶ 2, Ex. C (Papa Depo., Vol.1, 98:3-7).

- Veoh has adopted means for generating a "hash," or digital "fingerprint," for each video file. This technology essentially enables Veoh to terminate access to any other identical files and prevent additional identical files from *ever* being uploaded by *any* user. (Dunning Decl. ¶ 13).

Veoh asserts that, since its website was launched, it has terminated 1,096 users for repeat copyright violations. (Id., ¶ 12). Plaintiff has presented no evidence to the contrary; and,

13

there is no suggestion in the record before the court that Veoh actively prevents copyright owners from collecting information needed to issue notification of claimed copyright violations.

Io nevertheless contends that Veoh's policy fails because it does not prevent repeat infringers from reappearing on Veoh under a pseudonym and a different email address. At one time, Veoh apparently attempted to verify a user's email address by sending a confirming email message before allowing that user to upload video files to veoh.com. However, Veoh says that practice was discontinued as "an error-prone process." (See Scherb Decl., ¶ 2, Ex. B (Dunning Depo., 72:14-23)). Io agrees that Veoh is not obliged to locate repeat infringers, but argues that there is no way for Veoh to discover if a disingenuous user has, in fact, reappeared with a new account. Here, Io points out that its vice president, Keith Ruoff, was able to obtain a new Veoh account using the pseudonym "FauxUser99" and the email address "FauxUser01@yahoo.com" – an address which he says he acquired from Yahoo! using the pseudonym "John Doe." (Ruoff Decl., ¶7). In essence, Io contends that Veoh fails to reasonably track repeat infringers and that its repeat infringer policy is tantamount to no policy at all. This court disagrees.

With respect to the reasonableness of a service provider's implementation, the Ninth Circuit has explained:

> A service provider reasonably implements its repeat infringer policy if it terminates users "when appropriate." *See Corbis*, 351 F. Supp.2d at 1104. Section 512(i) itself does not clarify when it is "appropriate" for service providers to act. It only requires that a service provider terminate users who are "repeat infringers."
>
> *To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement.* Section 512(c) states that "[a] service provider shall not be liable for monetary relief" if it does not know of infringement. A service provider is also not liable under § 512(c) if it acts "expeditiously to remove, or disable access to, the material" when it (1) has actual knowledge, (2) is aware of facts or circumstances from which infringing activity is apparent, or (3) has received notification of claimed infringement meeting the requirements of § 512(c)(3). Were we to require service providers to terminate users under circumstances other than those specified in § 512(c), § 512(c)'s grant of immunity would be meaningless. This interpretation of the statute is supported by legislative history. *See* H.R. Rep., at 61 (Section 512(i) is not intended "to undermine the . . . knowledge standard of [§ 512](c).").

Id. at 1111 (citing H.R. Rep., at 61 (1998) (emphasis added).

Moreover, the hypothetical possibility that a rogue user might reappear under a different user name and identity does not raise a genuine fact issue as to the implementation of Veoh's policy. In Corbis, plaintiff alleged that Amazon failed to reasonably implement its repeat infringer policy because it did not prevent a prior infringer from reappearing on one of Amazon's retail platforms under different names. Observing that the DMCA requires reasonable, not perfect, policies, the court held that "[t]he mere fact that [the repeat infringer] appeared on zShops under a different user name and identity does not, by itself, create a legitimate question of fact regarding the procedural implementation of Amazon's termination policy." 351 F. Supp.2d at 1104. There, plaintiff presented no evidence that Amazon intentionally allowed the repeat infringer to open new accounts. Nor did plaintiff suggest that a more effective and reasonable means of denying the repeat infringer's access could have been implemented by Amazon. Id. at 1103-04.

Here, Io has presented no evidence that a repeat infringer has, in fact, established a new account under false pretenses, much less that Veoh has intentionally allowed that to happen. Its supposition about the hypothetical possibility that a repeat infringer may have done so is not evidence. There is no indication that Mr. Ruoff is a repeat infringer who should have been blocked; and, the fact that he was able to open a second account does not give rise to a genuine issue of material fact as to the reasonableness of Veoh's implementation.

Citing to an unpublished decision from this district, A&M Records, Inc. v. Napster, Inc., No. C99-05183, 2000 WL 573136, (N.D. Cal., May 12, 2000), Io contends that, in order to satisfy section 512(i), Veoh must be required to track users by their actual names or by Internet Protocol ("IP") addresses. That decision is readily distinguishable. There, the court found a triable issue as to whether Napster reasonably implemented its repeat infringer policy because plaintiff submitted evidence that Napster was not only capable of blocking IP addresses, but had in fact done so for certain users. See id. at *9-10.

Here, Io has presented no evidence suggesting that tracking (or verifying) users' actual identity or that blocking their IP addresses is a more effective reasonable means of implementation. There is no material dispute that, while IP addresses identify a particular

15

computer connected to the Internet, they do not distinguish between users (e.g., family members) who may share the same computer. See generally Columbia Ins. Co. v. Seescandy.Com, 185 F.R.D. 573, 575 (N.D. Cal. 1999) (IP addresses "are a series of numbers that are used to specify the address of a particular *machine* connected to the Internet.") (emphasis added).[8]

More to the point, section 512(i) does not require service providers to track users in a particular way to or affirmatively police users for evidence of repeat infringement. See CCBill, 488 F.3d at 1109-10. Instead, "[a] policy is unreasonable only if the service provider failed to respond when it had knowledge of the infringement." Id. at 1113. Here, the uncontroverted evidence shows that Veoh (a) has a working notification system, (b) has a procedure for dealing with DMCA-compliant notifications, and (c) does not actively prevent copyright owners from collecting information necessary to issue such notices. Plaintiff says that defendant does not qualify for safe harbor because it does not track infringers. However, Veoh does track content that has been identified as infringing and permanently blocks that content from ever being uploaded by any user.

Accordingly, the court finds that Veoh has presented evidence that it satisfies the threshold requirements to qualify for safe harbor under the DMCA. Plaintiff has not presented evidence raising a genuine issue of material fact as to whether Veoh implements its repeat infringer policy in a reasonable manner.

The court now turns to the question whether Veoh qualifies for safe harbor under Section 512(c).

## C.    DMCA Section 512(c) Safe Harbor

DMCA Section 512(c) limits a service provider's liability "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). A service provider

---

[8]    The court takes judicial notice of the Wikipedia definition of "IP address" as to the fact that an IP address may be shared by multiple users. This is not a matter that is subject to reasonable dispute.

that meets the threshold conditions of Section 512(i) then qualifies for safe harbor under Section 512(c) if it:

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(A)-(C).[9]  In essence, a service provider is eligible for safe harbor under section 512(c) if it (1) does not know of infringement; or (2) acts expeditiously to remove or disable access to the material when it (a) has actual knowledge, (b) is aware of facts or circumstances from which infringing activity is apparent, or (c) has received DMCA-compliant notice; and (3) either does not have the right and ability to control the infringing activity, or – if it does – that it does not receive a financial benefit directly attributable to the infringing activity.

According to plaintiff, Veoh does not qualify for safe harbor under Section 512(c) because (a) the materials in question were not stored on Veoh's system at the direction of a user; (b) Veoh was aware of apparent infringing activity; and (c) Veoh has the right and ability to control the infringing activity and obtains a direct financial benefit from such activities.  The court will address each of these contentions in turn.

**1.      "At the Direction of a User"**

As stated above, section 512(c) provides safe harbor "for infringement of a copyright by reason of the storage at the direction of a user of material" residing on a service provider's system or network.  17 U.S.C. § 512(c)(1).  The legislative history indicates that such storage

---

[9]      Additionally, Section 512(c)(2) requires service providers to designate an agent to receive notification of alleged copyright violations.  As noted above, there is no dispute that Veoh has done so.

United States District Court

For the Northern District of California

includes, by way of example, "providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users." H.R. Rep. 105-551 (II), at 53 (1998)). Excluded from Section 512(c)'s safe harbor is "material 'that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user.'" <u>CoStar Group., Inc.</u>, 164 F. Supp.2d at 701 (quoting H.R. Rep. 105-551 (II), at 53 (1998)).

Plaintiff contends that the Flash files and screencaps created during the publication process are not stored on Veoh's system "at the direction of a user," but by Veoh's own acts and decisions. Here, it asserts that users do not themselves create or possess the Flash and still-image files when they upload videos to Veoh's system. It further contends that, by agreeing that Veoh may make their videos freely available on its website, users never instruct or direct Veoh to create these files, except in the broadest possible sense. Io argues that Section 512(c) was not intended to protect the creation (automated or not) of these files because Veoh uses them as a means of distribution (e.g., by indexing content and organizing them into lists), and not just storage.

Defendant does not deny that, using third-party software, its system creates the Flash and still-image files from user-submitted content. Nonetheless, Veoh maintains that these files are the result of an automated encoding process initiated entirely at the volition of users when they upload video files. Veoh maintains that it falls within the Section 512(c) safe harbor because the Flash and still-image files are used to facilitate access to content submitted to its website.

There is no apparent dispute as to the material facts – only as to the conclusions to be drawn from them. Essentially, the issue is whether Veoh is disqualified from Section 512(c)'s safe harbor because of automated functions that facilitate access to user-submitted content on its website. In the context of Veoh's business, this appears to be a matter of first impression. Based on the record presented, this court concludes that Veoh is not disqualified from Section 512(c) safe harbor on this basis.

To begin, the structure and language of OCILLA indicate that service providers seeking safe harbor under Section 512(c) are not limited to merely storing material. The statute itself is structured in a way that distinguishes between so-called "conduit only" functions under Section 512(a) and those functions addressed by Section 512(c) (and other subsections as well). See 17 U.S.C. § 512(n) ("Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section."). Perhaps most notably, OCILLA contains two definitions of "service provider." 17 U.S.C. § 512(k). The narrower definition, which pertains only to service providers falling under Section 512(a), "means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, *without modification to the content of the material* as sent or received." Id., § 512(k)(1)(A) (emphasis added).

By contrast, no such limitation as to the modification of material is included in the broader definition of "service provider," which the parties agree applies to Veoh. Instead, "the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)." 17 U.S.C. § 512(k)(1)(B). Had Congress intended to include a limitation as to a service provider's modification of user-submitted information, it would have said so expressly and unambiguously.

Moreover, caselaw also supports the conclusion that Veoh is not precluded from safe harbor under Section 512(c) by virtue of its automated processing of user-submitted content. In at least one case, a service provider was not precluded from safe harbor even when its employees engaged in some review of submitted materials before posting them to defendant's website. In CoStar Group, Inc. v. LoopNet, Inc., the defendant offered a service that enabled subscribers to upload real estate photos to a folder on the defendant's system. 164 F. Supp.2d 688 (D. Md. 2001). Defendant's employees briefly reviewed the submitted photos and posted to the website only those that met defendant's criteria – that is, any photos that did not depict real estate or which obviously were copyrighted by a third-party would not be posted. The court held that defendant nonetheless satisfied the requirement that material be stored at the

19

direction of a user.  In essence, it concluded that the photos were uploaded, in the first instance, at the volition of users and that defendant's employees simply performed a "gateway" function that furthered the goals of the DMCA.  Id. at 702.

Here, Veoh has simply established a system whereby software automatically processes user-submitted content and recasts it in a format that is readily accessible to its users.  Veoh pre-selects the software parameters for the process from a range of default values set by the third-party software.  (See Dunning Decl. ISO Defendant's Opp. to Plaintiff's MSJ, ¶¶ 3-4).  But Veoh does not itself actively participate or supervise the uploading of files.  Nor does it preview or select the files before the upload is completed.  Instead, video files are uploaded through an automated process which is initiated entirely at the volition of Veoh's users. See The Cartoon Network LP, LLP v. CSC Holdings, Inc., — F.3d —, Nos. 07-1480-cv(L), 07-1511-cv(CON), 2008 WL 2952614 at *9 (2d Cir., Aug. 4, 2008) ("In determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically engages in no volitional conduct.").  Inasmuch as this is a means of facilitating user access to material on its website, this court finds that Veoh does not lose safe harbor through the automated creation of these files.  "[O]ne of the stated purposes of [the DMCA] was to 'facilitate the robust development and worldwide expansion of electronic commerce, communications, research, development, and education in the digital age.'" Perfect 10, Inc. v. VISA Int'l Service Ass'n, 494 F.3d 788, 794 n.2 (9th Cir. 2007) (quoting S. Rep. 105-190, at 1-2 (1998)).

## 2.    Actual Knowledge of Infringing Activity

It is undisputed that, before it filed the instant action, plaintiff provided no notice to Veoh of any claimed copyright infringement.  Thus, there is no question on the record presented that Veoh lacked actual knowledge of the alleged infringing activity at issue. See 17 U.S.C. § 512(c)(1)(A) and (C); see also Corbis Corp., 351 F. Supp.2d at 1107 ("[Plaintiff's] decision to forego the DMCA notice provisions . . . stripped it of the most powerful evidence of a service

provider's knowledge – actual notice of infringement from the copyright holder.") (citation omitted).

### 3.  Apparent Infringing Activity

Nonetheless, Io contends that Veoh was aware of several signs of apparent infringing activity.  Under this so-called "red flag" test, a service provider may lose safe harbor "if it fails to take action with regard to infringing material when it is 'aware of facts or circumstances from which infringing activity is apparent.'"  CCBill, 488 F.3d at 1114 (quoting 17 U.S.C. § 512(c)(1)(A)(ii)).  In determining whether a service provider has such awareness, "the question is not 'what a reasonable person would have deduced given all the circumstances.'"  Corbis Corp., 351 F. Supp.2d at 1108 (quoting 3 Nimmer on Copyright, § 12B.04[A][1], at 12B-49).  "Instead the question is whether the service provider deliberately proceeded in the face of blatant factors of which it was aware."  Id.  In other words, "apparent knowledge requires evidence that a service provider 'turned a blind eye to 'red flags' of obvious infringement.'"  Id. (quoting H.R.Rep. No. 105-551, pt. 2, at 57).

Io argues that there were several "red flags" of obvious infringement here.  Io says that, under 17 U.S.C. § 205(c), its copyright registrations provided constructive knowledge as to its ownership of the works.  Additionally, plaintiff says that it was obvious that the works in question were professionally created and, further, that one of them contained Io's trademark.  (*See* Ruoff Decl. ISO Plaintiff's MSJ, ¶¶ 15-16, Ex. F).  In any event, Io maintains that the absence of labels required under 18 U.S.C. § 2257(f)(4) was a "red flag" that the uploading user did not have authority to submit the content in question.

However, none of the allegedly infringing video files uploaded by Veoh's users contained Io's copyright notices.  (See Scherb Decl., ¶ 2, Ex. J (Io's response to RFA No. 58); Ex. G (Ruoff Depo., 55:13-16, 56:19-57:13)).  Although one of the works did contain plaintiff's trademark several minutes into the clip, there is no evidence from which it can be inferred that Veoh was aware of, but chose to ignore, it.  Nor is this court convinced that the professionally created nature of submitted content constitutes a per se "red flag" of infringement sufficient to impute the requisite level of knowledge or awareness to Veoh.  Indeed, with the video

equipment available to the general public today, there may be little, if any, distinction between "professional" and amateur productions.

Similarly unavailing are Io's arguments as to the sexually explicit nature of the works themselves.[10] Io nevertheless contends that the absence of labels on the material in question under 18 U.S.C. § 2257 was a "red flag" of apparent copyright infringement. In essence, the statute to which Io refers – section 2257 of the Child Protection and Obscenity Enforcement Act of 1988 – requires producers of sexually explicit material to maintain certain records as to the performers depicted and to label each such work with a statement indicating where those records are located. See 18 U.S.C. § 2257(a) and (f). There is some indication in the record that Veoh generally was aware of this law. (See Sperlein Decl. ISO Plaintiff's MSJ, ¶2, Ex. A (Papa Depo. at 195:19-196:3; Suppl. Sperlein Decl., Ex. D (Styn Depo. at 45:1-48:13)). Io argues that Veoh therefore should have known that no legitimate producer of sexually explicit material would have omitted the requisite labels on the video clips in question.

Viewing the evidence in the light most favorable to plaintiff, it has, at best, raised a fact question as to whether Veoh was aware that federal labeling laws might have been violated. However, the matter before this court does not concern whether there was a violation of those laws. Under the circumstances presented here, the absence of required labels does not give rise to a genuine issue of material fact as to whether Veoh had the requisite level of knowledge or awareness that plaintiff's copyrights were being violated. Even "[w]hen a website traffics in pictures that are titillating by nature" and describes them as "illegal" or "stolen," "[w]e do not place the burden of determining whether photographs are actually illegal on a service provider." CCBill, 488 F.3d at 1114.

---

[10]     Plaintiff claims that the user profile page for one of the users who submitted its works to Veoh indicates that the user was a 17-year old – i.e., someone who was not legally permitted to view Io's works, much less upload them to defendant's system. (See Ruoff Decl. ISO Plaintiff's MSJ ¶ 21). Plaintiff did not raise this argument in support of its opposition to Veoh's motion as to the DMCA safe harbor. At any rate, there is no evidence to suggest that Veoh was aware of, but chose to ignore, this circumstance.

**4.      Acts Expeditiously to Remove or Disable Access to Material**

Even assuming Veoh had sufficient knowledge or awareness of the allegedly infringing activity in question, Veoh would not lose safe harbor protection if it acted expeditiously to remove, or disable access to, the material.  See 17 U.S.C. §§ 512(c)(1)(A)(iii) and 512(c)(1)(C); see also Corbis Corp., 351 F. Supp.2d at 1108.  The instant action presents a somewhat unusual situation in that Veoh independently removed all adult content from its website before it received notice of any claimed copyright violations.

Nevertheless, undisputed evidence submitted by Veoh shows that when it receives DMCA-compliant notice of copyright infringement, it responds and removes noticed content as necessary on the same day the notice is received (or within a few days thereafter).  (Dunning Decl. ¶ 9).

In addition to responding to DMCA notices, Veoh says that it also promptly investigates other complaints about content on its website.  Here, Veoh points out that its website has a "Flag It!" feature that enables users to bring certain content to Veoh's attention by "flagging" it – that is, selecting from a set list of reasons (e.g., misrated content, sexually explicit content, obscene content, etc.).  (Id., Ex. E).  Plaintiff argues that Veoh has willfully blinded itself to facts suggesting infringement because the list of reasons on the "Flag It!" feature no longer contains a choice for "appears to contain copyrighted material."  Yet, the "Flag It!" feature itself contains a notice, prominently displayed at the top of the "Flag It!" dialog box, directing copyright owners to a link with instructions for submitting a copyright infringement notice to Veoh.  (Id.).

In sum, there is no evidence raising a genuine issue of material fact that Veoh was aware of, but deliberately chose to ignore, "red flags" of infringement or that Veoh fails to act expeditiously to remove or disable access to infringing material upon obtaining knowledge or awareness of infringing activity.

**5.      Right and Ability to Control Infringing Activity**

A service provider nonetheless loses the protection of Section 512(c)'s safe harbor where it (a) has the right and ability to control the infringing activity and (b) receives a financial

1    benefit directly attributable to such activity.  17 U.S.C. § 512(c)(1)(B).  "Both elements must be

2    met for the safe harbor to be denied."  Corbis Corp., 351 F. Supp.2d at 1109.  These

3    requirements grew out of the common law standard for vicarious liability, and the Ninth Circuit

4    has indicated that these elements under the DMCA are to be interpreted consistently with

5    common law.  See CCBill, 488 F.3d at 1117 ("[W]e hold that 'direct financial benefit' should

6    be interpreted consistent with the similarly-worded common law standard for vicarious

7    copyright liability.").  For present purposes, even assuming (without deciding) that Veoh

8    received a direct financial benefit from the alleged infringing activity, this court finds that

9    defendant does not have the right and ability to control such activity.

10       As formulated by the Supreme Court, one "infringes vicariously by profiting from direct

11   infringement while declining to exercise a right to stop or limit it."  Metro-Goldwyn-Mayer

12   Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930, 125 S. Ct. 2764, 2766 (2005).  "Thus, under

13   Grokster, a defendant exercises control over a direct infringer when he has both a legal right to

14   stop or limit the directly infringing conduct, as well as the practical ability to do so."  Perfect

15   10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1173 (9th Cir. 2007).

16       Plaintiff contends that elements of the requisite "right and ability to control" are present

17   here because Veoh has established and enforced policies that prohibit users from engaging in a

18   host of illegal and other conduct on its website – namely, policies which prohibit users from (a)

19   violating the intellectual property rights of others, (b) making unsolicited offers, sending ads,

20   proposals or junk mail, (c) impersonating other people, (d) misrepresenting sources of material,

21   (e) harassing, abusing, defaming, threatening or defrauding others, (f) linking to password

22   protected areas and (g) spidering material.  (See Papa Decl. ¶¶ 5-6, Exs. A-H; Ruoff Decl. ISO

23   Plaintiff's MSJ ¶ 9, Exs. B and C).  Plaintiff emphasizes that Veoh exercises the right to police

24   its system by conducting occasional "spot checks" of video files for compliance and that Veoh

25   has enforced its policies by removing content and terminating offending accounts.

26       However, the plain language of section 512(c) indicates that the pertinent inquiry is not

27   whether Veoh has the right and ability to control it *system*, but rather, whether it has the right

28

and ability to control the *infringing activity*. Under the facts and circumstances presented here, the two are not one and the same.

To begin, the statute presupposes a service provider's control of its system or network. See 17 U.S.C. § 512(c)(1) (applying safe harbor to "material that resides on a system or network *controlled or operated* by or for the service provider.") (emphasis added). The safe harbor will be closed only to those service providers who, among other things, have the "right and ability to control" the "*infringing activity*." 17 U.S.C. § 512(c)(1)(B) (emphasis added).

Moreover, courts have held that the right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to block or remove access to materials posted on its website or stored on its system. See Corbis Corp., 351 F. Supp.2d at 1110; CoStar Group, Inc., 164 F. Supp.2d at 704; Hendrikson v. eBay, Inc., 165 F. Supp.2d 1082, 1093-94 (C.D. Cal. 2001). Indeed, a contrary holding would render the DMCA internally inconsistent:

> The DMCA specifically requires a service provider to remove or block access to materials posted on its system when it receives notice of claimed infringement. The DMCA also provides that the limitations on liability *only* apply to a service provider that has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of [users] of the service provider's system or network who are repeat infringers. Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision of the DMCA because it engages in acts that are specifically required by the DMCA.

Hendrickson, 165 F. Supp.2d at 1093-94 (internal quotes and citations omitted). Borrowing from patent infringement cases involving the intent requirement for contributory liability of trademark licensors, one court has concluded that, instead, "something more" is required. Cybernet Ventures, Inc., 213 F. Supp.2d at 1181-82.

Precisely what constitutes the requisite right and ability to control in the present context is somewhat hard to define, although this court is not without some guidance. At least one court has observed that the requisite "right and ability to control" "presupposes some antecedent ability to limit or filter copyrighted material." Tur v. YouTube, Inc., No. CV064436, 2007 WL 1893635 at *3 (C.D. Cal., June 20, 2007).

Such a conclusion does not appear to be inconsistent with precedent set in <u>Fonovisa, Inc. v. Cherry Hill Auction, Inc.</u>, 76 F.3d 259 (9th Cir. 1996) and <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004 (9th Cir. 2001). In <u>Fonovisa</u>, the plaintiff owned copyrights and trademarks in certain music recordings. It claimed that the defendant, a swap meet proprietor, was liable for third-party vendors' sales of infringing counterfeit recordings. Sufficient elements of control were found where defendant had the right to terminate vendors for any reason, promoted the swap meet, and controlled customers' access to the swap meet area. <u>Id</u>. at 262. Notably, there was no dispute that the defendant was aware that vendors were selling counterfeit recordings in violation of plaintiff's copyrights and trademarks. Indeed, it was alleged that the County Sheriff previously seized thousands of counterfeit recordings from the swap meet and notified the defendant that infringing sales continued. <u>Id</u>. at 261. The defendant evidently agreed to provide the Sheriff with information about each vendor, but did not do so. <u>Id</u>. at 264. In essence, the swap meet proprietor and the infringing vendors "were engaged in a mutual enterprise of infringement." <u>See</u> <u>VISA Int'l Services Ass'n</u>, 494 F.3d at 798.

<u>Fonovisa</u> was extended to the online context in <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004 (9th Cir. 2001). <u>Napster</u> concerned the Internet service infamous for its software that facilitated the transmission of copyrighted music between and among its users free of charge. The court stated that "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." <u>Id</u>. at 1023 (citing <u>Fonovisa</u>, 76 F.3d at 262). However, the court went on to explain that "[t]o escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent. Turning a blind eye to *detectable* acts of infringement for the sake of profit gives rise to liability." <u>Id</u>. (emphasis added). There, plaintiffs were successful in establishing a likelihood of success on the merits where Napster controlled access to its system, reserved the right to terminate user accounts for any reason and had the ability to locate infringing material listed on its search indices, but nonetheless failed to police its system to prevent the exchange of copyrighted material <u>Id</u>. at 1023-24.

More recently in the electronic commerce context, other businesses have been found not to have the requisite right and ability to control infringing activity. For example, in Amazon.com, Inc., Google was found not to have the right and ability to control the infringing activity of third-party websites where Google did not have contractual relationships with the third-party websites and lacked the practical ability to police their activities. 508 F.3d at 1173-75. In VISA Int'l Service Ass'n, plaintiff alleged that Visa was secondarily liable for copyright infringement because its credit card payment services facilitated the purchase of infringing material online. Affirming the dismissal of those claims, the Ninth Circuit concluded that Visa lacked the ability to block access to the Internet or to particular websites and had no role in the alleged infringing activity. 494 F.3d at 802-05. Although Visa could exert financial pressure by blocking access to its payment systems, the court concluded that "[f]or vicarious liability to attach . . . the defendant must have the right and ability to *supervise* and *control* the infringement, not just affect it, and Defendants do not have this right or ability." Id. at 805.

By contrast, an on-line age verification service was found to have the requisite "something more" than the mere ability to remove or block access to its website where it prescreened websites within its network, gave those websites extensive advice, and prohibited the proliferation of identical sites within its network. Cybernet Ventures, Inc., 213 F. Supp.2d at 1181-82.

In the instant case, plaintiff maintains that Veoh has precisely the kind of control found in Napster and goes even further than the defendant in Cybernet Ventures. It points out that Veoh operates a closed system network requiring user registration, maintains a central index of video files on its servers, reserves the right to terminate user accounts for any reason, has the ability to remove infringing material from its website, and can even disable access to such material on its users' hard drives (assuming their computers are still connected to the Internet). It argues that the requisite control is further evidenced by the creation of the Flash and still-image files, the indexing of those files, Veoh's ability to feature certain videos on portions of its website, and by the fact that users are required to agree that Veoh shall have the irrevocable and

27

perpetual right to distribute submitted material freely on its website. (Papa Decl. ¶5, Exs. A and E).

However, Veoh is distinct from Napster in at least one significant respect. Napster existed solely to provide the site and facilities for copyright infringement, and its control over its system was directly intertwined with its ability to control infringing activity. See Napster, 239 F.3d at 1020 n.5; see also VISA Int'l Service Ass'n, 494 F.3d at 799 n.10 ("In fact, as virtually every interested college student knew – and as the program's creator expressly admitted – the *sole purpose* of the Napster program was to provide a forum for easy copyright infringement.").

Here, by contrast, Veoh's right and ability to control its system does not equate to the right and ability to control infringing activity. Unlike Napster, there is no suggestion that Veoh aims to encourage copyright infringement on its system. And, there is no evidence that Veoh can control what content users choose to upload before it is uploaded. Plaintiff suggests that Veoh should be required to prescreen every submission before it is published. However, Veoh has submitted evidence indicating that it has received hundreds of thousands of video files from users. (Dunning Decl. in Opp. to Plaintiff's MSJ, ¶ 6). Plaintiff has presented no evidence to refute those numbers; and, this court finds that no reasonable juror could conclude that a comprehensive review of every file would be feasible.

Even if such a review were feasible, there is no assurance that Veoh could have accurately identified the infringing content in question. True, Veoh maintains a central index of videos on its servers. However, unlike Napster (whose index was comprised entirely of pirated material), Veoh's ability to control its index does not equate to an ability to identify and terminate *infringing* videos. For the most part, the files in question did not bear titles resembling plaintiff's works; and, Io did not provide Veoh with its titles to search. (See Ruoff Decl. ISO Plaintiff's MSJ, ¶¶ 13-14 and Exhs. D & E). The record suggests that, upon review of the files, Io itself was not able to readily identify which of its works allegedly were infringed. It initially alleged copyright violations as to eight films. (See Complaint, ¶22). However, in the

course of discovery, it dropped one of those films and added three others. (See Scherb Decl. ¶ 3, Ex. I).

Perhaps most importantly, there is no indication that Veoh has failed to police its system to the fullest extent permitted by its architecture. See Napster, 239 F.3d at 1024 (stating that the "reserved 'right and ability' to police is cabined by the system's current architecture."). Plaintiff has presented no evidence raising a genuine issue of material fact as to Veoh's enforcement of its terms of use, including through the termination of access to allegedly infringing material and the termination of user accounts for policy violations. As discussed above, the record presented shows that Veoh has taken down blatantly infringing content, promptly responds to infringement notices, terminates infringing content on its system and its users' hard drives (and prevents that same content from being uploaded again), and terminates the accounts of repeat offenders. (See Dunning Decl. ¶¶ 10-13; Scherb Decl. Ex. C (Papa Depo., Vol.1, 98:3-7). Once content has been identified as infringing, Veoh's digital fingerprint technology also prevents the same infringing content from ever being uploaded again. All of this indicates that Veoh has taken steps to reduce, not foster, the incidence of copyright infringement on its website.

Plaintiff nevertheless argues that Veoh should have changed its business operations to prevent infringing activity from occurring on its site. Specifically, it contends that Veoh should have verified the source of all incoming videos by obtaining and confirming the names and addresses of the submitting user, the producer, as well as the submitting user's authority to upload a given file. It further asserts that California Penal Code § 653w[11] and 18 U.S.C. § 2257 (the federal labeling law discussed above) require as much and that the allegedly infringing conduct in question should have been readily apparent in view of the requirements of those statutes. Alternatively, plaintiff contends that, if Veoh cannot prevent infringement on its site given the current volume of its business, then Veoh should be required to either hire more employees or to decrease its operations and limit its business to a manageable number of users

---

[11] Briefly stated, California Penal Code section 653w prohibits the knowing possession of a "physical embodiment" of an audiovisual work that does not identify the manufacturer and author. Cal. Pen. Code § 653w(a).

(whatever that number might be). Its not-so-subtle suggestion is that, if Veoh cannot prevent infringement from ever occurring, then it should not be allowed to exist.

The issue here is not Veoh's compliance with California Penal Code § 653w and 18 U.S.C. § 2257. Nor is the issue whether Veoh should have been aware of that certain content was infringing. Rather the question is whether Veoh declined to exercise a right to stop it. Declining to change business operations is not the same as declining to exercise a right and ability to control infringing activity. See Amazon.com, Inc., 508 F.3d at 1175. Moreover, as discussed above, the DMCA does not require service providers to deal with infringers in a particular way. See CCBill, 488 F.3d at 1109 ("[T]he DMCA permits service providers to implement a variety of procedures" to deal with repeat infringers). Here, there is no genuine issue of material fact that Veoh actively enforces its user policy and acts expeditiously to remove, or disable access to infringing material. Further, plaintiff's suggestion that Veoh must be required to reduce or limit its business operations is contrary to one of the stated goals of the DMCA. The DMCA was intended to facilitate the growth of electronic commerce, not squelch it. S. Rep. No. 105-190, at 1-2 (105th Congress, 2d Session 1998).

In sum, Io has not raised a genuine issue of material fact that Veoh had the right and ability to control the alleged infringing activity on veoh.com. This court finds that there is no triable fact issue as to whether Veoh qualifies for safe harbor under section 512(c) with respect to the alleged infringing activity in question.

While the DMCA's safe harbors do not immunize qualified service providers from liability, "[t]hey do . . . protect eligible service providers from all monetary and most equitable relief that may arise from copyright liability." See Corbis Corp., 351 F. Supp.2d at 1098-99. Because the court finds that, under the particular facts presented here, Veoh qualifies for safe harbor under Section 512(c), the only relief available to plaintiff is the limited injunctive relief under Section 512(j).[12] In this case, before it ever received notice of any claimed infringement,

---

[12]     OCILLA Section 512(j) provides in relevant part:

  With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief

30

Veoh independently removed all adult content, including video files of plaintiff's works, and it no longer allows such material on veoh.com. Thus, any injunctive relief to which Io would be entitled is moot. Because an opinion as to Veoh's liability for copyright infringement would be merely advisory, this court does not reach the issues raised in plaintiff's motion for summary judgment.

## IV. CONCLUSION

The ever expanding realm of the Internet provides many new ways for people to connect with one another. This court appreciates that these new opportunities also present new challenges to the protection of copyright in the online world; and, the decision rendered here is confined to the particular combination of facts in this case and is not intended to push the bounds of the safe harbor so wide that less than scrupulous service providers may claim its protection. Nevertheless, the court does not find that the DMCA was intended to have Veoh shoulder the entire burden of policing third-party copyrights on its website (at the cost of losing its business if it cannot). Rather, the issue is whether Veoh takes appropriate steps to deal with copyright infringement that takes place. The record presented demonstrates that, far from encouraging copyright infringement, Veoh has a strong DMCA policy, takes active steps to limit incidents of infringement on its website and works diligently to keep unauthorized works

---

with respect to a service provider only in one or mor of the following forms:

   (i)   An order retraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

   (ii)   An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

   (iii)   Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

17 U.S.C. § 512(j)(1)(A).

off its website.  In sum, Veoh has met its burden in establishing its entitlement to safe harbor for the alleged infringements here.

### V.  ORDER

Based on the foregoing, IT IS ORDERED THAT defendant's motion for summary judgment is GRANTED.  The court does not reach the liability issues raised in plaintiff's summary judgment motion.

Dated:   August 27, 2008

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

**5:06-cv-3926 Notice electronically mailed to:**

Dennis Gill Sperlein legal@titanmedia.com

Jennifer A. Golinveaux jgolinveaux@winston.com, cfernandez@winston.com, docketsf@winston.com, mabutler@winston.com

Matthew Alex Scherb mscherb@winston.com, laegan@winston.com

Michael S. Elkin melkin@winston.com, rpagliaro@winston.com

**Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program**.